IN THE
# United States Court of Appeals for the Eighth Circuit

STATE OF IOWA, ET AL.,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

On Petitions for Review of an Order and Rule
of the Securities and Exchange Commission

## STATE PETITIONERS' EMERGENCY MOTION FOR ADMINISTRATIVE STAY AND STAY PENDING DISPOSITION OF PETITIONS FOR REVIEW

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*
PATRICK C. VALENCIA
*Deputy Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

April 3, 2024

*Counsel for Petitioner State of Iowa*

*\*Additional counsel listed in signature block*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES .................................................... ii

INTRODUCTION ................................................................... 1

ARGUMENT ........................................................................ 4

    I.    PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS. ............................................................... 6

        A.    The Commission Acted Without Authority. ................. 6

        B.    The Rule Compels Speech. .......................................... 18

        C.    The Rule Is Arbitrary And Capricious. ....................... 23

    II.    PETITIONERS WILL SUFFER IRREPARABLE INJURY ABSENT A STAY. ................................................ 24

    III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR A STAY. ................................................................................ 27

CONCLUSION ..................................................................... 28

# TABLE OF AUTHORITIES

Cases

*Ala. Ass'n of Realtors v. DHHS,*
 141 S. Ct. 2485 (2021) .................................................................. 9, 13
*Basic Inc. v. Levinson,*
 485 U.S. 224 (1988) ........................................................................ 10
*Bus. Roundtable v. SEC,*
 905 F.2d 406 (D.C. Cir. 1990) ....................................................... 17
*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
 447 U.S. 557 (1980) ........................................................................ 19
*Circuit City Stores, Inc. v. Adams,*
 532 U.S. 105 (2001) ........................................................................ 15
*DiLeo v. Ernst & Young,*
 901 F.2d 624 (7th Cir. 1990) ......................................................... 18
*Elrod v. Burns,*
 427 U.S. 347 (1976) ........................................................................ 26
*Encino Motorcars, LLC v. Navarro,*
 579 U.S. 211 (2016) ........................................................................ 23
*Ernst & Ernst v. Hochfelder,*
 425 U.S. 185 (1976) ........................................................................ 12
*FCC v. Fox Television Stations, Inc.,*
 556 U.S. 502 (2009) .................................................................. 23, 24
*FDA v. Brown & Williamson Tobacco Corp.,*
 529 U.S. 120 (2000) ........................................................................ 13
*First Nat'l Bank of Bos. v. Belloti,*
 435 U.S. 765 (1978) ........................................................................ 14
*FTC v. Bunte Bros.,*
 312 U.S. 349 (1941) .................................................................... 9, 13
*Gonzales v. Oregon,*
 546 U.S. 243 (2006) ........................................................................ 13
*Gutierrez v. Ada,*
 528 U.S. 250 (2000) ........................................................................ 15
*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.,*
 515 U.S. 557 (1995) .................................................................. 18, 21
*In re Cajun Elec. Power Co-op, Inc.,*
 185 F.3d 446 (5th Cir. 1999) ......................................................... 15

*Indus. Union Dep't, AFL-CIO v. API,*
    448 U.S. 607 (1980)................................................18

*Iowa Utils. Board v. FCC,*
    109 F.3d 418 (8th Cir. 1987)...............................24

*Janus v. AFSCME, Council 31,*
    585 U.S. 878 (2018)........................................12, 21

*Kahan v. Rosenstiel,*
    424 F.2d 161 (3d Cir. 1970) ...............................17

*Kamen v. Kemper Fin. Servs., Inc.,*
    500 U.S. 90 (1991)..............................................13

*King v. Burwell,*
    576 U.S. 473 (2015)...............................................7

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019).......................................12

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ................................27

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,*
    512 U.S. 218 (1994)......................................10, 12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983)..............................................23

*NAACP v. FPC,*
    425 U.S. 662 (1976)............................................17

*Nat'l Ass'n of Mfrs. v. SEC,*
    800 F.3d 518 (D.C. Cir. 2015) ...........................22

*Nat'l Rev., Inc. v. Mann,*
    140 S. Ct. 344 (2019)......................................12, 19

*Nebraska v. Biden,*
    52 F.4th 1044 (8th Cir. 2022) ..........................5, 27

*NIFLA v. Becerra,*
    585 U.S. 755 (2018)......................................19, 21

*Nken v. Holder,*
    556 U.S. 418 (2009)....................................4, 5, 27

*Radzanower v. Touche Ross & Co.,*
    426 U.S. 148 (1976)............................................12

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
   487 U.S. 781 (1988) ................................................. 19
*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) ................................................. 14
*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ................................................. 10
*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ................................ 24
*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976) ......................................... 10, 17
*United Hous. Found. v. Forman*,
   421 U.S. 837 (1975) ......................................... 11, 18
*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ....................................... 6, 7, 8
*West Virginia v. EPA*,
   597 U.S. 697 (2022) .............. 6, 7, 8, 9, 11, 12, 14, 16, 18
*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*,
   471 U.S. 626 (1985) ......................................... 21, 22

Statutes

15 U.S.C. § 77g ......................................................... 8
15 U.S.C. § 77g(a)(1) ......................................... 15, 19
15 U.S.C. § 77i(b) ..................................................... 4
15 U.S.C. § 78l(b) ................................................... 16
15 U.S.C. § 78m(a) ............................................. 8, 16
15 U.S.C. § 78m(p) ................................................. 16
15 U.S.C. § 78y(c)(2) ............................................... 4
28 U.S.C. § 1657(a) .................................................. 1
42 U.S.C. § 7414 ..................................................... 2
5 U.S.C. § 705 ......................................................... 4

Rules

Fed. R. App. P. 18(a)(2)(A)(i) ................................... 4

State Petitioners and the American Free Enterprise Chamber of Commerce ("State Petitioners") seek a stay of the Securities and Exchange Commission's Greenhouse Gas Disclosure rule, which usurps Congress's role in an attempt to set climate policy via securities regulation. To minimize immediate and irreparable harm, State Petitioners request expedited briefing of this appeal, together with a stay. *See* 8th Cir. I.O.P. III.D; 28 U.S.C. § 1657(a).

## INTRODUCTION

For more than 50 years, SEC conceded that it lacked authority to require blanket climate-related disclosures. *See, e.g.*, *Environmental and Social Disclosure, Notice of Commission Conclusions and Rulemaking Proposals*, 40 Fed. Reg. 51,656, 51,657 (Nov. 6, 1975) (inappropriate to require "comprehensive disclosure of the environmental effects of corporate activities"); Commission Guidance Regarding Disclosure Related to Climate Change, Exchange Act Release No. 33-9106, 75 Fed. Reg. 6290 (Feb. 8, 2010). Recently, Congress failed to pass legislation granting SEC just that power. *See, e.g.*, Climate Risk Disclosure Act, H.R. 2570, 117th Cong. (2021); Climate Risk Disclosure Act, S. 3481, 115th

Cong. (2018); *cf.* 42 U.S.C. § 7414 (granting Environmental Protection Agency authority to require emissions disclosures).

In late 2021, President Biden announced a "whole-of-government approach" to advance the Administration's "climate agenda"—even "without Congress." The White House, *Press Briefing by Principal Deputy Press Secretary Karine Jean-Pierre* (Oct. 21, 2021), http://tiny.cc/em4mxz. Within months, SEC proposed the now-final rule at issue here, which broke with decades of practice and announced SEC could mandate climate-related disclosures. *See* The Enhancement and Standardization of Climate-Related Disclosures for Investors, Securities Act Release No. 33-11275 (Mar. 6, 2024), *published at* 89 Fed. Reg. 21,668 (Mar. 28, 2024) ("The Rule") (included in Appendix at 1–886).

The Rule mandates extensive qualitative and quantitative disclosures relating to non-financial "climate-related risks," "climate-related targets and goals," "greenhouse-gas emissions," and more. App. 24–35 (Rule summary). Companies now must collect, process, and report vast climate-related information—including their greenhouse-gas emissions and forward-looking, speculative predictions of climate impacts on their business outlook. Companies must, for example,

speculate on how "severe weather events" affect their financials, even immaterially.

But under existing rules, companies must report climate-related information that they consider to be material to investors—that is, if climate-related information is important to an investor's decision whether to buy a security or how to vote as a shareholder, then it would be material under existing rules. The Rule thus requires disclosing *non-material* climate-related information. As one dissenting SEC Commissioner put it, the Rule is just a "climate regulation promulgated under the Commission's seal." Statement from Mark T. Uyeda, A Climate Regulation under the Commission's Seal: Dissenting Statement on The Enhancement and Standardization of Climate-Related Disclosures for Investors (Mar. 6, 2024), http://tiny.cc/jhvkxz. That goes well beyond SEC's authority.

Petitioners here—25 States and the American Free Enterprise Chamber of Commerce, a 501(c)(6) membership organization representing entrepreneurs and businesses—challenge the Rule on multiple grounds. The Rule goes beyond SEC's authority—all the more obvious when one applies the major-questions doctrine. It violates the

First Amendment by compelling speech on a highly controversial issue without substantiating a causal link between the mandated disclosures and the agency's statutory interests in fraud prevention or increased investment return. And it is arbitrary and capricious.

Petitioners not only have a strong likelihood of success on the merits, but they will also suffer irreparable injury if the Rule takes effect. The Rule, SEC admits, will create more than two billion dollars in annual compliance costs for affected public companies, starting in the Rule's first year. Those costs will begin to accrue immediately, absent a stay, and will be passed along to investors, like Petitioners. And the Rule will inflict constitutional injuries soon after. These harms will be irreversible if this Court later holds the Rule unlawful. The equities—and the merits—support staying the Rule pending disposition of the Petitions.

## ARGUMENT

This Court has statutory and inherent authority to stay the Rule pending its review. 15 U.S.C. § 77i(b); 5 U.S.C. § 705; *see* 15 U.S.C. § 78y(c)(2); *Nken v. Holder*, 556 U.S. 418, 426–427 (2009). Relief from SEC is "impracticable" because SEC has already opposed, and made clear it will continue to oppose, a stay. Fed. R. App. P. 18(a)(2)(A)(i); *see*

Comment, http://tiny.cc/dvvkxz (SEC was asked to "stay the effectiveness of the climate rule pending completion of all subsequent judicial review," which it denied by not staying the Rule upon issuance.); *Liberty Energy, Inc., et al. v. SEC*, No. 24-60109 (5th Cir.) (SEC opposed request in the Fifth Circuit to stay the Rule prior to the multi-circuit lottery.).

In weighing whether to grant a stay, courts consider likelihood of success on the merits, irreparable harm, whether the stay will substantially injure other parties, and the public interest. *Nken*, 556 U.S. at 426. A stay may be warranted even with less likelihood of success on the merits where petitioners raise a substantial question of law and the balance of equities tips strongly in their favor. *See Nebraska v. Biden*, 52 F.4th 1044, 1046–48 (8th Cir. 2022).

This Court should not allow a sweeping, sea-change regulation to take effect before judicial review plays out. Petitioners are likely to succeed on the merits and face immediate and irreparable harm. Meanwhile, SEC faces no harm under a stay, in part because the agency's rules already require disclosure of climate information that is material to investors. This Court should stay the Rule pending its review of Petitioners' challenges.

# I. PETITIONERS ARE LIKELY TO SUCCEED ON THE MERITS.

## A. The Commission Acted Without Authority.

The Rule gives rise to a "major questions case," where an agency acts without lawful congressional authority. *See West Virginia v. EPA*, 597 U.S. 697, 724 (2022). Courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 723 (cleaned up). Thus, in cases involving a "radical or fundamental change to a statutory scheme," an agency must show "something more than a merely plausible textual basis for the agency action." *Id.* (cleaned up). It needs "clear congressional authorization." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

The Rule wields securities law in a never-before-seen way, transforming SEC from Congress's assigned role as financial regulator to freewheeling environmental guardian. In doing so, SEC imposes massive costs, goes beyond its traditional purview, and intrudes on state law. Yet Congress never intended that result, let alone clearly authorized it. Applying the major-questions doctrine, the Rule fails.

### 1. The Rule presents a major question.

"Major questions" are "extraordinary cases . . . in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia*, 597 U.S. at 721 (cleaned up). At least six aspects of the Rule confirm it presents such a case.

*First*, the Rule asserts "extravagant statutory power over the national economy." *UARG*, 573 U.S. at 324. SEC estimates the Rule will cost registrants between "$197,000 to over $739,000" annually in compliance costs. App. 741. It "will increase the typical external costs of being a public company by around 21%." Statement from Hester M. Peirce, *Green Regs and Spam: Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024), http://tinyurl.com/2p8xzwj9. Even SEC's incomplete estimate says the Rule will result in "billions of dollars in [private] spending." *King v. Burwell*, 576 U.S. 473, 485 (2015).

Registrants are not the only ones to bear massive costs. "[T]he final rules will impose additional costs" on "investors," including State

Petitioners, and "other parties," too. App. 595. The public—which includes "market participants, customers, and suppliers"—will "face reduced demand for their services or higher prices for their inputs as a result of the final rules' required disclosures." App. 596. By passing these costs along, the Rule affects virtually every sector of the economy. *West Virginia*, 597 U.S. at 716, 722. (regulating a "significant portion of the American economy" indicates a major question); *UARG*, 573 U.S. at 324 (cleaned up).

*Second*, SEC has "claimed to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority." *West Virginia*, 597 U.S. at 724 (cleaned up). The Rule states disclosures are "necessary or appropriate in the public interest or for the protection of investors." App. 59–61 (quoting 15 U.S.C. § 77g and citing 15 U.S.C. § 78m(a)).

But for years, SEC acknowledged it could not mandate disclosures "solely" to produce "some indirect effect on corporate conduct," such as reducing greenhouse-gas emissions. *See* Commission Conclusions and Rule Making Proposals, Securities Act Release No. 5627, Exchange Act Release No. 11733, [1975-1976 Transfer Binder] Fed. Sec. L. Rep. (CCH)

P 80,310, 85,713 (Oct. 14, 1975). Indeed, SEC explained that requiring "comprehensive disclosure of the environmental effects of corporate activities" would be inappropriate. 40 Fed. Reg. at 51,662; *see also Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23,916, 23,970 (Apr. 22, 2016) ("[D]isclosure relating to environmental and other matters of social concern should not be required of all registrants.").

And "just as established practice may shed light on the extent of power conveyed by general statutory language," so too may "the want of assertion of power by those who presumably would be alert to exercise it." *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941). SEC never thought it had this power, and it never exercised it. SEC's attempts to use "decades-old statute[s]" now would usher in a brand-new regulatory regime. *Ala. Ass'n of Realtors v. DHHS*, 141 S. Ct. 2485, 2486 (2021). "Given these circumstances, there is every reason to hesitate before concluding that Congress meant to confer on [SEC] the authority it claims." *West Virginia*, 597 U.S. at 725 (cleaned up).

*Third*, the Rule's climate focus is a "fundamental revision of the statute, changing it from [one sort of] scheme of . . . regulation" into a

totally different one. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994). Financial materiality has been the "cornerstone of the disclosure system established by the federal securities laws." H. Comm. on Interstate and Foreign Com., 95th Cong., Rep. of the Advisory Comm. on Corp. Disclosure to the SEC (Comm. Print 1977). But the Rule jettisons that concern in favor of purely political, environmental policy.

Until recently, it was "universally agreed" that materiality is an "objective" financial question, "involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976). Under that definition, "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* And because investors buy securities "expect[ing] profits," *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–299 (1946), materiality necessarily speaks to a security's value and asks whether a given fact's "impact" on a company's "fortune" is "certain and clear" or "contingent or speculative," *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988).

The Rule abandons that longstanding definition to "apply[] a non-economic standard of materiality." Peirce, *supra*. Before, companies

needed to disclose all *financially-material* climate-related risks. But the Rule overhauls securities regulation, telling companies they must consider many climate-related issues to be material no matter the financial impact. Companies will be effectively forced to prove climate issues are *not* material, or risk facing SEC's wrath. *See, e.g.*, App. 246 (Companies must now make a preliminary "materiality determination[]" and "evaluat[e] whether [their] Scopes 1 and/or 2 emissions are material.").

That mandatory review requirement on a non-financial issue "reveals" the "breadth of the [SEC's] claimed authority." *West Virginia*, 597 U.S. at 729. By embracing that overly expansive view of SEC's power, the Rule "dismisses the role that materiality ought to play in balancing the costs and benefits of disclosure." Peirce, *supra*.

*Fourth*, "[t]here is little reason to think Congress assigned" environmental regulation like this to SEC. *West Virginia*, 597 U.S. at 729. "The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market." *United Hous. Found. v. Forman*, 421 U.S. 837, 849 (1975). SEC's job is to ensure "dealing in securities is fair and without undue preferences or

advantages among investors." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976). Thus, its stock-in-trade is combatting "fraud" and "manipulation of stock prices." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976).

SEC is not a climate regulator. And "[w]hen [an] agency has no comparative expertise" in a field, "Congress presumably would not" task it, an independent agency, with making policy judgments in that area. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2418 (2019); *see MCI*, 512 U.S. at 231. After all, it is the *Securities and Exchange* Commission.

*Fifth*, the Rule purports to make decisions of "vast . . . political significance." *West Virginia*, 597 U.S. at 716. To do so, it uses "newly uncovered" powers to enact a program Congress declined to adopt. *Id.* at 731. "Climate change" is a "controversial subject[]," *Janus v. AFSCME, Council 31*, 585 U.S. 878, 913 (2018), with a "place at the very center of this Nation's public discourse," *Nat'l Rev., Inc. v. Mann*, 140 S. Ct. 344, 348 (2019) (Alito, J., dissenting from denial of certiorari). So controversial that just two years ago, the Supreme Court said even EPA needed clearer authorization before it could implement a climate "solution." *West*

*Virginia*, 597 U.S. at 735. If EPA needs a clear statement to act, then SEC should, too.

More, climate change disclosure schemes disclosures "have been the subject of an earnest and profound debate across the country," which makes the "claimed delegation all the more suspect." *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (cleaned up). Congress has repeatedly "considered and rejected" them, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144, 159 (2000), some just before the Rule was proposed. *See, e.g.*, Climate Risk Disclosure Act, S. 1217, 117th Cong. (2021); Climate Risk Disclosure Act, H.R. 2570, 117th Cong. (2021). If Congress refused to give SEC this power, then the agency should not be able to independently take it. *See Bunte Bros.*, 312 U.S. at 352.

*Sixth*, by passing the Rule, SEC "intrudes into" "the particular domain of state law." *Ala. Ass'n*, 141 S. Ct. at 2489. "[C]orporation law" is an area traditionally governed by "state-law standards." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991). Yes, federal securities laws exist too. But the Supreme Court has been "reluctant" to infer that Congress wanted to federalize securities law "where established state

policies of corporate regulation would be overridden." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).

State law has long prioritized a "legitimate and traditional[]" interest in "protect[ing] corporate shareholders." *First Nat'l Bank of Bos. v. Belloti*, 435 U.S. 765, 792 (1978). But SEC expects the Rule's requirements will cause "changes in behavior" from corporations such as "prompt[ing] managers to alter their approach to climate-related risks." App. 784. Those "changes to registrant behavior" threaten "the potential cost of lower productivity, profitability, or market share." *Id.* at 785. They may even require "some registrants . . . to reorganize their business." *Id.*

It defies traditional state law, which emphasizes "shareholder primacy," to put climate concerns before a company's wellbeing when regulating the markets. Robert J. Rhee, *A Legal Theory of Shareholder Primacy*, 102 Minn. L. Rev. 1951, 2016 (2018). State financial and corporate regulators have not elevated environmental matters above the investors' profit-taking incentives. Now, SEC has.

\*   \*   \*

Together, these six factors "mak[e] this a relatively easy case" to apply the major-questions doctrine. *West Virginia*, 597 U.S. at 744–745

(Gorsuch, J., concurring). SEC must find a clear statement to justify the power it claims.

## 2. Congress did not clearly authorize the Rule.

SEC relies on the Securities Act to require disclosures that are "necessary or appropriate in the public interest or for the protection of investors." App. 59–60; *see* 15 U.S.C. § 77g(a)(1). But that act militates against the Rule. The statute's text and purpose show why.

1. Look first to that act's "necessary or appropriate" language, 15 U.S.C. § 77g(a)(1), that "can only be exercised within the confines of the [relevant statute]." *In re Cajun Elec. Power Co-op, Inc.*, 185 F.3d 446, 452 n.9 (5th Cir. 1999). Broad words like these are "known by their companions." *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000).

Following a list of specific disclosures, that necessary and proper language is a residual clause empowering SEC to mandate "other such information" it deems "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1); *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–115 (2001). Here, those preceding words concern purely "financial in nature" information. 81 Fed. Reg. at 23,921. The "gap filler" residual language limits SEC to

financially-material information. *West Virginia*, 597 U.S. at 724. It is not a blank check for SEC to compel any disclosures it chooses.

The Exchange Act's grant to SEC of a qualified power to implement "necessary or appropriate" disclosure regulations is no different. *See* 15 U.S.C. § 78l(b) (listing 11 disclosure categories tied to specific financial aspects). The Exchange Act's residual clause is even more precise. It says that SEC can require only "further financial statements." *Id.* § 78l(b)(1)(L). Similar portions of the Exchange Act allow SEC to mandate disclosing accounting items, such as "the items or details to be shown in the balance sheet and the earnings statement" or "the appraisal or valuation of assets and liabilities." *Id.* § 78m(b)(1).

When Congress intends SEC to regulate outside of traditional financial materiality, it does so clearly. *See, e.g.*, 15 U.S.C. § 78m(p) (requiring companies to disclose use of "conflict minerals"). But neither statute calls for climate disclosures. Instead, their reach is limited to *financially-material* information. SEC needs to show "clear congressional authorization," yet its claim of authority is not even "colorable" from the statute's text. *West Virginia*, 597 U.S. at 722–723.

2. Even if context did not cabin those residual clauses to financial materiality, the "public interest" qualifier also forecloses SEC's interpretation. "'[P]ublic interest' is never an unbounded term." *Bus. Roundtable v. SEC*, 905 F.2d 406, 413 (D.C. Cir. 1990). Instead, it must be limited to "the purposes that Congress had in mind when it enacted [the] legislation." *NAACP v. FPC*, 425 U.S. 662, 670 (1976). And both the Securities Act and the Exchange Act share the same primary purpose. *Supra* 11–12.

The Securities Act has never required disclosing "all facts necessary to a sound investment judgment." William O. Douglas & George E. Bates, *The Federal Securities Act of 1933*, 43 Yale L. J. 171, 188–189 (1933). It aimed to "protect the public from inaccurate, incomplete and misleading information" about a given security. *Kahan v. Rosenstiel*, 424 F.2d 161, 173 (3d Cir. 1970). The Exchange Act reinforced that purpose by responding to complaints from investors about fraudulent securities deals. And the "public interest" is not served by "bury[ing] the shareholders in an avalanche of trivial information." *Northway*, 426 U.S. at 448–449. Indeed, excessive, financially-immaterial disclosures impede "informed decisionmaking" and "accomplish more harm than good." *Id.*

SEC was never intended to "guarantee sound" or socially conscious "business practices." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). It was created to protect investors from stock-price manipulation, material misrepresentations, and other "serious abuses" present at the Acts' enactment. *Forman*, 421 U.S. at 849. SEC thus cannot augment its authority and require non-financial disclosures of climate information by relying on a reading of "public interest" divorced from the statutes' focus on financial materiality.

\* \* \*

In sum, SEC lacks a "clear delegation" of the power it claims in the Rule. *West Virginia*, 597 U.S. at 735. And because the Rule presents a major question, it is "unreasonable to assume" that Congress gave SEC this "unprecedented power" in the "absence of a clear [legislative] mandate." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 645 (1980) (plurality opinion). The Rule fails.

## B.    The Rule Compels Speech.

The government may not compel a speaker to make "statements of fact the speaker would rather avoid." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). But the Rule compels

speech and forces companies to enter a public conversation on climate change—"one of the most hotly debated issues of the day." *Nat'l Rev., Inc.*, 140 S. Ct. at 347 (Alito, J., dissenting from denial of certiorari). That First Amendment violation inflicts constitutional injury on thousands of companies and associations that operate as citizens of the States, including the American Free Enterprise Chamber and its members.

### 1.    The Rule fails heightened scrutiny.

This compelled speech is content-based and subject to strict scrutiny. *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795 (1988). But even if intermediate scrutiny applies, the Rule survives only if it (1) directly advances a substantial government interest (2) by means that are not more restrictive than necessary. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564, 570 (1980). The Rule fails even that standard.

Begin with SEC's asserted substantial interests. Those interests must fit SEC's regulatory authority to protect investors. *See, e.g.*, 15 U.S.C. §§ 77g(a)(1), 78n(a)(1), 78m(a); *see also NIFLA v. Becerra*, 585 U.S. 755, 763 (2018) (defining interest through statutory purpose). Disclosures may serve that goal when they prevent fraud, or further the

one goal common to all investors—"profit maximization." Roberta Romano, *Metapolitics and Corporate Law Reform*, 36 Stan. L. Rev. 923, 961 (1984).

The Rule fails intermediate scrutiny at the first step. SEC has not substantiated a causal link between climate-related disclosures and its statutory interests in fraud prevention or increased investment return. The Rule leaves investors in a worse position by increasing compliance costs passed on to shareholders without an offsetting benefit. *See, e.g.*, Sean J. Griffith, *What's "Controversial" About ESG? A Theory of Compelled Commercial Speech Under the First Amendment*, 101 Neb. L. Rev. 876, 930 n.281 (2023) (collecting sources).

The Rule also fails at the second step. It is more restrictive than necessary because preexisting regulations already require disclosure of any financially-material information. Peirce, *supra*. SEC understood its prior rules to cover financially-material climate-related disclosures. *See* 75 Fed. Reg. 6290, 6292–93 (Feb. 8, 2010). And nowhere in its nearly 900-page Rule did SEC explain why other regulators, like EPA, cannot achieve the same environmental ends. The Rule thus unconstitutionally compels speech.

## 2. The *Zauderer* exception does not save the Rule.

Resort to the narrow exception recognized in *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985), cannot cure these flaws. To fall within *Zauderer*'s narrow exception, the Rule must require disclosure of information satisfying three requirements: it is (1) "purely factual," (2) "uncontroversial," and (3) "about the terms under which" public companies offer their many services or products. 471 U.S. at 650–651. Though often invoked to bless compelled speech regimes, the Supreme Court has repeatedly refused to extend *Zauderer*. *NIFLA*, 585 U.S. at 768–769; *Hurley*, 515 U.S. at 573. The Rule fails all three requirements.

*First*, the Rule compels speculative environmental-impact assessments about, for example, "potential negative impacts of climate-related conditions and events" on their business operations, App. 91, which are not "purely factual."

*Second*, the Rule compels speech on a highly controversial issue. This Court need not identify the outer limits of "controversial" because the Supreme Court already acknowledged that climate change is "controversial." *Janus*, 585 U.S. at 913.

*Third*, the Rule does not seek to shape voluntary commercial advertisements but requires companies to confess one viewpoint on climate-change issues. It embodies assumptions about climate change's nature, causes, and solutions—issues hotly debated within the scientific community and the public more broadly. *See* Griffith, *supra* at 928–930 & nn.272–279.

To confirm how these principles apply here, the Court need look no further than when SEC unsuccessfully sought to compel speech via its conflict-minerals disclosure rule. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 529–530 (D.C. Cir. 2015). Even though Congress expressly authorized that disclosure, the D.C. Circuit said those regulations fell outside *Zauderer* because they did not regulate "voluntary commercial advertising." *Id.* at 523 & n.12. It infringed the First Amendment because it carried ideological weight and compelled some issuers to "confess" social responsibility. *Id.* at 530.

Here, too, the Rule is an "unjustified or unduly burdensome disclosure requirement[]" that offends the First Amendment. *Zauderer*, 471 U.S. at 651.

## C. The Rule Is Arbitrary And Capricious.

An agency's rule is arbitrary and capricious if the agency fails to "examine the relevant data," "explain the evidence available," and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43, 52 (1983) (quotation marks omitted). "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Although an agency may change its longstanding position, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And where "prior policy has engendered serious reliance interests," then a "more detailed justification" giving "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–516.

SEC failed these obligations. SEC does not even acknowledge its drastic position change. It instead claims the Rule is an extension of powers it had all along. But SEC itself has long recognized registrants'

preexisting obligation to report material climate-related information. The Rule thus does not fill any gaps in the agency's current disclosure obligations. It seeks to go where SEC has not gone before.

Because this is not even a "conscious change of course," SEC altogether fails to explain why it thinks "there are good reasons for [its shift in policy]." *Fox Television*, 556 U.S. at 515. Agencies may not "depart from a prior policy *sub silentio*," *id.*, but that is just what SEC tries to do here. For at least that reason (among many others), the Rule is arbitrary and capricious.

## II. PETITIONERS WILL SUFFER IRREPARABLE INJURY ABSENT A STAY.

Petitioners will suffer unrecoverable economic loss and loss of First Amendment freedoms.

*First*, "[t]he threat of unrecoverable economic loss . . . does qualify as irreparable harm." *Iowa Utils. Board v. FCC*, 109 F.3d 418, 426 (8th Cir. 1987). Indeed, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quotation omitted). The increase in compliance costs to publicly traded companies, passed along to investors, satisfies the irreparable injury prong.

Public companies must work out implementation challenges and become well-versed on climate issues. That will include approving and developing new technologies, hiring extra employees and additional counsel, and bringing on outside climate consultants. *See, e.g.*, *Chamber of Commerce of the United States of America, et al. v. SEC*, No. 24-1628, Appendix to Motion for Stay, at 1405, 1407–08, 1410–11 ¶¶ 22, 28, 33, 37, 40 (U-Haul executive detailing the compliance costs it must take on now to achieve compliance by 2026).

The Rule will require "elaborate internal control systems and disclosure control procedures to capture" diverse and technical risks. Peirce, *supra.* And it will result in "indirect costs of lost management time, board distraction, and disruptive changes in company operations." *Id.* SEC even admits the "costs of being a public company" will increase "by around 21%." *Id.*

Compliance costs will begin accruing now, not in 2026. The Rule's first disclosure deadline in 2026 will cover the 2025 fiscal year. This means companies must begin tracking and recording at the start of the 2025 fiscal year. *See, e.g.*, Chamber App., *supra*, at 1408, 1410, 1411

¶¶ 33, 37, 40. So all tracking systems and protocols must be a "go" by the end of *this* year. Preparation starts now. So irrecoverable costs start now.

These immediate compliance costs will be passed along to investors, like Petitioner States who participate in various investment accounts and funds. A company's profitability will suffer, a cost then passed along to investors. *Supra* 7–8. Indeed, "[s]hareholders will be footing this bill." Uyeda, *supra*; *see also* Peirce, *supra*, (It is "public companies and their shareholders who will be paying for climate disclosure spam.").

For Petitioner AmFree—which represents entrepreneurs and businesses across all sectors—those compliance costs, too, amount to irreparable injury. AmFree's members include companies that are subject to the earliest effective dates in the Rule and that will suffer economic harm and unrecoverable compliance costs because of the novel and burdensome compliance costs the Rule imposes.

*Second*, the Rule imposes constitutional harm—the loss of First Amendment freedoms—which, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Any one of these showings of irreparable injury is enough. Together, they decidedly tip the scales in favor of a stay here.

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR A STAY.

Though Petitioners' likelihood of success on the merits here is strong, that showing can be less and still justify a stay where Petitioners have "raised a substantial question and the equities are otherwise strongly in [their] favor." *Nebraska*, 52 F.4th at 1046–48 (quotation marks omitted). The third and fourth factors merge "when the Government is the opposing party." *Nken*, 556 U.S. at 435. Not only would a stay avoid irreparable harm to Petitioners, it renders no harm to the public.

SEC waited two years after proposing the Rule to issue its final version. It cannot now claim irreparable harm from delaying the Rule's effectiveness for a jot longer. Nor does a stay threaten the public interest because SEC's rules already require disclosure of any information, including climate-related items, that would be material to investors. *See, e.g.*, 75 Fed. Reg. at 6292–93. A stay preserves this status quo, and it prevents any possible "perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

SEC has no equitable interest in an invalid, unlawful rule, but the public, and Petitioners, have substantial interest in not shouldering billions of dollars of initial compliance costs on a rule later held invalid. When a rule such as this one seeks to enact a sea change in securities regulation, judicial review of the merits should be allowed to play out before the effects spread.

The equities favor a stay. The status quo should be preserved while this Court disposes of the petitions for review.

## CONCLUSION

For these reasons, this Court should stay the Rule pending judicial review and expedite briefing.

April 3, 2024

BRENNA BIRD
Attorney General of Iowa

Respectfully submitted,

*/s/ Eric Wessan*
ERIC WESSAN
*Solicitor General*
*/s/ Patrick C. Valencia*
PATRICK C. VALENCIA
*Deputy Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

*Counsel for Petitioner State of Iowa*

CHRISTOPHER M. CARR
Georgia Attorney General

/s/ *Stephen J. Petrany*
STEPHEN J. PETRANY
*Solicitor General*
Office of the Attorney General of
Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

DAVE YOST
Ohio Attorney General

/s/ *T. Elliot Gaiser*
T. ELLIOT GAISER
*Solicitor General*
MATHURA J. SRIDHARAN
*Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for Ohio Bureau of
Workers' Compensation*

PATRICK MORRISEY
West Virginia Attorney General

/s/ *Michael R. Williams*
MICHAEL R. WILLIAMS
*Principal Deputy Solicitor
General*
LINDSAY S. SEE
*Solicitor General*
Office of the Attorney General of
West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West
Virginia*

STEVE MARSHALL
Alabama Attorney General

/s/ *Edmund G. LaCour Jr.*
EDMUND G. LACOUR JR.
*Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
 (334) 242-7300
Edmund.LaCour@AlabamaAG.g
ov

*Counsel for State of Alabama*

TREG TAYLOR
Alaska Attorney General

/s/ *William Milks*
WILLIAM MILKS
*Assistant Attorney General*
BEN HOFMEISTER
*Assistant Attorney General*
Alaska Department of Law
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
bill.milks@alaska.gov
ben.hofmeister@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
Arkansas Attorney General

s/ *Nicholas J. Bronni*
NICHOLAS J. BRONNI
*Solicitor General*
DYLAN L. JACOBS
*Deputy Solicitor General*
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.g
ov

*Counsel for the State of Arkansas*

RAÚL R. LABRADOR
Attorney General of Idaho

/s/ *Joshua N. Turner*
JOSHUA N. TURNER
*Chief of Constitutional Litigation
and Policy*
ALAN M. HURST
*Solicitor General*
Office of the Idaho Attorney
General
P.O. Box 83720 Boise, Idaho
83720 (208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
Indiana Attorney General

/s/ *James A. Barta*
JAMES A. BARTA
*Solicitor General*
Office of the Attorney General of
Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone: (317) 232-0709
James.Barta@atg.in.gov

*Counsel for State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

/s/ *Matthew F. Kuhn*

MATTHEW F. KUHN
*Solicitor General*
VICTOR B. MADDOX
*Counsel for Special Litigation*
JACOB M. ABRAHAMSON
*Assistant Solicitor General*
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Matt.Kuhn@ky.gov
Victor.Maddox@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for the Commonwealth of Kentucky*

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
*Solicitor General*
AUTUMN HAMIT PATTERSON
*Special Assistant Solicitor General*
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagaj@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General of Mississippi

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
*Deputy Solicitor General*
Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205
(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW T. BAILEY
Missouri Attorney General

/s/ *Joshua M. Divine*
JOSHUA M. DIVINE, 69875MO
*Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, MO 65101
Phone: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

AUSTIN KNUDSEN
Montana Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401

Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for the State of Montana*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ *Grant D. Strobl*
GRANT D. STROBL
*Assistant Solicitor General*
Office of the Nebraska Attorney
General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.Strobl@nebraska.gov

*Counsel for the State of Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney
General

/s/ *Samuel R.V. Garland*
SAMUEL R.V. GARLAND
*Senior Assistant Attorney
General*
New Hampshire Department of
Justice
1 Granite Place
Concord, NH 03301
(603) 271-3650
samuel.rv.garland@doj.nh.gov

*Counsel for State of New
Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

/s/ *Philip Axt*
PHILIP AXT
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck ND 58505
Phone: (701) 328-2210
pjaxt@nd.gov

*Counsel for the State of North
Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II
*Solicitor General*
Office of the Attorney General of
Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for State of Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ *Thomas T. Hydrick*
THOMAS T. HYDRICK
*Assistant Deputy Solicitor
General*

Office of the South Carolina
Attorney General
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South
Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles McGuigan*
CHARLES MCGUIGAN
*Deputy Attorney General*
Paul S. Swedlund
*Solicitor General*
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
605-773-3215
charles.mcguigan@state.sd.us

*Counsel for the State of South
Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and
Reporter

J. MATTHEW RICE
*Solicitor General*
*/s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER
*Director of Strategic Litigation*
Office of the Attorney General
and
Reporter of Tennessee

P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 741-3491
matt.rice@ag.tn.gov

*Counsel for the State of
Tennessee*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
*First Assistant Attorney General*
JAMES LLOYD
*Deputy Attorney General for Civil
Litigation*
KELLIE E. BILLINGS-RAY
*Chief, Environmental Protection
Division*
*/s/ Wesley S. Williams*
WESLEY S. WILLIAMS
*Assistant Attorney General*
Office of the Attorney
General of Texas
Environmental Protection
Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012
Wesley.Williams@oag.texas.gov

*Counsel for State of Texas*

SEAN D. REYES
Utah Attorney General

*/s/ Christopher A. Bates*
CHRISTOPHER A. BATES

*Deputy Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114-2320
Telephone: (801) 538-9600
chrisbates@agutah.gov

*Counsel for the State of Utah*

JASON MIYARES
Virginia Attorney General

/s/ *Kevin M. Gallagher*
KEVIN M. GALLAGHER
*Principal Deputy Solicitor General*
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for Commonwealth of Virginia*

BRIDGET HILL
Wyoming Attorney General

/s/ *Ryan Schelhaas*
RYAN SCHELHAAS
*Chief Deputy*
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*

/s/ *R. Trent McCotter*
R. TRENT MCCOTTER
JONATHAN BERRY
MICHAEL BUSCHBACHER
BOYDEN GRAY PLLC
801 17th St. NW, Suite 350
Washington, DC 20006
Telephone: (202) 706-5488
tmccotter@boydengray.com

*Counsel for American Free Enterprise Chamber of Commerce*

# CERTIFICATE OF COMPLIANCE

Under Fed. R. App. P. 27 and Fed. R. App. P. 32 and Local R. 25A, I certify the following:

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 5,197 words, excluding those parts exempted by Fed. R. App. P. 27(d)(2).

2. This motion complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E) and Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the motion has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This motion complies with the electronic filing requirements of Local R. 25A because the text of the electronic motion is identical to the text of the paper copies and because the electronic version of this motion has been scanned for viruses and no viruses were detected.

April 3, 2024

/s/ *Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for Petitioner State of Iowa*

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on April 3, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

April 3, 2024

/s/ *Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for Petitioner State of Iowa*