No. 24-1522 and all consolidated cases: Nos. 24-1623, 24-1624, 24-1626, 24-1627, 24-1628, 24-1631, 24-1633, and 24-1634

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

STATE OF IOWA, *et al.*,
PETITIONERS,

V.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT.

ON PETITION FOR REVIEW OF AN ORDER AND RULE OF THE
SECURITIES AND EXCHANGE COMMISSION

**MOTION FOR LEAVE TO INTERVENE AS RESPONDENTS**

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

GLENN KAPLAN
Chief, Insurance and Financial Services
Division

JULIA JONAS-DAY
MICHELE HUNTON
Assistant Attorneys General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2453
glenn.kaplan@mass.gov
julia.jonas-day@mass.gov

*Additional counsel listed in signature block*

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

BRYAN J. LEITCH
MARCELLA COBURN
Assistant Attorneys General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 805-7426
ashwin.phatak@dc.gov

Pursuant to Federal Rule of Appellate Procedure ("FRAP") 15(d), Massachusetts, the District of Columbia, Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin ("States") move for leave to intervene as respondents to defend the Securities and Exchange Commission's ("SEC") rules titled, "The Enhancement and Standardization of Climate-Related Disclosures for Investors," Release Nos. 33-11275 & 34-99678 (Mar. 6, 2024), 89 Fed. Reg. 21,668 (Mar. 28, 2024) ("Final Rule"). The States have a substantial interest in defending the Final Rule, which provides the States, their residents, and other investors with information about climate-related risks that is critical to making informed investment decisions.

Investors need reliable, comparable information about risks that registered companies face and how they are managing those risks. Climate-related impacts are undeniably one such category of risk. As the SEC recognized, there is "a well-established link between climate-related risks and firm fundamentals," and "disclosures about climate-related risks, when they are made, become priced into the value of a firm." 89 Fed. Reg. 21,848-49. Those risks include the degree to which an issuer's physical assets are vulnerable to extreme-weather events and sea-level rise, the degree to which an issuer's supply chain depends on the use of certain fuels or other inputs that are or may become restricted by environmental laws, and the

degree to which issuers face shifting consumer preferences for less carbon-intensive products. *See id.* at 21,671-72. Investors, such as the States, thus benefit from specific, comparable disclosures about climate-related risks and registered companies' management of those risks.

The SEC's Final Rule accordingly elicits "more complete and useful information about the impacts of climate-related risks on registrants to improve the consistency, comparability, and reliability of climate-related information for investors." *Id.* at 21,909. That information will assist investors in pricing climate-related risks into their decision-making, while ensuring that investors are no longer forced to cobble together climate-related information from disparate sources without meaningful comparators. *See id.* at 21,912 ("[C]urrent requirements are not yielding consistent and comparable disclosure sufficient to meet investors' needs.").

The States thus have significant interests in defending the Final Rule. As institutional investors, the States will benefit from the comprehensive, comparable, and decision-useful information required by the Final Rule. Collectively, the States manage well over a quarter of a trillion dollars in public-pension funds, among others. Many of the States will also benefit from the Final Rule because it elicits information they otherwise would have to expend public resources to obtain. Finally, the Final Rule will also protect the States' residents—many of whom rely on some form of investment savings, such as retirement accounts and college-

savings plans—thus improving the States' economies and fostering economic growth. For those reasons, this Court should grant the States' motion to intervene.

## BACKGROUND

### 1. The SEC's Long Tradition of Risk-Disclosure Requirements.

Congress has long authorized the SEC to require disclosure of a variety of information for the benefit of investors. Indeed, Congress empowered the SEC to require disclosure of "such other information" as the SEC "may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §§ 77g(a)(1), 77aa. Congress also conditioned the registration of securities on disclosure of "[s]uch information, in such detail" as the SEC deems "necessary or appropriate in the public interest or for the protection of investors"—including information about "the organization, financial structure, and nature of the business." *Id.* § 78*l*(b), (g); *see id.* § 78m(a).

Consistent with those provisions, the SEC has recommended or required the disclosure of information to assist investors in evaluating risks, including—since at least the Nixon Administration—environmental-related risks. *See, e.g.*, Release No. 33-5170, 36 Fed. Reg. 13,989 (July 29, 1971); Release No. 33-5386 (Apr. 20, 1973) (38 Fed. Reg. 12,100-03). For example, in 1982, the SEC required registrants to describe any material pending legal proceedings that involved federal, state, or local environmental laws. *Adoption of Integrated Disclosure System*, 47 Fed. Reg.

11,380, 11,406-07 (Mar. 16, 1982). In 2010, the SEC published guidance on how existing disclosure rules may apply to the impact of climate change on a registrant's business. *Commission Guidance Regarding Disclosure Related to Climate Change*, 75 Fed. Reg. 6290 (Feb. 8, 2010). And in 2020, the SEC amended its rules again to address disclosure of certain effects that a registrant may experience as a result of complying with environmental regulations. *Modernization of Regulation S-K Items 101, 103, and 105*, 85 Fed. Reg. 63,726, 63,737 (Oct. 8, 2020).

**2.      The SEC's Proposed and Final Rules for Climate-Related Disclosures.**

In March 2022, the SEC built upon its tradition of risk-disclosure requirements by proposing a rule titled, "The Enhancement and Standardization of Climate-Related Disclosures for Investors," Release No. 33-11042 (Mar. 21, 2022), published in 87 Fed. Reg. 21,334 (Apr. 11, 2022) ("Proposed Rule"). Many of the States submitted comments in support of the Proposed Rule, explaining how it would benefit the States themselves as well as their residents. *See* State Atty. Generals' Comment on SEC Proposed Rule, 4-5, 15-17 (June 17, 2022) ("State Comment"), https://tinyurl.com/3atupd5s. They explained, for example, that they would benefit as institutional investors that manage taxpayer dollars and oversee public-pension funds, while residents would benefit from more informed investment decisions[1] and

_____

        [1]      Many investors rely on investment managers or other fiduciaries to make investment decisions. For investors who make their own decisions without

more efficiently priced securities, and would be better positioned to diversify their portfolios. *Id.* at 4-5.

The SEC issued the Final Rule on March 6, 2024, after considering more than 24,000 comment letters. The Final Rule aims to ensure that investors have specific, comparable disclosures about registrants' climate-related risks and impacts, helping to equalize the informational imbalances that threaten market efficiency. 89 Fed. Reg. 21,669. As the SEC found, climate-related risks can "significantly affect" a registrant's "financial performance and position," and the Final Rule will provide "more complete and decision-useful information about the impacts of climate-related risks on registrants, improving the consistency, comparability, and reliability of climate-related information for investors." *Id.*

In broad outline, the Final Rule requires disclosure of a few discrete categories of information. *See id.* at 21,673-76.

- *First*, registrants must describe "climate-related risks" that have materially impacted them or that are reasonably likely to do so in the short term (i.e., within 12 months) and in the long term (i.e., beyond 12 months), as well as describe how

---

intermediaries, the Rule will allow them to better analyze investment choices, compare issuers and securities, and make sound investment decisions.

registrants consider such impacts strategically, operationally, and financially. *Id.* at 21,674, 21,853-55, 21,915-16.[2]

- *Second*, registrants must disclose information about the tools and strategies, if any, that they use to mitigate or measure climate-related risks (e.g., transition plans, scenario analysis, or internal carbon prices). *Id.* at 21,674, 21,913, 21,915-16.[3]

- *Third*, registrants must disclose the role, if any, of their board of directors or managers in overseeing material climate-related risks, and describe the processes by which they are informed of such risks and the processes for identifying, assessing, and managing material climate-related risks, including how they decide whether to mitigate, accept, or adapt to a particular risk. *Id.* at 21,674, 21,915-16.

---

[2] "Climate-related risks" are "the actual or potential negative impacts of climate-related conditions and events on a registrant's business, results of operations, or financial condition." 89 Fed. Reg. 21,914. As the SEC explained, "registrants should rely on traditional notions of materiality" in determining whether "any climate-related risks have materially impacted or are reasonably likely to have a material impact on the registrant." *Id.* at 21,695-96.

[3] A "transition plan" is a "strategy and implementation plan to reduce climate-related risks." 89 Fed. Reg. 21,915. A "scenario analysis" is "a process for identifying and assessing a potential range of outcomes of various possible future climate scenarios." *Id.* "Internal carbon price" refers to "an estimated cost of carbon emissions used internally within an organization." *Id.* at 21,914.

- *Fourth*, certain types of registrants (i.e., large-accelerated filers or accelerated filers that are not smaller-reporting or emerging-growth companies)[4] must disclose material direct greenhouse-gas emissions (i.e., Scope 1 emissions) and material indirect greenhouse-gas emissions from purchased or acquired electricity, steam, heat, or cooling (i.e., Scope 2 emissions). *Id.* at 21,674, 21,916-18.[5] Such registrants must also describe the methodology, as well as the significant inputs and assumptions, used to calculate those emissions. *Id.* at 21,674-75, 21,917.

- *Fifth*, registrants must disclose certain contextual information in their audited financial statements about costs and expenditures related to severe-weather events and other natural conditions (e.g., hurricanes, droughts, wildfires, sea-level rises), and provide qualitative descriptions of whether and how those events and conditions materially impacted any estimates or assumptions underlying their financial statements. *Id.* at 21,675, 21,805-06, 21,912-13.

---

[4]     A "large accelerated filer" is an issuer with, among other things, an aggregate market value of at least $700 million, while an "accelerated filer" has an aggregate market value of at least $75 million but less than $700 million. 17 C.F.R. § 240.12b-2. A "smaller reporting company" is a particular type of issuer with (1) a public float under $250 million, or (2) annual revenues under $100 million and a public float under $700 million. *Id.* An "emerging growth company" is an issuer with less than $1,235,000,000 in total annual gross revenues. *Id.*

[5]     Scope 1 emissions are "direct [greenhouse-gas] emissions from operations that are owned or controlled by a registrant." 89 Fed. Reg. 21,915. Scope 2 emissions are "indirect [greenhouse-gas] emissions from the generation of purchased or acquired electricity, steam, heat, or cooling that is consumed by operations owned or controlled by a registrant." *Id.*

**3. The Consolidated Cases Challenging the SEC's Final Rule.**

The challenges underlying these consolidated cases were filed soon after the SEC issued its Final Rule.

- On March 6, 2024, ten States filed a petition for review in the Eleventh Circuit (West Virginia, Georgia, Alabama, Alaska, Indiana, New Hampshire, Oklahoma, South Carolina, Wyoming, Virginia). No. 24-10679 (11th Cir.).

- On March 8, 2024, two private entities (Liberty Energy, Inc.; Nomad Proppant Services, LLC) filed an emergency motion for administrative stay and stay pending judicial review in the Fifth Circuit. No. 24-60109 (5th Cir.).

- On March 12, 2024, the Natural Resources Defense Council filed a petition for review in the Second Circuit. No. 24-707 (2d Cir.).

- On March 12, 2024, two more private entities (Texas Alliance of Energy Producers; Domestic Energy Producers Alliance) filed a petition for review in the Fifth Circuit. No. 24-60109 (5th Cir.).

- On March 12, 2024, nine more States and one private entity filed a petition for review in the Eighth Circuit (Iowa, Arkansas, Idaho, Missouri, Montana, Nebraska, North Dakota, South Dakota, Utah, and American Free Enterprise Chamber of Commerce). No. 24-1522 (8th Cir.).

- On March 13, 2024, three other States or state actors filed a petition for review in the Sixth Circuit (Ohio Bureau of Workers' Compensation; Commonwealth of

Kentucky *ex rel.* Attorney General Russell Coleman; Tennessee *ex rel.* Attorney General Jonathan Skrmetti). No. 24-3220 (6th Cir.).

- On March 13, 2024, two nonprofits (Sierra Club; Sierra Club Foundation) filed a petition for review in the D.C. Circuit. No. 24-01067 (D.C. Cir.).

- On March 14, 2024, three private groups filed a petition for review in the Fifth Circuit (U.S. Chamber of Commerce; Texas Association of Business; Longview Chamber of Commerce). No. 24-60109 (5th Cir.).

On March 15, 2024, the Fifth Circuit issued an administrative stay of the SEC's Final Rule. *Liberty Energy, Inc. v. SEC*, No. 24-60109, ECF No. 59-2. On March 21, the Judicial Panel on Multidistrict Litigation consolidated and assigned these cases to this Circuit pursuant to 28 U.S.C. § 2112(a). On March 25, this Court vacated the administrative stay entered by the Fifth Circuit. *See Iowa v. SEC*, No. 24-1522 (8th Cir. Mar. 25, 2024), ECF No. 5376313.

On March 26, 2024, the *Liberty Energy* petitioners asked this Court to renew their motion for an administrative stay and stay pending appeal. *See Liberty Energy, Inc. v. SEC*, No. 24-1624 (8th Cir. Mar. 26, 2024), ECF No. 5377132. On the same day, three petitioners moved for a stay pending review with this Court. *See Chamber of Com. of the U.S. v. SEC*, No. 24-1628 (8th Cir. Mar. 26, 2024), ECF No. 5377362.

On March 27, 2024, the SEC requested that this Court order re-briefing of the *Liberty Energy* petitioners' motion to allow the two stay motions to be considered

together, or for this Court to deny those petitioners' motion. *See Liberty Energy, Inc. v. SEC*, No. 24-1624 (8th Cir. Mar. 27, 2024), ECF No. 5377813. On that same day, the *Liberty Energy* petitioners filed a reply letter. *See Liberty Energy, Inc. v. SEC*, No. 24-1624 (8th Cir. Mar. 27, 2024), ECF No. 5377822.

On March 29, 2024, the SEC moved in all the consolidated cases to establish a consolidated briefing schedule encompassing all motions for a stay. *See Iowa v. SEC*, No. 24-1522 (8th Cir. Mar. 29, 2024), ECF No. 5378581. On that same day, the *Liberty Energy* petitioners opposed that motion. *See Iowa v. SEC*, No. 24-1522 (8th Cir. Mar. 29, 2024), ECF No. 5378591.

The States seek to intervene as respondents in all consolidated cases.

## LEGAL STANDARD

FRAP 15(d) authorizes intervention in circuit courts reviewing agency actions. Putative intervenors must file a motion containing "a concise statement of interest" and "the grounds for intervention" "within 30 days after the petition for review." Fed. R. App. P. 15(d). Movants must also have Article III standing. *Alabama Mun. Distributors Grp. v. FERC*, 300 F.3d 877, 879 n.2 (D.C. Cir. 2002).

In deciding motions to intervene in appellate proceedings, courts often draw on the policies underlying Federal Rule of Civil Procedure ("FRCP") 24. *See Int'l Union, United Auto. v. Scofield*, 382 U.S. 205, 216 n.10 (1965). Chief among FRCP 24's animating policies is the recognition that "a lawsuit often is not merely

a private fight and will have implications on those not named as parties." 7C Charles Alan Wright, et al., *Federal Practice and Procedure* § 1901 (3d ed. April 2023). As such, FRCP 24 is "construed liberally," with "doubts resolved in favor of the proposed intervenor." *Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 164 F.3d 1080, 1081 (8th Cir. 1999).

FRCP 24 contemplates two modes of intervention: as of right and permissive. *United States v. Union Elec. Co.*, 64 F.3d 1152, 1157 (8th Cir. 1995). Intervention as of right is available to a movant with "an interest relating to" the "transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Permissive intervention is available when a movant's "claim or defense and the main action have a question of law or fact in common." Fed. R. Civ. P. 24(b)(1). In deciding such issues, this Court will "construe a motion to intervene in favor of the prospective intervenor, accepting all material allegations as true." *Liddell v. Special Admin. Bd. of Transitional Sch. Dist. of St. Louis*, 894 F.3d 959, 965 (8th Cir. 2018).

## ARGUMENT

This Court should grant the States' timely filed motion to intervene under FRAP 15(d) because the States satisfy Article III standing requirements and because allowing intervention here would serve the policies underlying FRCP 24.

## I.    The States Have Article III Standing To Intervene.

The States have standing because petitioners seek relief that will cause the States direct, tangible injuries, all of which can be avoided by upholding the Final Rule.  *See Liddell*, 894 F.3d at 965 ("[W]e accept as true the movants' allegations of injury, causation, and redressability, unless the pleading reflects a 'sham' or 'frivolity.'").  As this Court has held, "[r]isk of direct financial harm establishes injury in fact," *Nat'l Parks Conservation Ass'n v. EPA*, 759 F.3d 969, 975 (8th Cir. 2014), and this applies equally to States, *see Biden v. Nebraska*, 143 S. Ct. 2355, 2365-67 (2023) (holding that Missouri suffered cognizable harm because reduced revenues from a federal rule would impair state instrumentality's "performance of its public function").  Also, in the context of intervenor-respondents, causation and redressability require only that petitioners seek to compel agency action that would injure the putative intervenors in a way that a favorable decision would prevent.  *See Nat'l Parks*, 759 F.3d at 975 (holding that movants had standing to intervene where they would incur additional costs if petitioners prevailed).

Here, Article III's requirements are met.  To start, the States face an imminent risk of direct financial harm if petitioners prevail.  The Final Rule will, among other things, elicit information that helps the States make prudent investment decisions with taxpayer dollars and state-retirement funds and will save them money by reducing the need to independently collect and analyze climate-risk data.  *See infra*

at 15-18.  Vacating the Final Rule will thus deprive the States of significant economic benefits—a paradigmatic Article III injury.  *See Biden*, 143 S. Ct. at 2365-67; *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022) ("Economic injury to a State from increased proprietary costs . . . can certainly be sufficiently 'concrete and particularized[.]'" (citing *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019))).  Causation and redressability are likewise satisfied: Should petitioners succeed in having the Final Rule set aside, the SEC would be compelled to cause the injuries noted above, and as a result, the States' injuries can be redressed by a decision rejecting petitioners' challenges.  *See Nat'l Parks*, 759 F.3d at 975.  Nothing more is required for Article III standing.  *See id.* at 974-75.

## II.  The States' Intervention Would Serve The Policies Underlying FRCP 24.

Intervention under FRAP 15(d) is warranted here because the States timely filed this motion within 30 days of the first petitions for review and because they meet the standards for intervention under FRCP 24.

### A.  The States Satisfy the Standard for Intervention as of Right.

> 1.  The States' important interests in the Final Rule would be impaired if petitioners prevail.

The States have a responsibility to their residents and employees to make sound investment decisions, and they need consistent, comprehensive information about investment risks to do so.  For this reason, the States have strong interests in defending the Final Rule, which requires certain registrants to make disclosures

about climate-related risks in a consistent, comparable, and reliable manner.  That interest warrants intervention as of right, and it would be materially impaired by a decision in favor of petitioners.  *See Union Elec.*, 64 F.3d at 1161-63 (recognizing that a contingent financial interest in the outcome of litigation will suffice for intervention as of right).

Climate change is transforming the economy and amplifying a host of physical, regulatory, and other risks to businesses.  *See* 89 Fed. Reg. 21,671-72.  Those risks have a range of economic consequences for registrants, from damage to their facilities, to supply chain disruptions, to global population displacements affecting labor and consumer markets, to increased insurance costs and added energy expenses (whether imposed directly by law or indirectly by reputational, technological, or other market shifts).  State Comment 6-7; *see* Solomon Hsiang et al., *Economics: Markets & Budgets Respond to Climate Change*, *in* Fifth National Climate Assessment (Allison R. Crimmins et al. eds., 2023) (predicting with high confidence that climate risks will "change asset values as markets and prices adjust to reflect economic conditions that result from climate change"), https://tinyurl.com/mr24fmye.  Such effects will accelerate in the coming years, "even if societies take further, dramatic actions" to reduce greenhouse gas emissions.  State Comment 7 (citing IPCC, *Climate Change 2022: Impacts, Adapt. & Vulnerability Summary for Policymakers* 17 (2022)).  Investors, therefore, need

information about the degree to which registrants are exposed to risks from these significant—and growing—impacts and how they are managing those risks.

This need for information about climate-related risks gives rise to several important interests of the States—all of which would be impaired by a decision vacating the Final Rule. *See, e.g.*, *Union Elec.*, 64 F.3d at 1168 (allowing intervention as of right where movants "presented a protectable interest that may, as a practical matter, be impaired in the disposition of the present litigation").

*First*, the States are themselves investors—with significant holdings in registered companies. State Comment 4-5. As of December 2023, for instance, Oregon had invested $15.5 billion of its public-pension funds in publicly registered companies.[6] Likewise, in 2023, New York State had $108 billion of its public-pension funds invested in such firms.[7] And the State of Michigan administers various retirement plans with a current fair market value of over $100 billion, some of which is invested in publicly registered companies.[8] By requiring certain registrants to provide comparable and reliable information about climate-related

---

[6] Ore. Inv. Council, Returns for Periods Ending December 2023: Oregon Public Employees Retirement Fund (Dec. 2023), https://tinyurl.com/3fp9bsj8.

[7] N.Y. State & Loc. Ret. Sys., 2023 Annual Comprehensive Financial Report for Fiscal Year Ended Mar. 31, 2023 at 111 (Sept. 30, 2023), https://tinyurl.com/mnwapdc3.

[8] State of Mich., Annual Comprehensive Financial Report for Fiscal Year Ended Sept. 30, 2023 (Feb. 15, 2024), https://tinyurl.com/268embwz.

impacts and risks, and about how they are managing those risks, the Final Rule will enable the States to more accurately benchmark the risk profile of their investments and more wisely manage their treasuries and employee-pension funds. *See* Decl. of Thomas P. Dinapoli, Comptroller of the State of N.Y. (Exh. A) ¶¶ 9-16 (attesting that state fiduciaries will benefit from reliable, comparable data about registrants' climate-related risks and mitigation strategies).

*Second*, the consistent, validated information required by the Final Rule will save the States time and resources that they would otherwise expend to obtain such information. To be sure, the States already seek to understand registered companies' exposure to climate-related risks. *See, e.g.*, Letter from Ill. State Treasurer 3-4 (May 31, 2022), https://tinyurl.com/4zd3z7fw; Letter from N.Y. Office of the State Comptroller 2-3 (June 8, 2021), https://tinyurl.com/mpv5kn9y. And some registrants, including a petitioner in this litigation,[9] already disclose information about their exposure to such risks. *See, e.g.*, 89 Fed. Reg. 21,677-78. But without standardized and validated disclosures, as the Final Rule requires, investors like the States have been limited in their ability to evaluate and compare data about climate-

---

[9] For example, Liberty Energy has disclosed certain climate-related risks, including regulatory risks from methane-emissions charges under the Inflation Reduction Act and reputational risks related to hydraulic fracturing. Form 10-K, *Liberty Energy Inc.*, U.S. Sec. Exch. Comm'n at 7, 16-17 (filed Feb. 9, 2024), https://tinyurl.com/d7a42w2h.

related risks.  *See id.* at 21,677-78, 21,842 & n.2669, 21,850 & n.2754.  As Vermont's Pension Investment Commission wrote in comments on the Proposed Rule, "[t]he human and physical capital required [to standardize data on climate-related risks from voluntary disclosures] is cost-prohibitive for public asset owners with limited staffing and budgets who are managing the retirement security of thousands of public servants."  Letter from Vt. Pension Inv. Comm'n 2 (May 16, 2022), https://tinyurl.com/muwys3ns.

The Final Rule addresses those limitations.  It does so by requiring that certain registrants gather the essential data to inform investors of their exposure to material climate-related risks in a consistent, comparable, and decision-useful format.  *See* 89 Fed. Reg. 21,679-80.  The States have a financial interest in obtaining that information without expending the time and resources necessary to compile such data from a vast number of sources.  *See* Decl. of Jill E. Schurtz, Exec. Dir & Chief Inv. Officer of Minn. State Bd. of Inv. (Exh. B) ¶¶ 10-19 (discussing the importance of information about climate-related risks and the difficulties of gathering such data with a system of mandatory disclosure); Exh. A ¶ 13 (same).

*Third*, and finally, the States have an interest in protecting their residents' investments and in promoting efficient markets within their state economies.  *See* State Comment 4.  Just as the Final Rule allows the States to better protect the public fisc, the Rule also allows residents to make more informed investment decisions and

more effectively diversify their portfolios. The resulting efficiencies will, in turn, likely benefit the States' economies and foster economic growth. *See* Decl. of Mike Pellicciotti, Washington State Treasurer (Exh. C) ¶¶ 9-11 (explaining how Washington's citizens and the State itself will significantly benefit from access to standardized and reliable information about climate-related risks).

For all these reasons, setting aside the Final Rule would impair the States' manifold interests in the Rule because the resulting loss of climate-risk information will make it significantly more difficult and expensive for the States and their residents to gather sufficient information to make prudent investment decisions. The States thus satisfy the interest requirements for intervention as of right. *See Turn Key*, 164 F.3d at 1082 ("It is enough under Rule 24(a) that [movants] could be prejudiced by an unfavorable resolution in later litigation.").

> 2. The States' interests may not be adequately represented by the parties in this case.

No existing party in this case can adequately represent the States' unique sovereign and quasi-sovereign interests. *See Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 60 F.3d 1304, 1309 (8th Cir. 1995) ("[W]e must resolve any remaining doubts regarding the propriety of intervention in [the movant's] favor.").

The inadequate representation element imposes only a "minimal burden." *Id.* It is satisfied where the movant's interests "may be" inadequately represented, regardless of any "tactical similarity" between the intervenor's "legal contentions"

and those "of a current party." *Sierra Club v. Robertson*, 960 F.2d 83, 85-86 (8th Cir. 1992) (internal quotation marks omitted). Nor are government agencies presumed to "adequately represent" interests that are "not subsumed within the general interests of the public." *South Dakota v. Ubbelohde*, 330 F.3d 1014, 1025 (8th Cir. 2003) (holding that the Army Corps of Engineers could not adequately represent Nebraska's interests because the Corps must "balance multiple interests"); *see Mille Lacs Band of Chippewa Indians v. Minnesota*, 989 F.2d 994, 1000-01 (8th Cir. 1993) (holding that counties' specific ownership interest in lands went beyond Minnesota's generalized interest in preserving natural resources).

Here, the SEC may not adequately represent the States' interests. Unlike the SEC, the States have a direct sovereign and financial interest in using information the Final Rule requires in their capacity as investors of state funds and employee-pension funds under state control. That duty to safeguard taxpayer dollars and state retirement funds is separate and distinct from the SEC's generalized interest in protecting investors and capital markets. *See Nat'l Parks*, 759 F.3d at 977 (distinguishing EPA's "broader responsibility" under the Clean Air Act from power-plant owner's financial interests). The same is true of the States' interest in the savings associated with the Final Rule's data-collection requirements, which is a unique financial interest since not all investors currently seek out climate-related risk data. *See Mille Lacs*, 989 F.2d at 1001 (holding that government entity may not

adequately represent interests "not shared by the general citizenry"). Accordingly, even if the States and the SEC generally agree that petitioners should not prevail, the States' interests are not subsumed by the SEC's interests or shared by the general citizenry, and thus they may not be adequately represented in this litigation.

## B. The States Also Satisfy the Standard for Permissive Intervention.

Permissive intervention is warranted when a movant's "claim or defense" shares at least one "common question of law or fact" with the "main action," and intervention will not "unduly delay or prejudice" the case. Fed. R. Civ. P. 24(b)(1)(B), (b)(3). Common questions of law and fact exist where a movant "seeks to uphold" the "same actions that Plaintiffs seek to overturn," even if the movant's "reasons for doing so are inherently different than those of Defendants." *Franconia Mins. (US) LLC v. United States*, 319 F.R.D. 261, 268 (D. Minn. 2017). Also, intervening in the "earliest stages" of a case generally will not "unduly delay or prejudice" the litigation. *Id.*; *see Coffey v. Comm'r*, 663 F.3d 947, 951-52 (8th Cir. 2011) (holding that "any potential delay" caused by allowing the U.S. Virgin Islands to permissively intervene in tax dispute would not be "undue").

These standards counsel permissive intervention here. Common questions of law and fact exist because the States seek to defend the very agency action that petitioners challenge (the Final Rule), and the States' defenses will be "directly responsive" to petitioners' claims. *Franconia*, 319 F.R.D. at 268 (internal quotation

marks omitted). Indeed, while some petitioners assert that the Final Rule exceeds the SEC's authority and violates the First Amendment, the States have already argued that the SEC has ample authority to require disclosure of climate-related risks and that doing so comports with the First Amendment. *See* State Comment 23-28. Allowing intervention at this early stage also will not cause undue delay or prejudice. *See Franconia*, 319 F.R.D. at 268 (recognizing that adding a new party "at the table" is not "'unduly' burdensome" by itself). And that is especially true since these consolidated agency cases will not involve discovery, extensive motions practice, or a trial. The States thus satisfy the standard for permissive intervention.

# CONCLUSION

This Court should grant the States' motion for leave to intervene.

Respectfully submitted,

ANDREA JOY CAMPBELL
Attorney General for Massachusetts

/s/ Glenn Kaplan
GLENN KAPLAN
Assistant Attorney General & Chief
Insurance and Financial Services
Division

JULIA JONAS-DAY
MICHELE HUNTON
Assistant Attorneys General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2453
glenn.kaplan@mass.gov
julia.jonas-day@mass.gov

April 2024

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK
Principal Deputy Solicitor General

BRYAN J. LEITCH
MARCELLA COBURN
Assistant Attorneys General
Office of the Solicitor General
Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 805-7426
ashwin.phatak@dc.gov

FOR THE STATE OF ARIZONA

KRISTIN K. MAYES
Attorney General for Arizona

/s/ Kristin K. Mayes
Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-7922
AGinfo@azag.gov

FOR THE STATE OF
CONNECTICUT

WILLIAM TONG
Attorney General for Connecticut

/s/ Kaelah M. Smith
KAELAH M. SMITH
Assistant Attorney General
Connecticut Attorney General's
Office
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
kaelah.smith@ct.gov

FOR THE STATE OF COLORADO

PHILIP J. WEISER
Attorney General for Colorado

SHANNON WELLS STEVENSON
Solicitor General

ERNEST LEE REICHERT III
Deputy Attorney General
Revenue and Regulatory Section

/s/ Shalyn Kettering
SHALYN KETTERING
Counsel to the Attorney General
Colorado Department of Law
Office of the Attorney General
1300 Broadway
Denver, CO 80203
(720) 508-6000

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General for Delaware

CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation

JILLIAN A. LAZAR
Director of Investor Protection

RALPH K. DURSTEIN III
Deputy Attorney General

/s/ Vanessa L. Kassab
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street

Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

FOR THE STATE OF HAWAII

ANNE E. LOPEZ
Attorney General of the State for Hawai'i

KALIKO'ONĀLANI D. FERNANDES
Solicitor General

/s/ Ewan C. Rayner
EWAN C. RAYNER
Deputy Solicitor General
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
ewan.rayner@hawaii.gov

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General for Maryland

/s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
Office of the Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General for Illinois

MATTHEW J. DUNN
Chief, Environmental Enforcement/ Asbestos Litigation Division

/s/ Jason E. James
JASON E. JAMES
Assistant Attorney General
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

FOR THE STATE OF MICHIGAN

DANA NESSEL
Attorney General for Michigan

AARON J. WALDEN
Assistant Attorney General

/s/ Michael E. Moody
MICHAEL E. MOODY
Assistant Attorney General
Special Litigation Division
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
moodym2@michigan.gov

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General for Minnesota

/s/ Peter N. Surdo
PETER N. SURDO
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1061
Peter.surdo@ag.state.mn.us

FOR THE STATE OF NEW
MEXICO

RAÚL TORREZ
Attorney General for New Mexico

WILLIAM GRANTHAM
Assistant Attorney General
Director, Environment Protection
Division

/s/ Aletheia V.P. Allen
ALETHIA V.P. ALLEN
Solicitor General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 527-2776
Aallen.@nmdoj.gov

FOR THE STATE OF NEVADA

AARON D. FORD
Attorney General for Nevada

/s/ Heidi Parry Stern
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General for New York

BARBARA D. UNDERWOOD
Solicitor General

ELIZABETH A. BRODY
Assistant Solicitor General

STEPHANIE L. TORRE
Assistant Attorney General
Executive Division

/s/ Jonathan Bashi
JONATHAN BASHI
Assistant Attorney General
Investor Protection Bureau
28 Liberty Street
New York, NY 10005
(212) 416-8564
Jonathan.Bashi@ag.ny.gov

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General for Oregon

STEVE NOVICK
Special Assistant Attorney General

/s/ Paul Garrahan
PAUL GARRAHAN
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.state.or.us

FOR THE STATE OF VERMONT

CHARITY R. CLARK
Attorney General for Vermont

/s/ Hannah Yindra
HANNAH YINDRA
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General for Rhode Island

SARAH W. RICE
Deputy Chief, Public Protection Bureau

/s/ Alison Carney
ALISON CARNEY
Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General for Washington

SARAH REYNEVELD
Managing Assistant Attorney General
Environmental Protection Division

/s/ Yuriy Korol
YURIY KOROL
Assistant Attorney General
Environmental Protection Division
Washington State Attorney General's Office
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General for Wisconsin

/s/ Bradley J. Motl
BRADLEY J. MOTL
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-0505
motlbj@doj.state.wi.us

## CERTIFICATE OF SERVICE

I certify that on April 3, 2024, this motion was served on all parties via this

Court's CM/ECF system.

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK
Principal Deputy Solicitor General
Office of the Solicitor General
Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 805-7426
ashwin.phatak@dc.gov

**CERTIFICATE OF COMPLIANCE**

I certify that this motion complies with the type-volume limitation in Federal Rule of Appellate Procedure 27(d)(2)(A) because the brief contains 4,827 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

I also certify that this document has been scanned for viruses using the Microsoft Defender virus-scan software and is virus free.

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK
Principal Deputy Solicitor General
Office of the Solicitor General
Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 805-7426
ashwin.phatak@dc.gov

# ATTACHMENTS



# EXHIBIT A

No. 24-1522 and all consolidated cases: Nos. 24-1623, 24-1624, 24-1626, 24-1627, 24-1628, 24-1631, 24-1633, and 24-1634

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHT CIRCUIT

STATE OF IOWA, *et al.*,
Petitioners,

v.

SECURITIES AND EXCHANGE COMMISSION,
Respondent.

ON PETITION FOR REVIEW OF AN ORDER AND RULE OF THE
SECURITIES AND EXCHANGE COMMISSION

**DECLARATION OF THOMAS P. DINAPOLI,** Comptroller of the State of New York, as Administrative Head of the New York State and Local Retirement System, and as Trustee of the New York State Common Retirement Fund

I, Thomas P. DiNapoli, declare of my personal knowledge as follows:

1.    I am the elected Comptroller of the State of New York. As Comptroller, I also serve as Administrative Head of the New York State and Local Retirement System, and Trustee of the New York State Common Retirement Fund ("NYSCRF" or "The Fund").

2.    I have served as the New York State Comptroller since February 7, 2007.

3.    I am submitting this declaration in support of Movant Intervenor-Respondent States' motion to intervene in these consolidated cases challenging the Securities and Exchange Commission's (SEC) final rule entitled *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, Release Nos. 33-11275 & 34-99678 (Mar. 6, 2024), 89 Fed. Reg. 21,668 (Mar. 28, 2024) ("Final Rule").

1

4. In my role as Trustee of the Fund, I am responsible for the investment and management of the Fund's assets. I carry out this function with the assistance of the Chief Investment Officer and her professional staff who manage the assets on a day-to-day basis, together with internal counsel, external counsel, consultants, and external advisory committees. I determine investment policies and approve investments and the hiring of all investment managers.

5. NYSCRF is one of the largest public pension funds in the United States and holds the assets of the New York State and Local Retirement System. The estimated value of the Fund's assets was $259.9 billion as of December 31, 2023.

6. NYSCRF's general investment objectives are as follows:

    a. Provide the means, together with employee and employer contributions, to pay benefits, when due, to over 1.2 million New York State and Local Retirement System members, retirees and beneficiaries.

    b. Seek to optimize long-term risk-adjusted returns, consistent with liquidity and diversification parameters that are prudent under existing circumstances.

    c. Invest according to an asset allocation that provides for the diversification of assets.

    d. Invest assets efficiently, bearing in mind the impact of management and transaction costs on the return of the assets.

    e. Exercise all investor responsibilities on behalf of the Fund, including voting of proxies, in the best long-term interests of the Fund and in accordance with the applicable statutes and its voting guidelines.

7. NYSCRF's portfolio is well diversified and includes fixed income assets, public equities, and alternative investments (private equity, real estate, real assets, credit, and opportunistic/absolute return strategy funds).

8. As of fiscal year-end March 31, 2023, the fair values of our domestic and international public equity portfolios were over $75 billion and $33 billion, respectively, and the fair value of our global fixed income holdings were over $48 billion.

9.      Climate change is now widely recognized to pose significant risks of loss to the overall economy, impacting the value of a fund's current and potential investments. Accordingly, addressing climate-related investment risks and opportunities is an important component of my fiduciary duty as trustee of the Fund.

10.     It is my understanding that the Final Rule requires registered companies to disclose information regarding climate-related risks on their business, operations, and financial condition.

11.     To fully understand this risk, fiduciaries require good information from the companies they invest in related to both physical risks that may exist due to the changing climate, the risks that policies developed to mitigate climate change may pose to the company, and the plans that companies have put in place to mitigate this risk. This is why I previously called on the SEC to take steps, including mandatory disclosure of climate risk information, to protect investors and the broader marketplace.

12.     Further, the Fund's Climate Action Plan that I adopted in 2019 with significant input from investment, financial, environmental, energy, and legal experts, is intended to safeguard the Fund's investments, and the data that companies will provide under the new rule will facilitate meeting the Plan's goals and greatly improve the Fund's ability to assess and address climate-related investment risks and opportunities. These disclosures will allow NYSCRF to make even better-informed decisions about investments, proxy voting, and engagements with portfolio companies.

13.     The Fund's current practice for proxy voting, shareholder proposal research, engagement preparation, and climate risk assessments is to collect relevant data from a variety of data sources including companies' websites, sustainability reports and financial filings, CDP

3

reporting, and third-party data providers. Although Fund staff reaches out to individual companies to obtain such information, not every company is willing to respond to and engage with us. As such, this approach consumes time and resources without providing the Fund with complete data.

14. The full suite of disclosures required by the final rule will be useful to the Fund's efforts to mitigate climate-related investment risks to the Fund. In addition to the phased-in disclosure of Scope 1 and 2 emissions by larger companies, other disclosures that will be of significant value to NYSCRF include information about climate-related risks and activities to mitigate or adapt to such risks, board oversight of climate-related risks, climate-related targets or goals, and the risks and costs of physical impacts including severe weather, wildfires, drought, and sea level rise.

15. The consistent, comparable, and reliable information provided by companies pursuant to the provisions of the SEC's recently adopted Climate Change Disclosure Rule provides investors, including the NYSCRF, with better data for a clearer understanding of how climate change and the transition to a net-zero economy will impact their investments in order to make fully informed investment decisions.

16. In conclusion, the Final Rule will improve the Fund's ability to prudently manage and protect its investments.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Albany, New York on April 3, 2024.


Thomas P. DiNapoli
New York State Comptroller

# EXHIBIT B

24-1522 and all consolidated cases: Nos. 24-1623, 24-1624, 24-1626, 24-1627, 24-1628, 24-1631, 24-1633, and 24-1634

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHT CIRCUIT

STATE OF IOWA, *ET AL.*,
PETITIONERS,

V.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT.

ON PETITION FOR REVIEW OF AN ORDER AND RULE OF THE
SECURITIES AND EXCHANGE COMMISSION

**DECLARATION OF THE EXECUTIVE DIRECTOR AND CHIEF INVESTMENT
OFFICER OF THE MINNESOTA STATE BOARD OF INVESTMENT**

I, Jill E. Schurtz, declare of my personal knowledge as follows:

1.     I currently serve as the Executive Director and Chief Investment Officer (CIO) of the Minnesota State Board of Investment (MSBI), which invests over $138 billion (as of December 31, 2023) on behalf of Minnesota state pension plans, state government funds, non-retirement programs, and state-sponsored savings plans.

2.     I have served as the MSBI CIO since October 2022 and immediately prior served as the Chief Executive Officer and Chief Investment Officer of the Saint Paul Teachers Retirement Fund Association (SPTRFA) from June 2014 to September 2022.

1

3.　　　In my role as the MSBI CIO, I am directly responsible for the investment, oversight, and stewardship of the MSBI's $138 billion investment portfolios, implementation of the board's directives, and leadership of the SBI staff, including its investment staff.

4.　　　I am a 1986 graduate of the United States Military Academy at West Point. Following graduation, I served as a commissioned officer in the U.S. Military, attaining the rank of Captain. Upon the completion of military service, I attended and graduated from Columbia Law School.

5.　　　I have extensive experience in institutional asset management, in both my roles as the CIO of the MSBI and SPTRFA as well as my role as CEO of Robeco-Sage, an alternatives investment firm. My prior professional experiences also include practicing law at Skadden, Arps, Slate, Meagher, and Flom, investment banking with Piper Jaffray, and the technical research team at Knight Capital Markets. Additionally, I have and am currently serving on a number of profit and non-profit investment committees, including the West Point Association of Graduates Investment Committee, which I have served on since 2014. In each of these roles, the ability to carefully evaluate all material investment risks and opportunities was paramount.

6.　　　My professional roles have also involved the consideration and evaluation of asset allocation and portfolio construction in light of the risks and opportunities associated with climate change. I have worked with investment consultants, investment analysts, and stakeholders to assess and consider climate-related risks and opportunities, along with a variety of other factors. I strive to take a reasoned and pragmatic approach to address various risks and opportunities, based on consistent, reliable, and standardized data. I believe it is imperative to have access to such data when making investment decisions.

7.      I am submitting this declaration in support of Movant Intervenor-Respondent States' motion to intervene in these consolidated cases challenging the Securities and Exchange Commission's (SEC) final rule entitled *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, Releases Nos. 33-11275 & 34-99678 (Mar. 6, 2024), 89 Fed. Reg. 21,668 (Mar. 28, 2024) ("Final Rule" or "Rule").

8.      As I understand it, the Final Rule requires registered companies to disclose information regarding climate-related risks on their business, operations, and financial condition.

9.      In my opinion, the standardized, comparable, and reliable data that will be provided by registered companies under the Final Rule will provide a benefit to investors.

10.      By way of background, the MSBI is entrusted with managing $138 billion on behalf of state pension plans, state government funds, non-retirement programs, and state-sponsored savings plans.  Among other things, these plans help provide retirement security for over 800,000 Minnesota public employees.  Pursuant to Minnesota law, the MSBI acts as a fiduciary on behalf of the pension plans and the plan participants.  The MSBI has an obligation to invest the assets of the pension plan prudently and is required to evaluate all material risks and opportunities associated with an investment.  In connection with its fiduciary duties, the MSBI maintains a set of investment beliefs, which includes a belief that "Utilizing engagement initiatives to address environmental, social, and governance-related (ESG) issues can lead to positive portfolio and governance outcomes."

11.      The MSBI is increasingly aware of the material risks that climate change presents to the financial markets in which we operate and our investment portfolios.  Many businesses are already experiencing physical impacts from climate change, including more frequent and severe weather events that impact operations.  As global greenhouse gas emissions remain high and

continue to increase, it is the MSBI's expectation that these events will become significantly more disruptive to businesses in the future. Accordingly, the consideration of climate risk factors will remain an important component of our investment framework.

12. In 2019, the MSBI partnered with Meketa Investment Group ("Meketa") to evaluate the potential implications of climate change on the long-term investment risks associated with its portfolio. Subsequently, in August 2022, Meketa published another investment analysis report centered on climate change, accentuating both risks and opportunities inherent in the MSBI portfolio. At present, the MSBI is developing a Climate Change Roadmap (the "Climate Roadmap") to provide transparency and clarity regarding the MSBI's approach to executing on its fiduciary duty regarding the risks and opportunities related to climate change. As reflected in the Climate Roadmap, we believe access to reliable data is essential for us to make value-maximizing investment decisions as climate change affects companies, the financial markets in which we operate, and the MSBI's investment portfolio.

13. In order to make prudent investment decisions, the MSBI considers a variety of factors that it determines are material. To date, MSBI efforts to measure and engage on climate-related risks and opportunities have been constrained due to lack of consistent, reliable, and comparable information from companies. In particular, the lack of such information makes it challenging for the MSBI and its investment managers to evaluate the impact of emissions and estimate the potential physical impacts of climate change on companies in the MSBI's investment portfolio.

14. Comparable and reliable disclosure of Scope 1 and Scope 2 emissions are important to the MSBI's evaluation of investments. Emissions information will better enable the MSBI and its investment managers to make appropriate judgements about the relative value of

competing companies due to financial, reputational, and regulatory risks associated with their emissions levels. Such risks can impact the value of a company's stock. Likewise, a company's ability to reduce its emissions over time can result in greater value for shareholders as these risks are mitigated.

15.      While emissions present a risk to the MSBI's portfolio, physical risks to property due to climate change are the MSBI's most significant long-term concern. MSBI staff has conducted extensive research to assess the services and products from various providers who specialize in physical climate change risk data, seeking those with the capability to deliver accurate, credible insights rooted in cutting-edge climate science models. Ideally, investors should be able to integrate a variety of factors into their diligence, including property-level data, asset location, supply chain exposure, and revenue impacts to develop estimated security value repercussions from various climate change-related situations. It has been difficult, however, to obtain sufficient information to conduct this analysis due to lack of comprehensive reporting from companies on the locations and nature of the properties they own.

16.      In June 2022, the MSBI submitted a comment letter to the SEC regarding the proposed version of the Rule. The letter emphasized the importance of public companies disclosing current and projected future impacts of climate-related physical events.

17.      The Final Rule would provide more comprehensive and reliable data on physical risk than is currently available and significantly contribute to the MSBI's ability to make prudent investment decisions in the event that climate change continues to accelerate as is currently predicted. For example, the Final Rule requires that registrants disclose expenditures and capitalized costs due to severe weather events and other natural conditions. In addition,

registrants would be required to describe any material impacts on financial estimates and assumptions that directly result from activities to mitigate or adapt to the risks.

18.     Of note, the Final Rule requires disclosure of both short-term and long-term physical risks related to climate change. With respect to physical risk, the Final Rule requires companies to disclose the geographic location and nature of properties, processes, or operations subject to the physical risk. The Final Rule also establishes definitions for companies to use when identifying climate-related risks, how they report on these risks to investors, and how they are managing these risks. For investors like the MSBI, who utilize engagement efforts to promote best practices, the disclosure of governance mechanisms for the management climate-related risks and opportunities is especially important. Additionally, the comparable disclosures on governance in the Final Rule will provide material information that will improve the MSBI's ability to select appropriate companies for our engagement efforts.

19.     Therefore, it is my professional opinion that the Final Rule will significantly benefit investors by providing decision-useful information. Conversely, by preventing access to comprehensive data necessary for informed portfolio risk assessment, challenges to these enhanced disclosure requirements concerning climate-related risk will harm institutional investors like the MSBI and the broader investment community.

20.     Moreover, all investors deserve access to the information that this rule requires. The lack of comparable and reliable information prevents investment analysts from making informed decisions and disrupts the ability of market forces to properly price in risks and opportunities related to climate change. Properly functioning markets are key to the MSBI's ability to meet its mission of providing retirement security to over 800,000 workers and their families.

21.     In conclusion, the Final Rule will improve the MSBI's ability to prudently manage the investment assets entrusted to our care.  As institutions continue to evaluate their response to climate-related risks, uniform disclosures embodied in the Final Rule are critical.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Saint Paul, Minnesota on April 3, 2024.

_____

Jill E. Schurtz
Executive Director and Chief Investment Officer
Minnesota State Board of Investment

# EXHIBIT C

No. 24-1522 and all consolidated cases: Nos. 24-1623, 24-1624, 24-1626, 24-1627,
24-1628, 24-1631, 24-1633, and 24-1634

──────────────

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

──────────────

STATE OF IOWA, *et al.*,
PETITIONERS,
V.
SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT.

──────────────

ON PETITION FOR REVIEW OF AN ORDER AND RULE OF THE
SECURITIES AND EXCHANGE COMMISSION

──────────────

**DECLARATION OF MIKE PELLICCIOTTI**

I, Mike Pellicciotti, declare of my personal knowledge as follows:

1.      I am the elected Washington State Treasurer.

2.      I was elected State Treasurer in 2020.

3.      My office is dedicated to promoting financial transparency, protecting

Washington's financial health, and leading policies that best serve our state's working families

and retirees.

4.      I am Washington's chief financial officer and oversee the Office of the State

Treasurer ("OST").  OST manages investments, debt, and cash for the State of Washington and

leads policy initiatives affecting the state's long-term fiscal health.

5.      I have a Bachelor's Degree in Business Administration from Alfred University

and received my Master's in Rural Development as a United States Fulbright Scholar from

Brandon University.  I also received my Juris Doctor from Gonzaga University.

6.      Before being elected Washington State Treasurer, I served for two terms as a State Representative for the 30th Legislative District where I led efforts to increase penalties for corporate crime and increase government transparency.

7.      I also served as an Assistant Attorney General for over seven years where I managed the prosecution of corporate health care fraud and elder abuse in Washington.

8.      I am submitting this declaration in support of in support of Movant Intervenor-Respondent States' motion to intervene in these consolidated cases challenging the Securities and Exchange Commission's (SEC) final rule entitled *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, Release Nos. 33-11275 & 34-99678 (Mar. 6, 2024), 89 Fed. Reg. 21,668 (Mar. 28, 2024) ("Final Rule").

9.      As I understand it, the Final Rule requires registered companies to disclose information regarding climate related risks on their business, operations, and financial condition.

10.      In my opinion, the standardized, comparable, and reliable data that will be provided by registered companies under the Final Rule will provide a significant benefit to Washington's citizens and the state itself.  Disclosure of climate risks will allow Washington citizens to enjoy more wealth and financial stability from prudent investment decisions that take climate-related risks into account.  Wealthier citizens who are secure in their finances benefit Washington's economy, and rising tax revenues from a stronger economy allow the State to better fund services for its citizens.

11.      The Washington State Legislature has explicitly recognized the economic and investment risk to Washington when public investors are prevented from making informed decisions based on relevant factors like climate-related risks and corporate responses to these risks.  OST has been tasked by the Washington State Legislature with studying the risk posed by

laws in other jurisdictions that explicitly bar public investors from making these considerations. Preventing the Final Rule from taking effect will have a similar impact by keeping critical information from public investors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Olympia, Washington on April 3, 2024.

Mike Pellicciotti
Washington State Treasurer