Nos. 24-1522, 24-1627, 24-1631, 24-1634

IN THE
# United States Court of Appeals for the Eighth Circuit

---

STATE OF IOWA, ET AL.,

*Petitioners*,

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

DISTRICT OF COLUMBIA, ET AL.,

*Intervenors.*

---

On Petitions for Review of an Order and Rule
of the Securities and Exchange Commission

---

## CONSOLIDATED BRIEF OF STATE PETITIONERS

---

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*
PATRICK C. VALENCIA
*Deputy Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-8770
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

June 21, 2024

*Counsel for State of Iowa*

*\*Additional counsel listed in
signature block*

## SUMMARY AND STATEMENT REGARDING ORAL ARGUMENT

The Securities and Exchange Commission lacks statutory authority to mandate climate-related disclosures. Congress declined to grant SEC that authority. For decades, SEC admitted it lacked that authority. But now, without acknowledging its drastic reversal, and without a reasoned explanation to justify it, SEC asserts it had that power all along.

SEC is acting beyond its authority. Its Rule attempts to address a major question without the necessary authorization from Congress. It rewrites the decades-old materiality standard undergirding SEC's mandated financial disclosures. And its view of SEC's power would allow the agency to regulate most anything.

Making matters worse, the Rule is arbitrary and capricious at least four times over.

SEC's Rule has implications across our Nation's economy. It will increase the typical costs of being a public company by around 21%, to the tune of billions of dollars. All without congressional authorization. This case warrants oral argument. State Petitioners request 30 minutes.

i

# CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1, the undersigned counsel certifies as follows:

Petitioner American Free Enterprise Chamber of Commerce ("AmFree") (8th Cir. Case No. 24-1522), is a non-profit, tax-exempt entity organized in the manner allowed by Section 501(c)(6) of the Internal Revenue Code. AmFree has no parent corporation, and no publicly held company has 10% or greater ownership in AmFree.

June 21, 2024

*/s/ R. Trent McCotter*
R. TRENT MCCOTTER

*Counsel for Petitioner AmFree*

Appellate Case: 24-1522     Page: 3     Date Filed: 06/21/2024 Entry ID: 5405801

# TABLE OF CONTENTS

**Page**

SUMMARY AND STATEMENT REGARDING ORAL ARGUMENT ......................................................................... i

CORPORATE DISCLOSURE STATEMENT ........................................... ii

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES .................................................................. v

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES FOR REVIEW ...................................... 2

INTRODUCTION .............................................................................. 4

STATEMENT OF THE CASE ............................................................... 7

      A.   Federal Securities Disclosure Laws Have Long Turned On The Concept of Financial Materiality. ........................................................ 7

      B.   The Rule Mandates Non-Financial Climate-Related Disclosures Regardless of Materiality. ................................................. 10

      C.   Petitioners Sue To Vacate The Rule. ........................... 13

SUMMARY OF THE ARGUMENT ..................................................... 14

STANDARD OF REVIEW ................................................................. 17

ARGUMENT ................................................................................... 18

  I.   CONGRESS DID NOT GIVE SEC POWER TO ISSUE THE RULE .................................................................... 18

      A.   The Securities Act And Exchange Act Do Not Authorize The Rule. .......................................... 19

iii

B.    The Major Questions Doctrine Confirms The Rule Is Out Of Bounds. ................................. 28

II.    THE RULE IS ARBITRARY AND CAPRICIOUS. .............. 42

A.    SEC Has Not Provided A Reasoned Explanation For Changing Its Position. ...................... 42

B.    The Rule Fails To Explain Why Preexisting Regulations Are Inadequate. ....................................... 44

C.    The Rule Is Not Supported By Substantial Evidence. ............................................................ 47

D.    SEC Did Not Provide Notice Of The Scientific Research It Relied On In The Rule. .............................................................. 52

CONCLUSION ....................................................................... 54

CERTIFICATE OF COMPLIANCE ........................................... 61

CERTIFICATE OF SERVICE .................................................. 62

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. DHHS,*
594 U.S. 758 (2021) ....................................................... 2, 22, 31, 34, 37

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
522 U.S. 359 (1998) ................................................................. 3, 47

*Am. Equity Inv. Life Ins. Co. v. SEC.,*
613 F.3d 166 (D.C. Cir. 2010) .................................................. 44

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988) ............................................................... 8, 26

*Biden v. Nebraska,*
600 U.S. 477 (2023) ......................................... 2, 24, 28, 31, 35, 37, 41

*BNSF Ry. Co. v. DOL ARB,*
867 F.3d 942 (8th Cir. 2017) ................................................... 47

*Bond v. United States,*
572 U.S. 844 (2014) ............................................................... 38

*BST Holdings, LLC v. OSHA,*
17 F.4th 604 (5th Cir. 2021) ................................................... 35

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ............................................................... 47

*Bus. Roundtable v. SEC,*
647 F.3d 1144 (D.C. Cir. 2011) ...................................... 3, 17, 46, 48, 49

*Bus. Roundtable v. SEC,*
905 F.2d 406 (D.C. Cir. 1990) ............................................ 21, 39

*Calcutt v. FDIC,*
598 U.S. 623 (2023) ............................................................... 53

*Chamber of Com. of U.S. v. SEC,*
443 F.3d 890 (D.C. Cir. 2006) ................................................ 52

*Circuit City Stores, Inc. v. Adams,*
532 U.S. 105 (2001) ............................................................... 20

*Connecticut Light & Power Co. v. NRC,*
673 F.2d 525 (D.C. Cir. 1982) ................................................ 52

*CTS Corp. v. Dynamics Corp. of Am.,*
481 U.S. 69 (1987) ................................................................. 39

Appellate Case: 24-1522     Page: 6     Date Filed: 06/21/2024 Entry ID: 5405801

*DiLeo v. Ernst & Young,*
901 F.2d 624 (7th Cir. 1990).................................................23

*Encino Motorcars, LLC v. Navarro,*
579 U.S. 211 (2016)....................................................3, 42

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009)..............................................3, 42, 44

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000)......................................28, 30, 35, 41

*FEC v. Cruz,*
596 U.S. 289 (2022).................................................18

*First Nat'l Bank of Bos. v. Belloti,*
435 U.S. 765.........................................................38

*FTC v. Bunte Bros., Inc.,*
312 U.S. 349 (1941)...........................................33, 35

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.,*
594 U.S. 113 (2021)................................................27

*Gonzales v. Oregon,*
546 U.S. 243 (2006)...........................................34, 35

*Gregory v. Ashcroft,*
501 U.S. 452 (1991)................................................38

*Gutierrez v. Ada,*
528 U.S. 250 (2000)................................................19

*In re Bernard L. Madoff Inv. Sec. LLC,*
12 F.4th 171 (2d Cir. 2021).......................................33

*In re Cajun Elec. Power Co-op, Inc.,*
185 F.3d 446 (5th Cir. 1999)....................................19

*In re Certified Questions,*
958 N.W.2d 1 (Mich. 2020) ......................................22

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
448 U.S. 607 (1980)................................................40

*Kahan v. Rosenstiel,*
424 F.2d 161 (3d Cir. 1970) ....................................22

*Kamen v. Kemper Fin. Servs., Inc.,*
500 U.S. 90 (1991)................................................38

*King v. Burwell,*
576 U.S. 473 (2015)...........................................34, 37

Appellate Case: 24-1522     Page: 7     Date Filed: 06/21/2024 Entry ID: 5405801

**Page(s)**

*Kisor v. Wilkie,*
588 U.S. 558 (2019) ........................................................ 33, 34

*Laccetti v. SEC,*
885 F.3d 724 (D.C. Cir. 2018) ........................................ 17

*Marine Bank v. Weaver,*
455 U.S. 551 (1982) ........................................................ 23

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,*
512 U.S. 218 (1994) ........................................................ 30

*Morall v. DEA,*
412 F.3d 165 (D.C. Cir. 2005) ........................................ 18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
*State Farm Mut. Auto. Ins.,*
463 U.S. 29 (1983) .................................................. 18, 42, 47

*N.Y. Cent. Sec. Corp. v. United States,*
287 U.S. 12 (1932) ........................................................ 21

*N.Y. Shipping Ass'n, Inc. v. Fed. Mar. Comm'n,*
854 F.2d 1338 (D.C. Cir. 1988) ...................................... 46

*NAACP v. FPC,*
425 U.S. 662 (1976) ...................................................... 2, 21

*Nat'l Fuel Gas Supply Corp. v. FERC,*
468 F.3d 831 (D.C. Cir. 2006) .............................. 47, 48, 51

*Nat'l Rev., Inc. v. Mann,*
114 S. Ct. 344 (2019) .................................................... 34

*NBC v. United States,*
319 U.S. 190 (1943) ...................................................... 22

*NFIB v. OSHA,*
595 U.S. 109 (2022) ...................................................... 32

*Radzanower v. Touche Ross & Co.,*
426 U.S. 148 (1976) ...................................................... 33

*Santa Fe Indus., Inc. v. Green,*
430 U.S. 462 (1977) ...................................................... 38

*SEC v. Lauer,*
52 F.3d 667 (7th Cir. 1995) .......................................... 33

*SEC v. W.J. Howey Co.,*
328 U.S. 293 (1946) ...................................................... 26

*Solite Corp. v. EPA,*
952 F.2d 473 (D.C. Cir. 1991) ...................................... 52

Appellate Case: 24-1522     Page: 8     Date Filed: 06/21/2024 Entry ID: 5405801

# TABLE OF AUTHORITIES—Continued

*Sugule v. Frazier,*
639 F.3d 406 (8th Cir. 2011).......................................47, 48

*Texas v. EPA,*
2023 WL 7204840 (5th Cir. May 1, 2023)...........................53

*Touby v. United States,*
500 U.S. 160 (1991)......................................................21

*TSC Indus., Inc. v. Northway, Inc.,*
426 U.S. 438 (1976)..............................8, 23, 25, 26

*United Hous. Found. v. Forman,*
421 U.S. 837 (1975)...............................................22, 33

*United States v. District of Columbia,*
669 F.2d 738 (D.C. Cir. 1981).......................................28

*Universal Health Servs., Inc. v. United States,*
579 U.S. 176 (2016).....................................................25

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014).........................................29, 36, 37

*Wash. State Dep't of Soc. & Health Servs. v.
Guardianship Est. of Keffeler,*
537 U.S. 371 (2003)......................................................20

*West Virginia v. EPA,*
90 F.4th 323 (4th Cir. 2024)..........................................53

*West Virginia v. EPA,*
597 U.S. 697 (2022)................2, 28, 29, 31, 33, 34, 37, 38, 39, 40, 41

*Zacarias v. Stanford Int'l Bank, Ltd.,*
945 F.3d 883 (5th Cir. 2019).........................................33

## Statutes

5 U.S.C. § 553.....................................................................52
5 U.S.C. § 702......................................................................2
5 U.S.C. § 706............................................................17, 53
15 U.S.C. § 77g..........................................1, 2, 19, 20, 40
15 U.S.C. § 77i......................................................................1
15 U.S.C. § 77j......................................................................1
15 U.S.C. § 77q.....................................................................8
15 U.S.C. § 77s......................................................................1
15 U.S.C. § 77z-3..................................................................1
15 U.S.C. § 77aa................................................................20

Appellate Case: 24-1522     Page: 9     Date Filed: 06/21/2024 Entry ID: 5405801

**Page(s)**

15 U.S.C. § 78c-2 ...............................................................1
15 U.S.C. § 78*l* ..............................................1, 2, 19, 21
15 U.S.C. § 78m ...........................................................1, 41
15 U.S.C. § 78n ................................................................1
15 U.S.C. § 78o ................................................................1
15 U.S.C. § 78w ...............................................................1
15 U.S.C. § 78y ................................................................2
15 U.S.C. § 78mm ............................................................1
28 U.S.C. § 2112 ........................................................1, 14
42 U.S.C. § 7414 ................................................4, 43, 46
42 U.S.C. § 7607 .............................................................17
8 Del. Code § 141 ..........................................................39

## Regulations

17 C.F.R. § 229.103 ........................................................24
17 C.F.R. § 240.12b-20 ...................................................50
*Disclosures Pertaining to Matters Involving
    the Environment and Civil Rights*, Exchange
    Act Release No. 5170, 1971 WL 127132 (July 19, 1971)......................9
*Commission Conclusions and Rule Making
    Proposals,* Securities Act Release No.5627,
    Exchange Act Release No. 11733,
    [1975-1976 Transfer Binder] Fed. Sec. L. Rep.
    (CCH) P80,310, 85,713 (Oct. 14, 1975)................................31
*Environmental and Social Disclosure, Notice
    of Commission Conclusions and Rulemaking
    Proposals*, 40 Fed. Reg. 51,656 (Nov. 6, 1975) ......................4, 9, 31, 43
*Commission Guidance Regarding Disclosure
    Related to Climate Change*, Exchange Act Release
    No. 33-9106, 75 Fed. Reg. 6,290 (Feb. 8, 2010)...................4, 10, 32, 45
*Business and Financial Disclosure Required
    by Regulation S-K*, 81 Fed. Reg. 23,916 (Apr. 22, 2016)...............20, 32
*The Enhancement and Standardization of
    Climate-Related Disclosures for Investors*,
    87 Fed. Reg. 21,334 (Apr. 11, 2022)........................................10, 48, 52

Appellate Case: 24-1522    Page: 10    Date Filed: 06/21/2024 Entry ID: 5405801

<u>**Page(s)**</u>

*The Enhancement and Standardization of*
  *Climate-Related Disclosures for Investors,*
  Securities Act Release No. 33-11275 (Mar. 6, 2024),
  *published at* 89 Fed. Reg. 21,668 (Mar. 28, 2024).... 1, 5, 10, 11, 19, 24,
  26, 27, 30, 32, 36, 37, 38, 39, 40, 43, 44, 46, 48, 49, 52

Appellate Case: 24-1522    Page: 11    Date Filed: 06/21/2024 Entry ID: 5405801

# STATEMENT OF JURISDICTION

This case is before the Court on petitions for review of a final rule of the Securities and Exchange Commission, released on March 6, 2024. *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, Securities Act Release No. 33-11275 (Mar. 6, 2024), *published at* 89 Fed. Reg. 21,668 (Mar. 28, 2024). The Rule was adopted under 15 U.S.C. §§ 77g, 77j, 77s, 77z-3, 78c-2, 78l, 78m, 78n, 78o, 78w, 78mm.

State Petitioners timely filed their petitions for review in this Court on March 12, 2024, (8th Cir. Case No. 24-1522), in the U.S. Court of Appeals for the Fifth Circuit on March 6, 2024 (8th Cir. Case No. 24-1627), in the U.S. Court of Appeals for the Sixth Circuit on March 13, 2024 (8th Cir. Case No. 24-1631), and in the U.S. Court of Appeals for the Eleventh Circuit on March 6, 2024 (8th Cir. Case No. 24-1634). Under 28 U.S.C. § 2112(a), petitions were consolidated in this Court by the Judicial Panel on Multidistrict Litigation.

This Court has jurisdiction under 28 U.S.C. § 2112(a), Section 9 of the Securities Act of 1933, 15 U.S.C. § 77i, Section 25(b) of the Securities

1

Exchange Act of 1934, 15 U.S.C. § 78y(b), and Section 702 of the Administrative Procedure Act, 5 U.S.C. § 702.

## STATEMENT OF THE ISSUES FOR REVIEW

1. Whether SEC exceeded its authority when it enacted the Rule, which attempts to address a major question without clear authorization from Congress.

   **Cases**:

   *Biden v. Nebraska*, 600 U.S. 477 (2023)

   *West Virginia v. EPA*, 597 U.S. 697 (2022)

   *Ala. Ass'n of Realtors v. DHHS*, 594 U.S. 758 (2021).

   *NAACP v. FPC*, 425 U.S. 662 (1976)

   **Statutes**:

   15 U.S.C. § 77g(a)(1)

   15 U.S.C. § 78*l*(b), (g)

2. Whether SEC's Rule is arbitrary and capricious because SEC failed to recognize its drastic change in position, failed to explain why its existing regulatory regime is inadequate, failed to support its rule with substantial evidence, and failed to give notice of certain scientific research on which it relied.

2

**Cases**:

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359 (1998)

*Bus. Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011)

Appellate Case: 24-1522    Page: 14    Date Filed: 06/21/2024 Entry ID: 5405801

## INTRODUCTION

For more than fifty years, SEC conceded that it lacked authority to require blanket climate-related disclosures. *See, e.g.*, *Environmental and Social Disclosure, Notice of Commission Conclusions and Rulemaking Proposals*, 40 Fed. Reg. 51,656, 51,657, 51,662 (Nov. 6, 1975) (inappropriate to require "comprehensive disclosure of the environmental effects of corporate activities"); *Commission Guidance Regarding Disclosure Related to Climate Change*, Exchange Act Release No. 33-9106, 75 Fed. Reg. 6,290 (Feb. 8, 2010). Recently, Congress declined to pass legislation granting SEC just that power. *See, e.g.*, Climate Risk Disclosure Act, H.R. 2570, 117th Cong. (2021); Climate Risk Disclosure Act, S. 3481, 115th Cong. (2018); *cf.* 42 U.S.C. § 7414 (granting Environmental Protection Agency authority to require emissions disclosures).

President Biden was unsatisfied with this long-standing state of affairs. So in late 2021, he announced a "whole-of-government approach" to advance the Administration's "climate agenda"—even "without Congress." The White House, *Press Briefing by Principal Deputy Press Secretary Karine Jean-Pierre* (Oct. 21, 2021), http://tiny.cc/em4mxz.

4

Within months, SEC proposed the now-final rule here, which broke with decades of practice and announced SEC could, and would, mandate climate-related disclosures. *See The Enhancement and Standardization of Climate-Related Disclosures for Investors,* Securities Act Release No. 33-11275 (Mar. 6, 2024), *published at* 89 Fed. Reg. 21,668 (Mar. 28, 2024) ("Rule").

The Rule mandates extensive qualitative and quantitative disclosures relating to non-financial "climate-related risks," "climate-related targets and goals," "greenhouse-gas emissions," and more. 89 Fed. Reg. at 21,669–76 (Introduction and Rule Summary). Companies now must collect, process, and report vast amounts of climate-related information—including their greenhouse-gas emissions and forward-looking, speculative predictions of climate impacts on their business outlook. Companies must, for example, speculate on how "severe weather events" will affect their financials, even immaterially. *E.g.*, *id.* at 21,699, 21,799.

But companies must already report material climate-related information under existing rules. By contrast, the Rule requires disclosing *non*-material climate-related information unrelated to

5

company financials. As one dissenting SEC Commissioner explained, the Rule is just a "climate regulation promulgated under the Commission's seal." Statement from Mark T. Uyeda, *A Climate Regulation under the Commission's Seal: Dissenting Statement on The Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024), http://tiny.cc/jhvkxz.

The Rule goes beyond SEC's statutory authority. Among other things, it reworks SEC's materiality standard to effectuate the administration's policy choices, which carry enormous economic and political consequences. And it purports to tackle a major question without clear authorization from Congress. But if Congress intended SEC to have that responsibility, it would have clearly said so.

And the Rule is arbitrary and capricious for many different reasons.

This Court should grant the petitions for review and vacate the Rule.

6

## STATEMENT OF THE CASE

### A. Federal Securities Disclosure Laws Have Long Turned On The Concept of Financial Materiality.

Since Congress passed the federal securities laws in the 1930s, public companies have been required to publicly disclose information that is material to making an informed investment or voting decision. That helps the market identify useful information while filtering out less significant information that might otherwise inundate them.

#### 1. The Securities Act and Exchange Act requires disclosures of material information.

The "materiality" standard "runs through and appears practically everywhere in the Securities Act and the Exchange Act." Philip A. Loomis, Jr. Commissioner, SEC, *Presentation Before the Third Annual National Conference of the National Investor Relations Institute*, Materiality and the SEC (Oct. 2, 1972), http://tiny.cc/vf6lyz. For example, Section 17(a)(2) of the Securities Act of 1933 provides that "[i]t shall be unlawful for any person in the offer or sale of any securities . . . to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made,

7

not misleading." 15 U.S.C. § 77q(a)(2). And Section 18(a) of the Exchange Act makes it unlawful to make any statement "in any application, report, or document . . . which statement was at the time and in light of the circumstances under which it was made false or misleading with respect to any material fact." *Id.* § 78r(a). Indeed, materiality is the cornerstone of federal securities laws' disclosure system. H. Comm. On Interstate and Foreign Com., 95th Cong., Rep. of the Advisory Comm. On Corp. Disclosure to the SEC (Comm. Print 1977).

The Supreme Court has clarified materiality's meaning under securities laws over the decades: "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–449 (1976). The standard is an objective and "inherently fact-specific finding." *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988). Ultimately, the Court has been "careful not to set too low a standard of materiality" because "it was concerned that a minimal standard" might "bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking." *Id.* at 231 (quotations omitted).

Appellate Case: 24-1522     Page: 19     Date Filed: 06/21/2024 Entry ID: 5405801

## 2. SEC's policy position for fifty years was that it lacked statutory authority to mandate immaterial climate-related disclosures.

Beginning at least in the 1970s, SEC began to face questions about whether its materiality standard required registrants to disclose climate-related information. SEC answered that it would be inappropriate for it to require "comprehensive disclosure of the environmental effects of corporate activities." 40 Fed. Reg. at 51,657 (Nov. 6, 1975).

SEC understood its authority was limited to requiring financially material disclosures, which included certain climate-related information *if* it fell under the materiality standard. *See, e.g.*, *Disclosures Pertaining to Matters Involving the Environment and Civil Rights*, Exchange Act Release No. 5170, 1971 WL 127132 (July 19, 1971) (Registrants should consider disclosing financial impact of compliance with environmental laws only if impact is financially material.); SEC Opening Brief, at 2 n.1, *NRDC v. SEC*, No. 77-1761 (D.C. Cir. Oct 17, 1977) ("If environmental . . . information is material to investors, the Commission's rules already require the disclosure of such information.").

SEC reaffirmed this approach nearly 35 years later when it noted that its existing rules governing materiality cover only those climate-

9

related disclosures that fall under its materiality standard. *See* 75 Fed. Reg. at 6,297 (Feb. 8, 2010) (summarizing "obligations under existing federal securities laws and regulations to consider climate change and its consequences").

**B.    The Rule Mandates Non-Financial Climate-Related Disclosures Regardless of Materiality.**

On March 6, 2024, SEC finalized the Rule. *See* 89 Fed. Reg. 21,668; *see also The Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21,334 (Apr. 11, 2022) (proposed Rule). The Rule requires extensive qualitative and quantitative disclosure in annual reports and registration statements of "climate-related targets and goals," "climate-related risks," "greenhouse-gas emissions," and more. 89 Fed. Reg. at 21,699–76 (Introduction and Rule Summary).

The Rule requires certain public companies to disclose "Scope 1" greenhouse-gas emissions, which means the company's own emissions from every single activity it undertakes, including emissions from business travel, for example. *Id.* And it requires public companies to disclose "Scope 2" emissions, meaning emissions emitted by *third parties*

10

in providing electricity and other energy power sources to the covered company. *Id.*

The Rule compels companies to speculate on how "severe weather events and other natural conditions" affect their financials, even immaterially. *See id.* at 21,699, 21,792, 21,799, 21,913. Companies must make these disclosures any time costs or risks exceed remarkably low monetary thresholds. *See id.* at 21,793. The Rule also mandates that companies must disclose "climate-related risks" and the company's oversight of those risks, including risks faced by their "suppliers." *Id.* at 21,699, 21,915–16.

Though the Rule purports to require "materiality," it redefines the term. From the once-universally-accepted definition, SEC has shifted to one that now says climate issues are uniquely important and thus material as a matter of law. To name a few examples, the Rule presumes all climate-related risks elevated to a company's board level are material. *Id.* at 21,713. It requires disclosure of climate-related risks that are only "reasonably likely" to have a material impact. *Id.* at 21,670. And it triggers "materiality" whenever a company faces "transition risk[s],"

11

which are "risks related to a potential transition to a lower carbon economy." *Id.* at 21,687, 21,690–92.

But "transition risk" inherently requires speculation about a boundless number of primarily political outcomes; it "include[s], but [is] not limited to": "increased costs attributable to climate-related changes in law or policy, reduced market demand for carbon-intensive products leading to decreased sales, prices, or profits for such products, the devaluation or abandonment of assets, risk of legal liability and litigation defense costs, competitive pressures associated with the adoption of new technologies, reputational impacts (including those stemming from a registrant's customers or business counterparties) that might trigger changes to market behavior, changes in consumer preferences or behavior, or changes in a registrant's behavior." *Id.* at 21,692. It does not require consideration of risks that such transition may not occur or may be reversed.

The Rule requires companies to make preliminary "materiality determinations." *Id.* at 21,733. Practically speaking, companies must now examine everything under Scope 1 and 2 to determine what meets SEC's new "materiality" definition. They must collect, process, and report

12

vast climate-related information—including their greenhouse-gas emissions and forward-looking, speculative predictions of climate impacts on their business outlook—even when such information is immaterial.

SEC did not "assess whether the benefits of the information to the reasonable investor outweigh the costs of producing the disclosure." Uyeda, *supra*. But one dissenting SEC commissioner revealed the Rule will "increase the typical external costs of being a public company by around 21%." Statement from Hester M. Peirce, *Green Regs and Spam: Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024), http://tinyurl.com/2p8xzwj9.

### C. Petitioners Sue To Vacate The Rule.

As consolidated here, State Petitioners include 25 States and the American Free Enterprise Chamber of Commerce, a 501(c)(6) membership organization representing entrepreneurs and businesses challenge the Rule on multiple grounds. State Petitioners petitioned for review in multiple circuits. *See Iowa v. SEC*, 8th Cir. Case No. 24-1522, *Louisiana v. SEC*, 8th Cir. Case No. 24-1627, *Ohio v. SEC*, 8th Cir. Case No. 24-1631, and *West Virginia v. SEC*, 8th Cir. Case No. 24-1634.

13

Under the multi-circuit lottery, 28 U.S.C. § 2112(a), the JPML consolidated in this Court the petitions filed in six Circuits across the country.

## SUMMARY OF THE ARGUMENT

I.    The agency lacks authority to issue the Rule. *First*, SEC's reliance on the text in the Securities Act and the Exchange Act for its expansive authority is misplaced. Properly construed, those Acts only allow SEC to require information that is financially material. Indeed, the Acts confirm that their relevant parts concern fighting serious abuses in the securities market—not the climate or the environment. That reality, coupled with the Acts' "materiality" standard, makes clear that the Acts cannot be read to give SEC the authority it now claims.

*Second*, this is a major questions case. So even if the Acts could be stretched to plausibly authorize the Rule, Congress needed to state clearly that it intended SEC to tackle a major question like this. But Congress did not.

The Rule involves a quintessential major question. It makes policy choices with enormous economic and political consequences. The Rule reworks SEC's longstanding materiality standard to elevate climate

14

above nearly all other issues facing public companies—all while claiming this authority had been lurking in SEC's decades-old statutes. The Rule also purports to authorize SEC to do what EPA has long been thought to have the expertise in and authority over, and what Congress has not authorized SEC to do. And the Rule does this in a way that asserts extraordinary power over the national economy—conservative estimates expect complying with the Rule will cost companies billions of dollars. Common sense says Congress would have been crystal clear if it intended for SEC to make these choices. But in fact, Congress has *rejected* requirements like these, not authorized them. In the end, the Rule is an attempt to bypass Congress to achieve a political and social agenda Congress itself has declined to pass.

Because Congress did not clearly authorize SEC to weigh in on this major question—and not even SEC claims it has such clear authority—the statutes that SEC relies on do not support its Rule.

II.     The Rule is arbitrary and capricious for at least four reasons.

*First*, SEC fails to give reasons for its new policy. Indeed, SEC does not even acknowledge that it is changing its longstanding position. SEC instead claims the Rule is an extension of powers it had all along. But

Appellate Case: 24-1522     Page: 26     Date Filed: 06/21/2024 Entry ID: 5405801

that is contrary to decades of explanations SEC provided, wherein it explained that it could not require comprehensive climate-related disclosures under its existing authority.

*Second*, SEC has long recognized registrants' preexisting obligation to report material climate-related information. Against the backdrop of that obligation, SEC fails to explain why the existing regulations are inadequate. Nor does SEC address why EPA's existing authority to require emissions disclosures is inadequate.

*Third*, the Rule is not supported by substantial evidence. SEC concedes that it cannot even quantify the benefits and costs of the Rule, because the data to do so does not exist. Its judgment was instead based on anecdotes and speculative worries. Worse, SEC admits that where there is actual evidence, that evidence is mixed. Or, in SEC's own words, the empirical data is "seemingly contradictory."

*Fourth*, SEC failed to provide notice of the bases for a significant chunk of its reasoning. The Rule relies on several scientific articles that were not included in the Proposed Rule. Petitioners and the public thus

Appellate Case: 24-1522    Page: 27    Date Filed: 06/21/2024 Entry ID: 5405801

lacked sufficient notice to allow them to provide meaningful commentary. For each of these reasons, the Rule is arbitrary and capricious.

The petitions for review should be granted and the Rule vacated.

## STANDARD OF REVIEW

Courts review agency actions under the Administrative Procedure Act's substantial evidence and arbitrary and capricious standards. *See Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011). Under these standards, courts set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's rule may not exceed the agency's statutory authority. 42 U.S.C. § 7607(d)(9)(C); 5 U.S.C. § 706(2)(C). To understand an agency's statutory authority, courts consider the statute's text, structure, and context.

The rule must "be reasonable and reasonably explained." *Laccetti v. SEC*, 885 F.3d 724, 725 (D.C. Cir. 2018). The Court must assure itself that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983).

17

And the agency's factual findings must be supported by substantial evidence. The agency cannot ignore "contradictory evidence or evidence from which conflicting inferences could be drawn" nor can it minimize that evidence without adequate explanation. *Morall v. DEA*, 412 F.3d 165, 177, 179–180 (D.C. Cir. 2005).

If the agency fails under any of these standards, courts will vacate the agency's action.

## ARGUMENT

## I. CONGRESS DID NOT GIVE SEC POWER TO ISSUE THE RULE.

Like all agencies, SEC "literally has no power to act" until Congress says so. *FEC v. Cruz*, 596 U.S. 289, 301 (2022). And here, Congress never empowered SEC to undertake any action like the Rule. The relevant statutory text does not authorize this broad new scheme. And even if that text could be stretched to *plausibly* authorize the Rule, Congress needed to *clearly* state that it intended SEC to tackle a major question like this one. It did not.

18

## A. The Securities Act And Exchange Act Do Not Authorize The Rule.

This case can begin and end with just one basic truth: the statutory text SEC musters to justify the Rule cannot bear its weight.

SEC first relies on Section 7(a)(1) of the Securities Act, which allows SEC to include in required filings "such other information" SEC may "require as being necessary or appropriate in the public interest or for the protection of investors." 89 Fed. Reg. at 21,683 (quoting 15 U.S.C. § 77g(a)(1)). The agency also invokes Exchange Act Sections 12(b) and (g), *id.*, which include the same language for registration statements. 15 U.S.C. § 78*l*(b), (g). But neither part of the statutory phrase allows for the Rule's expended view of mandatory disclosures.

When it comes to the phrase "necessary or appropriate," broad terms like that must be "known by their companions." *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000). "[C]ontext is everything" in statutory construction. Antonin Scalia, A Matter of Interpretation 37 (1997). And for "necessary or appropriate," the powers Congress delegates "can only be exercised within the confines of" the relevant statute. *In re Cajun Elec. Power Co-op, Inc.*, 185 F.3d 446, 453 n.9 (5th Cir. 1999). Here, that context shows "necessary or appropriate"—in both Acts—is a residual

19

clause that must be read "restrictively." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003).

In the Securities Act, SEC's power to require other "necessary or appropriate" disclosures follows a list of categories central to a company's business and potential profitability—assets and debts, terms of securities and key contracts, and the people involved or with financial interests in the company. 15 U.S.C. § 77aa (cross-referenced in *id.* § 77g(a)(1)). When Congress said SEC could also require "*such* other information . . . necessary or appropriate," *id.* § 77g(a)(1) (emphasis added), it meant "only objects similar in nature to those objects enumerated by the preceding specific words," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–115 (2001). And as SEC acknowledged, those enumerated categories are "financial in nature." *Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23,916, 23,921 (Apr. 22, 2016).

If the Securities Act does not support the Rule, the Exchange Act's "necessary or appropriate" residual clause is even less helpful for SEC: the twelfth category of information Congress required for registration applications is "any further financial statements" SEC deems "necessary

20

or appropriate for the protection of investors." 15 U.S.C. § 78*l*(b)(1)(L).

Here again, the focus is firmly on the business and financial side of things, not whatever activities SEC might find interesting to the public. Both Acts, then, include "specific restrictions" that "meaningfully constrain[]" SEC from including just anything under the necessary or appropriate umbrella. *Touby v. United States*, 500 U.S. 160, 166–67 (1991).

As for "public interest," that phrase is "never an unbounded term." *Bus. Roundtable v. SEC*, 905 F.2d 406, 413 (D.C. Cir. 1990). It must be limited to the specific statutory context and "the purposes that Congress had in mind when it enacted" the relevant law. *NAACP v. FPC*, 425 U.S. 662, 670 (1976); *see also N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932) (explaining courts must consider "[t]he purpose of the Act, the requirements it imposes, and the context of the provision in question" in defining "public interest"). And "public interest" is never "a broad license to promote the general public welfare." *NAACP*, 425 U.S. at 669.

After all, if "public interest" is untethered from Congress's purpose as revealed in the text of the statute, and means little more than whatever the agency thinks is good, then the statute unavoidably violates

21

the non-delegation doctrine (even under the recently disfavored "intelligible principle" regime). *See, e.g.*, *In re Certified Questions*, 958 N.W.2d 1, 30 (Mich. 2020) ("[I]t reflects an incomplete understanding of United States Supreme Court nondelegation law to assert that vague terms such as 'public interest' are ordinarily or typically sufficient to sustain a statute against a nondelegation challenge."). So the phrase should not be "construed as comprehensively as the words alone [might] permit." *NBC v. United States*, 319 U.S. 190, 225–226 (1943).

Here, the Acts' contexts and ends do not concern climate or the environment—making the "public interest" qualifier "a wafer-thin reed on which to rest . . . sweeping power." *Ala. Ass'n of Realtors v. DHHS*, 594 U.S. 758, 765 (2021).

Rather, the text of both Acts share the "primary purpose" of eliminating "serious abuses in a largely unregulated securities market." *United Hous. Found. v. Forman*, 421 U.S. 837, 849 (1975). And even then, they do not extend to all that might fit within that "serious abuses prevention" mandate. For example, the Securities Act sought only to "protect the public from inaccurate, incomplete and misleading information." *Kahan v. Rosenstiel*, 424 F.2d 161, 173 (3d Cir. 1970). Its

22

disclosure requirements specifically are not understood to "provide disclosure of *all* facts necessary to a sound investment judgment." William O. Douglas & George E. Bates, *The Federal Securities Act of 1933*, 43 Yale L. J. 171, 188–189 (1933) (emphasis added). In short, federal securities laws do not even remedy "all fraud." *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982). So it is little surprise Congress never intended for them to "guarantee sound" or socially conscious "business practices," either. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

Beyond that, expanding the zone of required disclosures too far is counterproductive. The "public interest" is not served—and SEC is not doing its statutory job—through rules "bury[ing] the shareholders in an avalanche of trivial information." *Northway*, 426 U.S. at 448–449. Rather, excessive disclosures are "hardly conducive to informed decisionmaking" and actually "accomplish more harm than good." *Id.* Even though SEC "should assess whether the benefits of the information to the reasonable investor outweigh the costs of producing the disclosure," that "analysis did not occur" here. Uyeda, *supra.*

23

SEC's response is that the Acts' statutory text, read together with the "enumerated disclosures and the broader context," lets it require disclosure of any "information important to making informed investment and voting decisions." 89 Fed. Reg. at 21,683. But the text is not "greater than the sum of its parts." *Biden v. Nebraska*, 600 U.S. 477, 498 (2023). "However broad" certain language may be, it does not give "a free pass to avoid the limits inherent" when read in context. *Id.* at 500. So when it comes to what kind of information SEC can consider "important," the metric remains whether SEC's required disclosure falls within the categories of information Congress said investors should know about.

SEC's purported examples of similar disclosure regulations do not help, either. Yes, federal regulations have long required disclosing "all litigation that may materially affect the value of a security to be offered." 89 Fed. Reg. at 21,684. But whether a company may owe a sizable monetary judgment or settlement (exceeding "10 percent of the current assets of the registrant," 17 C.F.R. § 229.103(b)(2)) directly affects its bottom line. So too is requiring extra disclosure for securities "of a highly speculative nature," 89 Fed. Reg. at 21,684 n.188—a requirement for targeted classes of securities—a far cry from requiring all registrants to

24

disclose climate-related "risks" more generally that are subject to just a "one percent disclosure threshold," *id.* at 21,793. Nor are climate disclosures in the same category of plainly *financial* risk factors like "interest rate risk, foreign currency exchange rate risk, [and] commodity price risk." *Id.* at 21,684.

Beyond that, SEC is even less eager to engage the Acts' materiality standard. From the agency's inception, materiality has been the "cornerstone of the disclosure system." H. Comm. On Interstate and Foreign Com., 95th Cong., Rep. of the Advisory Comm. On Corp. Disclosure to the SEC (Comm. Print 1977). It "descends from common-law antecedents," *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) (quotation marks omitted), and "runs through and appears practically everywhere in the Securities Act and the Exchange Act." Loomis, *supra.* And before the Rule, the term was "universally agreed" to be "an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *Northway*, 426 U.S. at 445.

For nearly a century, everyone knew that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder

Appellate Case: 24-1522     Page: 36     Date Filed: 06/21/2024 Entry ID: 5405801

would consider it important in deciding how to vote." *Id.* at 446. And because investors buy securities "expect[ing] profits," *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–299 (1946), materiality speaks to a security's value and reaches only facts that affect a company's "fortune" in "certain and clear" ways, *Basic Inc.*, 485 U.S. at 232.

SEC insists that it is applying the traditional materiality standards here, but a close read shows otherwise. The Rule creates "an entirely new subpart of Regulation S-K and an entirely new article of Regulation S-X for one topic—climate change." Uyeda, *supra*. Many of the Rule's requirements are "without comparison in SEC's disclosure regime." *Id.* "[N]o other risk," for example, requires "prescriptive, forward-looking disclosure of the risk's impacts on the company's strategy, business model, outlook, financial planning, and capital allocation." *Id.*

The Rule goes beyond directing companies to report what's material and requires them to examine *everything* in Scopes 1 and 2 to affirmatively determine what is not material—or else risk answering to SEC. *See, e.g.*, 89 Fed. Reg. at 21,733 (describing required preliminary "materiality determinations"). Other times, as with certain required board disclosures, SEC does not even pretend to apply a materiality

26

requirement. *See, e.g.*, Fed. Reg. at 21,710. The Rule also requires disclosure any time items land above painfully low monetary thresholds. *See* Fed. Reg. at 21,793. Altogether, especially in requiring companies to speculate well into the future on all manner of hard-to-define risks based on subjective assessments, the Rule has replaced ordinary materiality with an overriding command that climate issues are uniquely important and thus material as a matter of law—even when financially immaterial. *See* 89 Fed. Reg. at 21,670 (requiring disclosure of climate-related risks that are only "reasonably likely" to have a material impact); *id.* at 21,713 (presuming that all climate-related risks elevated to the board level are material).

And ultimately, the Rule itself puts the truth to the lie that it is just about ordinary material risks. After all, businesses already must disclose such risks. *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 117–118 (2021). Why, then, would SEC bother adopting a rule that's redundant? The answer: it would not. This approach is new.

Courts rightly turn a wary eye to agencies that rely on broad terms to "create[] a novel and fundamentally different" statute that "does not

27

remotely resemble how it has been used on prior occasions." *Nebraska*, 600 U.S. at 496–497. That is what SEC did here.

## B. The Major Questions Doctrine Confirms The Rule Is Out Of Bounds.

This challenge also stands among a growing "series of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). Answering "whether Congress in fact meant to confer the power the agency has asserted," *id.* at 721, is always "shaped . . . by the nature of the question presented," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000). When the question is of the "major policy" variety, courts "presume" Congress kept it for itself. *West Virginia*, 597 U.S. at 723 (cleaned up); *see also*, *e.g.*, *United States v. District of Columbia*, 669 F.2d 738, 744 (D.C. Cir. 1981) (Significant policy decisions "should be made by the national legislature, the branch best equipped by its structure and constituency.").

So in a "major questions" case—one involving "unprecedented [agency] power over American industry" that works a "transformative expansion" into an area in which the agency lacks "comparative

28

expertise" and where "Congress has conspicuously and repeatedly declined to []act itself"—courts find "reason to hesitate." *West Virginia*, 597 U.S. at 721, 724, 728 (cleaned up). To wield power like that, the agency must show "something more than a merely plausible textual basis." *Id.* at 723. It needs "clear congressional authorization." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("*UARG*").

The Court should invalidate the Rule on this basis, too. It twists decades-old securities law in a brand-new way to transform the agency into an environmental guardian. But SEC "is a securities regulator without statutory authority or expertise to address political and social issues" like climate concerns. Uyeda, *supra*. And neither the Securities Act nor the Exchange Act clearly authorizes the Rule's sweep. So "this is a major questions case," *West Virginia*, 597 U.S. at 724—and an easy one.

### 1. The Rule addresses a major question.

The Rule bears the hallmarks of regulation trying to tackle a major question. SEC insists it "is not claiming to discover in a long-extant statute an unheralded power." *Id.* (citation omitted). But at least six features show how the Rule makes policy choices "of such economic and

29

political magnitude" that Congress would have spoken clearly if it meant for SEC to take them up. *Brown & Williamson*, 529 U.S. at 133.

*First*, the Rule works a "radical" and "fundamental revision" to disclosure law, "changing it from [one sort of] scheme" into a totally different one. *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 230–231 (1994).

Take SEC's overhaul of the materiality standard. SEC claims, for example, to be "agnostic as to whether and how issuers manage climate-related risks, so long as they appropriately inform investors of material risks." 89 Fed. Reg. at 21,687. But the Rule adds nothing if it hews to materiality's century-old meaning. So the most reasonable conclusion is that it does not. And indeed, the Rule "elevates climate above nearly all other issues facing public companies." Uyeda, *supra*. In doing so, it shows the Rule's "prescriptive nature," designed to "affect corporate behavior" and drive it toward SEC's preferred climate ends. Peirce, *supra*. Indeed, tying "materiality's" newfound malleability to a borderless view of "necessary or appropriate" and "public interest" makes most anything a potential target for regulation.

30

This expansion of materiality reveals the "breadth of [SEC's] claimed authority." *West Virginia*, 597 U.S. at 729. And because it runs so far afield of statutory constraints and past practice, it is hard to view SEC's theory as anything but "virtually unlimited power to rewrite" federal law. *Nebraska*, 600 U.S. at 502. Authority to "unilaterally define every aspect" of a subject area is always suspect. *Id.*

*Second*, the Rule deploys old law in a never-before-seen way. It is evidence of improper arrogation of authority when an agency "claim[s] to discover in a long-extant statute an unheralded power representing a transformative expansion of its regulatory authority." *West Virginia*, 597 U.S. at 724. Yet with the Rule, SEC calls on its "decades-old statute[s]" to spin something new. *Ala. Ass'n*, 594 U.S. at 760. Almost fifty years ago, SEC disclaimed power to issue rules aimed at "some indirect effect on corporate conduct." *Commission Conclusions and Rule Making Proposals,* Securities Act Release No. 5627, Exchange Act Release No. 11733, [1975-1976 Transfer Binder] Fed. Sec. L. Rep. (CCH) P 80,310, 85,713 (Oct. 14, 1975). Back then, SEC considered it inappropriate to require "comprehensive disclosure of the environmental effects of corporate activities." 40 Fed. Reg. at 51,662 (Nov. 6, 1975); *see also id.*

31

("[T]here appears to be virtually no direct investor interest" in disclosures.). Just seven years ago SEC said much the same: "disclosure relating to environmental and other matters of social concern should not be required of all registrants." 81 Fed. Reg. at 23,970. Why not? Those disclosures could be warranted only by "a specific congressional mandate," or if they satisfied the materiality threshold. *Id.*; *see also* 75 Fed. Reg. 6,290.

The Rule spins a different story, recalling fifty years of "requir[ing] disclosure about various environmental matters." 89 Fed. Reg. at 21,685. But its examples are disclosures directly affecting a company's profits that just so happen to involve environmental matters—"material pending legal proceedings" under environmental laws, *id.* at 21,685 n.203 (1982 Release), or "material effects" of complying with "environmental regulations" on "capital expenditures, earnings, and competitive position," *id.* at 21,685 (2020 rules).

SEC "has never before adopted a broad [environmental] regulation of this kind." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022). "[J]ust as established practice may shed light on the extent of power [Congress] conveyed," "the want of assertion of power by those who presumably

32

would be alert to exercise it, is equally significant." *FTC v. Bunte Bros., Inc.*, 312 U.S. 349, 352 (1941).

*Third*, the Rule takes SEC into areas well beyond its ken. "Congress presumably would not" task an agency lacking "comparative expertise" to make policy judgments in that field. *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019). Thus, "little reason" exists "to think Congress assigned" something like the Rule to SEC. *West Virginia*, 597 U.S. at 729.

SEC oversees Acts designed "to eliminate serious [market] abuses." *Forman*, 421 U.S. at 849. And "Congress created the SEC to" further that goal. *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 895 (5th Cir. 2019). SEC's job—and its expertise—lies in combatting "misrepresentations," *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995), avoiding "manipulation of stock prices," *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 193 (2d Cir. 2021), and ensuring "dealing in securities is fair and without undue preferences or advantages among investors," *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976).

SEC is not a climate regulator. *See* Uyeda, *supra* (SEC lacks "expertise to address political and social issues."). And though the current administration may think "all hands on deck" is the right approach to

33

climate matters, *see* The White House, *supra*, courts look more closely at *congressionally* defined mandates. Agencies' subject-specific "knowledge and experience largely account for the presumption that Congress delegates interpretative lawmaking power to the agency." *Kisor*, 588 U.S. at 577–578. No wonder assuming new powers *outside* that zone of expertise often "strains credulity," *Ala. Ass'n*, 594 U.S. at 760—like when the CDC tried to regulate the housing market, *id.* at 762–763, the IRS asserted power over insurance markets, *King v. Burwell*, 576 U.S. 473, 486 (2015), or the Attorney General took on physician-assisted suicide, *Gonzales v. Oregon*, 546 U.S. 243, 248–249 (2006). Solving climate change, in short, "is not a case for [SEC]," making its lack of "expertise" reason to think if Congress had something like the Rule in mind, it "would have [said] so expressly." *King,* 576 U.S. at 486.

*Fourth*, the Rule takes on an issue of "vast" "political significance" that Congress chose not to address. *West Virginia*, 597 U.S. at 716. "Climate change has staked a place at the very center of this Nation's public discourse." *Nat'l Rev., Inc. v. Mann*, 114 S. Ct. 344, 348 (2019) (Alito, J., dissenting from denial of certiorari). That topics like those in the Rule "ha[ve] been the subject of an earnest and profound debate

Appellate Case: 24-1522     Page: 45     Date Filed: 06/21/2024 Entry ID: 5405801

across the country . . . makes the oblique form of the claimed delegation all the more suspect." *Gonzales*, 546 U.S. at 267–268 (cleaned up).

Worse still for SEC, "Congress is []aware of the challenges," yet has not acted directly or passed a law letting SEC do so in its place. *Nebraska*, 600 U.S. at 503. Instead, Congress has repeatedly "considered and rejected," *Brown & Williamson*, 529 U.S. at 144, climate disclosure schemes. *See, e.g.*, S. 1217, 117th Cong. ("Climate Risk Disclosure Act of 2021"); H.R. 2570, 117th Cong. ("Climate Risk Disclosure Act of 2021"); H.R. 1187, 117th Cong. (2021) ("Corporate Governance Improvement and Investor Protection Act"); S. 3481, 115th Cong. (2018) (Climate Risk Disclosure Act). "[U]nsuccessful attempt[s]" to get "an express grant of" statutory authority confirm the agency lacks it. *Bunte Brothers*, 312 U.S. at 352.

Leaning on old powers in surprising ways to "conveniently enable[]" the agency "to enact a program that Congress has chosen not to enact itself" is a hallmark of major-questions cases. *Nebraska*, 600 U.S. at 503; *see also BST Holdings, LLC v. OSHA*, 17 F.4th 604, 612 (5th Cir. 2021) (rejecting agency "work-around" to impose a vaccine mandate under guise of workplace safety). So SEC's scheme "to bypass Congress to

35

achieve political and social change," also sounds a major-questions clarion call. Uyeda, *supra*.

*Fifth*, the Rule asserts "extravagant statutory power over the national economy." *UARG*, 573 U.S. at 324. SEC estimates the Rule will directly cost *each* registrant *each* of their first ten years of compliance between "$197,000" at the low end to "over $739,000" at the "upper end." 89 Fed. Reg. at 21,875. SEC concedes companies believe the actual costs will be "considerably higher," *id.* at 21,871—a concern worth taking seriously where SEC also admits it could not "reliably quantify" the Rule's costs "[i]n many cases," *id.* at 21,829. Those estimates are also too low because they fail to grapple with the "standalone cost estimate of making . . . materiality determinations." *Id.* at 21,875. Nor do they internalize that a "vast majority of companies will need . . . to develop their reporting capabilities, data requirements, and processes and controls" to even comply at all. *Comprehensive Analysis of the SEC's Landmark Climate Disclosure Rule*, Deloitte (Apr. 8, 2024), https://tinyurl.com/2w29ajkp.

Altogether, the Rule will "increase the typical external costs of being a public company by around 21%." Peirce, *supra*. So even SEC's

lowball estimates easily put the Rule in the "billions of dollars in [private] spending" category. *King*, 576 U.S. at 485. In other words, the costs are "staggering by any measure." *Nebraska*, 600 U.S. at 502.

Piling on, "market participants, customers, and suppliers" all will likely see "reduced demand for their services or higher prices for their inputs" from the Rule. 89 Fed. Reg. at 21,830. By passing on its costs to the public at large, the Rule does more than just "regulate a fundamental sector of the economy." *West Virginia*, 597 U.S. at 716. It touches virtually every sector. *See Nebraska*, 600 U.S. at 505–507. And by imposing costs so great even SEC knows it "may limit the ability of smaller registrants to compete with larger registrants," 89 Fed. Reg. at 21,890, it skirts dangerously near picking which companies get to stay in the market at all. *Cf. West Virginia*, 597 U.S. at 728 n.3 (agency cannot "direct [regulated entities] to effectively cease to exist"). "[V]ast economic" implications like these are another marker that a major question is on offer. *UARG*, 573 U.S. at 324 (cleaned up).

*Finally*, the Rule "intrudes into an area that is the particular domain of state law." *Ala. Ass'n*, 594 U.S. at 764. That concern triggers the separate federalism canon, which requires a "clear statement" before

37

rearranging "the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (quotation marks omitted); *see also*, *e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 459–460 (1991). The canon can also confirm that a major question is involved: "[w]hen an agency claims the power to regulate vast swaths of American life," as here, it "risks intruding on powers reserved to the States." *West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring).

"[C]orporation law" is traditionally "governed by state-law standards." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 98 (1991). And the Acts do not displace state power entirely; the Supreme Court has been "reluctant to federalize" securities law at the expense of "established state policies." *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977). Here, state law has long shown a "legitimate and traditional[]" interest in "protect[ing] corporate shareholders." *First Nat'l Bank of Bos. v. Belloti*, 435 U.S. 765, 792. The Rule even points to some state climate-disclosure laws. 89 Fed. Reg. at 21,833. But the Rule's "if they're doing it, no harm if we do, too" approach gets things backward: SEC needs *more* clarity to regulate in an area of traditional state authority, not less. *Gregory*, 501 U.S. at 460.

38

Even more for a Rule that SEC expects will drive "changes in behavior"—not just reporting—such as "prompt[ing] managers to alter their approach to climate-related risks." 89 Fed. Reg. at 21,888. These changes may well require "some registrants . . . to reorganize their business." *Id.* But remember, "[n]o principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). Corporate boards' management of ordinary business matters and risks is "part of corporate governance traditionally left to the states" that the securities laws do not confer authority to regulate. *Bus. Roundtable*, 905 F.2d at 407, 412–13; *see, e.g.*, 8 Del. Code § 141(a). The Rule's intrusion into this state-law zone in new, expansive ways underscores all the other markers of a major question.

### 2. Congress did not clearly authorize the Rule.

The States end where we began—with what the statute authorizes. If the Rule's characteristics "counsel[] skepticism toward" SEC's claimed power—and they do—then SEC "must" "point to clear congressional authorization." *West Virginia*, 597 U.S. at 732 (quotation marks omitted). SEC doesn't have it. To its credit, SEC never claims it built the Rule on

Appellate Case: 24-1522     Page: 50     Date Filed: 06/21/2024 Entry ID: 5405801

"clear" authority. It points simply to its authority to regulate as "necessary or appropriate in the public interest or for the protection of investors." 89 Fed. Reg. at 21,683, *see* 15 U.S.C. § 77g(a)(1). But as already explained, that text "provides no authorization for [SEC's Rule] even when examined using the ordinary tools of statutory interpretation—let alone 'clear congressional authorization.'" *Nebraska*, 600 U.S. at 507. Language that provides no basis to act obviously doesn't provide a clear basis, either.

Ambiguity is not enough to tackle a major question. In the "absence of a clear [legislative] mandate," it is "unreasonable to assume" one. *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) (plurality op.). Instead, SEC needs "clear evidence that the people's representatives in Congress have actually afforded [it] the power it claims." *West Virginia*, 597 U.S. at 746 (Gorsuch, J., concurring). It must pull on more than "definitional possibilities," particularly where, "shorn of all context," "almost anything" could fit its reading. *Id.* at 732 (majority op.). In other words, rather than claim that the statutory text "can" stretch, the agency needs to show its approach is the "kind" Congress had in mind. *Id.*

40

These principles mean that even if SEC's textual hooks were "colorable," *id.* at 722, they are unclear. They read nothing like provisions where Congress explicitly sends SEC beyond the statutes' typical zones, like when it told SEC to require companies to disclose whether "conflict minerals . . . originate[d] in the Democratic Republic of the Congo or an adjoining country." 15 U.S.C. § 78m(p).

Terms like "necessary or appropriate" and "public interest" are *broad*, but they are not *clear*—at least divorced from their statutory context of financially material information. *See West Virginia*, 597 U.S. at 732 (explaining that removing the broad term "system" from its context made it "an empty vessel"). Congress does not delegate power to answer major questions "in so cryptic a fashion." *Brown & Williamson*, 529 U.S. at 160. So the Rule lacks anything "close to the sort of clear authorization" precedent "require[s]." *West Virginia*, 597 U.S. at 732.

In sum, the "basic and consequential tradeoffs inherent in a mass [climate disclosure] program are ones that Congress would likely have intended for itself." *Nebraska*, 600 U.S. at 506. The statutes Congress wrote do not support SEC's Rule.

Appellate Case: 24-1522     Page: 52     Date Filed: 06/21/2024 Entry ID: 5405801

## II.   THE RULE IS ARBITRARY AND CAPRICIOUS.

An agency's rule is arbitrary and capricious if the agency fails to "examine the relevant data," "explain the evidence which is available," or "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm,* 463 U.S. at 43, 52 (quotations omitted). The Rule contains each of these flaws.

### A.   SEC Has Not Provided A Reasoned Explanation For Changing Its Position.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Although an agency may change its longstanding position, it must "display awareness that it *is* changing position" and "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And where "prior policy has engendered serious reliance interests," a "more detailed justification" and "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id.* at 515–516. The Rule is either an unexplained change in

42

agency policy or redundant. In both scenarios, it remains arbitrary and capricious.

SEC does not acknowledge its drastic change in position, much less give a reasoned explanation for the change. It says it has not changed position at all and claims the Rule is an extension of powers it had all along. 89 Fed. Reg. at 21,686–87. That odd interpretation of SEC's previous practice is inconsistent with its own earlier pronouncements. For more than fifty years, SEC said it lacked authority to require blanket climate-related disclosures. *See, e.g.*, 40 Fed. Reg. at 51,657 (Nov. 6, 1975) (inappropriate to require "comprehensive disclosure of the environmental effects of corporate activities"). SEC's lack of authority explains Congress's occasional consideration of legislation which would grant SEC just that power. *See, e.g.*, H. Rep. 117-39 (Climate Risk Disclosure Act); S. 3481, 115th Cong. (2018); *cf.* 42 U.S.C. § 7414 (granting U.S. Environmental Protection Agency authority to require emissions disclosures). For SEC to now say it has the "long standing authority" to require even immaterial climate disclosures, 89 Fed. Reg. at 21,686–87, is itself a clear shift in the agency's position.

Because this is not even a "conscious change of course," SEC altogether fails to explain why it thinks "there are good reasons for [its shift in policy]." *Fox Television*, 556 U.S. at 515. Agencies may not "depart from a prior policy *sub silentio*," *id.*, but that is just what SEC tries to do here.

## B.     The Rule Fails To Explain Why Preexisting Regulations Are Inadequate.

Contending that the Rule does not create a change in position is plausible if it only requires disclosing *material* climate-related information. But such a Rule would also be arbitrary and capricious because it would be redundant. *See Am. Equity Inv. Life Ins. Co. v. SEC.*, 613 F.3d 166, 179 (D.C. Cir. 2010) ("The SEC's failure to analyze the efficiency of the existing state law regime renders arbitrary and capricious the SEC's judgment that applying federal securities law would increase efficiency.").

SEC has long recognized registrants' preexisting obligation to report material climate-related information. *See, e.g.*, 89 Fed. Reg. at 21,797–98 ("We agree . . . registrants are already required to disclose the financial statement effect of material climate risks under existing rules" and have an "ongoing responsibility to consider material impacts,

44

whether climate-related or not, when preparing their financial statements and related disclosures."); 75 Fed. Reg. at 6,297 (summarizing "obligations under existing federal securities laws and regulations to consider climate change and its consequences"); SEC Opening Brief, at 2 n.1, *NRDC v. SEC*, No. 77-1761 (D.C. Cir. Oct 17, 1977) ("If environmental . . . information is material to investors, the Commission's rules already require the disclosure of such information.").

Registrants already recognize and abide by that preexisting disclosure obligation. *See* Rick E. Hansen, *Climate Change Disclosure by SEC Registrants: Revisiting the Sec's 2010 Interpretive Release*, 6 Brook. J. Corp. Fin. & Com. L. 487, 491 (2012) ("[S]ince the issuance of the [2010] Interpretive Release, registrant disclosures concerning climate change in the registrant's SEC filings have matured and increased . . . [and] we can expect to see these disclosures continue to mature and increase over time."). SEC's longstanding regulatory regime thus "reduce[s] the need for, and hence the benefit to be had from," the Rule; an additional regulation requiring disclosure of material climate-related information would create "no net benefit" because such requirement already exists.

45

*Bus. Roundtable*, 647 F.3d at 1154–56. SEC fails to explain why its preexisting regime is inadequate.

And when there are agencies and statutory regimes already effectuating the agency's desired new policy, an agency must "engage in a careful analysis of the possible effects" its proposed alternative might have on the "functioning and policies of other statutory regimes, with which a conflict is claimed." *N.Y. Shipping Ass'n, Inc. v. Fed. Mar. Comm'n*, 854 F.2d 1338, 1370 (D.C. Cir. 1988). Then the agency must explain why its action "minimizes" its "intrusion into policies that are more properly the province of another agency or statutory regime." *Id.* The Rule fails at both steps. SEC fails to explain why EPA's existing authority to require emissions disclosures is inadequate. *See, e.g.*, 42. U.S.C. § 7414. It recognizes, in mere passing reference, that it may be intruding on EPA's domain, 89 Fed. Reg. at 21,729, 21,740, 21,746, 21,833–34, but more is required. And the Rule lacks careful analysis of whether it would erode EPA's mandate and altogether fails to explain how SEC plans to "minimize" any intrusion. The Rule is thus arbitrary and capricious for this reason, too.

46

## C. The Rule Is Not Supported By Substantial Evidence.

Final agency action must be vacated if it is not supported by substantial evidence. *See BNSF Ry. Co. v. DOL ARB*, 867 F.3d 942, 945 (8th Cir. 2017). Agency action is not supported by substantial evidence unless it is "possible for a reasonable jury to reach the [agency's] conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366–367 (1998). An agency cannot "totally disregard[]" significant evidence and cannot refuse to credit evidence when doing so "is wholly irrational." *Id.* at 369–370; *see also Sugule v. Frazier*, 639 F.3d 406, 412 (8th Cir. 2011).

What is more, the agency "must draw all those inferences that the evidence fairly demands." *Allentown Mack*, 522 U.S. at 378–379. In other words, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). A rule must be vacated if it "runs counter to the evidence before the agency." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (Kavanaugh, J.) (quoting *State Farm*, 463 U.S. at

47

43); *Sugule*, 639 F.3d at 413. After all, "[p]rofessing that [a rule] ameliorates a real industry problem but then citing no record evidence demonstrating that there is in fact an industry problem is not reasoned decision making." *Nat'l Fuel Gas Supply Corp.*, 468 F.3d at 843.

Finally, agency action is not supported by substantial evidence if the evidence is "at best[] 'mixed.'" *Bus. Roundtable*, 647 F.3d at 1151.

SEC has readily admitted in the Proposed Rule that it was impossible to quantify the costs and benefits behind the rule. SEC admitted that "[i]n many cases" it was "unable to reliably quantify the[] potential benefits and costs." 87 Fed. Reg. at 21,428. Why? Because "existing empirical evidence does not allow us to reliably estimate how enhancements in climate-related disclosure affect information processing by investors or firm monitoring." *Id.* In the end, SEC "qualitatively describe[d] the factors that may affect disclosure costs but [was] unable to accurately quantify these costs." *Id.* That is, its analysis is not backed by substantial evidence.

Meanwhile, SEC openly admits the evidence supporting the Rule is mixed. The Rule calls the empirical data "seemingly contradictory." 89 Fed. Reg. at 21,849 n.2745. It also cites a study that argues "asset prices

may not fully price in climate related risks" and another that "find[s] a lack of relation between climate-related risks and asset prices." *Id.* (citing Harrison Hong, Frank Weikai Li & Jiangmin Xu, *Climate Risks and Market Efficiency*, 208 J. ECONOMETRICS 265 (Jan. 2019); and J. Aswani, A. Raghunandan & S. Rajgopal, *Are Carbon Emissions Associated with Stock Returns?*, 28 REV. FIN. 75 (Jan. 2024)). In the face of so much uncertainty, SEC's description of that evidence as "mixed" is generous at best.

Indeed, perhaps further proving why this Rule is far outside the agency's expertise, SEC does not even try to reconcile the contradictions in the data. It does not analyze the studies to explain why some cut against its findings or show why those studies do not deserve great weight. It labels contradicting evidence with a "but see" signal and then moves on like nothing ever happened. 89 Fed. Reg. at 21,849 n.2745.

Further, SEC provides no evidence the Rule is necessary to achieve its goals. *See Bus. Roundtable*, 647 F.3d at 1154 ("[T]he Commission failed adequately to address whether the [existing] regulatory requirements of the ICA reduce the need for, and hence the benefit to be had from, proxy access for shareholders of investment companies."). SEC

already requires companies to disclose material climate-related risks. *See, e.g.*, 17 C.F.R. § 240.12b-20 ("In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading."). SEC does not provide any evidence that its new disclosure requirements achieve anything, let alone explain what the new disclosures will do for investors.

Indeed, SEC already has a taskforce charged with authority to enforce climate-related disclosure requirements. SEC's Division of Enforcement has a Climate and ESG Task Force that brings enforcement actions when it believes there have been material climate-related misstatements. *See, e.g.*, *SEC Charges BNY Mellon Investment Adviser for Misstatements and Omissions Concerning ESG Considerations*, SEC Press Release (May 23, 2022), http://tiny.cc/xfacyz. And SEC does not say it is losing these enforcement actions because its existing regulatory requirements do not cover climate disclosures. In other words, SEC is trying to fix a problem that does not exist—a quintessential example of

50

arbitrary and capricious agency action. *See Nat'l Fuel Gas Supply*, 468 F.3d at 843 (Kavanaugh, J.).

Finally, SEC premises its requirements for climate disclosures on rank speculation. The Rule "mandates reporting of estimates that are too speculative and subjective to comport with fundamental principles of accounting and finance." J.W. Verret, Professor, Antonin Scalia Law School, George Mason University, Comment Letter on Proposed Rule: The Enhancement and Standardization of Climate-Related Disclosures for Investors (June 8, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20130713-299599.pdf, at 13. It relies on the TCFD framework—a privately established voluntary set of recommended climate-related disclosures—which "was not developed by international financial regulators" and "includes estimation methodologies that are entirely inconsistent with modern financial theory." *Id.* at 14. That framework and the securities disclosure system do not match. *Id.* at 13–15. Moreover, the Rule shows a failure to appreciate the limitations of weather modeling because it requires companies to predict adverse weather impacts felt in their specific zip code 15, 20, or 30 years in the future. *Id.* at 14–15. In short, the Rule is a "radical departure from the

51

type of discounted cash flow" modeling typically used by financial advisors, consultants, and theorists. *Id.* at 15–18.

### D. SEC Did Not Provide Notice Of The Scientific Research It Relied On In The Rule.

Agencies must provide "notice of" their "proposed rule" and "an opportunity to participate in the rule making through the submission of written data, views, or arguments." 5 U.S.C. §§ 553(b)–(c). "Among the information that must be revealed for public evaluation are the 'technical studies and data' upon which the agency relies." *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006) (quoting *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991)). "An agency commits serious procedural error when it fails to reveal portions" of a rule's basis "in time to allow for meaningful commentary." *Solite Corp.*, 952 F.2d at 484 (quoting *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 530–531 (D.C. Cir. 1982)).

SEC argues "increased exposure to higher temperatures, a form of physical climate risk, reduces firm revenues and operating income." 89 Fed. Reg. at 21,848. But in so doing, it relies on a panoply of articles that never appeared in the Proposed Rule. *Compare id.* at 21,848–49 nn.2737–46, *with* 87 Fed. Reg. 21,334. On that basis alone, SEC violated the APA,

52

and this Court should "hold unlawful and set aside" the Rule. 5 U.S.C. § 706(2).

Indeed, SEC did not even try to limit itself to the data it cited in the Proposed Rule. Many of the articles the Rule cited were published long after the comment period on the Proposed Rule closed. *See, e.g.*, 89 Fed. Reg. at n.2745 (citing J. Aswani, *supra*). And, over the last year, courts across the country, including this Court, took issue with EPA actions for doing precisely that. *See, e.g.*, *Texas v. EPA*, 2023 WL 7204840, at *8 (5th Cir. May 1, 2023); *Arkansas v. EPA*, No. 23-1320 (8th Cir. May 25, 2023); *Missouri v. EPA*, 23-1719 (8th Cir. May 26, 2023); *Allete, Inc. v. EPA*, No. 23-1776 (8th Cir. July 5, 2023); *see also West Virginia v. EPA*, 90 F.4th 323, 332 (4th Cir. 2024) (collecting cases).

Although the reliance on data never made available for public comment is just one of SEC's justification for the Rule, this deficiency alone requires vacatur. As the federal government conceded last year, appellate courts cannot uphold final agency action "after finding that the [agency] ha[s] erred." *Calcutt v. FDIC*, 598 U.S. 623, 629 (2023). Here, a significant chunk of SEC's reasoning was based on data it never presented in the Proposed Rule. Because the only way to uphold the Rule

is for this Court rely on data the public could not have commented on, the Rule must fall.

## CONCLUSION

For these reasons, the petitions for review should be granted and the Rule vacated.

June 21, 2024                      Respectfully submitted,

BRENNA BIRD                        /s/ Eric Wessan
Attorney General of Iowa           ERIC WESSAN
                                   *Solicitor General*

                                   /s/ Patrick C. Valencia
                                   PATRICK C. VALENCIA
                                   *Deputy Solicitor General*

                                   Hoover State Office Building
                                   1305 East Walnut Street
                                   Des Moines, Iowa 50319
                                   (515) 823-9117 / (515) 281-5191
                                   (515) 281-4209 (fax)
                                   eric.wessan@ag.iowa.gov
                                   patrick.valencia@ag.iowa.gov

                                   *Counsel for State of Iowa*

54

CHRISTOPHER M. CARR
Georgia Attorney General

/s/ *Stephen J. Petrany*
STEPHEN J. PETRANY
*Solicitor General*
Office of the Attorney General of
Georgia
40 Capitol Square, SW
Atlanta, GA 30334
(404) 458-3408
spetrany@law.ga.gov

*Counsel for State of Georgia*

DAVE YOST
Ohio Attorney General

/s/ *T. Elliot Gaiser*
T. ELLIOT GAISER
*Solicitor General*
MATHURA J. SRIDHARAN
*Deputy Solicitor General*
Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for Ohio Bureau of
Workers' Compensation*
PATRICK MORRISEY
West Virginia Attorney General

/s/ *Michael R. Williams*
MICHAEL R. WILLIAMS

*Principal Deputy Solicitor
General*
LINDSAY S. SEE
*Solicitor General*
Office of the Attorney General of
West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West
Virginia*

STEVE MARSHALL
Alabama Attorney General

/s/ *Edmund G. LaCour Jr.*
EDMUND G. LACOUR JR.
*Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
 (334) 242-7300
Edmund.LaCour@AlabamaAG.g
ov

*Counsel for State of Alabama*

TREG TAYLOR
Alaska Attorney General

/s/ *William Milks*
WILLIAM MILKS
*Assistant Attorney General*

55

BEN HOFMEISTER
*Assistant Attorney General*
Alaska Department of Law
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
bill.milks@alaska.gov
ben.hofmeister@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
Arkansas Attorney General

*s/ Nicholas J. Bronni*
NICHOLAS J. BRONNI
*Solicitor General*
DYLAN L. JACOBS
*Deputy Solicitor General*
Office of the Arkansas Attorney
General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.g
ov

*Counsel for the State of Arkansas*

RAÚL R. LABRADOR
Attorney General of Idaho

*/s/ Joshua N. Turner*
JOSHUA N. TURNER
*Chief of Constitutional Litigation
and Policy*
ALAN M. HURST
*Solicitor General*

Office of the Idaho Attorney
General
P.O. Box 83720 Boise, Idaho
83720 (208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
Indiana Attorney General

*/s/ James A. Barta*
JAMES A. BARTA
*Solicitor General*
Office of the Attorney General of
Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone: (317) 232-0709
James.Barta@atg.in.gov

*Counsel for State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

*/s/ Matthew F. Kuhn*
MATTHEW F. KUHN
*Solicitor General*
VICTOR B. MADDOX
*Counsel for Special Litigation*
JACOB M. ABRAHAMSON
*Assistant Solicitor General*
Office of Kentucky Attorney
General
700 Capital Avenue, Suite 118

56

Frankfort, Kentucky 40601
Phone: (502) 696-5300
Matt.Kuhn@ky.gov
Victor.Maddox@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for the Commonwealth of Kentucky*

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
*Solicitor General*
AUTUMN HAMIT PATTERSON
*Special Assistant Solicitor General*
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagaj@ag.louisiana.gov

*Counsel for State of Louisiana*

LYNN FITCH
Attorney General of Mississippi

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
*Deputy Solicitor General*
Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205

(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW T. BAILEY
Missouri Attorney General

*/s/ Joshua M. Divine*
JOSHUA M. DIVINE, 69875MO
*Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, MO 65101
Phone: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

AUSTIN KNUDSEN
Montana Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
*Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for the State of Montana*

MICHAEL T. HILGERS
Nebraska Attorney General

57

/s/ *Grant D. Strobl*
GRANT D. STROBL
*Assistant Solicitor General*
Office of the Nebraska Attorney
General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.Strobl@nebraska.gov

*Counsel for the State of Nebraska*
JOHN M. FORMELLA
New Hampshire Attorney
General

*/s/ Samuel R.V. Garland*
SAMUEL R.V. GARLAND
*Senior Assistant Attorney
General*
New Hampshire Department of
Justice
1 Granite Place
Concord, NH 03301
(603) 271-3650
samuel.rv.garland@doj.nh.gov

*Counsel for State of New
Hampshire*
DREW H. WRIGLEY
North Dakota Attorney General

/s/ *Philip Axt*
PHILIP AXT
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck ND 58505

Phone: (701) 328-2210
pjaxt@nd.gov

*Counsel for the State of North
Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II
*Solicitor General*
Office of the Attorney General of
Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for State of Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ *Thomas T. Hydrick*
THOMAS T. HYDRICK
*Assistant Deputy Solicitor
General*
Office of the South Carolina
Attorney General
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South
Carolina*

58

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles McGuigan*
CHARLES MCGUIGAN
*Deputy Attorney General*
Paul S. Swedlund
*Solicitor General*
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
605-773-3215
charles.mcguigan@state.sd.us

*Counsel for the State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

J. MATTHEW RICE
*Solicitor General*
*/s/ Whitney Hermandorfer*
WHITNEY HERMANDORFER
*Director of Strategic Litigation*
Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 741-3491
matt.rice@ag.tn.gov

*Counsel for the State of Tennessee*

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
*First Assistant Attorney General*
JAMES LLOYD
*Deputy Attorney General for Civil Litigation*
KELLIE E. BILLINGS-RAY
*Chief, Environmental Protection Division*
*/s/ Wesley S. Williams*
WESLEY S. WILLIAMS
*Assistant Attorney General*
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012
Wesley.Williams@oag.texas.gov

*Counsel for State of Texas*

SEAN D. REYES
Utah Attorney General

*/s/ Christopher A. Bates*
CHRISTOPHER A. BATES
*Deputy Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320

Salt Lake City, UT 84114-2320
Telephone: (801) 538-9600
chrisbates@agutah.gov

*Counsel for the State of Utah*

59

JASON MIYARES
Virginia Attorney General

/s/ *Kevin M. Gallagher*
KEVIN M. GALLAGHER
*Principal Deputy Solicitor General*
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for Commonwealth of Virginia*

BRIDGET HILL
Wyoming Attorney General

/s/ *Ryan Schelhaas*
RYAN SCHELHAAS
*Chief Deputy*
Office of the Attorney General of Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*

/s/ *R. Trent McCotter*
R. TRENT MCCOTTER
JONATHAN BERRY
MICHAEL BUSCHBACHER
BOYDEN GRAY PLLC
801 17th St. NW, Suite 350
Washington, DC 20006
Telephone: (202) 706-5488
tmccotter@boydengray.com

*Counsel for American Free Enterprise Chamber of Commerce*

60

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 25A, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 10,078 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements of Local R. 25A because the text of the electronic brief is identical to the text of the paper copies and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

June 21, 2024

/s/ Eric Wessan
ERIC WESSAN
*Solicitor General*

*Counsel for State of Iowa*

61

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on June 21, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

June 21, 2024                     /s/ Eric Wessan
                                  ERIC WESSAN
                                  *Solicitor General*

                                  *Counsel for State of Iowa*