Nos. 24-1522, 24-1624, 24-1626, 24-1627, 24-1628, 24-1631, 24-1634, 24-1685, 24-2173

*United States Court of Appeals for the Eighth Circuit*

———————

STATE OF IOWA, ET AL.

*Petitioners*,

—v.—

SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

———————

DISTRICT OF COLUMBIA, ET AL.,

*Intervenors*.

———————

AND CONSOLIDATED CASES

———————

ON PETITION FOR REVIEW OF AN ORDER OF
THE SECURITIES AND EXCHANGE COMMISSION

**BRIEF OF *AMICI CURIAE* ANDREW N. VOLLMER,
OF THE MERCATUS CENTER, AND THE CATO INSTITUTE
IN SUPPORT OF PETITIONERS SEEKING TO SET ASIDE
THE ORDER**

JENNIFER J. SCHULP
THOMAS A. BERRY
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, D.C. 20001
(202) 216-1458

ANDREW N. VOLLMER
MERCATUS CENTER AT GEORGE
MASON UNIVERSITY
3434 Washington Boulevard
Arlington, Virginia 22201
(703) 993-4930

June 20, 2024          *Counsel for Amici Curiae*

# CORPORATE DISCLOSURE STATEMENT

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. Amicus does not issue shares of stock and is not a subsidiary or affiliate of any publicly owned corporation. No publicly held corporation has a direct financial interest in the outcome of this litigation due to amicus's participation.

June 20, 2024

/s/ Andrew N. Vollmer

_____

Andrew N. Vollmer

# TABLE OF CONTENTS

**Page(s)**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICI CURIAE* ..............................................................1

ARGUMENT ...............................................................................3

    I.    The SEC's legal justification for the climate-change disclosure rules erred by resting mainly on an isolated statutory phrase that did not reflect the restrictions in the full text and context of the relevant statutes............4

    II.   Legislative history of the Securities Act and the Securities Exchange Act confirms restrictions on the SEC's disclosure rulemaking authority ......11

        A.    The Securities Act ........................................................11

        B.    The Securities Exchange Act..........................................14

    III.   Earlier SEC decisions confirm that the SEC does not have authority to issue the climate-change disclosure rules ................................16

        A.    Environmental disclosures from the 1970s ...................................16

        B.    2010 Guidance ...............................................................19

        C.    2016 Concept Release ...................................................19

CONCLUSION ..........................................................................21

CERTIFICATE OF COMPLIANCE .........................................................22

CERTIFICATE OF SERVICE.............................................................23

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ala. Assoc. of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ...................................................5

*AMG Cap. Mgmt., LLC v. FTC,*
141 S. Ct. 1341 (2021) ...............................................5, 15

*Biden v. Nebraska,*
143 S. Ct. 2355 (2023) .................................................15

*City of Arlington v. FCC,*
569 U.S. 290 (2013) .......................................................5

*FDA v. Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000) .......................................................5

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor,*
142 S. Ct. 661 (2022) ...................................................15

*NRDC v. SEC,*
606 F.2d 1031 (D.C. Cir. 1979) .................................15

*Util. Air Regul. Grp. v. EPA,*
573 U.S. 302 (2014) .................................................5, 15

*West Virginia v. EPA,*
142 S. Ct. 2587 (2022) .............................................5, 15

**Statutes and Regulations**

15 U.S.C. § 77c(b)(2)(G)(i) ............................................8

15 U.S.C. § 77d-1(b)(1) ..................................................8

15 U.S.C. § 77g(a)(1) .......................................................6

15 U.S.C. § 77aa..............................................................6

15 U.S.C. § 78*l*(b)(1) .................................................................................8

15 U.S.C. § 78*l*(c) .....................................................................................8

15 U.S.C. § 78m(a)(1)–(2) .......................................................................8

15 U.S.C. § 78m(b)(1) ...............................................................................8

42 U.S.C. §§ 4331-32 ..............................................................................16

17 C.F.R. pt. 210 .......................................................................................9

17 C.F.R. pt. 229 .......................................................................................9

17 C.F.R. § 229.303(b) ............................................................................10

Eighth Circuit Rule 28A(h)(2) ...............................................................22

Federal Rule of Appellate Procedure 29(a)(2) .......................................1

Federal Rule of Appellate Procedure 32 ................................................22

## Other Authorities

H.R. Rep. No. 73-85 (1933) ..............................................................13, 14

H.R. Rep. No. 73-1383 (1934) ................................................................15

James M. Landis, The Legislative History of the Securities Act of 1933, 28 Geo. Wash. L. Rev. 29 (1959) .........................................................12, 13

Jennifer J. Schulp, Thomas A. Berry & William Yeatman of the Cato Institute, Comment submitted to the SEC during the comment period on the climate-change disclosure proposal (Jun. 17, 2022), https://www.cato.org/sites/cato.org/files/2022-06/schulp-berry-yeatman-public-comments-6-17-22-updated.pdf ..........................................................2

SEC, Business and Financial Disclosure Required by Regulation S-K, 81 Fed. Reg. 23916 (Apr. 22, 2016) ..........................................................................20

SEC, Commission Guidance Regarding Disclosure Related to Climate Change, 75 Fed. Reg. 6290 (Feb. 8, 2010) ....................................................................10, 19

SEC, Conclusions and Final Action on Rulemaking Proposals Relating to Environmental Disclosure, 41 Fed. Reg. 21632 (May 27, 1976) ......................18

SEC, Environmental and Social Disclosure, 40 Fed. Reg. 51656 (Nov. 6, 1975) .17

SEC, The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21668 (Mar. 28, 2024) ("Release") ......................passim

Joel Seligman, The Transformation of Wall Street (3d ed. 2003) ...................12, 13

Andrew N. Vollmer, Comment submitted to the SEC during the comment period on the climate-change disclosure proposal (Apr. 12, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20123525-279742.pdf ..........2

Andrew N. Vollmer, Reasons a Court Should Find that the SEC Lacked Legal Authority for the Climate-Change Disclosure Rules, Parts 1 through 4, FinRegRag (Apr. 29 to May 9, 2024), first Part at https://www.finregrag.com/p/reasons-a-court-should-find-that....................... 3, 4

Andrew N. Vollmer, Second comment submitted to the SEC during the comment period on the climate-change disclosure proposal (May 9, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20128334-291089.pdf .......2, 4

## INTEREST OF *AMICI CURIAE*

Andrew N. Vollmer and the Cato Institute are the *amici curiae*. They submit this brief under Federal Rule of Appellate Procedure 29(a)(2) in support of the petitioners and their request that the Court hold the climate-change disclosure rules of the Securities and Exchange Commission unlawful and set the rules aside. All parties in the consolidated cases consented to the filing of this brief.[1]

Mr. Vollmer is currently a research scholar with the Mercatus Center at George Mason University. He was Deputy General Counsel at the Securities and Exchange Commission from 2006 to 2009 and taught securities regulation as Professor of Law, General Faculty, at the University of Virginia School of Law from 2014 to 2019. Mr. Vollmer for many years was a partner in the securities enforcement practice of Wilmer Cutler Pickering Hale and Dorr LLP.[2]

The Cato Institute is a nonpartisan public policy research foundation established in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Toward that end, Cato's Robert A. Levy

---

[1] No party's counsel wrote this brief in whole or part. No one other than the Mercatus Center, *amici curiae*, or counsel for *amici curiae* contributed money to fund the preparation or submission of this brief.

[2] Mr. Vollmer submits this brief in his capacity as a scholar at the Mercatus Center, but the views in the brief are his and not necessarily those of any of the institutions with which he is or was affiliated.

Center for Constitutional Studies publishes books and studies about legal issues, conducts conferences, produces the annual *Cato Supreme Court Review*, and files *amicus* briefs in federal courts across the country. Cato's Center for Monetary and Financial Alternatives focuses on identifying, studying, and promoting alternatives to centralized, bureaucratic, and discretionary financial regulatory systems.

The *amici curiae* have published extensive research on financial regulation and constitutional law and have an interest in the SEC regulating capital markets efficiently and in the SEC remaining within its authority to order public disclosures. Mr. Vollmer and Cato scholars submitted comments to the SEC questioning the agency's authority to adopt the proposed climate-change disclosure rules.[3] After the SEC adopted the rules, Mr. Vollmer wrote a series of public

---

[3] Andrew N. Vollmer, Comment submitted to the SEC during the comment period on the climate-change disclosure proposal (Apr. 12, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20123525-279742.pdf; Jennifer J. Schulp, Thomas A. Berry & William Yeatman of the Cato Institute, Comment submitted to the SEC during the comment period on the climate-change disclosure proposal (Jun. 17, 2022), https://www.cato.org/sites/cato.org/files/2022-06/schulp-berry-yeatman-public-comments-6-17-22-updated.pdf. See also Andrew N. Vollmer, Second comment submitted to the SEC during the comment period on the climate-change disclosure proposal (May 9, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20128334-291089.pdf.

internet posts analyzing the agency's explanation of its legal authority for the rules.[4]

## ARGUMENT

The Securities and Exchange Commission adopted mandatory climate-change disclosure rules[5] but did not have the legal authority to do so. That conclusion is based on the appropriate interpretation of the securities statutes granting the SEC authority to impose disclosure obligations on companies that issue securities or have a duty to make periodic public disclosures.

Construction of those statutes begins with an analysis of their text, structure, and context, as addressed in the petitioners' briefs in this case. The purpose of this *amici curiae* brief is to supplement and support that statutory analysis first by making a few comments about the SEC's position on its statutory authority to adopt the Rules and then by discussing two topics that typically receive less attention than statutory text. Those topics are the legislative history of the main

---

[4]     Andrew N. Vollmer, Reasons a Court Should Find that the SEC Lacked Legal Authority for the Climate-Change Disclosure Rules, Parts 1 through 4, FinRegRag (Apr. 29 to May 9, 2024) ("Lack of Authority Posts"). The first Part is at https://www.finregrag.com/p/reasons-a-court-should-find-that.

[5]     SEC, The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21668 (Mar. 28, 2024). This brief will refer to this SEC document as the "Release." The "Rules" are at the end of the Release.

statutes on the SEC's disclosure rulemaking authority and earlier SEC decisions disclaiming authority to order disclosures on climate-change matters.[6]

The legislative history and the earlier SEC decisions confirm restrictions on the SEC's authority to adopt rules on climate-change disclosure. The report of the House Commerce Committee on the bill that became the Securities Act and a House report for the bill that became the Securities Exchange Act have language restricting the discretion of the SEC to compel company disclosures. In earlier decisions, the SEC said it needed a specific congressional mandate to be able to adopt special disclosure rules on environmental, climate change, and social policy issues. The SEC did not have such a mandate for the new climate-change disclosure rules.

## I. The SEC's legal justification for the climate-change disclosure rules erred by resting mainly on an isolated statutory phrase that did not reflect the restrictions in the full text and context of the relevant statutes.

Under the separation of powers created by the Constitution, a federal agency such as the SEC must have a statutory source of authority when it proposes and

---

[6]     See Lack of Authority Posts, cited in note 4, Parts 3 and 4; Andrew N. Vollmer, Second comment submitted to the SEC, cited in note 3.

adopts a legislative rule.[7]  Congress, not a federal agency, sets the scope and terms of an agency's rulemaking and enforcement powers.

The Supreme Court's normal method of determining an agency's rulemaking power is to examine the text and context of the relevant statutes with a view to their place in the overall statutory scheme and not to confine itself to a particular statutory provision in isolation.[8]  In the Release supporting the Rules, the SEC described its interpretation of the statutes empowering the SEC to write binding disclosure rules on climate-change issues, Release 21683-85, but it did not follow the Supreme Court's approach.  To the contrary, the SEC relied primarily on a specific statutory phrase in isolation.  Id. 21683.

---

[7]    See *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) ("Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line. We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies.") (quotation marks and citations omitted); *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) ("No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*.") (emphasis in original).

[8]    *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 132–33 (2000); see also *West Virginia v. EPA*, 142 S. Ct. 2587, 2607-09 (2022); *Ala. Assoc. of Realtors v. HHS*, 141 S. Ct. 2485 (2021) (on application to vacate stay); *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348-49 (2021); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 318–20, 321 (2014).

The SEC asserted in the Release that it has a general power to require "disclosures of information that the Commission finds 'necessary or appropriate in the public interest or for the protection of investors.'" Id. It concluded that it has considerable discretion to "build on" provisions in the Securities Act and the Securities Exchange Act to issue disclosure regulations and develop its own disclosure system. Id.

That is not correct. The text, structure, and context of the disclosure statutes in the Securities Act and the Securities Exchange Act restrict the SEC's power to issue disclosure rules to information about certain internal characteristics of an issuing or reporting company, such as financial statements, core business information, directors and management, and a description of the securities being sold.

Section 7(a)(1) of the Securities Act (15 U.S.C. § 77g(a)(1)) is an example. Section 7(a)(1) says that a registration statement for a public offer "shall contain the information" and documents "specified in Schedule A" of the Act. Schedule A (15 U.S.C. § 77aa) has 31 items including the business of the company, its capital structure, material contracts, and detailed balance sheet and profit or loss statements.

Congress added two qualifications to the disclosures required by Schedule A. First, the SEC may, by rule, exclude some of the information if it concludes

that the information is not necessary for adequate disclosure to investors in particular classes of issuers.  Second, the SEC also may adopt rules to require a registration statement to include other information or documents as "necessary or appropriate in the public interest or for the protection of investors."

The SEC read section 7(a)(1) to support its discretion to create its own set of disclosure obligations.  It isolated and emphasized the phrase permitting it to add to the disclosures in Schedule A for the protection of investors and interpreted the statute to say that Congress "authorized," but did not require, disclosure of information listed in Schedule A.  Release 21683.  The SEC viewed Schedule A as optional suggestions.

That was not a fair reading of the statute as a whole.  The better reading is that Schedule A is the base disclosure for a registration statement.  The statute says a registration statement "shall contain" the Schedule A information, not that the SEC is "authorized" to require it.  It gives the SEC limited discretion to add to or subtract from the Schedule A items when it has a good reason, but the agency is not free to treat a power to create exceptions as the power to develop a new system.

Similarly, the SEC in the Release disregarded the limitations in sections 12 and 13 of the Exchange Act.  Section 12 gives the SEC power to adopt rules governing the disclosures for registering a security on an exchange, but this SEC rulemaking power is expressly limited to specific categories of information and

documents.  The categories include the nature of the business, the terms of

outstanding securities, descriptions of directors, officers, and major shareholders,

material contracts, balance sheets, profit and loss statements, and other financial

statements.  15 U.S.C. § 78*l*(b)(1).  The SEC may determine that a listed item is

not applicable to a class of issuers and order the class to submit comparable

information, but it may not add to the disclosure list.  Id. § 78*l*(c).

Section 13(a) provides for periodic reporting obligations of some companies

in accordance with rules the SEC "may prescribe as necessary or appropriate for

the proper protection of investors and to insure fair dealing in the security."  Id. §

78m(a)(1)–(2).  That rulemaking authority for periodic reports must be read with

section 13(b)(1), which restricts the power to certain subjects.  Id. § 78m(b)(1).

The subjects are accounting items, such as the details for a balance sheet and the

methods to be followed in the valuation of assets and liabilities.[9]

---

[9]    When Congress provided for a company's disclosure obligations in other
statutes of the Securities Act, it consistently singled out essential information about
the company's business, securities, management, financial statements, and
securities offering process.  See, e.g., 15 U.S.C. § 77c(b)(2)(G)(i) (requiring a
company selling a small issue to disclose audited financial statements, a
description of the business operations, its financial condition, corporate governance
principles, and use of investor funds); id. § 77d-1(b)(1) (requiring, in a
crowdfunding transaction, disclosures of information about the issuing company,
its business, securities being sold and capital structure, officers, directors, and
major shareholders, and use of proceeds).

The statutory text and context of the Securities Act and the Securities Exchange Act limit the SEC's power to issue disclosure rules to specific types of information about the disclosing company's business, finances, and securities that bear on investment returns.  The SEC therefore was wrong to ignore the limitations and interpret the statutes to confer near total discretion on it to decide on disclosure duties as long as it could cross low thresholds on investor protection, efficiency, and capital formation.

The SEC sometimes attempted to nod in the right direction in the Release by saying "climate-related risks can affect a company's business and its financial performance and position in a number of ways," Release 21685, but that did not bring the new Rules within the SEC's statutory authority.  The Rules create a new disclosure regime for climate change that differs from the extensive, pre-existing set of disclosure obligations written to comply with the disclosure statutes in the securities acts.

The disclosure rules for issuing and reporting companies in Regulations S-K and S-X comprehensively cover the areas of company information of interest to investors.[10]  They are based on the disclosure statutes in the Securities Act and the Securities Exchange Act and were in effect before the SEC adopted the new

---

[10]     17 C.F.R. pt. 229; id. pt. 210.

climate-change disclosure rules. When global warming or other environmental issues, including transition risk, affect or threaten the operations or financial performance of a specific company, many of the pre-existing disclosure rules require discussion of the effects, as the SEC conceded. Release 21680.

In 2010, the SEC issued guidance about the application of the Regulation S-K disclosure rules to climate-change matters and listed a variety of specific disclosure obligations that, depending on the particular circumstances of a company, could require disclosure of the effects of climate change developments.[11] For example, one item in Regulation S-K requires a company to disclose and discuss a trend or uncertainty that is reasonably likely to have a material positive or negative consequence for the company's liquidity, capital resources, or results of operations.[12]

The way to reach a business or financial effect from climate change on a particular company was through the disclosure obligations already in Regulation S-K as authorized by the securities statutes. It was not with an entirely new system centered on climate change.

---

[11] SEC, Commission Guidance Regarding Disclosure Related to Climate Change, 75 Fed. Reg. 6290 (Feb. 8, 2010).

[12] 17 C.F.R. § 229.303(b).

**II.** **Legislative history of the Securities Act and the Securities Exchange Act confirms restrictions on the SEC's disclosure rulemaking authority.**

Legislative history from the Securities Act and the Securities Exchange Act corroborates restrictions on the SEC's authority to adopt disclosure rules evident from the statutory text. A key congressional committee for each enactment stated explicitly that the SEC's authority to create new disclosure rules was limited.

Legislative history is not statutory text and should not carry the same weight, but it can help illuminate. It does so here because the relevant statutes on the SEC's ability to write disclosure rules have not changed in a way that matters to this case since they were enacted in the early 1930s.

**A.** **The Securities Act**

The legislative history of the Securities Act and Schedule A bears directly on the opposing interpretations of section 7(a)(1). As discussed above, the appropriate interpretation of that section is that it requires a registration statement to contain the information specified in Schedule A of the Act but gives the SEC power to create exceptions. The SEC's interpretation was that the disclosure items in Schedule A were optional and that the agency was free to build its own set of disclosures. Release 21683. The legislative history supports the reading of limitations on the SEC's authority and does not support the SEC's position.

The drafting of the Securities Act is particularly notable because it involved well-known figures in the nation's history: President Franklin Roosevelt; Representative Sam Rayburn, later Speaker of the House; Harvard Law Professor Felix Frankfurter, later a Supreme Court Justice; and proteges of Frankfurter, including James Landis, also a Harvard Law professor and later Chairman of the SEC and then dean of Harvard Law School. Landis did much of the work with Benjamin Cohen, a lawyer from private practice knowledgeable about securities.[13]

In April 1933, the White House asked Frankfurter to help draft a bill on securities offerings. He put together a team that included Landis and Cohen, who worked with Rayburn on a House bill that became the main basis for the Securities Act.[14]

During the drafting, Cohen and Landis prepared a detailed schedule of data to be disclosed by each company issuing securities. Cohen wanted the statute to include the items, but Landis decided he wanted to give an administrative agency general power to issue disclosure rules based on the expertise it developed.[15] The

_____

[13]     See Joel Seligman, The Transformation of Wall Street 61-63 (3d ed. 2003); James M. Landis, The Legislative History of the Securities Act of 1933, 28 Geo. Wash. L. Rev. 29, 29 n.*, 33, 37 (1959).

[14]     Seligman, cited in note 13, at 56-57, 61-63, 69; Landis, cited in note 13, at 33, 34, 45.

[15]     Seligman, cited in note 13, at 64.

two clashed, and Cohen telephoned Frankfurter to threaten to quit.  Frankfurter

intervened with the President about the disagreement, informing him that the

omission of specific data to be disclosed would, among other problems,

"jeopardize effective enforcement because of the enormous discretion it leaves to

Commission … thereby [inviting] laxity, favoritism, and indifference."[16]

Roosevelt agreed and contacted Rayburn.[17]  The drafters decided to keep the

detailed items for disclosure but put them in a schedule of the act.[18]

Landis and Cohen wrote a report for the responsible House committee, the

Committee on Interstate and Foreign Commerce chaired by Rayburn, to

accompany the House bill.[19]  The report vouched for the Schedule A disclosures:

"The items required to be disclosed, set forth in detailed form, are items

indispensable to any accurate judgment upon the value of the security" and the

proper direction of capital resources.[20]  The required disclosures fulfilled the

---

[16]    Id. at 64-65 (quoting telegram from Frankfurter to Roosevelt; ellipsis and
brackets in Seligman).

[17]    Id. at 65.

[18]    Id.; Landis, cited in note 13, at 35, 38.

[19]    Landis, cited in note 13, at 41.

[20]    H.R. Rep. No. 73-85, at 3 (1933).

President's demand that no essentially important element about the securities to be sold should be concealed from the public.[21]

The House report also warned that an administering agency should not have broad power over disclosures. The report used language resembling Frankfurter's telegram to Roosevelt about the need for the statute to specify disclosure items: "To assure the necessary knowledge for [an investor's] judgment, the bill requires enumerated definite statements. Mere general power to require such information as the Commission might deem advisable would lead to evasions, laxities, and powerful demands for administrative discriminations."[22]

## B. The Securities Exchange Act

A report of the House committee working on the bill that would become the Securities Exchange Act expressed similar concern about granting an agency too much discretion to impose disclosure obligations. As discussed above, the main disclosure provisions of the Exchange Act, sections 12 and 13, severely limited the SEC's ability to add disclosure items. The report said the committee specified the disclosures to register a security on an exchange under section 12 because it did

---

[21]     Id. at 4.

[22]     Id. at 7.

not want to give too much disclosure discretion to the SEC. The SEC was not to have "unconfined authority to elicit any information whatsoever."[23]

The SEC in the Release did not cite this part of the Exchange Act report but instead cited another part to bolster its assertion of broad authority to require additional disclosures to protect investors.[24] Although the pages the SEC cited do support the general position that the House committee wanted the administering agency to have certain amounts of discretion and flexibility to write regulations for abuses covered by the Exchange Act, they do not support a grant of such discretion for disclosure rules. The text of the relevant statutes in the Exchange Act together with the comment from the House committee report restrict disclosure rulemaking power.

---

[23]     H.R. Rep. No. 73-1383, at 23 (1934); see also id. at 23-24.

[24]     Release 21683 & n.181 (citing H.R. Rep. No. 73-1383, at 6-7 (1934)). That footnote in the Release also quoted *NRDC v. SEC*, 606 F.2d 1031, 1045, 1050 (D.C. Cir. 1979), which referred to the SEC's broad discretion to promulgate rules on corporate disclosure. Since the 1979 decision, much has changed in statutory interpretation, especially when evaluating rulemaking power claimed by an administrative agency. Courts defer to agencies less and are more attentive to the text, structure, and context of statutes. See *Biden v. Nebraska*, 143 S. Ct. 2355 (2023); *West Virginia v. EPA*, 142 S. Ct. 2587, 2607-08 (2022); *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661 (2022); *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1348-49 (2021); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 318–20, 321 (2014).

The passages from the two House committee reports refute the SEC's position in the Release that it has power to build on the statutory framework in some unconfined way to ensure that public company disclosures provide investors with any information the agency views as important to making investment decisions.  See Release 21683.

## III.  Earlier SEC decisions confirm that the SEC does not have authority to issue the climate-change disclosure rules.

The SEC ignored its own earlier decisions that the agency does not have power to adopt special disclosure rules on environmental, climate change, and social policy issues.  In the earlier decisions, the SEC said it needed a specific congressional mandate to have that power.  These decisions confirm that the SEC lacked authority for the new climate-change disclosure rules because Congress did not issue a statutory mandate for them.

### A.  Environmental disclosures from the 1970s

The SEC recognized limitations on its disclosure authority in the 1970s when it considered the possibility of ordering disclosure of environmental matters. Congress passed the National Environmental Policy Act in 1969 and required agencies to consider the promotion of environmental protection as a factor when making decisions.  See 42 U.S.C. §§ 4331-32.

Even in the face of such a congressional mandate, the SEC contested and took a narrow view of its disclosure authority on environmental matters.  In 1975,

16

the SEC concluded "it is generally not authorized to consider the promotion of social goals unrelated to the objectives of the federal securities laws."[25] The SEC asserted it had broad discretion to require disclosures under the federal securities laws but had the "view that the discretion vested in the Commission under the Securities Act and the Securities Exchange Act to require disclosure which is necessary or to consider appropriate 'in the public interest' does not generally permit the Commission to require disclosure for the sole purpose of promoting social goals unrelated to those underlying these Acts."[26] Disclosures under the Acts were to be limited to information about the financial condition of and matters of economic significance to the disclosing company.[27] NEPA did not change the purpose of the SEC's disclosure scheme, but it did require the SEC to consider environmental values and protection when determining whether to require securities disclosures.[28]

The SEC therefore proposed and ultimately adopted a small number of narrow rules generally consistent with the disclosure approach and framework in

---

[25]    SEC, Environmental and Social Disclosure, 40 Fed. Reg. 51656 (Nov. 6, 1975).

[26]    Id. at 51660.

[27]    Id. at 51658.

[28]    Id. at 51656, 51661-62.

the securities acts. An example was that a reporting company needed to disclose material effects on capital expenditures, earnings, and competitive position from compliance with government provisions on the protection of the environment.[29]

In the discussion of authority in the Release, the SEC cited these disclosure rules related to the environment from the 1970s as precedent for the new climate-change disclosure rules. Release 21685. That is not accurate. The disclosures connected to the environment issued in the 1970s were different in the most important way on the question of agency authority. In the 1970s, the SEC was responding to NEPA, a congressional enactment, but it did not have a specific statutory mandate for the new climate-change disclosure rules.[30]

As a result, the SEC's reliance on the disclosure rules related to the environment from the 1970s as precedent for the new Rules concedes the entire debate about the SEC's lack of authority to adopt the new Rules. The SEC had explicit statutory authority for the earlier environmental disclosures and did not

---

[29] See SEC, Conclusions and Final Action on Rulemaking Proposals Relating to Environmental Disclosure, 41 Fed. Reg. 21632 (May 27, 1976).

[30] NEPA did not provide a statutory basis for them. The SEC completed its response to NEPA in 1976, id. (concluding that "its existing rules, previously adopted, along with the action it is taking today, satisfy the Commission's obligations under the federal securities laws and the National Environmental Policy Act of 1969") (footnote omitted), and did not cite NEPA as authority for the new Rules. See Release 21912.

have it for the new climate-change disclosure rules.  Without it, the climate-change disclosure rules are not valid.

## B.   2010 Guidance

The SEC returned to the question of company disclosures on climate-change matters in 2010, when it issued guidance on that topic.[31]  The Release also cited the 2010 Guidance as precedent for the new Rules, Release 21685, but, as with the rules related to the environment from the 1970s, issuance of the Guidance weakens rather than strengthens the case for the SEC's authority to issue the Rules.  The 2010 Guidance was in keeping with the existing statutory authority for disclosures because it explained how a reporting company could apply items of disclosure already in Regulation S-K to weather events and other effects from climate-change.

## C.   2016 Concept Release

In 2016, the SEC again looked at its legal power to require disclosures on environmental and social issues.  The SEC summarized its 1975 conclusion on lack of power and said the relevant statutes had not changed:

> In 1975, the Commission considered a variety of "environmental and social" disclosure matters, as well as its own authority and responsibilities to require disclosure under the federal securities laws. Following extensive proceedings on these topics, the Commission concluded that it generally is

---

[31]     SEC, Commission Guidance Regarding Disclosure Related to Climate Change, 75 Fed. Reg. 6290 (Feb. 8, 2010).

not authorized to consider the promotion of goals unrelated to the objectives of the federal securities laws when promulgating disclosure requirements, although such considerations would be appropriate to further a specific congressional mandate.[32]

The SEC noted that Congress had not given new statutory authority for disclosures in these areas.[33]

This Court will now exercise its independent judgment to interpret the SEC's statutory authority to adopt the climate-change disclosure rules. The earlier decisions from the SEC support a conclusion that the new rules exceed the SEC's power.

---

[32]    SEC, Business and Financial Disclosure Required by Regulation S-K, 81 Fed. Reg. 23916, 23971 (Apr. 22, 2016) (concept release) (footnote omitted).

[33]    Id.

## CONCLUSION

The Court should hold unlawful and set aside the SEC's adoption of the new climate-change disclosure rules.

June 20, 2024

Respectfully submitted,

/s/ Andrew N. Vollmer

_____

JENNIFER J. SCHULP
THOMAS A. BERRY
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, D.C. 20001
(202) 216-1458

ANDREW N. VOLLMER
MERCATUS CENTER AT GEORGE MASON UNIVERSITY
3434 Washington Boulevard
Arlington, Virginia 22201
(703) 993-4930

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENT, TYPE STYLE REQUIREMENT, AND VIRUS SCAN

1.     The undersigned counsel for *amici curiae* certifies pursuant to Federal Rule of Appellate Procedure 32(a)(7) that the foregoing brief contains 4,444 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), according to the Word Count feature of Microsoft Word for Mac version 16.86.

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Mac version 16.86 in 14-point font of Times New Roman.

3.     To comply with 8th Cir. R. 28A(h)(2), the brief was scanned for viruses.  The brief is virus free.

June 20, 2021

/s/ Andrew N. Vollmer
_____
Andrew N. Vollmer

**CERTIFICATE OF SERVICE**

I hereby certify that on June 20, 2024, I caused the foregoing document to be electronically filed with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system, thereby serving all persons required to be served.

June 20, 2024

/s/ Andrew N. Vollmer
_____
Andrew N. Vollmer