Nos. 24-1522, -1624, -1626, -1627, -1628, -1631, -1634, -1685, -2173

# In the United States Court of Appeals for the Eighth Circuit

—————————

STATE OF IOWA, ET AL.,
*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,
*Respondent*

and

DISTRICT OF COLUMBIA; ARIZONA; COLORADO; CONNECTICUT;
DELAWARE; HAWAII; ILLINOIS; MARYLAND; MASSACHUSETTS;
MICHIGAN; MINNESOTA; NEVADA; NEW MEXICO; NEW YORK;
OREGON; RHODE ISLAND; VERMONT; WASHINGTON; AND WISCONSIN,
*Intervenors*.

—————————

**Petition for Review of an Order of the Securities and Exchange Commission**

—————————

**BRIEF OF THE MANHATTAN INSTITUTE, JAMES R. COPLAND,
AND BERNARD S. SHARFMAN AS *AMICI CURIAE* SUPPORTING PETITIONERS**

Ilya Shapiro
Tim Rosenberger
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

June 24, 2024

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and 8th Cir. R. 26.1(A), the Manhattan Institute states that it has no parent companies, subsidiaries, or affiliates, and does not issue shares to the public.

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ................................................................... iii

INTEREST OF *AMICI CURIAE* ...............................................................1

SUMMARY OF THE ARGUMENT .......................................................2

ARGUMENT ...................................................................................4

I. THE CLIMATE DISCLOSURE RULE (CDR) VIOLATES
FEDERALISM BY INTERVENING IN A POLICY AREA
TRADITIONALLY SUBJECT TO STATE REGULATION
WITHOUT CONGRESSIONAL AUTHORIZATION .................................5

    A. State Law Governs the Prerogatives of Corporate Boards and
Executive Management ........................................................5

    B. The CDR Modifies the Prerogatives of Corporate Boards and
Executive Management. .......................................................6

    C. Congress Has Not Empowered the SEC to Preempt State Laws
Governing the Management of Company Priorities. ...........................8

II. THE CDR VIOLATES THE SEPARATION OF POWERS BY
EXCEEDING THE SCOPE OF THE SEC'S STATUTORY
AUTHORITY AND COMMANDEERING THE EPA'S POWER
OVER ENVIRONMENTAL REGULATION .............................................12

    A. Congress Has Authorized the SEC to Require the Disclosure
Only of Financial Information That Is Financially Material to
Investment Decisions ........................................................13

    B. The CDR Requires Companies to Disclose Immaterial Data
That Does Not Advance the SEC's Investor-Protection Mandate
and Undercuts Its Mandate to Support Efficiency, Competition,
and Capital Formation ........................................................15

    C. The EPA, Not the SEC, Has the Authority to Regulate the
Corporate Disclosure of Environmental Data ....................................20

Appellate Case: 24-1522    Page: 3    Date Filed: 06/24/2024 Entry ID: 5406132

CONCLUSION ...................................................................................................21

CERTIFICATE OF COMPLIANCE ....................................................................22

CERTIFICATE OF SERVICE ..............................................................................22

iii

# TABLE OF AUTHORITIES

**Cases**                                                                    **Pages(s)**

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ..........................................................16

*Business Roundtable v. SEC,* 647 F.3d 1144 (D.C. Cir. 2011) .....................3, 10, 11

*Cort v. Ash*, 422 U.S. 66 (1975)..................................................................................2

*Gonzales v. Raich*, 545 U.S. 1 (2005)........................................................................8

*Gregory v. Ashcroft*, 501 U.S. 452 (1991).................................................................4

*NAACP v. FPC*, 425 U.S. 662 (1976).........................................................................9

*Santa Fe Indus. v. Green*, 430 U.S. 462 (1977)...............................................2, 5, 11

*Tafflin v. Levitt*, 493 U.S. 455 (1990).........................................................................4

*Wickard v. Filburn*, 317 U.S. 111 (1942)...................................................................8

## Constitutional Provisions

U.S. Const. Amend. X....................................................................................................4

## Statutes

15 U.S.C. § 77(b) ......................................................................................................3, 10

15 U.S.C. § 77g(a)(1).............................................................................................. 9, 12-13

15 U.S.C. §78c(f) ........................................................................................................10

15 U.S.C § 78m(b)(1) .............................................................................................9, 13

15 U.S.C. § 78w(a)(2) .................................................................................................10

15 U.S.C. § 80a-2(c) ...................................................................................................10

Appellate Case: 24-1522      Page: 5      Date Filed: 06/24/2024 Entry ID: 5406132

42 U.S.C. § 7414 .................................................................................................20

Del. Code Ann. tit. 8, § 141(a) ......................................................................5, 6, 7, 8

National Securities Markets Improvement Act of 1996,
Pub L. 104-290, 110 Stat. 3416 (1996) ...................................................10, 14

## Regulations

17 C.F.R. § 230.405 (1933) .................................................................................15

The Enhancement and Standardization of Climate-Related Disclosures for
Investors, 89 Fed. Reg. 21,688 (Mar. 28, 2024).......................6, 7, 12, 13, 17

## Other Authorities

A.C. Pritchard & Robert B. Thompson, A History of Securities Law in the
Supreme Court (2023) ...............................................................................4, 5

Alon Brav & J.B. Heaton, *Brown Assets for the Prudent Investor*,
12 Harv. Bus. Rev. L. Online, art. 2, 2021, at 1 .............................................8

Arthur Levitt, Chairman, U.S. Sec. and Exch. Comm'n, Address at the
Commonwealth Club, San Fransisco, Cal. (May 17, 1996)...........................9

Bernard S. Sharfman & James R. Copland, Comment Letter on Proposed Rule
on Climate-Related Disclosures (Jun. 16, 2022) ........................ 7-8, 9, 13, 19

Bernard S. Sharfman & James R. Copland, *The SEC Can't Transform Itself
into a Climate-Change Enforcer*, Wall St. J. (Sept. 14, 2022) .......................3

Hester M. Peirce, Green Regs and Spam: Statement on the Enhancement and
Standardization of Climate-Related Disclosures for Investors
(Mar. 6, 2024) ...............................................................................17, 19, 20

Louis J. Capozzi III, *The Past and Future of the Major Questions Doctrine*,
84 Ohio State L. J. 191 (2023) .......................................................................3

Appellate Case: 24-1522     Page: 6     Date Filed: 06/24/2024 Entry ID: 5406132

Michael D. Guttentag, *On Requiring Public Companies to Disclose Political Spending*, 2014 Col. Bus. L. Rev. 593 (2014)................................. 14, 16-17

Robert G. Eccles, *Untangling Climate Risk, Financial Risk, and Climate Impact*, Forbes (April 18, 2024) .................................................................8

Sean J. Griffith, *What's "Controversial" About ESG? A Theory of Compelled Commercial Speech Under the First Amendment*, 101 Neb. L. Rev. 876 (2023) .......................................................16

The Federalist, No. 47 (Madison) (Clinton Rossiter ed., 1961) ............................12

The Federalist, No. 51 (Madison) (Clinton Rossiter ed., 1961) .............................3

U.S. Sec. & Exch. Com., *Commission Guidance Regarding Disclosure Related to Climate Change*, Release Nos. 33-9106, 34-61469 (Feb. 2, 2010) .........15

Appellate Case: 24-1522     Page: 7     Date Filed: 06/24/2024 Entry ID: 5406132

## INTEREST OF *AMICI CURIAE*[1]

The Manhattan Institute (MI) is a nonprofit policy research foundation whose mission is to develop and disseminate ideas that foster individual responsibility and agency across multiple dimensions. It has sponsored scholarship and filed briefs opposing regulations that interfere with constitutionally protected liberties.

James R. Copland is a senior fellow and director of legal policy at MI, where he focuses on civil-justice issues, financial regulation, and administrative law. He has testified before Congress and state legislatures, and has authored many policy briefs, articles, and opinion pieces, including in the *Harvard Business Law Review* and *Yale Journal on Regulation*. His latest book is *The Unelected: How an Unaccountable Elite is Governing America* (2020).

Bernard S. Sharfman is a research fellow at the Law & Economics Center at George Mason University's Antonin Scalia Law School and a member of the *Journal of Corporation Law*'s editorial advisory board. Mr. Sharfman has written extensively on corporate, securities, and administrative law in articles, blog posts, comment letters, and opinion pieces, including in recent articles in the *University of Chicago Business Law Review* and the *Harvard Business Law Review Online*.

---

[1] No counsel for any party or intervenor authored this brief in whole or in part. No person other than *amici curiae* and their counsel made any monetary contribution intended to fund the preparation or submission of this brief. Counsel for *amici* sought consent for the filing of this brief from all parties and intervenors; no party or intervenor objected.

1

*Amici*'s interest lies in their belief that the states' longstanding practice of regulating corporations is vital to maintaining the proper balance of state and federal powers. This brief highlights how recent federal regulatory actions attempt to displace traditional state authority over corporate law without statutory authorization, thus upsetting the federalism envisioned by the framers of the Constitution and those who have since designed our regime of federal securities regulation. *Amici* Copland and Sharfman also submitted a comment in the rulemaking at issue here.

## SUMMARY OF ARGUMENT

Corporate law has long been within the regulatory domain of the states. "Absent a clear indication of congressional intent," *Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977), the Supreme Court has held that "state law will govern the internal affairs of the corporation." *Cort v. Ash*, 422 U.S. 66, 84 (1975). In so holding, the Court has not only safeguarded the balance of powers between the state and federal governments, but it has also ensured that the division of powers among the three branches of the federal government is not ignored by overly ambitious federal regulators. As James Madison once observed, such vertical and horizontal division of authority leads "[t]he different governments [to] control each other" and thus creates "double security . . . [for] the rights of the people." The Federalist No. 51, at 320 (Madison) (Clinton Rossiter ed., 1961).

2

In promulgating the Climate Disclosure Rule (CDR), the Securities and Exchange Commission (SEC) has violated the federalism and separation of powers principles intrinsic to our constitutional structure. At best, the CDR amounts to the SEC's overstepping of its statutory authority into a regulatory domain that Congress has already delegated to other federal agencies. At worst, it represents a usurpation of state authority over corporate law. Under either reading, the SEC has eschewed its "unique obligation," *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (2011), to "promote efficiency, competition, and capital formation," 15 U.S.C. § 77(b), and instead chosen to pursue an expansive political agenda with potentially severe consequences for the economy. Such a decision is repugnant to our constitutional structure and serves as a reminder that federal agencies will continue to seek to resolve major political questions of their own volition unless federal courts "enforc[e] Article I and ensur[e] that the people's elected representatives make the laws that govern all of us." Louis J. Capozzi III, *The Past and Future of the Major Questions Doctrine*, 84 Ohio State L. J. 191, 242 (2023); *see also* Bernard S. Sharfman & James R. Copland, *The SEC Can't Transform Itself into a Climate-Change Enforcer*, Wall St. J. (Sept. 14, 2022).

3

## ARGUMENT

### I. THE CLIMATE DISCLOSURE RULE (CDR) VIOLATES FEDERALISM BY INTERVENING IN A POLICY AREA TRADITIONALLY SUBJECT TO STATE REGULATION WITHOUT CONGRESSIONAL AUTHORIZATION

The Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. X. As the Supreme Court has observed, the states thus "retain substantial sovereign authority under our constitutional system" that is only subject to the "'limitations imposed by the Supremacy Clause.'" *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (quoting *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990)). In adopting the Securities Acts of 1933 and 1934, Congress acted in accordance with its powers under the Supremacy Clause to supplement individual states' regimes of corporate-law regulation, believing that federally mandated "[t]ransparency would help curb the speculative excesses seen in the 1920s." A.C. Pritchard & Robert B. Thompson, A History of Securities Law in the Supreme Court 21 (2023).

When the SEC promulgates regulations, like the CDR, that impose novel disclosure requirements on corporations, it trumps state laws that set the default parameters of corporate governance. To do so without violating principles of federalism, the SEC must therefore act under express statutory authority. Here,

4

however, Congress has not empowered the SEC to promulgate the CDR, violating the Constitution's federalist structure.

### A. State Law Governs the Prerogatives of Corporate Boards and Executive Management

In the early days of the New Deal, President Roosevelt and likeminded leaders in Congress knew that the enactment of federal securities legislation would "address[] subjects previously regulated by state law." *Id.* at 36. Although Congress did eventually choose to preempt some aspects of state corporate law, the Supreme Court has repeatedly emphasized that "[c]orporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." *Santa Fe Indus.*, 430 U.S. at 479 (quoting *Ash*, 422 U.S. at 84) (emphasis original) (internal quotation marks omitted).

Under state law, it is the prerogative of a company's board to decide corporate priorities and determine the criteria for top-level decision making. *See* Del. Code Ann. tit. 8, § 141(a). Likewise, state corporate law governs the levels of transparency with which a company's risk-mitigation procedures are disclosed to investors. *Id.* Additionally, state corporate law enables the board, as advised by its executive management, to determine the types of risks that a company faces and craft appropriate responses thereto. *Id.*

5

### B. The CDR Modifies the Prerogatives of Corporate Boards and Executive Management

The CDR displaces state-law provisions governing corporate boards and executive management. First, it instructs boards to move consideration of climate-related risks to the fore of company priorities and promote their inclusion into all types of top-level decision making. *See* The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21,712-13, (Mar. 28, 2024). State law, however, empowers corporate boards to determine these priorities. *See, e.g.*, Del. Code Ann. tit. 8, § 141(a).

Second, the CDR requires substantial new disclosures as to how public companies procedurally manage climate-related risks. *See* 89 Fed. Reg. 21,715. The Section D disclosures require a public company to provide information "about whether and which management positions or committees are responsible for assessing and managing climate-related risks" as well as the "processes by which such positions or committees assess and manage climate-related risks." *Id.* The CDR further requires public companies "to discuss whether and how [they] consider [climate] impacts as part of [their] strategy, financial planning, and capital allocation," 89 Fed. Reg. 21,853, and to disclose "information concerning the board's oversight of climate-related risks as well as management's role in assessing and managing" climate risks. *Id.* at 21,855. In each case, these new disclosures

6

substantially abrogate authority vested in corporate boards by state corporate law. *See, e.g.*, Del. Code Ann. tit. 8, § 141(a).

In a comment letter filed in response to the SEC's proposed rule, *amici* Sharfman and Copland explained that such proposed disclosures would implicitly preempt state "law, such as Delaware General Corporation Law, [which] universally directs that the governance of a corporation, including the setting of objectives and selecting the strategies that will achieve those objectives, be concentrated in the hands of the company's board of directors." Bernard S. Sharfman & James R. Copland, Comment Letter on Proposed Rule on Climate-Related Disclosures, at 15 (Jun. 16, 2022). These disclosures would provide uninformed shareholder activists the opportunity to exert pressure on corporate boards and executive management to change these procedures, creating a significant shift in the balance of decision-making authority from boards to shareholders that is inconsistent with state corporate law, not to mention the SEC's mandate to facilitate efficient markets and capital formation. *See id.* at 10–18.

Third, the CDR promotes a one-size-fits-all understanding of the risks associated with energy transitions ("transition risks") by assuming that the world and U.S. economies are quickly headed toward net-zero carbon emissions. *See* 89 Fed. Reg. at 21,845. The Final Rule, like the Proposed Rule, "does not substantiate its premise that there will be a rapid move toward a net-zero emissions economy."

7

Sharfman & Copland, Comment Letter, at 19–23; *see also* Robert G. Eccles, *Untangling Climate Risk, Financial Risk, And Climate Impact*, Forbes (April 18, 2024); Alon Brav & J.B. Heaton, *Brown Assets for the Prudent Investor*, 12 Harv. Bus. Rev. L. Online, art. 2, 2021, at 1. Regardless, under state law, it is a corporate board's prerogative to determine what kind of transition risks a company might face. *See, e.g.*, Del. Code Ann. tit. 8, § 141(a).

### C. Congress Has Not Empowered the SEC to Preempt State Laws Governing the Management of Company Priorities

Under modern if contestable conceptions of the Commerce Clause, Congress almost certainly has the authority to preempt significantly, if not wholly, state corporate law. *See generally*, *e.g.*, *Gonzales v. Raich*, 545 U.S. 1 (2005); *Wickard v. Filburn,* 317 U.S. 111 (1942). Recognizing that Congress "does not readily interfere" with the "substantial sovereign powers" reserved to the states, however, the Supreme Court has observed that the Constitution requires a "plain statement" of Congress's intent to preempt state law when legislation might affect the balance of power between the state and federal governments. *Ashcroft*, 501 U.S. at 461. The CDR can thus lawfully preempt state corporate law *only* if Congress granted the SEC explicit statutory authority to modify the prerogatives of corporate boards and executive management. But neither the Securities Acts of 1933 or 1934, nor subsequent amendments thereto, has given the SEC such authority.

8

The Securities Act of 1933 and the Securities and Exchange Act of 1934 enable the SEC to, for example, require companies to produce disclosures that the SEC deems "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1). As the Supreme Court has emphasized, however, such an allusion to "public interest" in a broad statutory grant of authority is not a "broad license to promote the general welfare" outside the delineated contours of a statuary scheme. *NAACP v. FPC*, 425 U.S. 662, 669 (1976). Similarly, the phrase "for the protection of investors" is not defined in the Securities Acts, but this language does not enable the SEC to promulgate any regulations it wishes. In the words of former SEC Chairman Arthur Levitt, "the primacy of investor interests was present" at the agency's establishment, such that investor-protection can be understood as the "overriding concern" of our regime of federal securities regulation. Arthur Levitt, Chairman, U.S. Sec. and Exch. Comm'n, Address at the Commonwealth Club, San Fransisco, Cal. (May 17, 1996). Yet the investor interests being protected in the '33 and '34 Acts are not *any* interests investors may have in a corporation's affairs but rather investors' interests in reaching "*financial* decisions regarding an investment in an issuer's securities," as is clearly evident from the items enumerated by Congress as codified in 15 U.S.C. § 78m(b)(1). Sharfman & Copland, Comment Letter, at 3 & n.19–20.

9

When Congress modified the Securities Acts in the National Securities Markets Improvement Act of 1996, Pub L. 104-290, 110 Stat. 3416 (1996), it added additional statutory language emphasizing that when the SEC acts in the public interest, the SEC's rulemaking procedures must take into account not only investor protection but also "whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. §77(b). This new statutory command places a "unique obligation" on the SEC, *Business Roundtable*, 647 F.3d at 1148 (D.C. Cir. 2011) (citing 15 U.S.C. §§ 78c(f), 78w(a)(2), 80a-2(c))—an obligation that goes above and beyond the ordinary limits of Administrative Procedure Act review. The unique requirements placed by Congress on SEC rulemaking to consider market factors reinforce the ordinary reading of the '33 and '34 Act's statutory grant of authority to be limited to protecting investors' financial interests.

Moreover, as the D.C. Circuit emphasized in its 2011 decision vacating the SEC's proposed proxy access rule, under the Administrative Procedure Act, the SEC uniquely has a "statutory responsibility to determine the *likely* economic consequences of" a proposed rule "and to connect those consequences to efficiency, competition, and capital formation." *Id.* But the SEC has not done so here. Although the CDR clearly reformulates board priorities in an implicit override of traditional state corporate law, nowhere in the agency's voluminous rule has it even attempted to quantify the likely economic consequences of its extraordinary intrusions into

10

these areas and "connect those consequences to efficiency, competition, and capital formation," as required under the 1996 amendments to the Securities Acts, *id*. at 1148—a fatal flaw even aside from the federalism implications.

In sum, the sweep of the CDR is vast and runs roughshod over long-established state corporate law principles. The SEC's new rules would force climate-related risks to the fore of company priorities, increase uninformed shareholder activists' voice in how a company manages climate-related risks, and impose on public companies a one-size-fits-all (and flawed) understanding of climate-related transition risks. Each of these proposed changes would move company decision-making away from the most informed locus of authority, the board of directors as advised by executive management, as long provided for by state corporate law; and instead foist the SEC's own substantive views on these matters onto all public companies, notwithstanding that the agency has no particularized knowledge about the internal corporate-governance affairs of any of the affected companies, let alone environmental policy. On its face, the CDR does not point to *any* statement, never mind a *"*a clear indication of congressional intent," *Santa Fe*, 430 U.S. at 479, to enable the SEC to preempt state laws that empower corporate boards and executive management to set company priorities.

11

## II. THE CDR VIOLATES THE SEPARATION OF POWERS BY EXCEEDING THE SCOPE OF THE SEC'S STATUTORY AUTHORITY AND COMMANDEERING THE EPA'S POWER OVER ENVIRONMENTAL REGULATION

As James Madison noted during debates over the ratification of the Constitution, "[t]here can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates." The Federalist No. 47, at 299 (Madison). Even if one were to accept the SEC's claim that the CDR does not resolve a major question of policy clearly within the province of the legislative branch, *see* 89 Fed. Reg. at 21,683 n.172 (rejecting commenters' assertions that the SEC "lacks authority to promulgate the proposed rules" because of the "major questions doctrine"), Congress has authorized the Environmental Protection Agency (EPA), not the SEC, to promulgate environmental regulations. Insofar as the CDR exceeds the scope of the SEC's statutory authority to promulgate regulations that promote investor protection, the CDR illustrates the danger about which Madison once warned—namely, that one division of the federal government might attempt to set the scope of its own authority unencumbered by the structural limits imposed by constitutional separation-of-powers principles.

### A. Congress Has Authorized the SEC to Require the Disclosure Only of Financial Information That Is Financially Material to Investment Decisions

Congress's statutory grant of authority to the SEC empowers the agency to require financial disclosures of companies so long as the disclosures are "in the

12

public interest" and "for the protection of investors." 15 U.S.C. § 77g(a)(1). This grant of authority is limited to the disclosure of information that will help an investor understand a company's material firm-specific risks from a financial perspective.

In its Final Rule, the SEC claims a broad authority to require disclosures "within the statutory authority conferred by Congress through the Securities Act and the Exchange Act." 89 Fed. Reg. at 21,683. But, as *amici* Sharfman and Copland explained in their comment letter on the Proposed Rule:

> Congress's delineation of the information required in annual and quarterly reports in 15 U.S.C. § 78m(b)(1) clearly lists items required for a reasonable investor to make *financial* decisions regarding an investment in an issuer's securities—precisely the sort of disclosures the Supreme Court has pointed to repeatedly in defining materiality under the securities laws.

Sharfman & Copland, Comment Letter, at 3 & n.19–20. Congress authorized the SEC to require a list of regular disclosures including:

> the items or details to be shown in the balance sheet and the earnings statement, and the methods to be followed in the preparation of reports, in the appraisal or valuation of assets and liabilities, in the determination of depreciation and depletion, in the differentiation of recurring and nonrecurring income, in the differentiation of investment and operating income, and in the preparation, where the Commission deems it necessary or desirable, of separate and/or consolidated balance sheets or income accounts of any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. . . .

15 U.S.C. § 78m(b)(1). From Congress's own words, it is clear that the Securities Acts are designed to protect "investors from fraud, an unlevel informational playing

13

field, the extraction of private benefits from the firm-by-firm insiders, and investors' propensity to make unwise investment decisions," Michael D. Guttentag, *On Requiring Public Companies to Disclose Political Spending*, 2014 Col. Bus. L. Rev. 593, 619 at n.92 (2014)—a far cry from the CDR disclosures asserted under the SEC's Final Rule.

Since Congress's passage of the National Securities Markets Improvement Act of 1996, Pub. L. No. 104-290, the SEC is further required to consider whether proposed disclosure requirements will promote "efficiency, competition, and capital formation." Thus, the SEC can today only promulgate mandatory disclosure regulations on the basis of their being "in the public interest" and for "the protection of investors" *after* considering whether the disclosures will promote "efficiency, competition, and capital formation." As discussed *supra*, the new limits imposed by Congress on the SEC's rulemaking authority reinforce the Securities Acts' implicit limitations on the agency's disclosure regime.

In 2010, the SEC published an interpretive release on climate change ("2010 Guidance") that illustrates the extent to which the SEC can mandate disclosures related to environmental issues without exceeding the scope of its statutory mandate. Through that guidance, the SEC sought disclosure of climate-related risks that were material to a company's financial well-being and therefore an investor's decision about whether to purchase a security. As defined in Rule 405, a disclosure rule

14

promulgated under the Securities Exchange Act of 1934, such a materiality standard limits disclosures to those "matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to purchase the security registered." 17 C.F.R. § 230.405.

Following Rule 405, the 2010 Guidance focused on the disclosure of climate-related risk factors that "make an investment in the registrant speculative or risky" or "are reasonably likely to have a material effect on a public company's [registrant's] *financial condition or operating performance*." U.S. Sec. & Exch. Com., *Commission Guidance Regarding Disclosure Related to Climate Change*, Release Nos. 33-9106, 34-61469 (Feb. 2, 2010) (emphasis added). The 2010 Guidance was within the scope of the SEC's authority because it required the disclosure of financially material information that, by virtue of being financially material, was "in the public interest" and "for the protection of investors." Having both of these qualities, the 2010 Guidance was, at a minimum, not poised to undermine "efficiency, competition, and capital formation."

**B. The CDR Requires Companies to Disclose Immaterial Data That Does Not Advance the SEC's Investor-Protection Mandate and Undercuts Its Mandate to Support Efficiency, Competition and Capital Formation**

Unlike the SEC's 2010 Guidance, the CDR mandates the disclosure of immaterial climate data that is unlikely to inform investment decisions. As Professor Sean Griffith has argued, investor-protection regulations seek to ensure that

15

investors are adequately informed of firm-specific investment risks that may impact their financial return. *See generally* Sean J. Griffith, *What's "Controversial" About ESG? A Theory of Compelled Commercial Speech Under the First Amendment*, 101 Neb. L. Rev. 876 (2023). In the Supreme Court's formulation, material-disclosure rules take as their object information "significant to the trading decision of a reasonable investor." *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988).

A comparison of the 2010 Guidance with the CDR clarifies the CDR's unlawful overbreadth. Under the guidance, the following topics, assuming they would materially impact the reporting company's financial condition, would require disclosure: the direct financial impact of climate-change legislation and regulation or international accords on climate change; the indirect consequences of climate-change regulation, such as a reduction of demand for goods that create high levels of greenhouse-gas emissions; and the physical impacts of climate change, such as severe weather, on the company's operations. Some of these purported risks may be too speculative to form a coherent disclosure regime, but they broadly comport with the Securities Acts' delegation to the SEC of authority to require disclosures regarding firm-specific investment risks.

What the Securities Acts decidedly do *not* do, however, is specify or imply that disclosures "for the protection of investors" include those that are for the purpose of "expressive investor protection." Guttentag, *On Requiring Public*

16

*Companies to Disclose Political Spending* at 606. As Professor Michael Guttentag has argued, requiring disclosures that investors would use to protect themselves from investing in securities issued by firms with attributes that investors simply find *objectionable* for non-financial reasons is not in furtherance of investor protection. *See id.* In her statement objecting to the Final Rule on CDR, SEC Commissioner Hester Pierce articulated some of the reasons why: "All reasonable investors value financial returns, but they may diverge on which non-economic considerations are important. A regime rooted in materiality helps companies inform investors without spamming them with information that is irrelevant to the company's financial picture." Hester M. Peirce, Green Regs and Spam: Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors (Mar. 6, 2024) (citations omitted).

That the Final Rule eschews traditional concepts of financial materiality in its disclosure regime may not be self-evident, given that it dresses itself in the garb of materiality language. But as Commissioner Peirce observes, even though "the Commission has decorated the final rule with materiality ribbons, the rule embraces materiality in name only"—requiring a "flood" of "granular" climate-related disclosures likely to "overwhelm" rather than "inform" investors. Peirce, Green Regs and Spam. To be sure, the Final Rule states that "materiality is not determined merely by the amount of [Scope 1 and 2] emissions." 89 Fed. Reg. at 21,733. Yet

17

the *amount of emissions* generated by a company in and of itself would *never* be financially material to an investor focused on maximizing his investment return; rather, the *climate-related risks* generated by a particular volume of emissions, including regulatory risks, *may* be financially material. The Final Rule elides this distinction, instead insisting that "the guiding principle for [determining materiality under the Rule] is whether a reasonable investor would consider the disclosure of [Scope 1 or 2] emissions[] important when making an investment or voting decision," *id.*—a broad characterization that fails to delimit investors' "reasonable" interests to financially material climate-related risks rather than mere "expressive interests" in broader climate concerns.

On its face, then, the CDR requires disclosures of Scope 1 and Scope 2 emissions that an issuing company may produce regardless of whether those emissions are material to a reasonable investor's *financial* decision to buy or sell a given issuer's securities. Indeed, as the SEC has structured its required emissions disclosures, a company with significant greenhouse gas emissions would presumably be compelled to make disclosures even if its board had affirmatively determined that those emissions *are not* a financially material climate-related risk.

Such disclosures could, of course, empower some investors to reject investments in the securities of a company that produces what those investors view as "too many" carbon emissions. Such disclosures could help certain investment

advisors structure "ESG" funds. But whether or not a policy empowering such goals would be wise, such expressive and idiosyncratic economic interests are irrelevant to the sort of firm-specific financial analysis contemplated by the disclosure regime Congress actually enacted in the Securities Acts. As Commissioner Peirce notes, there is virtually no limit to the potential "panoply of special interests" that might be foisted onto required public-company disclosures under the SEC's expansive reading of its mandate. *Id.*

In addition to the direct costs of these disclosures themselves, expressive and special-interest disclosures of the sort prescribed by the CDR can be adverse to the financial interests of the average diversified investor in a way that financially material disclosures never would be. Indeed, as *amici* Sharfman and Copland detail in their comment letter on the Proposed Rule, "the actual goals articulated" by many of the climate-oriented and investing entities to which the SEC points in characterizing the CDR as protective of investor interests "*purport to seek information about climate emissions with an eye toward how their investment decisions impact climate conditions*," rather than with how climate changes or regulations will affect their financial investments. Sharfman & Copland, Comment Letter, at 8–9.

In short, "expressive investor protection" is not provided for in the SEC's existing enabling statutes because the disclosures that would enable such expressive

19

protection are immaterial to, if not injurious to, a company's financial well-being. *See id.* As Commissioner Peirce observes, "Congress did not create [the SEC] to satisfy the wants of every investor, but to serve the interests of the objectively reasonable investor seeking a return on her capital." Peirce, Green Regs and Spam. Especially given that the agency "lack[s] the expertise to oversee these special interest disclosures . . . only a mandate from Congress should put [the SEC] in the business of facilitating the disclosure of information not clearly related to financial returns." *Id.* In the CDR, the SEC purports to redefine materiality to justify an exhaustive and granular array of climate disclosures unrelated to investors' financial interest in material, firm-specific information. But this purported redefinition is unmoored from the statutes under which Congress has delegated—and limited— SEC rulemaking authority.

### C. The EPA, Not the SEC, Has the Authority to Regulate the Corporate Disclosure of Environmental Data

The SEC's attempt to require companies to disclose immaterial environmental data is an obvious end-run around Congress's obvious delegation of environmental regulation to the EPA. The Clean Air Act specifically empowers the EPA with the authority to collect reports about emissions sources. See 42 U.S.C. § 7414. As such, Congress is clearly aware of how to statutorily enable certain federal agencies to mandate environmental disclosures. By implication, then, it is similarly clear that Congress has *not* empowered the SEC to require public companies to disclose

20

20

20

20

emission data. For these reasons, the SEC's efforts to expand the scope of its own authority are tantamount to an agent of the Executive Branch acting as both the grantor and grantee of its own regulatory authority. As James Madison warned long ago, such concentrations of legislative and executive functions in a unified agent are serious threats to individual liberty that run counter to the Constitution's separation of powers principles.

## CONCLUSION

For the foregoing reasons, and those stated by the Petitioners, this Court should rule for the Petitioners.

Respectfully submitted,

_s/ Ilya Shapiro_

Ilya Shapiro
Tim Rosenberger
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute

June 24, 2024

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. Proc. 29(b)(4) because this brief contains 4,692 words, excluding the parts of the brief exempted by Fed. R. App. Proc. 32(f), as determined by the word counting feature of the software (Microsoft Office 365) used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the type-style requirements of Fed. R. App. Proc. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman.

s/ <em>Ilya Shapiro</em>

DATED: June 24, 2024                    Counsel for *Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit for filing and transmittal of a Notice of Electronic Filing to the participants in this appeal who are registered CM/ECF users.

s/ <em>Ilya Shapiro</em>

DATED: June 24, 2024                    Counsel for *Amici Curiae*