Nos. 24-1522, -1624, -1626, -1627, 1628, -1631,
-1634, 1685, and -2173

# In the United States Court of Appeals
# for the Eighth Circuit

STATE OF IOWA, *et al.*,

*Petitioners,*

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION, *et al.*,

*Respondent*

DISTRICT OF COLUMBIA, *et al.*

*Intervenors*

Petition for Review of an Order of the Securities and Exchange
Commission

**Brief of *Amicus Curiae*
Hamilton Lincoln Law Institute
in Support of Petitioners**

HAMILTON LINCOLN LAW INSTITUTE
Neville S. Hedley
1629 K Street, NW, Suite 300
Washington, DC 20006
(312) 342-6008

*Attorneys for Amicus Curiae
Hamilton Lincoln Law Institute*

**Rule 26.1 Corporate Disclosure Statement**

The *amicus curiae* Hamilton Lincoln Law Institute is a nonprofit corporation. It does not issue stock and is neither owned by nor is the owner of any other corporate entity, in part or in whole. It has no parent companies, subsidiaries, affiliates, or members that have issued shares or debt securities to the public. The corporation is operated by a volunteer Board of Directors.

Appellate Case: 24-1522    Page: 2    Date Filed: 06/24/2024 Entry ID: 5406197

# Table of Contents

Rule 26.1 Corporate Disclosure Statement .................................................i

Table of Contents....................................................................................ii

Table of Authorities ............................................................................. iii

Interest of *Amicus Curiae* ........................................................................1

Summary of the Argument .......................................................................2

Argument ..................................................................................................3

I.   The Rule Will Lead To Excessive Disclosures And Meritless
     Event-driven Securities Litigation Without Benefitting
     Shareholders Or The Environment. .................................................3

II.  The Rule Exceeds The SEC's Statutory Authority And Is An
     Unwarranted Departure From Its Primary Mission....................10

     A.   The Rule is outside the scope of the SEC's Congressionally
          sanctioned remit.....................................................................10

     B.   The mandated disclosures are not financially material.......13

Conclusion..............................................................................................16

Combined Certifications of Compliance ................................................17

Appellate Case: 24-1522   Page: 3   Date Filed: 06/24/2024 Entry ID: 5406197

# Table of Authorities

<u>Cases</u>

*Alcarez v. Akorn, Inc.*,
  99 F.4th 368 (7th. Cir. 2024)........................................................................ 1

*Amgen Inc. v. Conn. Retirement Plans & Trust Funds*,
  568 U.S. 455 (2013) ..................................................................................... 6

*Barnhart v. Sigmon Coal Co.*,
  534 U.S. 438 (2002) ................................................................................... 10

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................... 14

*Competitive Enterprise Inst. v. FCC*,
  970 F.3d 372 (D.C. Cir. 2020) ..................................................................... 1

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
  141 S. Ct. 1951 (2021) ............................................................................. 5, 6

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ..................................................................................... 6

*Ersnt & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ................................................................................... 12

*Julianello v. K-V Pharm. Co.*,
  719 F.3d 915 (8th Cir. 2015) .................................................................... 7-8

*NAACP v. Fed. Power Comm'n*,
  425 U.S. 662 (1976) ................................................................................... 12

*In re Quality Sys.*,
  865 F.3d 1130 (9th Cir. 2017) ..................................................................... 8

*In re Stericylce Sec. Litig.*,
  35 F.4th 555 (7th Cir. 2022)......................................................................... 1

Appellate Case: 24-1522    Page: 4    Date Filed: 06/24/2024 Entry ID: 5406197

*TSC Indus., Inc. v. Northway, Inc.,*
426 U.S. 438 (1978) ..................................................................... 2, 14

*United States v. Naftalin,*
441 U.S. 768 (1979) ........................................................................ 12

*In re Walgreen Co. Stockholder Litig.,*
832 F.3d 718 (7th Cir. 2016) ............................................................ 1

*W. Virginia v. EPA,*
597 U.S. 697 (2022) ........................................................................ 13

Rules and Statutes and Administrative Materials

15 U.S.C. § 77g(b)(1) ...................................................................... 12

15 U.S.C. § 77j(a)(4) ....................................................................... 12

15 U.S.C. § 77z-2(c)(1) ...................................................................... 8

15 U.S.C. § 78j(b) ........................................................................... 11

15 U.S.C. § 78l(b)(1) ....................................................................... 12

15 U.S.C. § 78m-2 ........................................................................... 10

15 U.S.C. § 78m(p) .......................................................................... 10

15 U.S.C. § 78m(q) .......................................................................... 10

15 U.S.C. § 78n(i) ........................................................................... 11

15 U.S.C. § 78u-5(c)(1)(A) ................................................................. 8

42 U.S.C. § 7414 ............................................................................. 11

12 C.F.R § 229.1507 .......................................................................... 7

17 C.F.R. § 240.10b-5 ....................................................................... 14

40 C.F.R. Part 98 ............................................................................ 11

iv

Fed. R. App. P. 29(a)(2) .............................................................. 2

Fed. R. App. P. 29(a)(4)(E) ......................................................... 1

Fed. R. Civ. P. 23 ...................................................................... 6

86 Fed. Reg. 26967 (May 25, 2021), Executive Order 14030,
Executive Order on Climate-Related Financial Risk ........................... 14

87 Fed. Reg. 21334 (Apr. 11, 2022) .............................................. 14

89 Fed. Reg. 21668 (Mar. 28, 2024) .............................. 7, 8, 11, 13, 15, 16

<u>Legislative History</u>

S. Rep. No. 47, 73d Cong., 1st Sess., 1(1933) .......................................... 12

<u>Other Authorities</u>

Cutler, Joshua, et al.,
    *Disclosure and the Outcome of Securities Litigation*,
    REVIEW OF ACCOUNTING STUDIES 24:230-63 (2019) ........................ 7

Joseph Goffman & Laura Bloomer,
    *Symposium: The Environmental Protection Agency Turns
    Fifty: Disempowering the EPA: How Statutory Interpretation
    of the Clean Air Act Serves the Trump Administration's
    Deregulatory Agenda*,
    70 CASE W. RES. 929 (2020) .................................................. 13

Rose, Amanda M.,
    *A Response to Calls for SEC-Mandated ESG Disclosure*,
    WASH. U. L. REV. 1821 (2021)............................................ 4, 5, 13

Rose, Amanda M.,
    *Reforming Securities Litigation Reform: Restructuring the
    Relationship Between Public and Private Enforcement of*

Appellate Case: 24-1522    Page: 6    Date Filed: 06/24/2024   Entry ID: 5406197

*Rule 10b-5*,
108 COLUM L. REV. 1301 (2008) ..................................................... 10

Strauss, Emily,
*Is Everything Securities Fraud?*
12 U.C. IRVINE L. REV. 1331 (2022).................................................. 5

Weinkle, Jessica, et al.
*Historical Global Tropical Cyclone Landfalls*
25 J. CLIMATE 4729 (2012)............................................................... 9

## Websites

www.archrsc.com/sustainability/climate/ ................................................ 15

www.arlp.com/sustainability/ ................................................................. 15

www.consolenergy.com/sustainability/ ................................................... 15

www.nrplp.com/about/#docs ................................................................. 15

https://finance.yahoo.com ..................................................................... 15

Appellate Case: 24-1522    Page: 7    Date Filed: 06/24/2024 Entry ID: 5406197

## Interest of *Amicus Curiae*

*Amicus curiae* Hamilton Lincoln Law Institute ("HLLI") is a 501(c)(3) public-interest law firm committed to, among other things, the principles of protecting consumers and shareholders from conflicts of interest and defending the constitutional separation of powers and principles of limited government against executive-branch abuse. *E.g.*, *Competitive Enterprise Inst. v. FCC*, 970 F.3d 372 (D.C. Cir. 2020). The Center for Class Action Fairness ("CCAF") is part of HLLI, and its mission is to litigate on behalf of class members against unfair class action procedures and settlements, including securities class-action lawsuits. *See e.g., Alcarez v. Akorn, Inc.*, 99 F.4th 368 (7th Cir. 2024) (allowing investor intervention to challenge useless "mootness" fees paid to class counsel); *In re Stericylce Sec. Litig.*, 35 F.4th 555 (7th Cir. 2022) (successful objection to class counsel fee award); *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718 (7th Cir. 2016) (successful objection to class settlement that would have paid attorneys solely for obtaining non-material disclosures). This case sits at the intersection of HLLI's interest in limited government and combating regulatory overreach and CCAF's interest in protecting shareholders from abusive class action practices.

HLLI states under FRAP 29(a)(4)(E) that no counsel for a party other than HLLI authored this brief in whole or in part, and no counsel or party other than HLLI made a monetary contribution intended to fund

1

the preparation or submission of this brief. No person other than *amicus* or its counsel made a monetary contribution to its preparation or submission. All parties in the listed cases have consented to the filing of this brief: 24-1522, 24-1624, 24-1626, 24-1627, 24-1628, 24-1631, 24-1634, 24-1685, and 24-2173. FRAP 29(a)(2). HLLI submits this *amicus* brief in support of all the Petitioners in the above referenced cases. Because the rules limit Petitioners' opening briefs to 13,000 words, we limit our *amicus* brief to under 6,500 words.

## Summary of the Argument

The Securities and Exchange Commission's newly promulgated Enhancement and Standardization of Climate-Related Disclosures for Investors rule (Climate Disclosure Rule or Rule) exceeds the agency's statutory authority and represents a dramatic and unwarranted deviation from its primary mission of investor protection into the realm of environmental regulation, which is best reserved for the Environmental Protection Agency.

The Rule mandates costly, unnecessary, and immaterial climate-related disclosures that will bury shareholders "in an avalanche of trivial information [that] is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1978). The primary beneficiaries of the Rule will be an army of climate disclosure consultants who will be called on to provide the data and metrics upon which issuers

Appellate Case: 24-1522    Page: 9    Date Filed: 06/24/2024 Entry ID: 5406197

will be forced to rely upon to make the required disclosures. But these disclosures are of little or no material benefit to investors, particularly when assessing a company's financial performance and attendant risks. The other significant beneficiaries of the Rule will be securities class action attorneys, because as surely as night follows day, the newly mandated climate disclosures will result in expensive, meritless event-driven securities litigation. This will only further burden registrants by driving up compliance costs and lead to even more exhaustive and superfluous climate disclosures of little or no benefit to shareholders. More significantly, any successful lawsuits will mostly enrich class action attorneys and provide little in the way of meaningful compensation to shareholders and will do little with respect to stemming the allegedly negative effects of climate change. ("Good" corporations will face the same burdens and securities litigation risk as the worst polluters.) Accordingly, the Court should grant the Petitioners' request to vacate the Rule.

## Argument

## I. The Rule Will Lead To Excessive Disclosures And Meritless Event-driven Securities Litigation Without Benefitting Shareholders Or The Environment.

There will be two primary beneficiaries of the SEC's mandate of disclosures of questionable materiality. An army of expensive climate

Appellate Case: 24-1522    Page: 10    Date Filed: 06/24/2024 Entry ID: 5406197

consultants will form and grow to assist companies in cataloging, quantifying climate risks and the disclosures mandated by the Rule. This deadweight transactions cost will be enormously burdensome on issuers. "The resources U.S. public companies spend collecting and assuring the accuracy of information required to be included in SEC filings is significant, not just because the volume of information that companies are required to disclose, but also because of the unique liability risk that U.S. public companies face for inaccuracies in those filings." Amanda M. Rose, *A Response to Calls for SEC-Mandated ESG Disclosure*, 98 WASH U. L. REV. 1821, 1832 (2021). "Even companies that do currently … prepar[e] sustainability reports would bear additional costs, because the process for preparing SEC filings is much more rigorous and involved." *Id.* at 1842.

The second beneficiary of the Rule will be opportunistic securities class-action attorneys. "Placing ESG disclosures in SEC filings also heightens the private liability risk faced by companies and directors and officers. This is perhaps the biggest elephant in the room." Rose, *supra* at 1847 (emphasizing that "mandating that such disclosures be included in SEC filings heightens" considerably the risk of private securities fraud lawsuits). Securities class action lawsuits related to inherently imprecise climate and "severe weather" disclosures "threaten to impose massive damages on defendants and thus may have settlement value out of

proportion to their merits." *Id.* at 1848. *Cf., e.g.*, *Goldman Sachs Group, Inc. v. Ark. Teachers Ret. Sys.*, 141 S. Ct. 1951 (2021) (over a decade of litigation over generic disclosure "We have extensive procedures and controls that are designed to identify and address conflicts of interest").

Securities lawsuits tied to climate-related disclosures are event-driven class actions because they are typically tied to some catastrophic event, the risk of which an issuer company allegedly failed to appropriately disclose or manage. The risk of event-driven litigation is high and has been increasing. *See e.g.,* Emily Strauss, *Is Everything Securities Fraud*, 12 U.C. IRVINE L. REV. 1331 (2022) (noting the increasing prevalence of event-driven securities litigation); Rose, *supra* at 1849-50 (same).

Such event-driven litigation is more likely to survive a motion to dismiss "even when of dubious merit." Rose, *supra* at 1850. And the normal defenses to event-driven fraud-on-the-market actions are of marginal utility with respect to actions stemming from events allegedly related to climate disclosures or the lack thereof. This is because the alleged risk does not materialize until the negative event that triggers the decline in the stock price. The issuer company cannot counter the alleged lack of risk disclosure, because the alleged fraud on shareholders didn't result in an artificially elevated stock price. Rather, the alleged fraud is the mismanagement of the risk that resulted in the event that

triggers the collapse in the stock price. Rose, *supra* at 1852. Accordingly, to counter these unpredictable supposed risks, issuers will over-disclose, trying to cover all possible climate-related risks, regardless of how remote or unlikely.

But even generic statements about climate or weather events could be enough to trigger a class action that satisfy class certification. Then the issuer company has the burden of persuasion to prove that the statements about climate or weather events did not affect the stock price and must do so by a preponderance of the evidence. *Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021). But critically, questions of materiality are "left to the merits stage because it does not bear on Rule 23's predominance requirement." *Goldman Sachs*, 141 S. Ct. at 1959 (citing *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 466-58 (2013)). This is true even if the alleged misrepresentations are generic in nature. *Goldman Sachs Grp.*, 141 S. Ct. at 1953 (citing *Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 278-79 (2014)). Adding more mandatory disclosures regarding climate and weather events that are inherently unpredictable, coupled with the risk of event-driven class action will only incentivize companies to needlessly pursue expensive and irrelevant disclosures to provide protection against costly class actions. But even this is likely to backfire as there is empirical evidence that more disclosures result in *more*

Appellate Case: 24-1522    Page: 13    Date Filed: 06/24/2024 Entry ID: 5406197

adverse litigation outcomes. *See* Joshua Cutler, Angela K. Davis & Kyle Peterson, *Disclosure and the Outcome of Securities Litigation*, REVIEW OF ACCOUNTING STUDIES 24:230-263 (2019), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2614609 (more public disclosures allow plaintiffs to present more extensive cases). Thus, rather than providing more protection to issuers, layering on disclosures will only provide more targets at which to shoot.

The Rule's few safe-harbor protections are insufficient to prevent this. The Rule extends safe-harbor protection only to disclosures related to transition plans, scenario analysis, and the use of internal carbon price and relevant targets and goals. 89 Fed. Reg. 21668 at 21676 (Mar. 28, 2024). 12 C.F.R. § 229.1507. Thus, the safe harbor does not insulate all the mandated climate-related disclosures.

Moreover, the safe harbor for forward-looking statement is not bullet-proof; and the distinction between statements that are and aren't sheltered by safe harbor provisions is not always a clear, bright line. The safe harbor shelter is only available if the allegedly forward-looking statements are accompanied by "meaningful cautionary language … directly related to the alleged misrepresentation" and must be "company specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Julianello v. K-V Pharm. Co.*, 719 F.3d

915, 921 (8th Cir. 2015) (cleaned up); *see also* 15 U.S.C. §§ 77z-2(c)(1) & 78u-5(c)(1)(A) (stating that forward-looking statement are protected only if "accompanied by meaningful cautionary statements identifying important risk factors that could cause actual results to differ materially"). But what is considered mere boilerplate and what qualifies as "meaningful cautionary language?" Forward-looking statements are regularly mixed with non-forward-looking statements, and parsing such statements and ascertaining which ones truly qualify as forward-looking sheltered by the safe harbor often results in litigation because "the non-forward-looking statements are not protected by the safe harbor of the PSLRA." *In re Quality Sys.*, 865 F.3d 1130, 1142 (9th Cir. 2017) (collecting cases across several circuits holding the same). The SEC acknowledged this pitfall when it finalized the Rule, recognizing "that the PSLRA safe harbors may not be applicable to disclosures … to the extent the disclosures consist of a complex mix of factual and forward-looking statements and because the PSLRA safe harbors do not apply to certain parties and certain transactions." 89 Fed. Reg. 21668 at 21775 (Mar. 28, 2024).

The requirement that companies make disclosures regarding the financial impacts of severe weather events illustrates that such disclosures are a fool's errand and will lead to an endless stream of meaningless disclosures that cannot possibly account for all possible

8

negative consequences of severe weather. Consider two severe weather-related events in the 1930s that had lasting economic impact: the Dust Bowl drought and the 1938 New England Hurricane. Both were extreme weather events that occurred long before climate change was a significant policy consideration. The Rule, however, demands that such severe weather events be viewed through the lens of climate change. Sometimes severe weather is just that—severe weather unrelated to climate change. Not every hurricane is the result of warmer waters, assuming any are. *Cf.* Jessica Weinkle *et al.*, *Historical Global Tropical Cyclone Landfalls*, 25 J. CLIMATE 4729 (2012). Under the Rule, however, a severe weather event that adversely affects a company's financial performance will, by default, be considered climate-related and potentially expose the company to litigation for failing to make appropriate disclosures under the Rule. Thus, as a practical matter, registrants will be overinclusive and treat all potential risks as climate-related to alleviate the risk of litigation. Managers and board members will error on the side of disclosure to address all possible risks, regardless of how remotely associated those risks are to climate change, the weather, or carbon emissions, and regardless of how remotely upstream or downstream those risks are to the registrant's value chain. These disclosures will do little in the way of combating the alleged risks and effects of climate change. Issuers will still consume energy and produce

emissions, but now they will be under an increased threat of abusive and costly securities litigation that will further burden federal courts.

Based on CCAF's experience, this litigation risk will too frequently lead to settlements that will not provide any meaningful compensation to shareholders, but rather will be vehicles to enrich opportunistic plaintiffs' attorneys with outsized fee awards. *See* Amanda M. Rose, *Reforming Securities Litigation Reform: Restructuring the Relationship Between Public and Private Enforcement of Rule 10b-5*, 108 COLUM. L. REV. 1301, 1312-14 (2008) (10b-5 class actions "fail to provide meaningful compensation to class members"; citing authorities for such "compensatory shortcomings"). And such lawsuits will do little or nothing to improve the environment.

## II. The Rule Exceeds The SEC's Statutory Authority And Is An Unwarranted Departure From Its Primary Mission.

## A. The Rule is outside the scope of the SEC's Congressionally sanctioned remit.

When Congress deems it necessary for publicly traded companies to disclose certain environmental information they might not otherwise be compelled to disclose "it [does] so explicitly." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002). For instance, 15 U.S.C. § 78m(p) mandates disclosure regarding use of conflict minerals, 15 U.S.C. § 78m-2 mandates disclosure of information related to mine safety, 15 U.S.C. § 78m(q)

Appellate Case: 24-1522    Page: 17    Date Filed: 06/24/2024 Entry ID: 5406197

mandates disclosures of certain payments made by issuers engaged in the extraction of oil, natural gas and other minerals, and 15 U.S.C. § 78n(i) requires issuers to disclose data regarding executive compensation. Thus, Congress has demonstrated that its willingness to impose disclosures related to environmental, social or governance ("ESG") matters on registrant companies. Congress so far has refrained from mandating climate or green house gas (GHG) disclosures, and this should be taken as powerful evidence that the Rule exceeds the limits of the SEC's statutory authority. But more importantly, another agency, the Environmental Protection Agency (EPA), already mandates GHG disclosures by a significant swath of companies, including suppliers of fossil fuels. *See* 40 C.F.R. Part 98; 42 U.S.C. § 7414.

The SEC and EPA have very distinct and separate statutory missions and goals, and the Rule represents a dramatic departure from its traditional primary mission of investor protection. A hallmark of that mission is the SEC's role in mandating that public companies make timely and accurate disclosures of material financial information to the investing public.

The SEC points to sections 7, 10, 19(a), and 28 of the Securities Act of 1933, and sections 3(b), 12, 13, 15 23(a), and 26 of the Exchange Act of 1934 as the statutory authority for the Rule. 89 Fed. Reg. 21668 at 21919 (Mar. 28, 2024). But the SEC's rule-making authority in those statutory

provisions is generally reserved for rules that are "in the public interest or for the protection of investors." *See, e.g.*, 15 U.S.C. §§ 77g(b)(1); 77j(a)(4); and 78l(b)(1). Viewed through the appropriate statutory lens, the SEC's rulemaking authority in pursuit of "the public interest" is confined to its mission to protect investors. The Supreme Court emphasized this point in *NAACP v. Fed. Power Comm'n*, stating "[t]his Court's cases have consistently held that the use of the words 'public interest' in a regulatory statute is not a broad license to promote the general welfare. Rather, the words take meaning from the purposes of the regulatory legislation." 425 U.S. 662, 669-70 (1976). And the primary purpose of the Securities Act of 1933 is clear: to protect investors by ensuring greater transparency of financial information of issuer companies. *See United States v. Naftalin*, 441 U.S. 768, 775 (1979) ("'The purpose of this bill is to protect the investing public and honest business.'" (quoting S. Rep. No. 47, 73d Cong., 1st Sess., 1 (1933)). A similar motivation prompted Congress to pass the Exchange Act of 1934. "The 1934 Act was intended principally to protect investors against manipulation of stock prices … [by] impos[ing] regular reporting requirements on companies whose stock is listed on national securities exchanges." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976). Thus, "[w]hen the SEC mandates disclosure of information because of its demonstrable importance to companies' **financial performance**, it

clearly acts within the scope of both its expertise and authority." Rose, *A Response to Calls*, *supra* at 1842 (emphasis added).

In contrast, Congress has charged the EPA with the mission of protecting human health and the environment. *See* Joseph Goffman & Laura Bloomer*, Symposium: The Environmental Protection Agency Turns Fifty: Disempowering the EPA: How Statutory Interpretation of the Clean Air Act Serves the Trump Administrations Deregulatory Agenda*, 70 CASE W. RES. 929, 932 (2020) (EPA's statutory goal in context of Clean Air Act is to protect environment and promote human health). Thus, the Rule represents an unprecedented overreach by the SEC into a sphere reserved for another, more competent agency.  "When an agency has no comparative expertise in making certain policy judgments … Congress presumably would not task it with doing so." *W. Virginia v. EPA*, 597 U.S. 697, 729 (2022).

## B.  The mandated disclosures are not financially material.

The SEC attempts to avoid this clear division of authority and responsibility with repeated references to "materiality," asserting that climate-related disclosures are financially "material" to investors. *See, e.g.,* 89 Fed. Reg. 21668 at 21669 (Mar. 28, 2024) (the Federal Register release of the Rule contains over 800 references to "material" or "materiality"). Information is "material if there is a substantial likelihood that a reasonable shareholder would consider it important" in making

13

the investment decision or that the disclosure of an "omitted fact would have been viewed by a reasonable investor as having significantly altered the 'total mix of information' available to the investor in reaching … an investment decision." *TCS Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448-49 (1976); *see also Basic, Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (extending materiality standard to Section 10(b) and Rule 10b-5). The materiality standard is designed to ensure that investors are not inundated with "an avalanche of trivial information … [that] is hardly conducive to informed decisionmaking") *TSC Indus., Inc.*, 426 U.S. at 448-49.

The SEC's assertion that the financial risks of climate-change are "material" for most issuers is dubious, or at the very least begs for more rigorous, empirical analysis. This point is illustrated by examining the stock prices of a handful of publicly traded coal companies over one and three years, which coincides with the SEC's proposal of the Rule and the Biden administration's policy emphasis on climate change. *See* 87 Fed. Reg. 21334 (Apr. 11, 2022) (proposed Rule); Executive Order 14030, Executive Order on Climate-Related Financial Risk, 86 Fed. Reg. 26967 (May 25, 2021). It is worth noting that the companies analyzed, like a great many issuers, voluntarily provide some form of climate-related or

sustainability disclosures.[1] *See* 89 Fed. Reg. 21668 at 21669 (Mar. 28, 2024). Consol Energy (CEIX) is up 59.68% over one year and 494.15% over three years as of June 14, 2024, compared to the broader market S&P 500, which is up 24.32% over the past year and 27.88% over three years. Similarly, Alliance Resource Partners, LP (ARLP) is up 46.31% over one year and 331.79% over three years, while Natural Resource Partners, LP (NRP) is up 91.47% over one year and 445.98% over three years, and Arch Resources, Inc. (ARCH) is up 53.68% for the past year and 250.25% over three years. Thus, all these issuers in the coal industry—the poster child of climate pariahs—have dramatically outperformed the broader market during a time when the SEC and the Biden Administration have been particularly focused on combating climate change. The performance of these four companies is hardly a ringing endorsement of the "materiality" of climate disclosures or the financial risks of climate change or transition risks. At the very least, it should prompt the SEC to pursue a more rigorous, empirical analysis of whether climate-related disclosures truly are material with respect to an

---

[1] *See, e.g.,* www.consolenergy.com/sustainability/ (sustainability reports for 2018 – 2022); www.arlp.com/sustainability/ (link to Corporate Responsibility Report); www.nrplp.com/about/#docs (link to sustainability statements including statement on carbon emissions and climate); www.archrsc.com/sustainability/climate/ (link to annual sustainability report).

Appellate Case: 24-1522     Page: 22     Date Filed: 06/24/2024 Entry ID: 5406197

issuer's financial performance. This is particularly so when the SEC even admits that the evidence that climate-related disclosures are relevant to an issuer's financial performance is mixed and "seemingly contradictory." 89 Fed. Reg. 21668, at 21849 n.2745 (Mar. 28, 2024).

## Conclusion

For these reasons, this Court should grant Petitioners' request to vacate the Rule.

Dated:  June 24, 2024    Respectfully submitted,

            */s/ Neville S. Hedley*
            Neville S. Hedley
            HAMILTON LINCOLN LAW INSTITUTE
            1629 K Street, NW, Suite 300
            Washington, DC 20006
            Telephone: (312) 342-6008
            Email: ned.hedley@hlli.org

            *Counsel for Amicus Curiae*
            *Hamilton Lincoln Law Institute*

Appellate Case: 24-1522  Page: 23  Date Filed: 06/24/2024 Entry ID: 5406197

## Combined Certifications of Compliance

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B):

This brief is 3377 words long, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

3.     This brief complies with 8th Cir. R. 28A(h) because the PDF file has been scanned for viruses by and is said to be virus-free by that program.

Dated:  June 24, 2024                Respectfully submitted,

                                                     */s/ Neville S. Hedley*
                                                     Neville S. Hedley

Appellate Case: 24-1522    Page: 24    Date Filed: 06/24/2024 Entry ID: 5406197

## Certificate of Service

I certify that on June 24, 2024, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system. All participants are registered CM/ECF users and service will be accomplished through electronic notification of the CM/ECF system.

Respectfully submitted,

*/s/ Neville S. Hedley*
Neville S. Hedley

Appellate Case: 24-1522    Page: 25    Date Filed: 06/24/2024 Entry ID: 5406197