**Nos. 24-1522, 24-1624, 24-1626, 24-1627,
24-1628, 24-1631, 24-1634, 24-1685, 24-2173**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

---

STATE OF IOWA, ET AL.,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

DISTRICT OF COLUMBIA, ET AL.,

*Intervenors*.

---

On Petitions for Review of an Order and Rule of the Securities and
Exchange Commission

---

**BRIEF OF AMICUS CURIAE
AMERICANS FOR PROSPERITY FOUNDATION
IN SUPPORT OF ALL PETITIONERS AND REVERSAL**

---

Michael Pepson
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
571.329.4529
mpepson@afphq.org

June 24, 2024      *Attorney for Amicus Curiae*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

The *amicus curiae* Americans for Prosperity Foundation is a nonprofit corporation. It has no parent companies, subsidiaries, or affiliates that have issued shares or debt securities to the public.

i

# TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT...................................i

TABLE OF CONTENTS...................................................................ii

TABLE OF AUTHORITIES .............................................................iii

INTEREST OF *AMICUS CURIAE*......................................................1

SUMMARY OF ARGUMENT ...........................................................2

ARGUMENT ..............................................................................3

   I.  The SEC Must Respect the Separation of Powers ........................3

   II.  The SEC Has Usurped Congress's Exclusive Legislative Power ...............6

    A.  The Major Questions Threshold Inquiry ....................................6

    B.  The SEC's Rule Triggers the Major Questions Doctrine........................7

    1. The SEC Attempted to Decide Matters of Great Political Importance......7

    2. The SEC's Rule Has Vast Economic Significance ...................10

    3. The SEC's Rule Intrudes on the Province of the States............11

    C.  The SEC's Rule Fails the Major Questions Doctrine's Clear Statement Requirement...............................................................12

    1. The Acts' Place in the Overall Statutory Scheme ...................13

    2. Age and Focus of the Acts in Relation to the Rule ..................16

    3. The SEC's Past Interpretations of the Acts ..........................17

    4. Mismatch Between the Rule and the SEC's Congressionally Assigned Mission .................................................................19

   III. If the Acts Authorized the SEC to Make Major Social Policy Choices, the Acts Would Violate the Nondelegation Doctrine........................21

CONCLUSION .........................................................................23

CERTIFICATE OF COMPLIANCE ...................................................25

CERTIFICATE OF SERVICE ..........................................................26

Appellate Case: 24-1522    Page: 3    Date Filed: 06/24/2024  Entry ID: 5406302

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Ass'n of Realtors v. HHS*,
  141 S. Ct. 2485 (2021) ................................................................7, 14, 20

*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011) ................................................................................20

*Biden v. Nebraska Ala.*,
  600 U.S. 477 (2023) ..............................................................2, 8, 15, 19, 21

*BST Holdings, L.L.C. v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ..........................................................10, 17

*City of Hoboken v. Chevron Corp.*,
  45 F.4th 699 (3d Cir. 2022) ....................................................................8

*Cort v. Ash*,
  422 U.S. 66 (1975) ..................................................................................11

*Ctr. for Biological Diversity v. EPA*,
  722 F.3d 401 (D.C. Cir. 2013) ................................................................8

*CTS Corp. v. Dynamics Corp. of Am.*,
  481 U.S. 69 (1987) ..................................................................................11

*Dept. of Transp. v. Ass'n of Am. R.R.*,
  575 U.S. 43 (2015) ..................................................................................22

*DOC v. New York*,
  139 S. Ct. 2551 (2019) ............................................................................20

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ................................................................................16

*FCC v. Cruz*,
  596 U.S. 289 (2022) ..................................................................................3

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ..............................................................4, 5, 13, 14, 15, 16

iii

*FTC v. Bunte Brothers, Inc.*,
    312 U.S. 349 (1941).........................................................................17

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)...........................................................................6

*Janus v. AFSCME, Council 31*,
    585 U.S. 878 (2018)...........................................................................8

*Kamen v. Kemper Fin. Servs.*,
    500 U.S. 90 (1991).........................................................................11

*King v. Burwell*,
    576 U.S. 473 (2015).........................................................................21

*La. Pub. Serv. Com v. Fed. Commc'ns Comm'n*,
    476 U.S. 355 (1986)...........................................................................3

*Loving v. United States*,
    517 U.S. 748 (1996).........................................................................22

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)...........................................................................8

*MCI Tele. Corp. v. American Telephone & Telegraph Co.*,
    512 U. S. 218 (1994).........................................................................13

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
    No. 23-60471, 2024 WL 2836655 (5th Cir. June 5, 2024) .................14

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
    595 U.S. 109 (2022)..........................................................5, 6, 21, 22

*Nat'l Review, Inc. v. Mann*,
    140 S. Ct. 344 (2019).........................................................................8

*NRDC v. SEC*,
    606 F.2d 1031 (D.C. Cir. 1979).......................................................17

*N.Y. Stock Exch. LLC v. SEC*,
    962 F.3d 541 (D.C. Cir. 2020)...........................................................3

iv

*Ry. Labor Executives' Assn's v. Nat'l Mediation Bd.*,
    29 F.3d 655 (D.C. Cir. 1994) ................................................................4

*Sackett v. EPA*,
    598 U.S. 651 (2023) .......................................................................12

*Santa Fe Indus. v. Green*,
    430 U.S. 462 (1977) ...................................................................11, 12

*SAS Inst., Inc. v. Iancu*,
    584 U.S. 357 (2018) ........................................................................4

*Seila Law LLC v. Consumer Fin. Prot. Bureau*,
    591 U.S. 197 (2020) .......................................................................21

*Spector v. Norwegian Cruise Line Ltd.*,
    545 U.S. 119 (2005) .......................................................................14

*Tiger Lily, LLC v. HUD*,
    5 F.4th 666 (6th Cir. 2021) ..........................................................21, 22

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975) .......................................................................16

*U.S. Telecom Assn. v. FCC*,
    855 F. 3d 381 (D.C. Cir. 2017) ..................................................4, 7, 10

*Util. Air Regulatory Grp. v. EPA*,
    573 U.S. 302 (2014) .....................................................................5, 12

*Wayman v. Southard*,
    23 U.S. (10 Wheat.) 1 (1825) ...................................................21, 22, 23

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ...................................... 2, 3, 4, 5, 6, 7, 12, 13, 14, 16, 17

*Whitman v. Am. Trucking Ass'ns., Inc.*,
    531 U.S. 457 (2001) .......................................................................23

*Wilkinson v. Garland*,
    144 S. Ct. 780 (2024) .....................................................................15

v

**Constitution**

U.S. Const. art. I, § 1 ............................................................................2, 22, 23

**Statutes**

15 U.S.C. § 77aa ...............................................................................................15

15 U.S.C. § 77g(a)(1) ........................................................................................14

15 U.S.C. § 77j(c) ..............................................................................................14

15 U.S.C. § 78l(b) ..............................................................................................15

15 U.S.C. § 78l(b)(1) ..........................................................................................14

15 U.S.C. § 78m(a) .............................................................................................14

15 U.S.C. § 78m(p)(1)(A) ..................................................................................15

15 U.S.C. § 78m(q)(2)(A) ..................................................................................15

15 U.S.C. § 78n(i) ..............................................................................................15

15 U.S.C. § 78o(d) .............................................................................................14

42 U.S.C. § 7414 ...............................................................................................20

42 U.S.C. § 7414(a)(1) .......................................................................................13

42 U.S.C. § 7414(c) ...........................................................................................13

**Federal Register**

Business and Financial Disclosure Required by Regulation S-K,
81 Fed. Reg. 23,916 (Apr. 22, 2016) ...........................................................17

Environmental and Social Disclosure, Notice of Commission Conclusions and
Rulemaking Proposals,
40 Fed. Reg. 51,656 (Nov. 6, 1975) .............................................................17

E.O. 14008, Tackling the Climate Crisis at Home and Abroad,
86 Fed. Reg. 7,619 (Jan. 27, 2021) ..............................................................10

Appellate Case: 24-1522    Page: 7    Date Filed: 06/24/2024 Entry ID: 5406302

E.O. 14030, Climate-Related Financial Risk,
86 Fed. Reg. 27,967 (May 25, 2021) ................................................................10

The Enhancement and Standardization of Climate-Related Disclosures for
Investors Rule,
89 Fed. Reg. 21,668 (Mar. 28, 2024) ..............................................3, 9, 10, 15, 19

**Other Authorities**

Amanda M. Rose,
*A Response to Calls for SEC-Mandated ESG Disclosure*,
98 Wash. U. L. Rev. 1821 (2021) .....................................................................12

Alec Tyson et al., *What the Data Says About Americans' Views of Climate
Change*, Pew Research Center (Aug. 9, 2023),
https://www.pewresearch.org/short-reads/2023/08/09/what-the-data-says-about-
americans-views-of-climate-
change/#:~:text=Nearly%20eight%2Din%2Dten%20Democrats,identical%20to
%2010%20years%20ago ......................................................................................8

Caroline Crenshaw, Commissioner, SEC,
A Risk by Any Other Name: Statement on the Enhancement and
Standardization of Climate-Related Disclosures (Mar. 6, 2024) ........................9

Comment of Andrew N. Vollmer, Release Nos. 33-11042; 34-94478; File No. S7-
10-22 (April 12, 2022) ...................................................................................9, 10

Comment of Senators at the U.S. Senate Committee on Banking, Housing, and
Urban Affairs Re: Public Input on Climate Change Disclosures (June 13, 2021)
https://www.sec.gov/comments/climate-disclosure/cll12-8911330-244285.pdf .9

Elaine Kamarck, *The Challenging Politics of Climate Change*, Brookings
(Sept. 23, 2019), https://www.brookings.edu/articles/the-challenging-politics-
of-climate-change/ ...............................................................................................8

Federalist No. 47 (Madison) .....................................................................................2

Federalist No. 73 (Hamilton) ..................................................................................22

Greenhouse Gas Reporting Program and the U.S. Inventory of Greenhouse Gas
Emissions and Sinks, EPA, https://www.epa.gov/ghgreporting/ghgrp-and-us-
inventory-greenhouse-gas-emissions-and-sinks .................................................20

Appellate Case: 24-1522     Page: 8     Date Filed: 06/24/2024 Entry ID: 5406302

Hester M. Peirce, Commissioner, SEC,
Green Regs and Spam: Statement on the Enhancement and Standardization of
Climate-Related Disclosures for Investors (Mar. 6, 2024).. 10, 11, 18, 19, 20, 23

Hester M. Peirce, Commissioner, SEC, We are Not the Securities and Environment
Commission—At Least Not Yet (March 21, 2022),
https://www.sec.gov/news/statement/peirce-climate-disclosure-20220321 ......20

H.R. 1187, 117th Cong. (2021)........................................................................9

H.R. 2570, 117th Cong. (2021)........................................................................9

H.R. 3623, 116th Cong. (2019)........................................................................9

Letter from Congressman Sean Casten et al. to SEC Chairman Gary Gensler
(Aug. 9, 2023)........................................................................................9

Letter from Sen. Elizabeth Warren et al. to SEC Chairman Gary Gensler
(Mar. 5, 2023) .......................................................................................9

Mark T. Uyeda, Commissioner, SEC,
A Climate Regulation under the Commission's Seal: Dissenting Statement on
The Enhancement and Standardization of Climate-Related Disclosures for
Investors (Mar. 6, 2024) ..........................................7, 8, 18, 19, 20, 23

Mission, SEC, https://www.sec.gov/about/mission..................................19

Philip A. Loomis, Jr., Commissioner, SEC, Presentation Before the Third Annual
National Conference of the National Investor Relations Institute, Materiality
and the SEC (October 2, 1972), https://bit.ly/38bl3wz ........................................

S. 1217, 117th Cong. (2021)........................................................................9

S. 2075, 116th Cong. (2019)........................................................................9

S. 3481, 115th Cong. (2018)........................................................................9

Testimony of Professor Joshua T. White, House Financial Services Committee
Hearing entitled "Beyond Scope: How the SEC's Climate Rule Threatens
American Markets" (April 14, 2024),
https://docs.house.gov/meetings/BA/BA00/20240410/117092/HHRG-118-
BA00-Wstate-WhiteJ-20240410.pdf...................................................11

Appellate Case: 24-1522     Page: 9     Date Filed: 06/24/2024 Entry ID: 5406302

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Americans for Prosperity Foundation ("AFPF") is a 501(c)(3) nonprofit organization committed to educating and training Americans to be courageous advocates for the ideas, principles, and policies of a free and open society. Some of those key ideas include the separation of powers and constitutionally limited government. As part of this mission, AFPF appears as *amicus curiae* before state and federal courts.

AFPF has a particular interest in this case because of the critical separation of powers issues that underlie it. At bottom, this case presents a familiar question: which branch of government is responsible for making law and how? It is not this Court's role to set public policy. Nor is it the job of unelected federal bureaucrats or the Executive acting alone. Instead, the Constitution tasks the democratically elected, politically accountable actors—Congress and the President—with resolving important policy questions within the scope of Congress's limited enumerated powers through the deliberately arduous processes of bicameralism and presentment.

---

[1] All parties have consented to the filing of this brief. Pursuant to FRAP 29(a)(4)(E), *amicus curiae* states that no counsel for a party other than AFPF authored this brief in whole or in part, and no counsel or party other than AFPF made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to its preparation or submission.

1

## SUMMARY OF ARGUMENT

This case is not about what constitutes good public policy. "The question here is not whether something should be done; it is who has the authority to do it." *Biden v. Nebraska*, 600 U.S. 477, 501 (2023).

Our system of government relies on the consent of the governed, memorialized in the Constitution. Subject to constitutional constraints on federal power, our Constitution exclusively tasks the People's elected representatives with answering policy questions through legislation that survives bicameralism and presentment, a deliberately difficult process designed to ensure such laws reflect broad political consensus and thus remain durable over time. Toward this end, the Constitution flatly prohibits Congress from delegating legislative power to other entities. U.S. Const. art. I, § 1. This means that unelected people are not allowed to make law in this country through administrative edict, as the Securities and Exchange Commission ("SEC" or "Commission") sought to do here. This is because "the Constitution does not authorize agencies to use pen-and-phone regulations as substitutes for laws passed by the people's representatives." *West Virginia v. EPA*, 597 U.S. 697, 753 (2022) (Gorsuch, J., concurring); *see* Federalist No. 47 (Madison).

The SEC's sweeping assertion of power to unilaterally reimagine the financial disclosure regime Congress enacted to protect the pecuniary interests of investors to instead advance unrelated social and energy policy goals flies in the face of these

Appellate Case: 24-1522     Page: 11     Date Filed: 06/24/2024 Entry ID: 5406302

basic principles. The Administration's circumvention of the People's elected representatives in Congress at every turn on the most politically and economically important (and controversial) issues of our day—mass student debt cancellation, vaccine mandates, a national eviction moratorium, and, as here, the question of climate change—is unconstitutional. And the SEC's climate regulation masquerading as an investor-protection rule must not be allowed to stand.

This Court should set aside the SEC's Enhancement and Standardization of Climate-Related Disclosures for Investors Rule, 89 Fed. Reg. 21,668 (Mar. 28, 2024) (the "Rule").

## ARGUMENT

### I.     The SEC Must Respect the Separation of Powers.

The SEC is a creature of statute, which possesses only those powers Congress chooses to confer upon it.[2] *See FCC v. Cruz*, 596 U.S. 289, 301 (2022); *La. Pub. Serv. Com v. FCC*, 476 U.S. 355, 374 (1986). After all, "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line" as it sees fit. *West Virginia*, 597 U.S. at 723 (cleaned up). "That an agency's improvisation might be

---

[2] "An agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *N.Y. Stock Exch. LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020) (cleaned up). "Merely because an agency has rulemaking power does not mean that it has delegated authority to adopt a particular regulation." *Id.* at 554.

3

thought by some more expedient than what the law allows does nothing to commend it either, for lawful ends do not justify unlawful means." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 368 n.* (2018) (citation omitted).

The SEC must establish statutory authorization for its actions. *West Virginia*, 597 U.S. at 723 ("We presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" (quoting *U.S. Telecom Assn. v. FCC*, 855 F. 3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)). And "[r]egardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (cleaned up). Congress need not expressly negate an agency's claimed powers; "[w]ere courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with . . . the Constitution[.]" *Ry. Labor Executives' Assn's v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc).

Under the major questions doctrine, "cases in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia*, 597 U.S.

4

at 721 (quoting *Brown & Williamson*, 529 U.S. at 159–60). In those cases, "both separation of powers principles and a practical understanding of legislative intent make [courts] 'reluctant to read into ambiguous statutory text' the delegation claimed to be lurking there. . . . [S]omething more than a merely plausible textual basis for the agency action is necessary. The agency instead must point to 'clear congressional authorization' for the power it claims." *West Virginia*, 597 U.S. at 723 (quoting *Util. Air Regulatory Grp. ("UARG") v. EPA*, 573 U.S. 302, 324 (2014)).

The major questions doctrine "refers to an identifiable body of law that has developed over a series of significant cases all addressing a particular and recurring problem: agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 724. "If administrative agencies seek to regulate the daily lives and liberties of millions of Americans, the doctrine says, they must at least be able to trace that power to a clear grant of authority from Congress." *Nat'l Fed'n of Indep. Bus. ("NFIB") v. OSHA*, 595 U.S. 109, 124 (2022) (per curiam) (Gorsuch, J., concurring).

"Like many parallel clear-statement rules in our law, this one operates to protect foundational constitutional guarantees." *West Virginia*, 597 U.S. at 735 (Gorsuch, J., concurring). Specifically, it "protect[s] the Constitution's separation of powers." *Id.* (Gorsuch, J., concurring). It does this by "guarding against unintentional, oblique, or otherwise unlikely delegations of the legislative power."

5

*NFIB*, 595 U.S. at 125 (Gorsuch, J., concurring). This doctrine "is vital because the framers believed that a republic—a thing of the people—would be more likely to enact just laws than a regime administered by a ruling class of largely unaccountable 'ministers.'" *West Virginia*, 597 U.S. at 737 (Gorsuch, J., concurring) (citation omitted). Applying these principles to the SEC's Rule confirms that it is *ultra vires*.

**II.    The SEC Has Usurped Congress's Exclusive Legislative Power.**

**A. The Major Questions Threshold Inquiry.**

Whether an agency action implicates the major questions doctrine is a threshold inquiry. *See, e.g.*, *id.* at 720–25; *see id.* at 743 n.3 (Gorsuch, J., concurring) ("[O]ur precedents have usually applied the doctrine as a clear-statement rule, and the Court today confirms that is the proper way to apply it."). The Supreme Court's "cases supply a good deal of guidance about when an agency action involves a major question for which clear congressional authority is required." *Id.* at 743 (Gorsuch, J., concurring). *First*, the "Court has indicated that the doctrine applies when an agency claims the power to resolve a matter of great 'political significance' or end an 'earnest and profound debate across the country.'" *Id.* (Gorsuch, J., concurring) (quoting *NFIB*, 595 U.S. at 117; *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006)). *Second*, it "has said that an agency must point to clear congressional authorization when it seeks to regulate a significant portion of the American economy or require billions of dollars in spending by private persons or entities." *Id.* at 744 (Gorsuch,

6

J., concurring) (cleaned up).  *Third*, the "Court has said that the major questions doctrine may apply when an agency seeks to intrude into an area that is the particular domain of state law." *Id.* (Gorsuch, J., concurring) (cleaned up); *see, e.g.*, *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam) ("The moratorium intrudes into an area that is the particular domain of state law[.]").

### B. The SEC's Rule Triggers the Major Questions Doctrine.

The SEC's Rule "is an extraordinary exercise of regulatory authority by the Commission that involves an economically and politically significant policy decision." Mark T. Uyeda, Commissioner, SEC, A Climate Regulation under the Commission's Seal: Dissenting Statement on The Enhancement and Standardization of Climate-Related Disclosures for Investors (Mar. 6, 2024) [hereinafter "Uyeda Dissent"]. Here, everything about the Rule implicates the major questions doctrine, as demonstrated by "the amount of money involved for regulated and affected parties, the overall impact on the economy, the number of people affected, and the degree of congressional and public attention to the issue." *See U.S. Telecomms. Ass'n*, 855 F.3d at 422–23 (Kavanaugh, J., dissenting from denial of rehearing en banc) (listing factors).

### 1. The SEC Attempted to Decide Matters of Great Political Importance.

The SEC's newly reimagined disclosure regime is a thinly disguised "climate regulation promulgated under the Commission's seal" that marks "the culmination

7

of efforts by various interests to hijack and use the federal securities laws for their climate-related goals." Uyeda Dissent, *supra*.

"Climate change has staked a place at the very center of this Nation's public discourse." *Nat'l Review, Inc. v. Mann*, 140 S. Ct. 344, 348 (2019) (Alito, J., dissenting from denial of certiorari); *see Ctr. for Biological Diversity v. EPA*, 722 F.3d 401, 415 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (describing issue as "important at the national and international level"); *City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 713 (3d Cir. 2022) (Bibas, J.) (describing issue as "important problem with national and global implications"). It is a subject of vast political importance and "earnest and profound debate across the country[.]"[3] *Nebraska*, 600 U.S. at 504 (cleaned up); *see Janus v. AFSCME, Council 31*, 585 U.S. 878, 913 (2018) (recognizing it is "controversial subject"). "It is not a problem, however, that has escaped the attention of policymakers in the Executive and Legislative Branches of our Government[.]" *Massachusetts v. EPA*, 549 U.S. 497, 535 (2007).

---

[3] *See* Alec Tyson et al., *What the Data Says About Americans' Views of Climate Change*, Pew Research Center (Aug. 9, 2023), https://www.pewresearch.org/short-reads/2023/08/09/what-the-data-says-about-americans-views-of-climate-change/#:~:text=Nearly%20eight%2Din%2Dten%20Democrats,identical%20to%2010%20years%20ago; *see also* Elaine Kamarck, *The Challenging Politics of Climate Change*, Brookings (Sept. 23, 2019) (issue "remains the toughest, most intractable political issue we, as a society, have ever faced"), https://www.brookings.edu/articles/the-challenging-politics-of-climate-change/

Unsurprisingly, then, the SEC's Rule itself has not escaped the attention of the political branches and the public at large. *See, e.g.*, Letter from Sen. Elizabeth Warren et al. to SEC Chairman Gary Gensler (Mar. 5, 2023); Letter from Congressman Sean Casten et al. to SEC Chairman Gary Gensler (Aug. 7, 2023); Comment of Senators at the U.S. Sen. Comm. on Banking, Housing, and Urban Affairs Re: Public Input on Climate Change Disclosures, 1–3 (June 13, 2021);[4] *see* 89 Fed. Reg. at 21,670–71 (describing public comments); *see also* Caroline Crenshaw, Commissioner, SEC, A Risk by Any Other Name: Statement on the Enhancement and Standardization of Climate-Related Disclosures (Mar. 6, 2024) ("There has been an intense media glare on our proposal and robust public dialogue.").

Tellingly, Congress has repeatedly declined to pass legislation authorizing the SEC to require environmental disclosures. *See, e.g.*, H.R. 2570, 117th Cong. (2021) (Climate Disclosure Act); H.R. 3623, 116th Cong. (2019); S. 1217, 117th Cong. (2021); S. 2075, 116th Cong. (2019); S. 3481, 115th Cong. (2018); H.R. 1187, 117th Cong. (2021). This legislation would, of course, be superfluous if the SEC already had statutory authority to require the disclosures, which it plainly does not.[5]

---

[4] https://www.sec.gov/comments/climate-disclosure/cll12-8911330-244285.pdf

[5] Ironically, the disclosure-related legislation that Congress has passed in recent years indicate that Congress wants more simplified disclosures, which is the exact opposite of what the Rule will do. *See* Comment of Andrew N. Vollmer, Release

Appellate Case: 24-1522     Page: 18     Date Filed: 06/24/2024 Entry ID: 5406302

The President has also made clear the political importance of this issue. *See, e.g.*, E.O. 14030, 86 Fed. Reg. 27,967 (May 25, 2021); E.O. 14008, 86 Fed. Reg. 7,619, 7,622 (Jan. 27, 2021) ("It is the policy of my Administration to organize and deploy the full capacity of its agencies . . . to implement a Government-wide approach[.]"). "The President's intervention only underscores the enormous significance of" these issues. *U.S. Telecomms. Ass'n*, 855 F.3d at 424 (Kavanaugh, J., dissenting from denial of rehearing en banc).

## 2. The SEC's Rule Has Vast Economic Significance.

The Rule is of vast economic significance. According to the SEC's own estimates, the direct compliance costs, standing alone, will top $4 billion in the first two years. *See* 89 Fed. Reg. at 21,908. *Cf. BST Holdings, L.L.C. v. OSHA,* 17 F.4th 604, 617 (5th Cir. 2021) ($3 billion in compliance costs triggers major questions doctrine). The SEC's estimates also indicate that "15 percent of a company's annual SEC disclosure costs would be attributable to climate disclosures." Hester M. Peirce, Commissioner, SEC, Green Regs and Spam: Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors (Mar. 6, 2024)

---

Nos. 33-11042; 34-94478; File No. S7-10-22, at 11 & n.19 (April 12, 2022) (citing Section 108 of the JOBS Act, Pub. L. No. 112-106, 126 Stat. 306 (2012); Fixing America's Surface Transportation Act, Pub. L. No. 114-94, § 72002, 129 Stat. 1784, 1784 (Dec. 4, 2015); *id.* § 72003, 129 Stat. 1784, 1785).

[hereinafter "Peirce Dissent"]. "[T]his rule will increase the typical external costs of being a public company by around 21%." *Id.*

On top of this, the Rule also imposes "the indirect costs of lost management time, board distraction, and disruptive changes in company operations." *Id.* Indeed, the Rule has the potential to disrupt and change the entire economy. *See* Testimony of Professor Joshua T. White, House Financial Services Committee Hearing entitled "Beyond Scope: How the SEC's Climate Rule Threatens American Markets" 9 (April 14, 2024) ("These rules could ultimately stifle public offerings, harm capital formation, and impede economic growth.").[6]

### 3. The SEC's Rule Intrudes on the Province of the States.

The Rule also encroaches on an area traditionally governed under State law. "Corporations are creatures of state law[.]" *Cort v. Ash*, 422 U.S. 66, 84 (1975); *see Kamen v. Kemper Fin. Servs.,* 500 U.S. 90, 98–99 (1991). "No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations[.]" *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). And the Supreme Court has said that it is "reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would

---

[6] https://docs.house.gov/meetings/BA/BA00/20240410/117092/HHRG-118-BA00-Wstate-WhiteJ-20240410.pdf

Appellate Case: 24-1522    Page: 20    Date Filed: 06/24/2024 Entry ID: 5406302

be overridden," "[a]bsent a clear indication of congressional intent[.]" *Santa Fe Indus. v. Green*, 430 U.S. 462, 479 (1977); *see Sackett v. EPA*, 598 U.S. 651, 679 (2023) (Congress must use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power[.]" (cleaned up)).

"[U]sing disclosure rules to influence corporate behavior," as the SEC has done here, attempts "to blur the line between the domains of federal securities regulation and state corporate law." Amanda M. Rose, *A Response to Calls for SEC-Mandated ESG Disclosure*, 98 Wash. U. L. Rev. 1821, 1844 (2021). The Rule intrudes on the province of the States, mandating a reordering of corporate priorities at odds with State corporate law. *See, e.g.*, *id.* at 1845 ("The behavior sought to be promoted by ESG disclosure . . . conflicts with Delaware corporate law to the extent it promotes the prioritization of non-shareholder constituencies in corporate decision-making."). That, too, is a telltale sign of a major question.

## C. The SEC's Rule Fails the Major Questions Doctrine's Clear Statement Requirement.

Against this backdrop, the SEC's "claim to extravagant statutory power over the national economy" should be greeted skeptically. *UARG*, 573 U.S. at 324. And where, as here, the major questions doctrine applies, "a colorable textual basis" is not enough to justify the agency's assertion of power. *See West Virginia*, 597 U.S. at 722–23. Instead, "[a]t this point, the question becomes what qualifies as a clear congressional statement authorizing an agency's action." *Id.* at 746 (Gorsuch, J.,

concurring). "*First*, courts must look to the legislative provisions on which the agency seeks to rely 'with a view to their place in the overall statutory scheme.'" *Id.* (Gorsuch, J., concurring) (quoting *Brown & Williamson*, 529 U.S. at 133). "*Second*, courts may examine the age and focus of the statute the agency invokes in relation to the problem the agency seeks to address." *Id.* at 747 (Gorsuch, J., concurring). "*Third*, courts may examine the agency's past interpretations of the relevant statute." *Id.* (Gorsuch, J., concurring). "*Fourth*, skepticism may be merited when there is a mismatch between an agency's challenged action and its congressionally assigned mission and expertise." *Id.* at 748 (Gorsuch, J., concurring). The SEC's Rule independently fails all four of these tests.

## 1. The Acts' Place in the Overall Statutory Scheme.

Congress does not "typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *Id.* at 723 (majority op.) (quoting *MCI Tele. Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218, 229 (1994)). If Congress wanted to grant the SEC power to use its disclosure power to drive transformative social and political change it deems desirable, it would have clearly said so. It did not.

The statutory structure Congress has enacted makes clear that Congress tasked a *different agency*—the EPA—with collecting environmental reports from emission sources and making that data publicly available. *See* 42 U.S.C. §§ 7414(a)(1), (c).

13

By contrast, the SEC bases its newly claimed power to unilaterally reimagine its disclosure regime to set national energy policy in general statutory language authorizing disclosures that are "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1); *see* §§ 77j(c), 78l(b)(1), 78o(d), 78m(a). *See generally* 89 Fed. Reg. at 21,683. Nothing in these provisions purports to authorize, let alone clearly authorize, the SEC to do this. *See Spector v. Norwegian Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality) (suggesting "broad or general language" insufficient to find clear statement); *West Virginia*, 597 U.S. at 723 ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle device[s]." (cleaned up)).

"It is [also] a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Brown & Williamson*, 529 U.S. at 133. Statutory context further confirms that general rulemaking provisions, like those in Securities Act, are "a wafer-thin reed on which to rest such sweeping power." *Alabama Ass'n of Realtors*, 141 S. Ct. at 2489. The Rule simply "does not fit within the statutory design." *Nat'l Ass'n of Priv. Fund Managers v. SEC*, No. 23-60471, 2024 WL 2836655, at *12 (5th Cir. June 5, 2024).

For example, 15 U.S.C. § 77g(a)(1) references the requirements of Schedule A, a provision of the SEC Act that sets out categories of information Congress

14

thought companies should include in their registration statements, all of which go to a company's financial health and thus the value of securities. *See* 15 U.S.C. § 77aa; *see also* 89 Fed. Reg. at 21,685 ("Schedule A . . . requires disclosure of balance sheet and profit and loss statement (i.e., comprehensive income statement) information[.]").

The Exchange Act likewise focuses SEC's rulemaking powers on categories of management and balance-sheet information. *See* 15 U.S.C. § 78l(b); *id.* § 78l(b)(1)(L) (referencing "financial statements"). The Exchange Act thus makes clear that SEC may only issue regulations "in respect of" *those* categories of financial information. *See* 15 U.S.C. § 78l(b). Tellingly, when Congress has wanted to authorize the SEC to demand non-traditional disclosures of information that would not be material to reasonable investors, it has done so explicitly through targeted statutes narrowly authorizing mandated disclosures under limited circumstances. *See, e.g.,* 15 U.S.C. §§ 78m(p)(1)(A) (conflict minerals), 78m(q)(2)(A) (resource extraction), 78n(i) (executive compensation). But Congress conspicuously chose not to do so here, repeatedly (and recently) rejecting legislation that would explicitly give the SEC these powers. *See supra* Section II.B.1.

Finally, "[c]ontext also includes common sense[.]" *Nebraska*, 600 U.S. at 512 (Barrett, J., concurring); *see Wilkinson v. Garland*, 144 S. Ct. 780, 795 (2024) (Alito, J., dissenting). Simple "common sense as to the manner in which Congress is likely

15

to delegate a policy decision of such economic and political magnitude," *Brown & Williamson*, 529 U.S. at 133, further confirms Congress did not do so here. Congress did not grant power to effectively set energy policy, a topic of intense debate with immense economic consequences, to the SEC "in so cryptic a fashion." *Id.* at 160.

### 2. Age and Focus of the Acts in Relation to the Rule.

"[A]n agency's attempt to deploy an old statute focused on one problem to solve a new and different problem may also be a warning sign that it is acting without clear congressional authority." *West Virginia*, 597 U.S. at 747 (Gorsuch, J., concurring) (citation omitted). So too here.

"Federal regulation of transactions in securities emerged as part of the aftermath of the market crash in 1929." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976). The Securities Act and the Exchange Act are Great Depression-era statutes, enacted almost forty years before the EPA—the primary federal agency responsible for protecting the environment—was first established. "The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). The "focus" of these statutes is the "capital market," including "the sale of securities to raise capital for profit-making purposes" and fraud prevention, *id.*—not on national social or energy policy.

16

In short, the Rule "derives its authority from an old statute employed in a novel manner[.]" *BST Holdings,* 17 F.4th at 617. This is yet another telltale sign the SEC has strayed from its congressionally assigned lane.

### 3. The SEC's Past Interpretations of the Acts.

The SEC's prior interpretations of the Acts further underscores the extent of its overreach. As the Supreme Court explained in *West Virginia,* "'just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.'" 597 U.S. at 725 (quoting *FTC v. Bunte Brothers, Inc*., 312 U.S. 349, 352 (1941)). So too here.

Beginning in 1975, and as recently as 2016, the SEC disclaimed the general power to require non-traditional disclosures absent a new "specific congressional mandate."[7] *See* Business and Financial Disclosure Required by Regulation S-K, 81 Fed. Reg. 23,916, 23,970–71 & nn. 663, 687 (Apr. 22, 2016); Environmental and Social Disclosure, Notice of Commission Conclusions and Rulemaking Proposals, 40 Fed. Reg. 51,656, 51,657 (Nov. 6, 1975). As discussed above, there has been no change in law authorizing the SEC to require non-traditional disclosures.

---

[7] The SEC has previously taken the position that "these laws . . . were designed generally to require disclosure of financial information in the narrow sense only." *NRDC v. SEC*, 606 F.2d 1031, 1039 (D.C. Cir. 1979).

17

By contrast, "the greenhouse gas emissions disclosures seem to be something new." Peirce Dissent, *supra*. And the Rule breaks sharply with the SEC's past disclosure activities in several important and unprecedented ways:

- "In no other context is a company required to provide an explanation of expenses that exceed one percent of income before taxes and analyze the significant contributing factor to the expense." Uyeda Dissent, *supra*.

- "For no other risk does the Commission require prescriptive, forward-looking disclosure of the risk's impacts on the company's strategy, business model, outlook, financial planning, and capital allocation." *Id.*

- The Rule "requires disclosure of climate-related targets and goals, even though the Commission has no similar requirements for a company's targets and goals related to other, more important matters affecting the company, such as financial performance, product development, customer acquisition, or market expansion." *Id.*

- "Finally, the requirement to disclose GHG emissions and obtain an attestation report on such disclosure is in a class of its own without comparison in the Commission's disclosure regime." *Id.*

This further shows that the SEC has transgressed limits on its powers.

Appellate Case: 24-1522    Page: 27    Date Filed: 06/24/2024 Entry ID: 5406302

### 4. Mismatch Between the Rule and the SEC's Congressionally Assigned Mission.

"Another telltale sign that an agency may have transgressed its statutory authority is when it regulates outside its wheelhouse." *Nebraska*, 600 U.S. at 518 (Barrett, J., concurring). That observation resonates here. Bolstering the commonsense conclusion that Congress did not grant the SEC authority to mandate costly and burdensome disclosures for the purpose of reimagining our economy is the mismatch between the SEC's mission and the goal of the Rule.

Here, the SEC has "ventured outside of its lane[.]" Uyeda Dissent, *supra*. The Rule has nothing to do with the agency's actual mission: "protecting investors, maintaining fair, orderly, and efficient markets, and facilitating capital formation." Mission, SEC, https://www.sec.gov/about/mission. Instead, it "is [a] climate regulation promulgated under the Commission's seal." Uyeda Dissent, *supra*; *see* Peirce Dissent, *supra* ("This rule replaces our current principles-based regime with dozens of pages of prescriptive climate-related regulations."). Indeed, the Rule itself reveals its true purpose: "[M]andatory reporting of GHG emissions results in reduced aggregate reported emissions among affected firms." 89 Fed. Reg. at 21,888; *see* Peirce Dissent, *supra* ("While the Commission feigns agnosticism about how public companies should think about climate risks, the prescriptive nature of this new climate regime will affect corporate behavior."). And this Court is "not

required to exhibit a naiveté from which ordinary citizens are free." *DOC v. New York*, 139 S. Ct. 2551, 2575 (2019) (cleaned up).

The SEC's lack of expertise is yet additional evidence that its Rule is ultra vires and unlawful. As Commissioner Hester Peirce explained: "the regulators designing the framework have no expertise in capital allocation, political and social insight, or the science used to justify these [politically and socially] favored ends." We are Not the Securities and Environment Commission—At Least Not Yet (March 21, 2022). The SEC "lack[s] the expertise to oversee these special interest disclosures[.]" Peirce Dissent, *supra*. Commissioner Uyeda has echoed this point: "The Commission is a securities regulator without statutory authority or expertise to address political and social issues." Uyeda Dissent, *supra*.

Congress has instead tasked EPA with regulating the environment, *see Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011), including collecting reports from emissions sources and making these reports publicly available, *see* 42 U.S.C. § 7414. EPA has done so. *See* Greenhouse Gas Reporting Program and the U.S. Inventory of Greenhouse Gas Emissions and Sinks, EPA, https://www.epa.gov/ghgreporting/ghgrp-and-us-inventory-greenhouse-gas-emissions-and-sinks.

Just as the CDC lacked the power to reimagine landlord-tenant law, *see Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; OSHA lacked the power to mandate

vaccinations, *see NFIB*, 595 U.S. at 117; the IRS lacked power to make national health policy, *see King v. Burwell*, 576 U.S. 473, 486 (2015); and the Department of Education lacked the power to mass cancel student debt, *see Nebraska*, 600 U.S. at 504, the SEC is not allowed to go on a frolic into climate policy. Whatever the boundary of the major questions doctrine, the SEC's Rule transgresses it.

### III. If the Acts Authorized SEC to Make Major Social Policy Choices, the Acts Would Violate the Nondelegation Doctrine.

In any event, Congress cannot constitutionally transfer to the SEC the legislative power the agency claims to possess. Under the SEC's reading of the Acts, the SEC "would enjoy virtually unlimited power to rewrite" those statutes to accomplish whatever social policy goals it wanted. *Nebraska*, 600 U.S. at 502. That cannot be right. If the Acts did authorize SEC to reimagine its disclosure regime for the purpose of fundamentally transforming entire sectors of the economy, then they would constitute an unlawful delegation of legislative authority. *Cf. NFIB*, 595 U.S. at 126 (Gorsuch, J., concurring); *Tiger Lily, LLC v. HUD*, 5 F.4th 666, 672 (6th Cir. 2021) (Thapar, J., concurring).

"The Constitution sets out three branches of Government and provides each with a different form of power—legislative, executive, and judicial." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 239 (2020) (Thomas, J., concurring) (citations omitted). "[T]he legislature makes, the executive executes, and the judiciary construes the law[.]" *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46

21

(1825). "That is the equilibrium the Constitution demands. And when one branch impermissibly delegates its powers to another, that balance is broken." *Tiger Lily*, 5 F.4th at 673 (Thapar, J., concurring).

"The allocation of powers in the Constitution is absolute[.]" *Dept. of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 69 (2015) (Thomas, J., concurring). Our Constitution exclusively tasks the People's elected representatives with making policy choices. U.S. Const. art. I, § 1. Not the SEC. And under the Constitution, the political branches may only do so through duly enacted legislation that survives bicameralism and presentment, a deliberately difficult process designed to ensure such laws reflect broad political consensus. For good reason. As Alexander Hamilton wrote: "The injury which may possibly be done by defeating a few good laws will be amply compensated by the advantage of preventing a number of bad ones." Federalist No. 73.

Congress may not duck the Constitution's accountability checkpoints by divesting itself of its legislative responsibilities. *See NFIB*, 595 U.S. at 124–25 (Gorsuch, J., concurring); *Ass'n of Am. R.R.*, 575 U.S. at 61 (Alito, J., concurring). The Constitution bars Congress from transferring "powers which are strictly and exclusively legislative" to other entities. *Wayman*, 23 U.S. (10 Wheat.) at 42; *see Loving v. United States,* 517 U.S. 748, 758 (1996). Instead, "important subjects" "must be entirely regulated by the legislature itself[.]" *Wayman*, 23 U.S. (10 Wheat.)

Appellate Case: 24-1522    Page: 31    Date Filed: 06/24/2024 Entry ID: 5406302

at 43. Article I's text makes this pellucidly clear: "All legislative Powers herein granted shall be vested in a Congress, which shall consist of a Senate and House of Representatives." U.S. Const. art. I, § 1. "This text permits no delegation of those powers[.]" *Whitman v. Am. Trucking Ass'ns., Inc.*, 531 U.S. 457, 472 (2001).

If the Rule is within the SEC's statutory authority, this would mean Congress granted the SEC the power to "us[e] disclosure not as a tool to aid investors, but to bypass Congress to achieve political and social change without the corresponding accountability to the electorate." Uyeda Dissent, *supra*. Underscoring this, "[t]he Commission d[id] not articulate any limiting principle for its claimed authority" to mandate non-traditional disclosures. Uyeda Dissent, *supra*; *accord* Pierce Dissent, *supra* ("The Commission argues that it is well within its authority in adopting this rule, but the argument we make for our authority here has no limiting principle."). Such a grant of sweeping power to make important policy choices would be unconstitutional.

## CONCLUSION

For these reasons, this Court should set aside the Rule without remand.

23

Respectfully submitted,

/s/ Michael Pepson
Michael Pepson
AMERICANS FOR PROSPERITY FOUNDATION
4201 Wilson Blvd., Ste. 1000
Arlington, VA 22203
571.329.4529
mpepson@afphq.org

24

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of FRAP 29(a)(5) and FRAP 32(a)(7)(B) because it contains 5,350 words. This brief also complies with the typeface and type-style requirements of FRAP 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Times New Roman 14-point font.

I further certify that this motion has been scanned for viruses and is virus-free.

/s/ Michael Pepson
Michael Pepson

Dated: June 24, 2024

Appellate Case: 24-1522   Page: 34   Date Filed: 06/24/2024 Entry ID: 5406302

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2024, I electronically filed the above Brief of Amicus Curiae Americans for Prosperity Foundation in Support of Petitioners and Reversal with the Clerk of the Court by using the appellate CM/ECF system. I further certify that service will be accomplished by the appellate CM/ECF system.


<u>/s/ Michael Pepson</u>
Michael Pepson

Dated: June 24, 2024