**UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

**STATE OF IOWA, ET AL.,**

*Petitioners,*

**v.**

**SECURITIES AND EXCHANGE COMMISSION,**

*Respondent,*

**DISTRICT OF COLUMBIA, ET AL.,**

*Intervenors.*

# BRIEF OF *AMICUS CURIAE* OHIO CHAMBER OF COMMERCE IN SUPPORT OF PETITIONERS

Larry J. Obhof
Mark D. Wagoner
Shumaker, Loop & Kendrick, LLP
41 South High Street
Suite 2400
Columbus, OH 43215
(614) 463-9441
lobhof@shumaker.com
mwagoner@shumaker.com

*Counsel for Amicus Curiae*

Dated: June 24, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, *amicus curiae* the Ohio Chamber of Commerce states that it is a non-profit corporation organized in the manner allowed by Section 501(c)(6) of the Internal Revenue Code. The Ohio Chamber of Commerce has no parent corporation, and no publicly held company has 10% or greater ownership in the Ohio Chamber of Commerce.

# <u>TABLE OF CONTENTS</u>

**Page**

INTEREST OF AMICUS CURIAE ....................................................1

SUMMARY OF ARGUMENT .......................................................2

ARGUMENT ...............................................................................4

   I.   **The Major Questions Doctrine Precludes the SEC's Adoption of the Disclosure Rule.**................................4

     A.   **The Disclosure Rule presents a major question of public policy.**......................................................6

     B.   **The SEC does not have "clear congressional authorization" for the Disclosure Rule.**.................10

CONCLUSION...........................................................................15

CERTIFICATE OF COMPLIANCE...............................................17

CERTIFICATE OF SERVICE ......................................................18

i

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021)...................................................................9

*In re Bernard L. Madoff Inv. Sec. LLC*,
12 F.4th 171 (2d Cir. 2021).....................................................8

*Biden v. Nebraska*,
143 S. Ct. 2355 (2023)........................................................10, 12

*BST Holdings, L.L.C. v. Occupational Safety & Health
Admin., United States Dep't of Labor*,
17 F.4th 604 (5th Cir. 2021) ...............................................10

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976)..................................................................8

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)........................................................6, 12, 14

*Fed. Trade Comm'n v. Bunte Bros.*,
312 U.S. 349 (1941)..........................................................13, 14

*Free Enterprise Fund v. Public Company Accounting
Oversight Bd.*,
561 U.S. 477 (2010).............................................................2, 5

*Gonzales v. Oregon*,
546 U.S. 243 (2006)..................................................................6

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*,
448 U.S. 607 (1980)...............................................................13

*King v. Burwell*,
576 U.S. 473 (2015)..................................................................9

Appellate Case: 24-1522    Page: 4    Date Filed: 06/24/2024 Entry ID: 5406459

*Kisor v. Wilkie*,
   588 U.S. 558 (2019) ................................................................. 9

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ................................................................. 5

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational
   Safety & Health Admin.*,
   595 U.S. 109 (2022) ................................................................ 13

*Radzanower v. Touche Ross & Co.*,
   426 U.S. 148 (1976) ................................................................. 8

*S.E.C. v. Lauer*,
   52 F.3d 667 (7th Cir. 1995) .................................................... 8

*United Housing Foundation, Inc. v. Forman*,
   421 U.S. 837 (1975) ............................................................. 7, 8

*Utility Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) ................................... 4, 5, 6, 11, 13, 14

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ..........................3, 4, 6, 7, 9, 10, 11, 13

*Zacarias v. Stanford Int'l Bank, Ltd.*,
   945 F.3d 883 (5th Cir. 2019) ................................................. 7

## Statutes and Bills

15 U.S.C. § 77g(a)(1) .............................................................. 12

15 U.S.C. §§ 77g(a)(1), 77aa ............................................... 3, 8

15 U.S.C. § 78*l*(b), (g) .............................................................. 12

15 U.S.C. § 78m(p) .................................................................. 15

H.R. 1187, 117th Cong. (2021) ("Corporate Governance
   Improvement and Investor Protection Act") ..................... 14

Appellate Case: 24-1522      Page: 5      Date Filed: 06/24/2024 Entry ID: 5406459

S. 3481, 115th Cong. (2018) ("Climate Risk Disclosure Act of 2018") ............................................................................... 14

S. 1217, 117th Cong. (2021) ("Climate Risk Disclosure Act of 2021") ............................................................................... 14

Securities Act ......................................................................... 4, 11

Securities Exchange Act ........................................................ 4, 11

**Rules**

Fed. R. App. P. 29(a)(2) ............................................................. 1

Fed. R. App. P. 29(a)(4)(E) ........................................................ 1

**Other Authorities**

*Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23,916 (Apr. 22, 2016) ................................. 3

Constitution of the United States ............................................. 5

*The Enhancement and Standardization of Climate-Related Disclosures for Investors,* 89 Fed. Reg. 21,668 (Mar. 28, 2024) ...................................................................................... 6, 11

*Environmental and Social Disclosure, Notice of Commission Conclusions and Rulemaking Proposals*, 40 Fed. Reg. 51,656 (Nov. 6, 1975) ............................................................ 13

Appellate Case: 24-1522    Page: 6    Date Filed: 06/24/2024 Entry ID: 5406459

## INTEREST OF *AMICUS CURIAE*[1]

Founded in 1893, the Ohio Chamber of Commerce (the "Ohio Chamber") is Ohio's largest and most diverse statewide business advocacy organization, representing businesses ranging from small sole proprietorships to some of the nation's largest companies. The Ohio Chamber works to promote and protect the interests of its more than 8,000 business members, while building a more favorable business climate in Ohio by advocating for the interests of Ohio's business community on matters of statewide importance.

The Ohio Chamber promotes a pro-growth agenda with policymakers and in courts across Ohio. It seeks a stable and predictable legal system which fosters a business climate where enterprise and Ohioans can prosper. The Ohio Chamber regularly files amicus briefs in cases that are important to its members' interests.

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), *amicus curiae* states that counsel acting on behalf of all parties have consented to the filing of this brief or filed a global consent letter. Pursuant to Fed. R. App. P. 29(a)(4)(E), *amicus curiae* states that no counsel for any party authored this brief in whole or in part, nor did any person or entity, other than *amicus*, its members, or its counsel make a monetary contribution to the preparation or submission of this brief.

1

The Ohio Chamber supports a regulatory environment that is conducive to economic growth. As the United States Supreme Court has recognized, the administrative state "wields vast power and touches almost every aspect of daily life." *Free Enterprise Fund v. Public Company Accounting Oversight Bd.,* 561 U.S. 477, 499 (2010). *Amicus curiae* therefore has a strong interest in ensuring that that administrative agency actions are not unnecessarily burdensome on businesses and other job creators, and that such agencies adhere to the constitutional and statutory limitations on their regulatory authority.

## SUMMARY OF ARGUMENT

Administrative agencies exercise a significant amount of authority when implementing and enforcing our nation's laws. However, consistent with the Constitution's separation of powers, any agency's authority is necessarily limited. Such is the case here.

Respondent Securities and Exchange Commission (the "SEC") has gone beyond the scope of what the securities laws authorize. For nearly a century, the SEC has protected investors through a variety of mechanisms, including disclosure of necessary or appropriate information. Those disclosures have historically concerned financial

information that is material to investors' evaluation of a security. *See, e.g.*, *Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23,916, 23,921 (Apr. 22, 2016); 15 U.S.C. §§ 77g(a)(1), 77aa.

With the Disclosure Rule challenged by Petitioners, however, the SEC seeks to significantly expand its regulatory authority by invoking previously "unheralded power" allegedly granted by "long-extant statute[s]." *West Virginia v. EPA*, 597 U.S. 697, 724 (2022) (citation omitted). It moves beyond financial regulation and into climate-related policy. Compliance with this new Disclosure Rule would cost public companies billions of dollars each year, by the SEC's own estimates.

Respectfully, the SEC is "asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 724. By now it is well-established that courts must "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* at 723 (internal quotation omitted). This presumption would apply to *any* agency's actions. However, it is particularly compelling here, where the traditional scope of the agency's regulatory authority relates to financial regulation

rather than environmental policy.

When, as here, an agency adopts a rule on a question of "vast economic and political significance," a colorable basis for the agency's authority is not enough. *West Virginia*, 597 U.S. at 716 (citation omitted). "The agency must instead point to 'clear congressional authorization' for the power it claims." *Id.* at 723 (quoting *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). Yet the Securities Act and Securities Exchange Act do not contain a clear authorization for the Disclosure Rule. Whatever the policy merits of the Disclosure Rule may or may not be, Congress did not expressly authorize the SEC to mandate climate disclosures.

## ARGUMENT

## I. The Major Questions Doctrine Precludes the SEC's Adoption of the Disclosure Rule.

*Amicus curiae* agrees with the Petitioner States that the Disclosure Rule should be analyzed under the "major questions doctrine." This case involves an issue of great economic and political importance, on which Respondent Securities and Exchange Commission (the "SEC") has worked a novel expansion of its traditional authority.

4

Administrative agencies exercise a significant amount of authority when implementing and enforcing our nation's laws. *See Free Enterprise Fund*, 561 U.S. at 499. However, consistent with the Constitution's separation of powers, any agency's authority is necessarily limited. The "legislative Powers" lie with Congress, not an agency or commission. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992) (noting that "the Constitution of the United States divides all power conferred upon the Federal Government into 'legislative Powers,' Art. I, § 1, '[t]he executive Power,' Art. II, § 1, and '[t]he judicial Power,' Art. III, § 1"). Thus, it is Congress which looks for societal problems to solve, and which passes laws to remedy those problems. Agencies enforce those laws. They cannot, however, go beyond their constitutionally-appointed scope in order to make policy where Congress has not delegated them authority.

Such is the case here. Respondent exercises broad enforcement authority over financial markets, but the Disclosure Rule falls outside the scope of the SEC's purview. The SEC does not have "clear congressional authorization" for the climate-related policies embodied by the Rule. *See Utility Air*, 573 U.S. at 324. And absent clear congressional authorization, this Court should "presume that 'Congress intends to

5

make major policy decisions itself,'" rather than leave them to the SEC. *West Virginia*, 597 U.S. at 723 (quoting *United States Telecom Assn. v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc)).

### A. The Disclosure Rule presents a major question of public policy.

This case presents a clear-cut example of a "major questions case." *See West Virginia*, 597 U.S. at 724. The major questions doctrine precludes an agency from effecting a "transformative expansion in [its] regulatory authority" by using "newfound power" in long-existing statutes. *Id.* (citations omitted). This is particularly true where an agency "adopt[s] a regulatory program that Congress had conspicuously and repeatedly declined to enact itself." *Id.*; *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000); *Gonzales v. Oregon*, 546 U.S. 243, 267-68 (2006).

In promulgating the Disclosure Rule, the SEC asserts substantial "power over the national economy." *Utility Air*, 573 U.S. at 324. The SEC itself estimates that the Disclosure Rule will cost each registrant between $197,000 and $739,000 per year, for each of the first ten years of compliance. *See The Enhancement and Standardization of Climate-*

6

*Related Disclosures for Investors,* 89 Fed. Reg. 21,668, 21,875 (Mar. 28, 2024). The SEC acknowledges, however, that it could not "reliably quantify" the Rule's costs in "many" circumstances, *id.* at 21,829, and that companies believe the actual costs could be "considerably higher" than these estimates, *id.* at 21,871. In any event, the costs to companies, including members of *amicus curiae*, will be significant.

There are compelling reasons for this Court to "'hesitate before concluding that Congress' meant to confer such authority." *West Virginia*, 597 U.S. at 721 (quoting *Brown & Williamson*, 529 U.S. at 159). Chief among these is the fact that the SEC has a specific (and laudable) purpose—to protect investors by preventing abuses in financial markets. As the Supreme Court has long recognized, "[t]he primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849 (1975). In short, "Congress created the SEC to protect investors and financial markets." *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883, 895 (5th Cir. 2019).

Thus, for nearly a century, the SEC has protected investors through a variety of mechanisms, including disclosure of necessary or appropriate

information. Unsurprisingly, those disclosures have historically concerned financial information that is material to investors' evaluation of a security. *See, e.g.*, 15 U.S.C. §§ 77g(a)(1), 77aa. And that makes sense, in light of the SEC's core mission. *See Forman*, 421 U.S. at 849.

The SEC fulfills the "central purpose of the securities laws" by "protect[ing] investors and would-be investors in the securities markets against misrepresentations." *S.E.C. v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (citing *Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986) and *United States v. Naftalin*, 441 U.S. 768, 774-76 (1979)). It ensures that "dealing in securities is fair and without undue preferences or advantages among investors." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (citation omitted). And it works to prevent fraud and "manipulation of stock prices." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 193 (2d Cir. 2021) ("The 1934 Act was intended principally to protect investors against manipulation of stock prices …. Its overall goal is to protect investors against false and deceptive practices that might injure them.") (internal quotations and citations omitted).

8

Significantly, the SEC is not now, and has never been, an environmental regulatory agency. There is little reason to believe that Congress would have given the SEC authority in that area without saying so explicitly. *Cf. West Virginia*, 597 U.S. at 729. To the contrary, the Supreme Court has often considered an agency's "knowledge and expertise" of a subject matter when determining whether Congress intended to delegate authority to the agency. *Kisor v. Wilkie*, 588 U.S. 558, 577-78 (2019) (citation omitted); *see id.* at 578 ("When the agency has no comparative expertise in resolving a regulatory ambiguity, Congress presumably would not grant it that authority."); *King v. Burwell*, 576 U.S. 473, 486 (2015) (finding it "especially unlikely that Congress would have delegated" responsibility for health insurance policy "to the *IRS,* which has no expertise" in that subject) (emphasis in original). Unsurprisingly, the Supreme Court has found the alleged delegation lacking where Congress has not specifically authorized the agency's expansion of authority. *See, e.g.*, *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 760, (2021) (finding that "[i]t strains credulity to believe" that Congress granted the CDC power to "impose a nationwide moratorium on evictions" in a "decades-old

9

statute that authorizes it to implement measures like fumigation and pest extermination").

Respectfully, the Disclosure Rule presents a "work-around" to impose public policy decisions that were not made or adopted by Congress. *Cf. BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Labor*, 17 F.4th 604, 612 (5th Cir. 2021). But agencies may not intrude into the "power of the Legislature" by simply "'enact[ing] a program' that Congress has chosen not to enact itself." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (quoting *West Virginia*, 597 U.S. at 731).

In short, the SEC is "asserting highly consequential power beyond what Congress could reasonably be understood to have granted." *West Virginia*, 597 U.S. at 724. This Court, consistent with Supreme Court precedent, should "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 597 U.S. at 723 (internal quotation omitted).

## B. The SEC does not have "clear congressional authorization" for the Disclosure Rule.

Because this case presents agency action on a major question of public policy, mere statutory ambiguity or even broad-based delegations

10

of authority are not enough to support the Disclosure Rule.  To be clear, *amicus curiae* does not believe that the Securities Act or the Securities Exchange Act provide a plausible basis for the Rule.  However, even if they did, that would not be sufficient here.

The Supreme Court has made clear that courts should not "read into ambiguous statutory text" the delegation of authority claimed by an agency.  *Utility Air*, 573 U.S. at 324; *see also West Virginia*, 597 U.S. at 723.  Thus, a "plausible textual basis for the agency action" is not enough. *Id.*  "The agency instead must point to 'clear congressional authorization' for the power it claims."  *Id.* at 723 (quoting *Utility Air*, 573 U.S. at 324); *see also id.* at 746 (Gorsuch, J., concurring) ("[W]e look for clear evidence that the people's representatives in Congress have actually afforded the agency the power it claims.").

The SEC's enabling statutes do not contain a clear authorization for the Disclosure Rule. Whatever the policy merits of the Rule may or may not be, Congress *did not* expressly authorize the SEC to mandate climate disclosures.

The SEC relies on its authority to regulate as "necessary or appropriate in the public interest for the protection of investors." 89 Fed.

Appellate Case: 24-1522     Page: 17     Date Filed: 06/24/2024 Entry ID: 5406459

Reg. at 21,683; *see* 15 U.S.C. § 77g(a)(1) (registration statements "shall contain such other information … as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors"); *see also* 15 U.S.C. § 78*l*(b), (g). For reasons set forth by the State Petitioners in their opening brief, the phrases "necessary and appropriate" and "public interest," as used in these statutes, do not include environmental information such as that encompassed by the Disclosure Rule. *See* Pet. Br. at 19-23. Those phrases must be read in context and are limited to the subject areas that the SEC traditionally had the power to regulate. *See id.* In short, the statutes provide "no authorization" for the Disclosure Rule, "even when examined using the ordinary tools of statutory interpretation." *Nebraska*, 143 S. Ct. at 2375.

Here, the SEC falls far short of the heightened standard applicable to major questions. Even if "necessary and appropriate" or "public interest" could be stretched broadly enough to permit the Disclosure Rule, they would not do so clearly. Congress does not and cannot delegate power on a major question in "cryptic" fashion. *Brown & Williamson*, 529 U.S. at 160. Thus, without "a clear mandate" in the relevant statutes, it

Appellate Case: 24-1522   Page: 18   Date Filed: 06/24/2024 Entry ID: 5406459

is "unreasonable to assume" that Congress intended to delegate such power. *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) (plurality op.); *cf. Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("The question, then, is whether the Act *plainly authorizes* the Secretary's mandate. It does not.") (emphasis added).

The lack of "clear congressional authorization" in the statutory texts is, by itself, dispositive here. *See West Virginia*, 597 U.S. at 723; *Utility Air*, 573 U.S. at 324. However, at least three additional factors strongly suggest that Congress did not delegate authority for the Disclosure Rule to the SEC, much less do so clearly.

First, the SEC has long disclaimed that it has the power to adopt rules like the Disclosure Rule. *See, e.g.*, *Environmental and Social Disclosure, Notice of Commission Conclusions and Rulemaking Proposals*, 40 Fed. Reg. 51,656, 51,662 (Nov. 6, 1975) (inappropriate to require "comprehensive disclosure of the environmental effects of corporate activities"). This cuts against any suggestion that an alleged pre-existing grant of authority was "clear." *See Fed. Trade Comm'n v. Bunte Bros.*, 312 U.S. 349, 352 (1941) ("[T]he want of assertion of power

13

by those who presumably would be alert to exercise it, is … significant in determining whether such power was actually conferred.").

Second, Congress has "considered and rejected" climate disclosure plans, including in recent legislative sessions. *See Brown & Williamson*, 529 U.S. at 144; *see* S. 1217, 117th Cong. (2021) ("Climate Risk Disclosure Act of 2021"); H.R. 1187, 117th Cong. (2021) ("Corporate Governance Improvement and Investor Protection Act"); S. 3481, 115th Cong. (2018) ("Climate Risk Disclosure Act of 2018"). The fact that "Congress has considered and rejected bills that would have granted" the agency such authority confirms that the agency lacks such authority. *Brown & Williamson*, 529 U.S. at 144; *see also Bunte Bros.*, 312 U.S. at 352 (an "unsuccessful attempt" to pass legislation grating authority to an agency "reinforced" the conclusion that the agency lacked such authority). It is unlikely that members of Congress would have attempted to give the SEC powers if it already had "clear congressional authorization." *See Utility Air*, 573 U.S. at 324.

Finally, Congress certainly knows how to provide "clear congressional authorization" to the SEC when it actually intends for the SEC to go beyond its traditional scope. For example, Congress has

specifically required the SEC to promulgate regulations requiring disclosures regarding "conflict minerals" and which originated in the Democratic Republic of the Congo or adjoining countries. *See* 15 U.S.C. § 78m(p). In short, when Congress intends to provide clear authorization, it does so.

There is no clear textual authorization for the Disclosure Rule. *Amicus curiae* respectfully submits that this is because Congress did not grant that authority. For years, the SEC did not believe that it had that authority. And even in recent years, supportive members of Congress believed it was necessary to give the SEC that authority, and when they tried to do so, they were unsuccessful. Quite simply, the SEC does not have "clear congressional authorization" for the Disclosure Rule. The Rule is precluded by the major questions doctrine.

## CONCLUSION

For the foregoing reasons, *amicus curiae* respectfully requests that the Petitions for Review be granted, and that the challenged Disclosure Rule be vacated.

Appellate Case: 24-1522   Page: 21   Date Filed: 06/24/2024 Entry ID: 5406459

Dated: June 24, 2024

Respectfully submitted,

/s/ Larry J. Obhof

Larry J. Obhof
Mark D. Wagoner
Shumaker, Loop & Kendrick, LLP
41 South High Street
Suite 2400
Columbus, OH 43215
(614) 463-9441

*Counsel for Amicus Curiae*
*Ohio Chamber of Commerce*

Appellate Case: 24-1522    Page: 22    Date Filed: 06/24/2024 Entry ID: 5406459

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B) because it contains 2,882 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

I further certify that this PDF has been scanned for viruses and no viruses were detected.

*/s/ Larry J. Obhof*
Larry J. Obhof

*Counsel for Amicus Curiae*

17

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on June 24, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ *Larry J. Obhof*
Larry J. Obhof

*Counsel for Amicus Curiae*

Appellate Case: 24-1522     Page: 24     Date Filed: 06/24/2024 Entry ID: 5406459