# In the United States Court of Appeals for the Eighth Circuit

STATE OF IOWA, ET AL.,

*Petitioners,*

*v.*

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent.*

DISTRICT OF COLUMBIA, ET AL.,

*Intervenors.*

———

Petition for Review from an Order
of the Securities and Exchange Commission

———

## BRIEF OF *AMICI CURIAE* LAW AND FINANCE PROFESSORS IN SUPPORT OF PETITIONERS SEEKING TO SET ASIDE THE ORDER

———

Heather Gebelin Hacker
HACKER STEPHENS LLP
108 Wild Basin Road South
Suite 250
Austin, Texas 78746
(512) 399-3022 (phone)
heather@hackerstephens.com
*Counsel for Amici Curiae*

# Corporate Disclosure Statement

Pursuant to Fed. R. App. P. 26.1 and 29(a)(4)(A), there is no parent corporation or publicly held corporation that owns 10% or more of stock of any *amici curiae* described below.

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER
*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Page(s)

Corporate Disclosure Statement ...................................................... i

Table of Authorities ..................................................................... iii

Interest of *Amici Curiae* .............................................................. 1

Summary of the Argument ............................................................ 2

Argument ..................................................................................... 4

    I.   The SEC Lacks Authority to Issue the Climate Rule. ............... 4

        A.   The Rule exceeds the SEC's statutory authority under the securities laws. ...................................................... 4

        B.   The Rule violates the Major Questions Doctrine. .............. 8

        C.   The SEC's rulemaking process was arbitrary and capricious. ............. 9

    II.   The Climate Rule Violates the First Amendment. .................. 16

        A.   The First Amendment applies to the Climate Rule. .......... 16

        B.   The Rule is not directed at misleading commercial speech. .............. 19

        C.   The Climate Rule is not "purely factual and uncontroversial." .................................................. 20

        D.   Strict scrutiny applies because the Climate Rule regulates ideological expression and engages in viewpoint discrimination. ...................................... 23

        E.   The Climate Rule fails both strict and intermediate scrutiny. ............. 25

Conclusion ................................................................................. 27

Certificate of Service .................................................................. 28

Certificate of Compliance ............................................................ 28

Appendix: List of *Amici Curiae* ................................................. 29

# Table of Authorities

Page(s)

**Cases**

Am. Beverage Ass'n v. City and Cnty. of San Francisco,
871 F.3d 884 (9th Cir. 2017) ................................................. 19

Am. Meat Inst. v. U.S. Dep't of Agric.,
760 F.3d 18 (D.C. Cir. 2014) ................................................. 19

Biden v. Nebraska,
143 S. Ct. 2355 (2023) ........................................................... 8

Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,
447 U.S. 557 (1980) ................................................. 24, 26, 27

Citizens United v. FEC,
558 U.S. 310 (2010) ............................................................. 16

CTIA - The Wireless Ass'n v. City of Berkeley,
854 F.3d 1105 (9th Cir. 2017) ............................................. 19

Discount Tobacco City & Lottery, Inc. v. U.S.,
674 F.3d 509 (6th Cir. 2012) ............................................... 19

Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,
472 U.S. 749 (1985) ............................................................. 18

Dwyer v. Cappell,
762 F.3d 275 (3d Cir. 2014) ................................................ 19

Ent. Software Ass'n v. Blagojevich,
469 F.3d 641 (7th Cir. 2006) ............................................... 19

First Nat'l Bank of Boston v. Bellotti,
435 U.S. 765 (1978) ............................................................. 16

Grand Canyon Air Tour Coalition v. FAA,
154 F.3d 455 (D.C. Cir. 1998) ............................................. 10

Handsome Brook Farm v. Humane Farm Animal Care,
700 Fed. App'x 251 (4th Cir. 2017) ..................................... 19

J.I. Case Co. v. Borak,
377 U.S. 426 (1964) ............................................................... 4

Lowe v. SEC,
472 U.S. 181 (1985) ............................................................. 18

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
    541 F.3d 785 (8th Cir. 2008) ..............................................19

*Milavetz, Gallop & Milavetz, P.A. v. United States,*
    559 U.S. 229 (2010) ...............................................17, 19, 24

*Nat'l Ass'n of Mfrs. v. SEC,*
    748 F.3d 359 (D.C. Cir. 2014) .........................................18

*Nat'l Ass'n of Mfrs. v. SEC,*
    800 F.3d 518 (D.C. Cir. 2015) ...................................18, 25

*Nat'l Ass'n of Mfrs. v. SEC,*
    956 F. Supp. 2d 43 (D.D.C. 2013) ...................................18

*Nat'l Elec. Mfrs. Ass'n v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001) .............................................19

*Nat'l Inst. of Family & Life Advocates v. Becerra,*
    585 U.S. 755 (2018) ........................................................20

*North Carolina v. FAA,*
    957 F.2d 1125 (4th Cir. 1992) ...........................................9

*Ohralik v. Ohio State Bar Ass'n,*
    436 U.S. 447 (1978) ........................................................18

*Paris Adult Theatre I v. Slaton,*
    413 U.S. 49 (1973) ..........................................................18

*Pharm. Care Mgmt. Ass'n v. Rowe,*
    429 F.3d 294 (1st Cir. 2005)............................................19

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ........................................................25

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155 (2015) ........................................................17

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) ........................................................25

*Tcherepnin v. Knight,*
    389 U.S. 332 (1967) ..........................................................4

*U.S. v. Wegner,*
    427 F.3d 840 (10th Cir. 2005) .........................................19

*UARG v. EPA,*
    573 U.S. 302 (2014)............................................................8

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ................................................................. 17

*Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ................................................................. 19

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ................................................................. 17

*W. Va. v. EPA*,
    597 U.S. 697 (2022) ................................................................... 8

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ................................................................. 17

*Zauderer v. Off. of Disciplinary Council*,
    471 U.S. 626 (1985) ........................................................... 17, 20

**Statutes**

15 U.S.C.
    § 77b(b) ...................................................................................7
    § 77g(a)(1) ............................................................................. 4
    § 78c(f) ...................................................................................7
    § 78l(b) .................................................................................. 4
    § 78n(a)(1) ............................................................................ 4
    § 78o(d) ................................................................................ 4

**Regulations**

The Enhancement and Standardization of Climate-Related Disclosures
    for Investors, 89 Fed. Reg. 21,668 (Mar. 28, 2024) ("Climate Rule") ....... *passim*

**Other Authorities**

Akane Otani, *Big Technology Stocks Dominate ESG Funds*, Wall St. J. (Feb.
    11, 2020) ...............................................................................23

Alec Tyson, et al., *What the data says about Americans' views of climate
    change*, Pew Research Center (August 9, 2023) ............................... 9

Andrew N. Vollmer, *Does the SEC Have Legal Authority to Adopt Climate-
    Change Disclosure Rules?*, Mercatus Ctr. Pol'y Brief 6-9 (Aug. 2021) ................7

Andy Puzder and Sanjai Bhagat, *President Biden's Climate Policies Weaken
    the U.S. and Strengthen China*, Real Clear Energy (Jul. 9, 2023) ......................23

Aneesh Raghunandan & Shivaram Rajgopal, *Do ESG Funds Make Stakeholder-Friendly Investments?* (Nov.19, 2021) .............................................23

Bjorn Lomborg, *False Alarm* (2020) ........................................................ 21

Bradford Cornell & Aswath Damodaran, *Valuing ESG: Doing Good or Sounding Good?* (2020).................................................................... 22

Camila Hodgson, *Funds Branded "ESG" Are Laden with Technology Stocks*, Financial Times (Aug. 14, 2020)........................................................23

Camille Smith, et al., *ESG Factors and Risk-Adjusted Performance: A New Quantitative Model*, J. Sustainable Finance & Investment (Oct. 5, 2016)............................................................................................... 22

Christina Parajon Skinner, *Capitalism Stakeholderism*, 47 Seattle U. L. Rev. 643 (2024) ................................................................................ 2

Climate Disclosure Act of 2021, H.R. 2570, 117th Cong. (2021) ........................... 9

Climate Disclosure Risk Act of 2019, H.R. 3623, 116th Cong. (2020) ................... 9

Climate Risk Disclosure Act of 2018, S.3481, 115th Cong. (2018) ........................ 9

Comment Letter of Law and Finance Professors on the Proposal on Climate-Related Disclosures for Investors (April 25, 2022) ................. 1, 10, 11

Comment Letter of Law and Finance Professors on the Proposal on Climate-Related Disclosures for Investors (Feb. 29, 2024) .................... 1, 10, 15

Comment Letter of Law and Finance Professors on the Proposal on Climate-Related Disclosures for Investors (June 17, 2022) ............... 1, 4, 10, 15

Comment Letter of Matthew Winden on the Proposal on Climate-Related Disclosures for Investors (June 17, 2022).......................................... 9

Comment Letter of Sean J. Griffith on the Proposal on Climate-Related Disclosures for Investors (June 1, 2022)...................................... 1, 10

Comment Letter of Stephen M. Bainbridge on the Proposal on Climate-Related Disclosures for Investors (June 8, 2022) ...................................1, 10, 26

Democratic Nat'l Comm., *Combating the Climate Crisis and Pursuing Environmental Justice* ...................................................................... 24

FINRA Investor Education Foundation & NORC at the University of Chicago, *Investors say they can change the world, if they only knew how: Six things to know about ESG and retail investors* (Mar. 2022)..........................13

FINRA Investor Education Foundation, *Investors of Color in the United States* (Jan. 2024) ...............................................................................14

Hans Bonde Christensen, et al., *Economic Analysis of Widespread Adoption of CSR and Sustainability Reporting Standards* (Jan. 25, 2019) ........................ 22

Henry Hansmann, *The Ownership of Enterprise* (1996) ............................5

Hoover Institute, et al., *2023 Survey of Investors, Retirement Savings, and ESG* ..................................................................................14

Jason S. Johnston, *Climate Rationality: From Bias to Balance* (2021) ..................... 21

Jitendra Aswani, et al., *Are Carbon Emissions Associated with Stock Returns?*, Rev. of Finance (forthcoming) (Feb. 23, 2023) ................................. 6

Jun Xie, et al., *Do Environmental, Social, and Governance Activities Improve Corporate Financial Performance?*, Business Strategy and the Environment (Aug. 14, 2018) ........................................................... 22

Kenneth J. Arrow, *Social Choice and Individual Values* (1951) ..................................5

Lauren Foster, *Investors Know Little About ESG, a New Study Finds*, Barron's (Apr. 12, 2022) ...................................................................... 13

Lydia Saad, *ESG Not Making Waves With American Public*, Gallup (May 22, 2023) ...........................................................................14

Lydia Saad, *Where U.S. Investors Stand on ESG Investing*, Gallup (Feb. 23, 2022) ...........................................................................14

Notice of Comm'n Conclusions & Rulemaking Proposals in the Pub. Proceeding Announced in Sec. Act Release No. 5569 (February 11, 1975), Exchange Act Release No. 5627, 1975 WL 160503 (Oct. 14, 1975) ................................................................................. 6

Paul G. Mahoney and Julia D. Mahoney, *The New Separation of Ownership and Control: Institutional Investors and ESG*, 2021 Columbia Bus. L. Rev. 840 (2021) ........................................................................... 2

Public Holdings, *The Retail Investor Report* (Aug. 2023) .........................................14

Roberta Romano, *Metapolitics and Corporate Law Reform*, 36 Stan. L. Rev. 923 (1984) ..................................................................................5

Samuel Hartzmark & Abigail Sussman, *Do Investors Value Sustainability? A Natural Experiment Examining Ranking and Fund Flows*, J. Finance (Aug. 9, 2019) ...........................................................................23

Sanjai Bhagat, *An Inconvenient Truth About ESG Investing*, Harv. Bus. Rev. (Mar. 31, 2022) ......................................................................2, 22

Scientific Beta, *"Honey, I Shrunk the ESG Alpha": Risk-Adjusting ESG Portfolio Returns* (Apr. 2021) .................................................................23

Sean J. Griffith, *Corporate Speech and Corporate Purpose: A Theory of Corporate First Amendment Rights*, Fordham Law Legal Studies Research Paper No. 4709312 (Jan. 30, 2024).................................... 17

Sean J. Griffith, *What's "Controversial" About ESG? A Theory of Compelled Commercial Speech Under the First Amendment*, 101 Neb. L. Rev. 876 (2023)...................................................... 2, 21

SEC, *Commission Guidance Regarding Disclosure Related to Climate Change* 21-27, (Feb. 8, 2010) ...................................................26

Stephen Bainbridge, *Investors Want Returns, Not Political Fights*, Barron's (Jul. 6, 2023) ................................................................ 15

Stephen M. Bainbridge, *The Profit Motive: Defending Shareholder Value Maximization* (2023) .........................................................5

Steven E. Koonin, *Unsettled: What Climate Science Tells Us, What It Doesn't, And Why It Matters* (2021) ................................. 21

The White House, *Press Briefing by Principal Deputy Press Secretary Karine Jean-Pierre* (Oct. 21, 2021)............................................. 24

Timo Busch, *The Robustness of the Corporate Social and Financial Performance Relation: A Second-Order Meta-Analysis, Corporate Social Responsibility and Environmental Management* (March 30, 2018).................... 22

Vaclav Smil, *How The World Really Works* (2022) ................................21

William Carney, *The SEC's False Premise for Emissions Disclosure Requirements*, Summer 2023 Sec. Reg. L. Rev. 109 (2023)..........................2, 21

## Rules

Fed. R. App. P. 29(a) ...............................................................1

# Interest of Amici Curiae

*Amici curiae* are a group of 18 law and finance professors at leading universities with expertise in the area of securities regulation.[1] A list of the *amici* professors is attached as an appendix to this brief. During the notice-and-comment period, *amici* submitted a series of comment letters exposing flaws in the rule that Securities and Exchange Commission ("SEC") has now adopted as The Enhancement and Standardization of Climate-Related Disclosures for Investors, Securities Act Release No. 33-11275 (Mar. 6, 2024), published at 89 Fed. Reg. 21,668 (Mar. 28, 2024) (the "Climate Rule").[2] *Amici* have also written scholarly articles addressing questions raised

---

[1] All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). Pursuant to Rule 29(a)(4)(E), undersigned counsel affirms that no counsel for any party authored this brief in whole or in part and that no person or entity other than amicus curiae or their counsel made a monetary contribution intended to fund the preparation and submission of this brief.

[2] *See* Comment Letter of Law and Finance Professors on the Proposal on Climate-Related Disclosures for Investors (April 25, 2022) https://perma.cc/7YR9-QJPT [hereinafter "First Comment Letter"]; Comment Letter of Law and Finance Professors on the Proposal on Climate-Related Disclosures for Investors (June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132133-302619.pdf/ ["Second Comment Letter"]; Comment Letter of Law and Finance Professors on the Proposal on Climate-Related Disclosures for Investors (Feb. 29, 2024) www.sec.gov/comments/s7-10-22/s71022-436979-1084682.pdf ["Third Comment Letter"]. *See also* Comment Letter of Sean J. Griffith on the Proposal on Climate-Related Disclosures for Investors (June 1, 2022), www.sec.gov/comments/s7-10-22/s71022-20130040-296591.pdf. ["Griffith Comment Letter"] (writing separately to address First Amendment issues); Comment Letter of Stephen M. Bainbridge on the Proposal on Climate-Related Disclosures for Investors (June 8, 2022), www.sec.gov/comments/s7-10-22/s71022-20130704-299569.pdf ["Bainbridge

by the Climate Rule.[3] *Amici* therefore have specific expertise in the issues raised by the parties in this case.

## Summary of the Argument

The Climate Rule represents a tectonic shift in the foundation of securities regulation. With it, the SEC breaks the confines of investor protection and assumes authority to regulate in pursuit of the common good, provided only that its vision of the good is shared by a sub-group of investors. Today, the issue is climate change. One day soon it may be economic inequality, race and gender diversity, or another topic from the commissioners' wish list. Under the logic of "investor demand," the SEC need only cite the interest of an advocacy group to regulate in pursuit of the general welfare.

But this seizure of regulatory authority violates both the statutory and constitutional limits of the SEC's power. There are two fundamental constraints on the SEC's power to act. First, it must not exceed the scope of its statutory authority.

---

Comment Letter"] (writing separately to address differences between the now-final rule and the SEC's 2010 guidance).

[3] *See, e.g.*, Sanjai Bhagat, *An Inconvenient Truth About ESG Investing*, Harv. Bus. Rev. (Mar. 31, 2022), https://hbr.org/2022/03/an-inconvenient-truth-about-esg-investing; William Carney, *The SEC's False Premise for Emissions Disclosure Requirements*, Summer 2023 Sec. Reg. L. Rev. 109 (2023); Sean J. Griffith, *What's "Controversial" About ESG? A Theory of Compelled Commercial Speech Under the First Amendment*, 101 Neb. L. Rev. 876 (2023); Paul G. Mahoney and Julia D. Mahoney, *The New Separation of Ownership and Control: Institutional Investors and ESG*, 2021 Columbia Bus. L. Rev. 840 (2021); Christina Parajon Skinner, *Capitalism Stakeholderism*, 47 Seattle U. L. Rev. 643 (2024).

Second, it must not violate the United States Constitution. The Climate Rule does both.

The SEC's statutory mandate does not confer regulatory authority to adopt the Climate Rule. First, the text and plain meaning of the securities laws do not permit the SEC to adopt the Climate Rule. *See infra* Part I.A. Second, the major questions doctrine requires Congressional action before the SEC can undertake the regulations contemplated by the Climate Rule. *See infra* Part I.B. Third, the SEC acted arbitrarily and capriciously, in violation of the Administrative Procedure Act, in adopting the Climate Rule. *See infra* Part I.C.

Furthermore, the Climate Rule, as adopted, violates the First Amendment. The key issue here is controversy. Compelled commercial speech is reviewed under a standard of "less exacting" scrutiny. *See infra* Part II.A. However, less exacting scrutiny is applicable only when the speech compelled is "purely factual and uncontroversial." The Climate Rule fails this test. *See infra* Parts II.B. and II.C.

The Climate Rule is controversial, as it is inextricably bound to hotly contested issues in public discourse—climate change and climate policy. It is thus not entitled to the standard of less exacting scrutiny but must instead be evaluated under a form of heightened scrutiny. *See infra* Part II.D. Whether the resulting scrutiny is strict or intermediate, the Climate Rule fails. *See infra* Part II.E.

The Climate Rule therefore exceeds both the statutory and constitutional limits of the SEC's authority. *Amici* therefore ask the Court to vacate the Climate Rule.

## Argument

### I. The SEC Lacks Authority to Issue the Climate Rule.

#### A. The Rule exceeds the SEC's statutory authority under the securities laws.

Investor protection is the basis of the SEC's statutory authority to regulate disclosure. Congress has granted the SEC authority to require disclosures that are "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1).[4] The Supreme Court has repeatedly observed that the SEC's purpose is "to protect investors through the requirement of full disclosure." *See Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *accord J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964) ("[A]mong [the Exchange Act's] chief purposes is 'the protection of investors.'" (citation omitted)).

The SEC justifies the Climate Rule by reference to "investor demand."[5] But this justification elides the distinction between investor *demand* and investor *protection*. The distinction matters because disclosures are costly and have the potential to cause additional harm. For example, disclosures may reveal competitively sensitive

---

[4] The phrase recurs in Congress's delegation to the SEC to regulate proxy statements, annual reports, and other periodic disclosures. *See* 15 U.S.C. § 78n(a)(1) (granting the SEC authority to regulate proxies "as necessary or appropriate in the public interest or for the protection of investors"); § 78m(a) (requiring registered companies to file annual reports "in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security"); §§ 78l(b), 78o(d).

[5] *See, e.g.,* Climate Rule, Section IV.B.1 "Investor Demand for Additional Climate Information." As noted in the Second Comment Letter, the SEC's rule proposal referenced "investor demand" 54 times.

data or information that can be seized upon and wielded against the corporation. The latter harm seems especially likely here. Environmental advocacy groups may use carbon dioxide emissions or other information disclosed under the Climate Rule to organize consumer boycotts against offending corporations. Harming the corporation does not protect investors.

Further, the reality of intra-investor conflict destroys the coherence of investor demand as a regulatory justification. True, investors who worry about climate change might want climate disclosures. Likewise, pro-life investors might want details about how corporate health plans cover women's health. Other investors might want to know about workplace diversity. Investors want all sorts of things. But it is equally certain that in a group as large as all investors in a publicly traded corporation, some investors will *oppose* these disclosures. Indeed, given the divergent and conflicting preferences within large groups, it seems impossible to characterize any interest as representative of investors as a class.[6]

There is one exception: It is safe to assume that the one interest all investors share is an interest in maximizing the financial return of their investment.[7] Thus,

---

[6] *See generally* Kenneth J. Arrow, *Social Choice and Individual Values* (1951) (given divergent individual preferences, there is no means of deriving a collective social welfare function).

[7] *See* Henry Hansmann, *The Ownership of Enterprise* 62 (1996); Stephen M. Bainbridge, *The Profit Motive: Defending Shareholder Value Maximization* 156 (2023) (identifying reasons shareholders will want companies to maximize shareholder value); Roberta Romano, *Metapolitics and Corporate Law Reform*, 36 Stan. L. Rev. 923, 961 (1984) (observing that "profit maximization is the only goal for which we

mandating disclosures to protect investors means mandating disclosures that are relevant to the financial return of the investment—no more, no less.[8] Focusing on financial return protects investors from concerned citizens—that is, those interested in social or political issues for their own sake and not as they relate to corporate performance and share value.

The Climate Rule exceeds the SEC's authority by requiring items that are irrelevant to financial return. Greenhouse gas emissions, for example, lack any connection to financial return.[9] Worse, such disclosures are more likely to harm investors by facilitating product boycotts, activist protests, divestment campaigns, supply chain disruption and other activities that can damage a company's financial return.

---

can at least theoretically posit shareholder unanimity."). The SEC has also acknowledged the uniform interest in financial return among investors:

> The SEC's experience over the years in proposing and framing disclosure requirements has not led it to question the basic decision of the Congress that, insofar as investing is concerned, the primary interest of investors is economic. After all, the principal, if not the only, reason why people invest their money in securities is to obtain a return.

Notice of Comm'n Conclusions & Rulemaking Proposals in the Pub. Proceeding Announced in Sec. Act Release No. 5569 (February 11, 1975), Exchange Act Release No. 5627, 1975 WL 160503 (Oct. 14, 1975).

[8] SEC disclosure requirements have traditionally focused on information exclusively available to the issuer and not available to the investor, such as revenues and costs for the completed accounting period. The Climate Rule departs from the norm by requiring the issuer to collect and disclose information not immediately available to it, as in the case of upstream (Scope 2) emissions disclosures.

[9] *See* Jitendra Aswani, et al., *Are Carbon Emissions Associated with Stock Returns?*, Rev. of Finance (forthcoming) (Feb. 23, 2023), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3800193.

Whatever investor protection may mean, it does not mean empowering activists to harm investors. The statutory framework bars this outcome by authorizing the SEC to act only for investor *protection*, not investor *demand*.

Finally, for avoidance of doubt, *amici* note that the phrase "public interest," as used in the securities laws, narrows rather than expands the statutory meaning of "investor protection." The "public interest" language *adds* the requirement that whatever financially relevant disclosures the SEC requires also be in the public's interest.[10] The statute further limits the meaning of "public interest" to efficiency, competition, and capital formation.[11] In this way, the text and plain meaning of the securities laws limit regulatory action to investor protection and further require that any such regulations also promote efficiency, competition, and capital formation.

---

[10] *See* Andrew N. Vollmer, *Does the SEC Have Legal Authority to Adopt Climate-Change Disclosure Rules?*, Mercatus Ctr. Pol'y Brief 6-9 (Aug. 2021), *available at* https://www.mercatus.org/research/policy-briefs/does-sec-have-legal-authority-adopt-climate-change-disclosure-rules (providing statutory analysis of the language and context of each relevant provision).

[11] The securities laws specify the content of the "public interest" analysis as follows:

> Whenever pursuant to this subchapter the Commission is engaged in rulemaking and is required to consider or determine whether an action is necessary or appropriate in the public interest, the Commission shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation.

Securities Exchange Act, 15 U.S.C. §§77b(b), 78c(f) (2023). Note the additive "also," meaning that the SEC shall consider investor protection and the three interests (efficiency, competition, and capital formation) nested within "public interest" analysis. *See id.*

The SEC's frolic and detour in pursuit of a climate agenda is not permitted by statute, even if some investors want it.

## B.  The Rule violates the Major Questions Doctrine.

The major questions doctrine (MQD) is a framework courts use to maintain the separation of powers between the legislative and executive branches. Under the MQD, courts hesitate to recognize implicit or tacit grants of power on major questions of economic or political significance. *See W. Va. v. EPA*, 597 U.S. 697 (2022) (holding that regulatory authority to prescribe site-specific "systems" to reduce emissions did not extend to system-wide shifts in energy production); *Biden v. Nebraska*, 143 S. Ct. 2355 (2023) (holding that the Department of Education's authority to "modify" certain loans did not include authority to forgive student loans *en masse*). According to the Court, "when (1) the underlying claim of authority concerns an issue of 'vast economic and political significance,' and (2) Congress has not clearly empowered the agency with authority over the issue," the agency action should be vacated under the MQD. *See UARG v. EPA*, 573 U.S. 302, 324 (2014).

Applying the MQD to the questions presented in this case, the first question is whether the Climate Rule addresses questions of "vast economic and political significance." The answer is clearly yes. The Climate Rule would impose costs on all public companies that even the SEC estimates as vast. As one comment letter noted,

the scope is equivalent to 0.1% of U.S GDP, with even higher costs inflicted on certain industries, such as manufacturing and construction.[12] Climate policy is also a controversial issue on which citizens hold divergent views.[13] Thus, the Climate Rule easily qualifies as both economically and politically significant.

The second issue under the MQD test is whether Congress has "clearly empowered the agency with authority over the issue." The answer is clearly no. Congress has never empowered the SEC to enact climate-related disclosures. To the contrary, Congress has considered and *rejected* legislation that might have empowered the SEC to do so.[14] The Court should therefore vacate the Climate Rule under the MQD.

### C. The SEC's rulemaking process was arbitrary and capricious.

The Administrative Procedure Act (APA) requires regulatory agencies to engage with public comments on proposed rules in a manner that is both faithful and reasoned. The agency is not obligated to address every comment, *North Carolina v. FAA*, 957 F.2d 1125, 1135 (4th Cir. 1992), but it must not overlook those that are both

---

[12] *See* Comment Letter of Matthew Winden on the Proposal on Climate-Related Disclosures for Investors ( June 17, 2022), https://www.sec.gov/comments/s7-10-22/s71022-20132304-302836.pdf.

[13] Alec Tyson, et al., *What the data says about Americans' views of climate change*, Pew Research Center (August 9, 2023) https://www.pewresearch.org/short-reads/2023/08/09/what-the-data-says-about-americans-views-of-climate-change/.

[14] *See, e.g.,* Climate Disclosure Act of 2021, H.R. 2570, 117th Cong. (2021); Climate Disclosure Risk Act of 2019, H.R. 3623, 116th Cong. (2020); and Climate Risk Disclosure Act of 2018, S.3481, 115th Cong. (2018).

relevant and significant, especially when they pertain to the core rationale for a rule or the statutory authority underpinning it, *Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998).

*Amici* submitted a series of comment letters during the Climate Rule's notice and comment period raising critical defects in the Climate Rule. The First Comment Letter raised the statutory authority arguments summarized above. The Second Comment Letter rebutted arguments raised by a group of law professors in favor of the proposed rule. The Third Comment Letter informed the SEC of the unraveling of various coalitions relied upon in support of the proposed rule, most notably the withdrawal of institutional investors from "Climate Action 100." The Griffith Comment Letter described the First Amendment defects of the rule. The Bainbridge Comment Letter explained that the Climate Rule was burdensome and unnecessary because disclosure of material risks arising from climate change is already required under existing SEC rules.

Yet the SEC ignored or blithely dismissed these comments, ignoring the most consequential challenges of the First Comment Letter, ignoring the Second Comment Letter altogether, and dismissing the Third Comment Letter with a "*but see*" citation without addressing its substance. The SEC's responses—or lack thereof—

to specific critical points raised in comment letters fail to comport with the APA's requirements. These points include the following:

*Ignoring Comments About Investor Sentiment:* The SEC did not adequately address the objection that it prioritized the interests of climate activists over the views of a broader investor base, including ordinary American investors. *Amici* made this point in the First Comment Letter by counting the SEC's citations in favor of the proposed rule. As these charts demonstrate, the SEC's citations skew heavily toward environmental activists:

| MOST CITED OVERALL | No. of Times Cited |
|---|---|
| Environmental Protection Agency (EPA) | 28 |
| Carbon Disclosure Project (CDP) | 27 |
| Natural Resources Defense Council | 22 |
| American Institute of Certified Public Accountants (AICPA) | 22 |
| Coalition for Environmentally Responsible EconomieS (CERES) | 21 |
| Sustainability Accounting Standards Board (SASB) | 19 |
| United Nations Principles for Responsible Investment Corp.  (PRI) | 14 |

When the SEC did cite investors, their citations skewed towards large institutional asset managers focused on social and political investing, many of which are non-U.S. entities.

| MOST CITED INVESTORS | No. of Times Cited |
|---|---|
| New York State Comptroller | 14 |
| BNP Paribas (French) | 12 |

| BlackRock | 11 |
|---|---|
| Impax Asset Management (English) | 9 |
| Baillie Gifford (Scottish) | 9 |
| Trillium: Socially Responsible Investing | 9 |
| Northwest & Ethical Investments (NEI) (Canadian) | 9 |

Of the 36 other organizations the SEC cited heavily (at least 5 footnotes), 12 are climate advocates.

| OTHER MOST CITED | No. of Times Cited |
|---|---|
| Climate Governance Initiative | 12 |
| Interfaith Center on Corporate Responsibility | 9 |
| Carbon Tracker Initiative | 8 |
| Regenerative Crisis Response Committee | 7 |
| Friends of the Earth | 7 |
| Amazon Watch | 6 |
| Partnership for Carbon Accounting Financials (PCAF) | 5 |
| As You Sow | 5 |
| Center for Climate and Energy Solutions | 5 |
| Institute for Governance and Sustainable Development | 5 |
| World Benchmarking Alliance | 5 |
| World Resources Institute | 5 |

The SEC ignored these comments and this information.

*Ignoring Comments About Retail (Individual) Investors:* Comment letters demonstrated that the SEC's assertions of investor demand were based almost entirely on the statements and preferences of certain institutional asset managers, not individual investors. In response, the SEC claimed that "most individual retail investors and firms advising such investors who submitted comments supported the

proposed rules" and cited, in support of its claim, comment letters from four individuals plus the Investment Company Institute.[15] The Investment Company Institute, as the name suggests, represents investment companies, not individual investors, and four letters out of the 15,000 submitted does not demonstrate "investor demand," but its absence.

Furthermore, the SEC ignored survey data demonstrating that individual investors do not prioritize climate change over investment return, thus undermining the "investor demand" justification. Many of these surveys were called to the SEC's attention in the comment letters, including:

- A survey of individual investors, co-sponsored by FINRA, indicates that most do not share institutional investor enthusiasm for "ESG investing."[16]

- A survey, co-sponsored by FINRA and the University of Chicago, finds that individual investors prioritize financial results and return on investment over any other factor.[17]

---

[15]Climate Rule, page 23, n. 40.

[16] Lauren Foster, *Investors Know Little About ESG, a New Study Finds*, Barron's (Apr. 12, 2022), https://www.barrons.com/articles/esg-meaning-sustainable-investing-study-51649719876.

[17] FINRA Investor Education Foundation & NORC at the University of Chicago, *Investors say they can change the world, if they only knew how: Six things to know about ESG and retail investors* (Mar. 2022), https://www.finrafoundation.org/sites/finrafoundation/files/Consumer-Insights-Money-and-Investing.pdf.

- A FINRA survey of investors of color confirms that they likewise over-whelmingly prioritize financial returns above all other reasons for investing.[18]

- A 2022 Gallup poll of individual investors finds that most prioritized risk and return over environmental and other issues.[19]

- A 2023 Gallup poll of more than 1,000 investors finds that nearly half do not want retirement fund managers to take ESG factors into account when making investment decisions.[20]

- A 2023 Stanford survey reveals a sharp decline in support among young and middle-aged retail investors for using their investments to further ESG goals.[21]

- A 2023 report from Public Holdings providing data from 1105 individual investors demonstrates that the majority are anti-ESG.[22]

The SEC failed to acknowledge or consider them.

---

[18] FINRA Investor Education Foundation, *Investors of Color in the United States* (Jan. 2024), https://www.finrafoundation.org/sites/finrafoundation/files/investors-of-color-in-the-us.pdf.

[19] Lydia Saad, *Where U.S. Investors Stand on ESG Investing*, Gallup (Feb. 23, 2022), https://news.gallup.com/poll/389780/investors-stand-esg-investing.aspx.

[20] Lydia Saad, *ESG Not Making Waves With American Public*, Gallup (May 22, 2023), https://news.gallup.com/poll/506171/esg-not-making-waves-american-public.aspx.

[21] Hoover Institute, et al., *2023 Survey of Investors, Retirement Savings, and ESG* 3, https://www.hoover.org/sites/default/files/research/docs/ESG%20Survey%202023%20-%20FINAL.pdf.

[22] Public Holdings, *The Retail Investor Report* (Aug. 2023), https://public.com/research/2023-retail-investor-report.

*Ignoring Comments About Fund Flow Data*: The SEC overlooked the significance of data indicating a decline in investor interest in climate-focused funds.[23] This trend is crucial as it directly challenges the SEC's rationale for the rule based on investor demand.

*Ignoring Comments About Shareholder Proposals and Support Trends*: The SEC failed to engage with the trend data on shareholder proposals that show waning support for climate-related disclosures. This data contradicts the SEC's use of past experiences as a primary rationale for the rule.[24]

*Blithely Citing Comment About Withdrawal of Investment from Climate Activist Groups*: During the period between the release of the proposed rule and the final adoption of the Climate Rule, institutions managing trillions of dollars of shareholder funds withdrew from "Climate Action 100," one of the investor coalitions the SEC relied heavily upon for its assertion of "investor demand." Our Third Comment Letter pointed this out, yet the SEC brushed this point aside in a "but see" citation

---

[23] *See* Second Comment Letter.

[24] *See* Second Comment Letter; *see also* Stephen Bainbridge, *Investors Want Returns, Not Political Fights*, Barron's (Jul. 6, 2023), https://www.barrons.com/articles/investors-wants-returns-not-political-fights-c0dc18b (noting that shareholders are increasingly rejecting shareholder proposals dealing with social issues and that, in 2023, support for ESG-related proposals fell to just 22% on average, a decline of 11 percentage points since 2021).

acknowledging the withdrawal but failing to respond in any way to the underlying argument about waning investor demand.[25]

The SEC's treatment of these and other points raised in the notice and comment process falls far short of what the APA requires of federal agencies engaged in any rulemaking, but particularly one of such vast economic and political significance as the Climate Rule. Failure to engage with counterarguments, particularly those challenging core assumptions of the Rule, reveals an arbitrary and capricious rulemaking process.

## II.    The Climate Rule Violates the First Amendment.

The Climate Rule triggers heightened First Amendment scrutiny because it is controversial. The Climate Rule cannot satisfy the requirements of either strict or intermediate scrutiny. It must therefore be struck down as a violation of the First Amendment.

### A. The First Amendment applies to the Climate Rule.

Corporations as well as individuals have speech rights protected by the First Amendment. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978); *Citizens United v. FEC*, 558 U.S. 310 (2010). Freedom of speech includes both the affirmative right to speak as well as the negative right to refrain from speaking, and First Amend-

---

[25] Climate Rule at n. 41.

ment doctrine generally protects both rights equally. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Wooley v. Maynard*, 430 U.S. 705 (1977); *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) ("[C]ontent-based burdens must satisfy the same rigorous scrutiny as its content-based bans."). Regulations that target speech based on its content are subject to strict scrutiny, which requires that the government prove the restrictions are narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

Disclosure mandates infringe upon negative speech rights.[26] But compelled *commercial* speech—that is, communications involved in marketing goods or services—may be subject to "less exacting" scrutiny. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 230 (2010). This standard requires only that "disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Zauderer v. Off. of Disciplinary Council*, 471 U.S. 626, 651 (1985). Less exacting scrutiny is available only if two requirements are met. First, the compelled disclosure must be "directed at *misleading* commercial speech." *Milavetz*, 559 U.S. at 230 (emphasis added). Second, the information compelled must be "purely factual and uncontroversial." *Zauderer*, 471 U.S. at 651.

---

[26] *See* Sean J. Griffith, *Corporate Speech and Corporate Purpose: A Theory of Corporate First Amendment Rights*, Fordham Law Legal Studies Research Paper No. 4709312 (Jan. 30, 2024), *available at* https://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID4709312_code339387.pdf?abstractid=4709312&mirid=1&type=2.

Securities regulation has no special immunity from the First Amendment. *Lowe v. SEC*, 472 U.S. 181, 210, n.58 (1985) ("[I]t is difficult to see why the expression of an opinion about a marketable security should not… be protected" under the First Amendment). Recent circuit-level precedent is also clear in the application of the First Amendment to SEC disclosure rules. See *Nat'l Ass'n of Mfrs. v. SEC*, 956 F. Supp. 2d 43 (D.D.C. 2013); *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359 (D.C. Cir. 2014); *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015). Any suggestion to the contrary is cursory dicta.[27]

The Climate Rule is a content-based regulation that compels speech. As such, it is subject to strict scrutiny unless it is both (1) directed at misleading speech, and (2) purely factual and uncontroversial. As described below, the Climate Rule fails to meet either requirement. Thus, the Climate Rule should be judged under scrutiny, though the Climate Rule would also fail under intermediate scrutiny.

---

[27] *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61-62 (1973) (noting that the First Amendment permits "expression by issuers of and dealers in securities… commanding what they must and must not publish and announce"); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (citing "the exchange of information about securities" and "corporate proxy statements" as "examples … of communications that are regulated without offending the First Amendment") (citations omitted); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758, n.5 (1985) (citing *Ohralik* in a string of cases applying deferential review). None of these cases probed why the First Amendment permits securities regulation in each of these contexts. The answer to that question, it is now clear, is the commercial speech paradigm.

## B. The Rule is not directed at misleading commercial speech.

The commercial speech doctrine extends First Amendment protections to commercial speech while also allowing regulation of commercial speech to prevent consumers from being deceived or misled. *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 771-72 (1976) ("The First Amendment, as we construe it today does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely."). Following this logic, the Eighth Circuit has limited the standard of less exacting scrutiny to regulations aimed at curbing *misleading* speech. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 541 F.3d 785, 795 (8th Cir. 2008), *aff'd in part, rev'd in part*, 559 U.S. 229 (2010). Although some circuits differ,[28] the Eighth Circuit's approach has been affirmed by the Supreme Court, applying less exacting scrutiny only to regulations "directed at *misleading* commercial speech...." *Milavetz*, 559 U.S. at 230 (emphasis added). Accordingly, regulations aimed at accomplishing any objective other than the prevention of

---

[28] Circuits limiting less exacting scrutiny to regulations aimed at preventing deception include the Third, Fourth, Seventh, Eighth, and Tenth Circuits. *See Dwyer v. Cappell*, 762 F.3d 275, 283 (3d Cir. 2014); *Handsome Brook Farm v. Humane Farm Animal Care*, 700 Fed. App'x 251, 258 (4th Cir. 2017); *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 652-53 (7th Cir. 2006); *Milavetz,* 541 F.3d at 795-96; *U.S. v. Wegner*, 427 F.3d 840, 850 (10th Cir. 2005). Circuits making less exacting scrutiny available to a broader set of regulatory objectives include the First, Second, Sixth, Ninth, and D.C. Circuits. *See Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 310 (1st Cir. 2005); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 115 (2d Cir. 2001); *Discount Tobacco City & Lottery, Inc. v. U.S.*, 674 F.3d 509, 530 (6th Cir. 2012); *CTIA - The Wireless Ass'n v. City of Berkeley*, 854 F.3d 1105, 1117 (9th Cir. 2017); *Am. Beverage Ass'n v. City and Cnty. of San Francisco*, 871 F.3d 884, 892 (9th Cir. 2017); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27 (D.C. Cir. 2014).

consumer deception do not enjoy the standard of less exacting scrutiny, and because the Climate Rule is not directed at misleading commercial speech, it is not eligible for less exacting scrutiny.

### C. The Climate Rule is not "purely factual and uncontroversial."

A second requirement to access lesser scrutiny is that the regulation in question must compel the production of information that is "purely factual and uncontroversial." *Zauderer*, 471 U.S. at 651. The Supreme Court has emphasized that the paired elements of this test have independent significance. *Nat'l Inst. of Family & Life Advocates v. Becerra,* 585 U.S. 755, 768 (2018) (*NIFLA*). To be eligible for lesser scrutiny, mandatory disclosures must be *both* factual *and* uncontroversial.

Many of the disclosures required under the Climate Rule are not factual. The Climate Rule is replete with requirements making companies disclose speculative, non-factual information, including how "severe weather events" might affect returns, discussion of "opportunities" created by climate change, and potential impacts on "suppliers, purchasers and counterparties." The central failure of the Climate Rule, however, is that it is controversial. This analysis depends upon the meaning of "controversy" under the commercial speech paradigm.

Supreme Court precedent understands "controversy" by reference to whether the information compelled connects to a contested issue in public discourse. *NIFLA*, 585 U.S. at 769 (finding that abortion is "anything but an 'uncontroversial' topic"). It made no difference in *NIFLA* that the required information—the tele-

phone number of a nearby abortion clinic—was not intrinsically controversial. Rather, the telephone number was controversial because of the broader public context in which the morality and legality of abortion is contested.

Climate change and policy are controversial issues in public discourse. Each involves a series of contested premises concerning the causes of change—in particular, the causal significance of carbon dioxide emissions—and the necessity and efficacity of various efforts to limit them. These are contested issues in the scientific literature.[29] Moreover, when the question turns to what ought to be done, the question necessarily becomes political, involving consideration of costs, benefits, and tradeoffs. The Climate Rule is controversial because it takes sides and compels disclosures inextricably connected to a hotly contested political issue.

"Controversy" might also be judged by reference to the purpose of the commercial speech doctrine.[30] Here, the question is not public debate, but rather whether a regulation is plausibly motivated to protect consumers. If the state acts for some reason other than consumer protection, it creates controversy by reference to the doctrine's foundational purpose, and less exacting scrutiny is thus inapplicable.

As noted above, the SEC justifies the Climate Rule by reference to "investor demand." Not only does this justification fail as a coherent regulatory principle, it

---

[29] *See generally* Jason S. Johnston, *Climate Rationality: From Bias to Balance* (2021); Steven E. Koonin, *Unsettled: What Climate Science Tells Us, What It Doesn't, And Why It Matters* (2021); Bjorn Lomborg, *False Alarm* (2020); Vaclav Smil, *How The World Really Works* (2022); Carney, *supra* note 3.

[30] *See* Griffith, *supra* note 3, at 916 ("[A]ctions that plausibly exceed their regulatory purpose imply pretext and therefore imply controversy.")

also does not serve the basic purpose of the commercial speech paradigm—consumer (here investor) protection. Protecting investors means focusing on financial return—the one interest that unites investors *as such*. When a disclosure item strays from a plausible relationship to financial return, it becomes controversial by reference to the purpose of the commercial speech paradigm and therefore subject to heightened scrutiny under the First Amendment.

There is no causal evidence to support the claim that climate risks have financial consequences.[31] Some studies addressing the question find a positive correlation between pro-climate policies and investment returns,[32] while others find no relationship or a negative relationship.[33] Moreover, correlation is not causation, and it is

---

[31] Bhagat, *supra.* n.3; *see also* Hans Bonde Christensen, et al., *Economic Analysis of Widespread Adoption of CSR and Sustainability Reporting Standards* (Jan. 25, 2019) https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3315673 (meta-analysis finding lack of support for connection between ESG reporting with firm financial performance); Bradford Cornell & Aswath Damodaran, *Valuing ESG: Doing Good or Sounding Good?* (2020), https://papers.ssrn.com/abstract_id=3557432.

[32] *See, e.g.*, Timo Busch, *The Robustness of the Corporate Social and Financial Performance Relation: A Second-Order Meta-Analysis, Corporate Social Responsibility and Environmental Management* (March 30, 2018), https://onlinelibrary.wiley.com/doi/10.1002/csr.1480; Camille Smith, et al., *ESG Factors and Risk-Adjusted Performance: A New Quantitative Model*, J. Sustainable Finance & Investment (Oct. 5, 2016), https://www.unpri.org/Uploads/g/t/y/ESG-Factors-and-Risk-Adjusted-Performance.-A-New-Quantitative-Model.pdf.

[33] Jun Xie, et al., *Do Environmental, Social, and Governance Activities Improve Corporate Financial Performance?*, Business Strategy and the Environment (Aug. 14, 2018), *available at* https://onlinelibrary.wiley.com/doi/10.1002/bse.2224 (finding that most ESG activities have a "nonnegative relationship" with corporate financial performance); Scientific Beta, *"Honey, I Shrunk the ESG Alpha": Risk-Adjusting*

likely that any apparent effect on performance is driven by other factors, such as the presence of high-performing tech stocks in ESG portfolios.[34] It is not enough for the SEC to pay lip service to financial considerations and then to proceed in a manner that is contrary to the available evidence. Doing so raises the question of pretext and, with it, controversy.

The Climate Rule is controversial whether it is judged by reference to public debate or to the purpose underlying the commercial speech doctrine.[35] Less exacting scrutiny should therefore not apply.

### D. Strict scrutiny applies because the Climate Rule regulates ideological expression and engages in viewpoint discrimination.

Having failed to qualify for less exacting scrutiny, the question becomes what standard of review applies to the Climate Rule. Regulations of commercial speech

---

*ESG Portfolio Returns* (Apr. 2021), https://cdn.ihs-markit.com/www/pdf/0521/Honey-I-Shrunk-the-ESG-Alpha.pdf; Samuel Hartzmark & Abigail Sussman, *Do Investors Value Sustainability? A Natural Experiment Examining Ranking and Fund Flows*, J. Finance (Aug. 9, 2019), *available at* https://onlinelibrary.wiley.com/doi/abs/10.1111/jofi.12841; Aneesh Raghunandan & Shivaram Rajgopal, *Do ESG Funds Make Stakeholder-Friendly Investments?* (Nov.19, 2021), *available at* https://ssrn.com/abstract=3826357.

[34] Akane Otani, *Big Technology Stocks Dominate ESG Funds*, Wall St. J. (Feb. 11, 2020), *available at* https://www.wsj.com/articles/big-technology-stocks-dominate-esg-funds-11581330601; Camila Hodgson, *Funds Branded "ESG" Are Laden with Technology Stocks*, Financial Times (Aug. 14, 2020), https://www.ft.com/content/ea295d51-d5c2-4916-8c63-017c352ea577.

[35] *See, e.g.*, Andy Puzder and Sanjai Bhagat, *President Biden's Climate Policies Weaken the U.S. and Strengthen China*, Real Clear Energy (Jul. 9, 2023), https://www.realclearenergy.org/articles/2023/07/09/joe_bidens_climate_policies_weaken_the_us_and_strengthen_china_964705.html.

that are non-political and non-discriminatory may qualify for a form of "intermediate" scrutiny. *See Milavetz*, 559 U.S. at 249 (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)). But intermediate scrutiny is not available for regulations of political expression or for regulations that engage in viewpoint discrimination. Because the Climate Rule compels political expression and engages in viewpoint discrimination, intermediate scrutiny does not apply. Rather, strict scrutiny is the standard.

As noted above, the Climate Rule compels the production of information linked to a contested political debate. Absent evidence that such information is relevant to financial return, investor interest in such information must depend upon one's personal political viewpoint. Viewpoints on these issues can be generally divided into two: either the prospect of climate change calls for urgent action to curb carbon dioxide emissions, or it does not.

The Climate Rule adopts a viewpoint on this debate, which is also the viewpoint of the Democratic party, whose President promised a "whole-of-government" commitment to the issue.[36] If climate disclosures are relevant, they are relevant only to the side of the debate that favors urgent action. For the negative side of the debate,

---

[36] "Combatting the Climate Crisis" was one of ten core agenda items in the party's 2020 platform. *See* Democratic Nat'l Comm., *Combating the Climate Crisis and Pursuing Environmental Justice*, https://democrats.org/where-we-stand/party-platform/combating-the-climate-crisis-and-pursuing-environmental-justice/ (last accessed June 17, 2024). President Biden's commitment to a "whole-of-government approach" to advance the "climate agenda" even "without Congress" was announced in a press conference. *See* The White House, *Press Briefing by Principal Deputy Press Secretary Karine Jean-Pierre* (Oct. 21, 2021), http://tiny.cc/em4mxz.

the information is irrelevant and, given that it is costly to produce, harmful. The Climate Rule is thus not viewpoint neutral. Rather, it implicitly endorses the viewpoint that demands urgent action on climate change.

Even regulations affecting traditionally unprotected speech are impermissible when they discriminate based on viewpoint. For example, in *R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992), the Court struck down a law targeting the use of "fighting words," an otherwise unprotected category of speech, because it applied "special prohibitions on those speakers who express views on disfavored subjects." *Id.* at 391 (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). Similarly, in the conflict minerals case, the D.C. Circuit found that factual disclosures that a product was "DRC conflict free" nevertheless implied a moral stance on the conflict which, because it was not aimed at preventing deception, could not survive First Amendment challenge. *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518 (D.C. Cir. 2015).

Because viewpoint-based discrimination triggers strict scrutiny and because the Climate Rule discriminates based on viewpoint, strict scrutiny applies.

### E. The Climate Rule fails both strict and intermediate scrutiny.

In ordinary commercial contexts—that is, when regulations are non-ideological and non-discriminatory—disclosure rules that fail to qualify for less exacting scrutiny under *Zauderer* are reviewed according to a form of intermediate scrutiny. Intermediate scrutiny in the context of commercial speech requires, first, that the regulation advance a "substantial" governmental end and, second, that it "directly advance" that end by means that are "no more extensive than necessary." *Cent.*

*Hudson*, 447 U.S. at 569-70. Although strict scrutiny is the appropriate standard of review as discussed above, the Climate Rule fails under either standard.

Regarding urgency of ends, mandatory disclosure of climate information that is irrelevant to a company's financial performance cannot be said to serve the purpose of investor protection. Absent financial relevance, the Climate Rule advances no cognizable goal of securities regulation.

Moreover, even granting a substantial governmental interest in investor protection, the disclosures compelled by the Climate Rule cannot be said to advance it and must therefore fail the under the means prong of the test. Compulsory disclosure of information that is irrelevant to financial return does not provide even "ineffective or remote" support for investor protection. *Id.* at 564. It provides no support at all. Moreover, insofar as these disclosures may be weaponized against non-conforming companies through boycotts and other political action, they allow ideologically motivated investors to impose costs on financially motivated investors, subverting the goal of investor protection. Furthermore, insofar as climate disclosures may be financially relevant to a particular company, existing disclosure rules already require disclosure of material risks and trends relating to climate.[37] Because these disclosures

---

[37] *See, e.g.*, SEC, *Commission Guidance Regarding Disclosure Related to Climate Change* 21-27, (Feb. 8, 2010), *available at* https://www.sec.gov/files/rules/interp/2010/33-9106.pdf (requiring disclosure, among other things, of information relating to the "[i]mpact of legislation and regulation," "[i]ndirect consequences of regulation and business trends," and "[p]hysical impacts of climate change"); *see also* Bainbridge Comment Letter (describing application of existing rules to the subject matter of the proposed Climate Rule).

are required under existing law, the Climate Rule cannot be said to be "no more extensive than necessary." *Cent. Hudson*, 447 U.S. at 570.

Thus, the Climate Rule cannot survive First Amendment scrutiny under either an intermediate or strict standard of review.

## Conclusion

The Court should grant the Petition and vacate the Climate Rule.

Respectfully submitted.

/s/Heather Gebelin Hacker
Heather Gebelin Hacker
HACKER STEPHENS LLP
108 Wild Basin Road South
Suite 250
Austin, Texas 78746
(512) 399-3022 (phone)
heather@hackerstephens.com

*Counsel for Amicus Curiae*

## Certificate of Service

I hereby certify that on June 21, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER

## Certificate of Compliance

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6493 words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type style requirements of Rule 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the program used for the word count). This brief has been scanned for viruses and is virus-free.

/s/ Heather Gebelin Hacker
HEATHER GEBELIN HACKER

# APPENDIX: LIST OF *AMICI CURIAE*

*Stephen M. Bainbridge*
William D. Warren Distinguished Professor of Law
UCLA School of Law

*Sanjai Bhagat*
Provost Professor of Finance
University of Colorado

*Bernard S. Black*
Chabraja Professor
Northwestern University Pritzker School of Law & Kellogg School of Management

*William J. Carney*
Charles Howard Candler Professor Emeritus
Emory University School of Law

*Lawrence A. Cunningham*
Managing Partner, Quality Shareholders Group
Henry St. George Tucker III Research Professor Emeritus
The George Washington University Law School

*David J. Denis*
Terrence P. Laughlin Chair in Finance
University of Pittsburgh Katz School of Business

*Diane Denis*
Terrence P. Laughlin Chair in Finance, Emeritus
University of Pittsburgh Katz School of Business

*Charles M. Elson*
Edgar S. Woolard Jr. Chair in Corporate Governance (ret.)
Founding Director, Weinberg Center on Corporate Governance
University of Delaware

*Jesse M. Fried*
Dane Professor of Law
Harvard Law School

*Sean J. Griffith*
T. J. Maloney Chair in Business Law
Fordham University School of Law

*F. Scott Kieff*
Stevenson Bernard Professor of Law
The George Washington University Law School
Former Commissioner, U.S. International Trade Commission

*Edmund W. Kitch*
Mary and Daniel Loughran Professor of Law
University of Virginia School of Law

*Katherine Litvak*
Professor of Law
Northwestern University Pritzker School of Law

*Julia D. Mahoney*
John S. Battle Professor of Law
University of Virginia School of Law

*Paul G. Mahoney*
David and Mary Harrison Distinguished Professor
University of Virginia School of Law

*Adam C. Pritchard*
Frances & George Skestos Professor of Law
University of Michigan Law School

*Christina P. Skinner*
Assistant Professor of Legal Studies & Business Ethics
University of Pennsylvania Wharton School

*Todd J. Zywicki*
George Mason University Foundation Professor of Law
George Mason University Antonin Scalia Law School