**Nos. 24-1522, 24-1624, 24-1627, 24-1628, 24-1631, 24-1633, 24-1634, 24-1685, 24-2173**

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

*State of Iowa, et al.*

Petitioners

v.

*United States Securities and Exchange Commission*

Respondent

*District of Columbia, et al.*

Intervenors

Petition for Review of an Order of the Securities & Exchange Commission

**Amici Curiae Brief of the Job Creators Network Foundation and National Association of Wholesaler-Distributors in Support of Petitioners**

Ivan L. London
Grady J. Block
MOUNTAIN STATES
LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
ilondon@mslegal.org
gblock@mslegal.org

July 8, 2024        *Counsel for* Amici Curiae

i

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Circuit Rule 26.1A, counsel for Amici Curiae certifies that:

1. The National Association of Wholesaler-Distributors (NAW) is a 501(c)(6) non-profit trade association. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

2. The Job Creators Network Foundation (JCNF) is a 501(c)(3) non-profit organization. It has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Neither NAW nor JCNF is a subsidiary or affiliate of any publicly owned corporation, and neither organization issues shares or debt securities to the public.

Appellate Case: 24-1522    Page: 2    Date Filed: 07/08/2024 Entry ID: 5410942

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................... i

TABLE OF CONTENTS ........................................................ ii

TABLE OF AUTHORITIES.................................................... iii

INTERESTS OF AMICI CURIAE ............................................ 1

SUMMARY OF ARGUMENT................................................. 2

ARGUMENT ................................................................... 4

I.    Legal Framework........................................................ 4

II.   The SEC's Rule is Arbitrary and Capricious............................... 5

III.  The SEC's Rule Will Harm Businesses, Particularly Small
      and Medium-Sized Enterprises........................................ 8

CONCLUSION ................................................................ 21

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT,
TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS   24

CERTIFICATES OF SERVICE FOR DOCUMENTS FILED USING
CM/ECF ....................................................................... 25

Appellate Case: 24-1522    Page: 3    Date Filed: 07/08/2024 Entry ID: 5410942

# TABLE OF AUTHORITIES

**Cases**                                                        **Page(s)**

*Business Roundtable v. SEC*,
   647 F.3d 1144 (D.C. Cir. 2011) ...................................................... 4

*Chamber of Commerce v. SEC*,
   412 F.3d 133 (D.C. Cir. 2005) ...................................................... 4, 7

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ...................................................... 5, 6

*Michigan v. EPA*,
   576 U.S. 743 (2015) ...................................................... 6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ...................................................... 4

## Statutes

5 U.S.C. § 706(2)(A) ...................................................... 4

5 U.S.C. § 706(2)(C) ...................................................... 4

5 U.S.C. § 706(2)(D) ...................................................... 4

## Rules

Fed. R. App. P. 5(c)(1) ...................................................... 24

Fed. R. App. P. 32(a)(5) ...................................................... 24

Fed. R. App. P. 32(a)(6) ...................................................... 24

Fed. R. App. P. 32(f) ...................................................... 24

## Regulations

Business and Financial Disclosure Required by Regulation S-K,
   81 Fed. Reg. 23,916 (Apr. 22, 2016) ...................................................... 5

Environmental and Social Disclosure,
   40 Fed. Reg. 51,656 (Nov. 6, 1975) ...................................................... 5

Appellate Case: 24-1522     Page: 4     Date Filed: 07/08/2024 Entry ID: 5410942

The Enhancement and Standardization of Climate-Related Disclosures for
  Investors,
    87 Fed. Reg. 21,334 (April 11, 2022).................................................... 8

The Enhancement and Standardization of Climate-Related Disclosures for
  Investors,
    89 Fed. Reg. 21,668 (March 28, 2024) ................................................. 6, 8

iv

NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS

National Association of Wholesaler-Distributors (NAW) is an employer and a non-profit, non-stock, incorporated trade association that represents the wholesale distribution industry—the essential link in the supply chain between manufacturers and retailers as well as commercial, institutional, and governmental end users. NAW is made up of direct member companies and a federation of national, regional, and state associations across 19 commodity lines of trade which together include approximately 35,000 companies operating nearly 150,000 locations throughout the nation. The overwhelming majority of wholesaler distributors are small-to-medium-size, closely held businesses. As an industry, wholesale distribution generates more than $8 trillion in annual sales volume providing stable and well-paying jobs to more than 6 million workers. NAW files this brief on its own behalf and on behalf of its members' companies, whose operations and employees are placed at risk by the SEC's Rule.

JOB CREATORS NETWORK FOUNDATION

The Job Creators Network Foundation (JCNF) is a 501(c)(3) nonpartisan organization founded by entrepreneurs committed to educating employees of Main Street America about government policies that harm economic freedom. JCNF's

1

Legal Action Fund defends against government overreach to ensure that America's free market system is not only protected but allowed to thrive.

The SEC's Rule represents a significant expansion of government power and regulatory overreach. By claiming broad authority to mandate climate disclosures, the SEC is intruding into the operations of businesses and imposing its own policy preferences on the private sector. JCNF has a strong interest in opposing the SEC's Rule and defending the rights and interests of privately held businesses against such government overreach. By filing this brief, JCNF seeks to ensure that the SEC remains within the bounds of its legal authority and does not impose undue burdens on the entrepreneurs and job creators who drive America's economic growth and prosperity.

## SUMMARY OF ARGUMENT

The Securities and Exchange Commission's final rule, The Enhancement and Standardization of Climate-Related Disclosures for Investors (the Rule), constitutes an extraordinary and unauthorized expansion of the Commission's regulatory powers. This Rule mandates comprehensive and onerous disclosure obligations for public companies, requiring detailed information on climate risks, greenhouse gas emissions, and related governance. Such demands breach the Administrative Procedure Act (APA) and place significant financial burdens on businesses, especially those that are privately held and small to mid-sized.

First, the Rule is arbitrary and capricious under the APA because the SEC has failed to provide a reasoned explanation or substantial evidence to support its necessity and benefits. The Commission's abrupt reversal of its longstanding position on the scope of its disclosure authority, coupled with its reliance on equivocal and limited evidence, renders the Rule unreasonable. The SEC has also failed to adequately consider the Rule's significant compliance costs and potential unintended consequences.

Second, the Rule places substantial and undue burdens on businesses, including—as described in this brief—impacting *privately* held enterprises. The extensive disclosure requirements necessitated by the Rule will compel companies to reallocate resources from job creation and growth, leading to diminished economic productivity, fewer job opportunities, and reduced investor returns. That part is obvious. Moreover, the Rule's indirect effects on *private companies* will compound these economic harms, as small businesses face pressure from their larger, public company customers to make their own climate disclosures.

For these reasons, this Court should vacate the SEC's climate disclosure rule and hold that the Commission has failed to engage in reasoned decision-making. By doing so, this Court can check agency overreach, protect the rights and interests of American businesses, and ensure that major policy decisions are made by Congress, not administrative agencies.

3

## I. Legal Framework

The APA provides the framework for reviewing rules promulgated by federal agencies. Under the APA, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D).

Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Courts have not hesitated to invalidate SEC rules that lack substantial evidence or fail to adequately consider the economic consequences of the agency's actions. *See, e.g., Business Roundtable v. SEC*, 647 F.3d 1144, 1148–49 (D.C. Cir. 2011); *Chamber of Commerce v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005).

Under the arbitrary and capricious standard, courts must ensure that agencies have engaged in reasoned decision-making and have not overlooked important aspects of the problem before them. *See State Farm*, 463 U.S. at 43. Agencies must provide a logical and rational connection between the facts found and the policy choices made, and they must offer a reasoned explanation for any change in position.

*See id*.; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Failure to do so renders an agency's action arbitrary and capricious.

The SEC's Rule falls short under the arbitrary and capricious standard through its failure to provide a reasoned explanation or substantial evidence to support the Rule's necessity and benefits.[1] This Court should therefore vacate the Rule and prevent the SEC from exceeding its legal authority and imposing undue burdens on American businesses.

## II. The SEC's Rule is Arbitrary and Capricious

The SEC's Rule is also arbitrary and capricious because it fails to justify the drastic change in policy and lacks substantial evidence. For decades, the SEC maintained that it lacked authority to impose broad climate disclosures absent a change in statutory authority. *See* Environmental and Social Disclosure, 40 Fed. Reg. 51,656, 51,657 (Nov. 6, 1975); Business and Financial Disclosure Required by Regulation S-K, 81 Fed. Reg. 23,916, 23,970 (Apr. 22, 2016). The SEC has not adequately explained its abrupt reversal in position, rendering its action arbitrary and

---

1 Counsel for amici previously filed a comment on the Rule when it was first proposed, highlighting concerns about the SEC's statutory authority and potential First Amendment violations. See Mountain States Legal Foundation, Comment Letter on Proposed Rule: The Enhancement and Standardization of Climate-Related Disclosures for Investors (June 17, 2022), https://mslegal.org/wp-content/uploads/2022/05/MSLF-Comments-re-Proposed-Rule.pdf. These concerns remain relevant to the final rule and underscore its arbitrary and capricious nature.

capricious. *See FCC v. Fox Television Stations*, Inc., 556 U.S. 502, 515 (2009) (requiring agencies to provide "good reasons" for a policy change).

The SEC's failure to acknowledge and explain its change in position is particularly glaring given the significant economic and political stakes of the Rule. The Commission has long recognized that its disclosure authority is limited to information that is financially material to investors, and it has previously rejected calls to expand that authority to encompass environmental and social issues. *See*, *e.g.*, 81 Fed. Reg. at 23,970. The SEC's sudden embrace of sweeping climate disclosure requirements, without a clear justification for the change, suggests that the Rule is driven more by political considerations than reasoned decision-making.

The SEC also fails to adequately consider the Rule's significant compliance costs and the potential economic consequences for businesses. The Commission's own estimates project that the Rule will impose an average of around $739,000 in *annual* compliance costs on public companies. *See* The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21,668, 21,875 (March 28, 2024). These costs will likely be passed on to investors and consumers, resulting in lower returns and higher prices. The SEC's failure to fully grapple with these economic impacts renders its analysis arbitrary and capricious. *See Michigan v. EPA*, 576 U.S. 743, 750–51 (2015) ("One would not say that it is

6

even rational, never mind 'appropriate,' to impose billions of dollars in economic costs in return for a few dollars in health or environmental benefits.").

Moreover, the SEC has not adequately considered the potential unintended consequences of the Rule, such as the disincentive for companies to go public or the pressure on private businesses to make their own climate disclosures. These effects could have significant negative impacts on capital formation, job creation, and economic growth. The SEC's failure to fully analyze and account for these potential consequences further undermines the reasonableness of its decision-making process. *See Chamber of Commerce v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005) (invalidating SEC rule for failure to adequately consider effects on efficiency, competition, and capital formation).

In short, the SEC's Rule is arbitrary and capricious because it represents an unexplained and unjustified departure from the agency's longstanding position on the scope of its disclosure authority. The SEC has not provided substantial evidence to support the Rule's necessity or benefits, and it has failed to adequately consider the significant costs and potential unintended consequences of its sweeping climate disclosure mandate. This Court should therefore vacate the Rule and send a clear message that the SEC must engage in reasoned decision-making and stay within the bounds of its statutory authority.

7

### III. The SEC's Rule Will Harm Businesses, Particularly Small and Medium-Sized Privately Held Enterprises

While the SEC's Rule directly regulates large public companies, its effects will cascade down to impose significant indirect burdens on businesses throughout the supply chain, including privately held enterprises. Complying with the Rule's extensive disclosure requirements will necessitate the creation of complex data collection and reporting systems, leading to substantial compliance costs. Some studies estimate the compliance costs for non-registrants to be as high as $14 billion. *See* The Enhancement and Standardization of Climate-Related Disclosures for Investors, 89 Fed. Reg. 21,668, 21, 21851 (March 28, 2024) (citing a letter from the Heritage Foundation). The SEC itself estimates that compliance will cost over $10.2 billion. *See* The Enhancement and Standardization of Climate-Related Disclosures for Investors, 87 Fed. Reg. 21,334, 21,461 (April 11, 2022).

These costs will disproportionately impact smaller privately held companies, which lack the resources of larger firms, despite being non-registrants and not specifically targeted by the Rule. Many of NAW's members, for example, are small-to-medium-sized businesses that, while not directly regulated, will likely struggle to meet the climate-related data demands passed down from their larger, regulated business partners. These businesses operate on thin margins and have limited staff and financial resources to devote to regulatory compliance. As large companies seek to comply with the Rule's extensive disclosure requirements, they are highly likely

8

to demand climate-related data from their smaller suppliers and partners. This will force these smaller companies to divert resources away from core business functions, such as product development, marketing, and customer service, in order to collect and report this data.

The indirect costs associated with the Rule will likely serve as an additional barrier to entry for new businesses in affected supply chains. Furthermore, the prospect of direct regulation may discourage some existing private companies from going public. The added expense and regulatory burden of complying with the SEC's climate disclosure mandate will make it more difficult for privately held businesses to access the capital markets and grow their operations. This, in turn, will reduce job creation and economic growth, as fewer companies will be able to expand and hire new workers.

Moreover, the Rule's effects will extend far beyond the publicly traded companies directly subject to its requirements. Large public companies, facing pressure to comply with the Rule, will likely force their suppliers and business partners to provide climate-related data and make their own disclosures. This dynamic will effectively impose the Rule's burdens on countless private businesses that are not directly covered by the SEC's mandate.

Small, privately held businesses in the wholesale distribution industry, which serve as critical links in the supply chain, will be particularly vulnerable to this type

9

of pressure from their larger, public company customers. Just as many small businesses have been compelled to comply with California's Proposition 65 labeling requirements due to demands from large retailers, small wholesaler-distributors may find themselves forced to bear the costs and burdens of the SEC's climate disclosure regime.

Although not directly subject to the Rule, these businesses may be required by their publicly traded customers to collect and report data on its greenhouse gas emissions, climate-related risks, and environmental policies. Failure to comply could result in the loss of key contracts and threaten the company's viability.

HT Metals, a distributor of ready-to-manufacture custom-cut raw materials to precision manufacturers and fabricators in Arizona, provides a compelling example. With just five employees and 21 years of operation in Tucson, HT Metals exemplifies the type of small, privately held enterprise that forms the backbone of America's economy. While they primarily serve Tier 2 companies and aren't directly connected to many publicly traded firms, the ripple effects of the SEC's Rule could still significantly impact their operations.

Currently, HT Metals manages product-level compliance, such as providing certificates for the Restriction of Hazardous Substances (RoHS). While this requires additional documentation and incurs some costs, the metals industry has largely adapted its processes to make such compliance manageable for small businesses.

10

However, the SEC's new climate disclosure rule presents a far more daunting challenge. Unlike product-specific regulations, this rule deals with broad, often uncontrollable factors like climate risks that require continual observation. HT Metals will have to contend with how to respond to potential requests related to this rule, particularly from any publicly traded customers. The prospect of having to hire external experts annually to assess and report on climate-related risks, or continuously monitor potential regulatory changes at local, state, and federal levels, would impose a significant burden on a small operation such as HT Metals. This could force HT Metals and similar small businesses to divert precious resources away from their core operations and growth initiatives, potentially making decisions that are detrimental to their long-term viability.

Now multiply this scenario across countless small businesses, and the true economic impact of the SEC's Rule becomes clear. Thousands of small wholesaler-distributors, manufacturers, and service providers will be indirectly subject to the Rule's requirements, forcing them to divert resources away from job creation and growth in order to comply with the demands of their larger, public company customers.

HT Metals, for instance, may have to hire additional staff to collect and report emissions data, invest in new software systems to track climate-related risks, and spend countless hours completing disclosure forms and questionnaires. These costs

11

will eat into the company's already thin profit margins, making it harder to compete and grow. Multiply this impact across the thousands of small businesses that make up the wholesale distribution industry, and the cumulative effect on job creation and economic growth becomes staggering.

Guy Berkebile, owner of Guy Chemical, exemplifies these concerns. Established in 1995, Guy Chemical specializes in producing silicone sealants, greases, and two-part epoxy adhesives, serving both consumer and industrial markets, including many publicly traded companies. Despite his company's success, Berkebile expresses profound apprehension about the potential impact of the SEC's Rule. "I'm not even sure where to begin on wrapping my head around this," he states.

Berkebile's experience highlights a common problem: entrepreneurs who have built their companies from the ground up often lack the specialized staff or expertise to address complex climate-related issues. Unlike large corporations with dedicated sustainability departments, small businesses typically don't have employees qualified to assess and report on climate risks or emissions data. Berkebile points out, "I don't know who on my staff I would assign this to, as I don't have anyone qualified to answer climate-related questions." This skills gap is not easily filled, as climate expertise is not a traditional component of most small business operations.

12

The likely result is that these businesses will be forced to divert precious resources away from core operations and growth initiatives to hire expensive third-party consultants. Berkebile anticipates, "We most likely would have to hire a third-party firm, who specializes in this subject matter, to tackle these questions and ensure we are compliant." This additional layer of compliance cost echoes previous regulatory burdens, such as those imposed by the Affordable Care Act, where small privately held businesses, had to contract external firms to ensure adherence to complex regulations. For many small business owners, this represents yet another financial strain in an already challenging economic environment.

Berkebile laments that these compliance costs divert resources away from growing his company and into the hands of outside consultants. His concluding remark, "I am glad I am older and phasing myself out of running the business. The business environment is so complicated now for an upstart entrepreneur," underscores the chilling effect such regulations can have on entrepreneurship and innovation in small to medium-sized businesses.

Guy's concerns are not unique. They echo and parallel the apprehensions of countless other privately held small to medium-sized enterprise owners across the nation. From family-owned manufacturing businesses to local service providers, entrepreneurs in various sectors face similar challenges. Whether it's a small metal distributor like HT Metals in Arizona or a specialized chemical producer like Guy

Chemical in Pennsylvania, these businesses form the backbone of the American economy. They share common struggles: limited resources, lean staffing, and a focus on core operations that leaves little room for navigating complex regulatory landscapes. The SEC's Rule threatens to impose a one-size-fits-all approach that fails to account for the diverse nature and limited capacities of these smaller enterprises.

While the Rule directly targets publicly traded companies, its effects will inevitably wreak havoc up and down the supply chain. Larger, publicly traded companies are likely to impose the Rule's requirements on their upstream partners and suppliers, many of whom are non-registrants and small to medium-sized businesses. This indirect application of the Rule's burdens will force these smaller enterprises to comply with regulations they were never meant to face directly. As a result, thousands of businesses could find themselves grappling with compliance burdens that are disproportionate to their size and resources, potentially stifling growth, innovation, and job creation across entire industries and regions.

Moreover, the need to rely on external consultants raises concerns about the accuracy and ownership of the data being reported. Small business owners, particularly privately held businesses, may find themselves in the uncomfortable position of being responsible for climate-related disclosures they don't fully understand or control. This not only increases their liability risk but also potentially

14

puts them at a competitive disadvantage compared to larger firms with in-house expertise.

The cumulative effect of such regulations is creating an increasingly hostile business environment, particularly for new entrants and smaller firms. Many seasoned entrepreneurs, especially those nearing retirement or considering passing their companies to the next generation, express frustration and concern about the future of small business in America. They fear that the regulatory landscape is becoming so complex and costly that it will stifle entrepreneurship, making it exceptionally difficult for new businesses to start and thrive.

This regulatory burden also threatens to slow innovation and job creation in small businesses, which have historically been major drivers of economic growth. As more resources are diverted to compliance and consultant fees, less capital is available for research and development, expansion, or hiring new employees. This shift could have long-term implications for economic dynamism and competitiveness, particularly in sectors dominated by small and medium-sized enterprises.

Furthermore, the indirect pressure from this rule may force small businesses to make premature or ill-advised operational changes in an attempt to meet the climate-related expectations of their larger business partners. Without the resources

Appellate Case: 24-1522   Page: 20   Date Filed: 07/08/2024 Entry ID: 5410942

to properly analyze and implement sustainable practices, these hasty changes could lead to inefficiencies or even financial instability for small firms.

The Rule's burdens on privately held small and medium-sized businesses will have far-reaching consequences for the U.S. economy as a whole. Small businesses are the backbone of the American economy, accounting for 99.9% of all businesses in the United States and employing nearly half of the private sector workforce.[2] These businesses are also responsible for generating a significant portion of new job growth, with small businesses creating 62.7% of new job creation since 1997.[3]

The SEC's Rule threatens to stifle this engine of economic growth and job creation by imposing significant costs and burdens on small businesses. As these businesses struggle to comply with the Rule's extensive disclosure requirements (many of which likely will be pushed down on them by the larger businesses with whom they contract) they will have fewer resources to invest in expansion, innovation, and hiring. This, in turn, will lead to slower economic growth, reduced job creation, and decreased competitiveness for American businesses in the global marketplace. And because many small businesses are located in rural areas and

---

[2] *See* U.S. Small Business Administration Office of Advocacy, *Frequently Asked Questions About Small Business* (Mar. 2023), https://advocacy.sba.gov/wp-content/uploads/2023/03/Frequently-Asked-Questions-About-Small-Business-March-2023-508c.pdf.
[3] *Id.*

Appellate Case: 24-1522    Page: 21    Date Filed: 07/08/2024 Entry ID: 5410942

smaller cities, where they serve as a critical source of employment and economic activity, the economic vitality of these communities will be put at risk.

Another significant concern is that some privately held small businesses may lose valuable contracts with larger companies due to the SEC's climate disclosure rule. As large, publicly traded companies strive to meet the extensive reporting requirements and potentially set ambitious climate-related targets, they may fundamentally alter their supplier selection criteria. These larger firms might preferentially choose to contract with suppliers and partners who can guarantee low or zero greenhouse gas emissions, or who can readily provide comprehensive climate-related data to support the larger company's compliance efforts.

This shift in procurement practices could create a two-tiered market where privately held small businesses without the resources to track, report, or significantly reduce their emissions are increasingly shut out of lucrative contracts with larger firms. For instance, a privately held small manufacturing company that has been a long-time supplier to a large corporation might find itself replaced by a competitor that can offer detailed emissions data or carbon-neutral operations. Similarly, small privately held logistics firms unable to demonstrate low-emission transportation methods might lose business to larger, better-equipped competitors. This unintended consequence of the SEC's rule could accelerate market consolidation, reduce

17

diversity in supply chains, and further disadvantage small businesses that are already struggling to compete in an increasingly climate-conscious business environment.

Innovation and entrepreneurship will also suffer under this rule. Small businesses are often at the forefront of developing new technologies, products, and services, and they play a vital role in driving innovation and competitiveness in the U.S. economy. However, the downstream impact of the Rule's compliance costs and regulatory burdens will make it harder for small businesses to invest in research and development, bring new products to market, and compete with larger, more established firms.

Moreover, the SEC's Rule will also have indirect consequences for these companies by increasing the costs of goods and services they rely on. Many private small businesses depend on larger, publicly traded companies for raw materials, components, and other inputs. As these larger companies pass on the costs of complying with the SEC's climate disclosure mandate to their customers, small businesses will face higher prices for the goods and services they need to operate.

This dynamic will be particularly challenging for small businesses in industries with tight margins and intense competition, such as retail, hospitality, and food service. For these businesses, even small increases in the cost of goods and services can have a significant impact on their bottom line. As a result, the SEC's

Appellate Case: 24-1522    Page: 23    Date Filed: 07/08/2024 Entry ID: 5410942

Rule will put additional pressure on these businesses, making it harder for them to compete and survive.

The SEC's climate disclosure rule does not exist in a regulatory vacuum. Rather, it adds another layer to an already complex web of regulations that businesses, particularly small and medium-sized enterprises, must navigate. This cumulative regulatory burden is a critical factor that the SEC has failed to adequately consider in its rulemaking process.

Currently, businesses are subject to a multitude of federal, state, and local regulations covering areas such as financial reporting, environmental compliance, labor laws, and industry-specific requirements. For instance, many companies already report certain environmental data to the Environmental Protection Agency under various programs. The SEC's new rule would require these businesses to collect, analyze, and report much of this same information again, but in a different format and with different specifications.

This duplication of effort not only increases compliance costs but also raises the risk of inconsistencies in reporting, potentially exposing companies to legal liabilities. Moreover, the interplay between the SEC's climate disclosure requirements and existing environmental regulations could create confusion and uncertainty for businesses trying to ensure compliance across multiple regulatory regimes. The SEC's failure to comprehensively assess how its new rule interacts

19

with and compounds existing regulatory burdens represents a significant oversight in its rulemaking process. This oversight further underscores the arbitrary and capricious nature of the SEC's action and its potential to create unintended consequences that could stifle economic growth and innovation.

The Rule's indirect impact on privately held businesses will also have consequences for consumers. As small businesses face higher costs for goods and services, they will likely be forced to raise prices for their own products and services, leading to higher costs for consumers across a wide range of industries. This, in turn, will have a regressive impact on low- and middle-income consumers, who spend a larger portion of their income on basic goods and services.

The SEC's failure to fully consider and account for these significant economic impacts renders the Rule arbitrary and capricious under the APA. The Commission has not provided substantial evidence to justify the Rule's necessity or demonstrated that its benefits outweigh its considerable costs, particularly for small and medium-sized businesses. Absent such evidence, the Rule cannot stand.

Furthermore, the sweeping nature of the SEC's climate disclosure mandate and its impact on businesses of all sizes underscores the need for clear congressional authorization under the major questions doctrine. The Rule represents a transformative expansion of the SEC's regulatory authority, with far-reaching consequences for the U.S. economy and the competitiveness of American businesses

20

in the global marketplace. Such a significant policy decision must be made by Congress, not an administrative agency acting unilaterally.

For all these reasons, this Court should vacate the SEC's climate disclosure rule and make clear that the Commission has exceeded its statutory authority and failed to engage in reasoned decision-making. By doing so, this Court can protect the rights and interests of American businesses, particularly the small and medium-sized enterprises that drive economic growth, job creation, and innovation in the U.S. economy. The Court can also reaffirm the fundamental principle that major policy decisions with sweeping economic consequences must be made by Congress, not administrative agencies, ensuring that our system of government remains true to the separation of powers and the rule of law.

## CONCLUSION

For the foregoing reasons, amici curiae JCNF and NAW respectfully request that this Court grant the relief sought by the Petitioners and vacate the SEC's Rule. The Rule is arbitrary and capricious and will impose significant burdens on businesses, particularly small and medium-sized privately held enterprises. This Court should intervene to prevent the SEC's unlawful overreach and protect the rights and interests of American businesses.

The SEC's Rule represents a clear case of agency overreach, with wide-ranging consequences for the economy. By mandating extensive climate disclosures

from public companies, the Rule will impose billions of dollars in compliance costs, force companies to make speculative and burdensome disclosures, and pressure even private businesses to follow suit. This sweeping regulatory mandate cannot be justified by the general disclosure provisions relied upon by the SEC, and it represents a major policy decision that must be made by Congress, not an administrative agency.

Moreover, the SEC has failed to provide a reasoned explanation or substantial evidence to support the Rule's necessity and benefits. The Commission's abrupt reversal of its longstanding position on the scope of its disclosure authority, coupled with its reliance on equivocal and limited evidence, renders the Rule arbitrary and capricious under the APA. The SEC's failure to fully consider and account for the Rule's significant economic impacts further underscores the unreasonableness of its decision-making process.

This Court has an important role to play in checking agency overreach. By vacating the SEC's climate disclosure rule, this Court can send a clear message that major policy decisions must be made by Congress, not unelected bureaucrats. The Court can also protect the rights and interests of American businesses, particularly the small and medium-sized enterprises that are the backbone of our economy.

In short, the SEC's climate disclosure rule is a classic example of agency overreach that cannot be allowed to stand. This Court should grant the relief sought

by the Petitioners and vacate the Rule, reaffirming the fundamental principles of separation of powers, reasoned decision-making, and the rule of law.

Dated: July 8, 2024

Respectfully submitted,

*/s/ Ivan L. London*
Ivan L. London
Grady J. Block
MOUNTAIN STATES
LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
ilondon@mslegal.org
gblock@mslegal.org

*Counsel for Amici Curiae*

Appellate Case: 24-1522    Page: 28    Date Filed: 07/08/2024 Entry ID: 5410942

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This document complies with the word limit of Fed. R. App. P. 5(c)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

⊠ this document contains 4,765 words, **or**

this brief uses a monospaced typeface and contains [state the number of] lines of text.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

⊠ this document has been prepared in a proportionally spaced typeface using **Microsoft Word for Microsoft 365 in 14 pt. Times New Roman**, **or**

this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

3.      This document has been scanned for viruses and is virus free

*/s/ Ivan L. London*
Ivan L. London
MOUNTAIN STATES
LEGAL FOUNDATION

*Counsel for Amici Curiae*

Dated: July 8, 2024

Appellate Case: 24-1522     Page: 29     Date Filed: 07/08/2024 Entry ID: 5410942

## CERTIFICATES OF SERVICE FOR DOCUMENTS FILED USING CM/ECF

I hereby certify that on July 8, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

**For Petitioners:**

**State of Iowa**
Patrick Cannon Valencia
Eric H. Wessan
ATTORNEY GENERAL'S OFFICE
Hoover Building
1305 E. Walnut Street
Des Moines, IA 50319-0001

**State of Arkansas**
Nicholas J. Bronni
Dylan L. Jacobs, Assistant Solicitor
General
ATTORNEY GENERAL'S OFFICE
200 Catlett-Prien Building
323 Center Street
Little Rock, AR 72201-0000

**State of Idaho**
Alan M. Hurst
Joshua N. Turner
ATTORNEY GENERAL'S OFFICE
700 W. Jefferson
P.O. Box 83720
Boise, ID 83720-0010

**State of Missouri**
Joshua Divine
ATTORNEY GENERAL'S OFFICE
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102-0000

**State of Montana**
Christian Brian Corrigan
ATTORNEY GENERAL'S OFFICE
215 N. Sanders
P.O. Box 201401
Helena, MT 59620-1401

**State of Nebraska**
Grant Donald Strobl, Assistant
Attorney General
ATTORNEY GENERAL'S OFFICE
2115 State Capitol
P.O. Box 98920
Lincoln, NE 68509-0000

**State of North Dakota**
Philip J. Axt, Assistant Attorney
General

**State of South Dakota**
Charles David McGuigan
ATTORNEY GENERAL'S OFFICE

25

ATTORNEY GENERAL'S OFFICE
600 E. Boulevard Avenue
Bismarck, ND 58505-0000

Suite 1
1302 E. Highway 14
Pierre, SD 57501-8501

**State of Utah**
Stanford Purser
ATTORNEY GENERAL'S OFFICE
160 E. 300 S.
P.O. Box 140856
Salt Lake City, UT 84114-0857

**American Free Enterprise Chamber of Commerce**
Jonathan Andrew Berry
R. Trent McCotter
BOYDEN & GRAY
Suite 350
801 17th Street, N.W.
Washington, DC 20006

**For Respondent:**

**United States Securities and Exchange Commission**
Megan Barbero
Tracey A. Hardin
John Robert Rady
Daniel Staroselsky
U.S. SECURITIES & EXCHANGE COMMISSION
Office of General Counsel
100 F Street, N.E.
Washington, DC 20549-9040

**United States Securities and Exchange Commission**
Vanessa Countryman
Direct: 202-551-5400
SECURITIES AND EXCHANGE COMMISSION
Office of the Secretary
100 F. Street, N.E.

**For Intervenors**:

**District of Columbia**
Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Arizona**
Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Colorado**
Shayln Kettering
ATTORNEY GENERAL'S OFFICE
10th Floor

**State of Connecticut**
Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100

26

1300 Broadway
Denver, CO 80203

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

400 Sixth Street, N.W.
Washington, DC 20001

Kaelah M. Smith
ATTORNEY GENERAL'S OFFICE
165 Capitol Avenue
Hartford, CT 06115

**State of Delaware**
Vanessa L. Kassab
ATTORNEY GENERAL'S OFFICE
Carvel Building
820 N. French Street
Wilmington, DE 19801-0000

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Hawaii**
Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

Ewan C. Rayner
ATTORNEY GENERAL'S OFFICE
425 Queen Street
Honolulu, HI 96813

**State of Illinois**
Jason E. James
ATTORNEY GENERAL'S OFFICE
Suite 7
201 W. Pointe Drive
Swansea, IL 62226

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Maryland**
Steven J. Goldstein
ATTORNEY GENERAL'S OFFICE
200 St. Paul Place
Baltimore, MD 21202-0000

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Massachusetts**
Michele Ann Hunton
Julia Erica Jonas-Day
Glenn S. Kaplan
ATTORNEY GENERAL'S OFFICE

**State of Michigan**
Michael E. Moody
ATTORNEY GENERAL'S OFFICE
525 W. Ottawa Street
P.O. Box 30212

27

18th Floor
1 Ashburton Place
Boston, MA 02108-0000

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Minnesota**
Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

Peter N. Surdo, Assistant Attorney
General
ATTORNEY GENERAL'S OFFICE
Suite 1400
445 Minnesota Street
Saint Paul, MN 55101-2127

**State of New Mexico**
Aletheia V.P. Allen
William Grantham
ATTORNEY GENERAL'S OFFICE
408 Galisteo Street
Santa Fe, NM 87501

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Oregon**
Paul Garrahan
ATTORNEY GENERAL'S OFFICE

Lansing, MI 48909-0212

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Nevada**
Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

Heidi Parry Stern
ATTORNEY GENERAL'S OFFICE
555 E. Washington
Las Vegas, NV 89101

**State of New York**
Jonathan Bashi
ATTORNEY GENERAL'S OFFICE
Investor Protection Bureau
28 Liberty Street
New York, NY 10005

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Rhode Island**
Alison Carney
ATTORNEY GENERAL'S OFFICE

Appellate Case: 24-1522    Page: 33    Date Filed: 07/08/2024 Entry ID: 5410942

1162 Court Street NE
Salem, OR 97301

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Vermont**
Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

Hannah Yindra
ATTORNEY GENERAL'S OFFICE
109 State Street
Montpelier, VT 05609-0000

**State of Wisconsin**
Bradley J. Motl, Assistant Attorney
General
WISCONSIN DEPARTMENT OF
JUSTICE
Office of the Attorney General
17 W. Main Street
P.O. Box 7857
Madison, WI 53707-7857

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

150 S. Main Street
Providence, RI 02903-0000

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

**State of Washington**
Yuriy Korol, Assistant Attorney
General
ATTORNEY GENERAL'S OFFICE
Environmental Protection Division
Suite 2000
800 Fifth Avenue
Seattle, WA 98104-3188

Ashwin P. Phatak
ATTORNEY GENERAL'S OFFICE
Suite 8100
400 Sixth Street, N.W.
Washington, DC 20001

*/s/ Ivan L. London*

29

Ivan L. London
MOUNTAIN STATES
LEGAL FOUNDATION

*Counsel for Amici Curiae*