No. 24-1522 and all consolidated cases: Nos. 24-1624, 24-1626, 24-1627, 24-1628, 24-1631, 24-1634, 24-1685, and 24-2173

UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

STATE OF IOWA, ET AL.,

*Petitioners*,

v.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Respondent*,

DISTRICT OF COLUMBIA, ET AL.,

*Intervenors*.

On Petitions for Review of an Order of the
Securities and Exchange Commission

CONSOLIDATED BRIEF FOR RESPONDENT
SECURITIES AND EXCHANGE COMMISSION

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
DANIEL STAROSELSKY
Assistant General Counsels

SAMUEL B. GOLDSTEIN
Counsel to the General Counsel

JOHN R. RADY
Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4997 (Rady)
radyjo@sec.gov

*Counsel for Respondent*

# SUMMARY OF THE CASE AND STATEMENT REGARDING ORAL ARGUMENT

These consolidated petitions for review challenge rules adopted by the Securities and Exchange Commission that require issuers of securities to disclose certain information in their registration statements and annual reports about, among other things, climate-related risks that have materially impacted or are reasonably likely to materially impact their business. *See The Enhancement and Standardization of Climate-Related Disclosures for Investors*, Securities Act Release No. 33-11275, Exchange Act Release No. 34-99678 (Mar. 6, 2024), published at 89 Fed. Reg. 21668 (Mar. 28, 2024) (the "Rules"), App. __-__. The Commission promulgated the Rules—which it modified from its proposal to respond to comments and to make the required disclosures more useful to investors and less costly—pursuant to its well-established statutory authority to require the disclosure of information important to investors in making investment and voting decisions.

The Commission believes that oral argument is appropriate and requests 30 minutes per side.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND
STATEMENT REGARDING ORAL ARGUMENT ............................................... i

TABLE OF AUTHORITIES .................................................................................. vi

INTRODUCTION ................................................................................................1

STATEMENT OF ISSUES ...................................................................................4

BACKGROUND ...................................................................................................5

    A.    Congress authorized the Commission to require corporate
        disclosures. .............................................................................5

    B.    The Commission adopted new climate-related disclosure rules. ........12

        1.    The Commission proposed climate-related disclosure
            rules and received significant public comment. .......................12

        2.    The Commission adopted the Rules after considering
            comments and moderating its proposal. ...................................13

            a.    Climate-related risks, their impacts, and oversight ........15

            b.    Targets, goals, processes, and metrics...........................16

            c.    Financial statement effects .............................................17

            d.    GHG emissions information...........................................17

        3.    The Commission analyzed the Rules' economic effects. .........19

    C.    Petitioners sought judicial review.......................................................22

SUMMARY OF ARGUMENT ...........................................................................23

STANDARD OF REVIEW .................................................................................25

Appellate Case: 24-1522    Page: 3    Date Filed: 08/06/2024 Entry ID: 5421154

ARGUMENT ......................................................................................26

I.   The Commission has statutory authority for the climate-related
     disclosure rules. ..........................................................................26

     A.   Congress granted the Commission authority to require
          disclosure of information important to investors'
          investment and voting decisions. .........................................26

     B.   The Commission has statutory authority to promulgate
          each of the Rules. ...............................................................36

     C.   Petitioners' contrary arguments lack merit. ..........................41

          1.   The Rules regulate the securities markets,
               not the environment. ..................................................41

          2.   The Rules require disclosure of information that
               bears on an issuer's financial performance. ...............45

          3.   The Rules' approach to materiality is consistent
               with the Commission's statutory authority. ...............50

     D.   The major questions doctrine does not apply,
          and in any event, the Rules are consistent with that doctrine. ............54

     E.   The Securities Act and the Exchange Act do not violate
          the nondelegation doctrine. .................................................59

II.  The Commission reasonably explained its decision to adopt the Rules. ......62

     A.   The Rules will facilitate informed investment and voting
          decisions by providing more detailed, consistent,
          and comparable information. ................................................63

     B.   Petitioners' criticisms of the Commission's rationale fail. ..................66

          1.   The Commission reasonably explained and substantiated
               the need for the Rules. ...............................................66

          2.   The Commission reasonably analyzed the record evidence. .....69

          3.   The Commission adequately considered reasonable
               alternatives. ...............................................................74

iii

    4.  The Rules are internally consistent. ...........................75

  C.  The Rules apply traditional concepts of materiality. ...........................77

III. The Commission reasonably considered the Rules' economic effects. ........80

  A.  The Commission reasonably considered the Rules' impact on efficiency, competition, and capital formation. ............................81

  B.  The Commission reasonably estimated the costs of the Rules. ...........83

    1.  The Commission reasonably considered varying cost estimates from commenters. ....................................84

    2.  The Commission reasonably accounted for the costs of disclosing material Scopes 1 and 2 GHG emissions. ..............86

    3.  Petitioners' other challenges to the Commission's economic analysis lack merit. ...................................88

IV. The Commission satisfied the APA's procedural requirements. .................92

  A.  The Rules are a logical outgrowth of the proposal. ............................92

  B.  The Commission reasonably relied on supplementary studies in adopting the Rules. ...............................................94

V. The Rules are consistent with the First Amendment. ....................................97

  A.  Commission disclosure rules are generally subject to the lesser scrutiny applicable to commercial speech. ...........................................97

  B.  The lesser scrutiny applicable to commercial disclosures applies to the Rules. .................................................................101

    1.  The Rules require "purely factual" disclosures. ....................101

    2.  The required disclosures are uncontroversial. ........................104

  C.  The Rules satisfy *Zauderer*. .................................................................107

    1.  The disclosure requirements are reasonably related to a legitimate government interest. ...........................................107

Appellate Case: 24-1522  Page: 5  Date Filed: 08/06/2024  Entry ID: 5421154

      2.     The disclosure requirements are not "unjustified or unduly burdensome."........................................................110

    D.    The Rules would survive more exacting scrutiny under *Central Hudson*. ......................................................111

VI.    Petitioners' requested relief is overbroad. ....................................112

CONCLUSION ....................................................................................116

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

Appellate Case: 24-1522    Page: 6    Date Filed: 08/06/2024   Entry ID: 5421154

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935)................................................................61

*A.P. Bell Fish Co., Inc. v. Raimondo*,
    94 F.4th 60 (D.C. Cir. 2024)..............................................113

*Ala. Ass'n of Realtors v. HHS*,
    594 U.S. 758 (2021) (per curiam)......................................55

*Allied Loc. & Reg'l Mfrs. Caucus v. EPA*,
    215 F.3d 61 (D.C. Cir. 2000)..............................................75

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
    934 F.3d 649 (D.C. Cir. 2019)..........................................113

*Am. Beverage Ass'n v. City & Cnty. of S.F.*,
    916 F.3d 749 (9th Cir. 2019) (en banc).............................100

*Am. Hosp. Ass'n v. Azar*,
    983 F.3d 528 (D.C. Cir. 2020)................................. 100, 110

*Am. Meat Inst. v. U.S. Dep't of Agric. (AMI)*,
    760 F.3d 18 (D.C. Cir. 2014) (en banc)............ 98, 101, 108, 109

*Am. Power & Light Co. v. SEC*,
    329 U.S. 90 (1946)..............................................................60

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012)............................................91

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
    591 U.S. 610 (2020)..........................................................114

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
    492 U.S. 469 (1989)................................................. 111, 112

*Bhatti v. Fed. Hous. Fin. Agency*,
    15 F.4th 848 (8th Cir. 2021)..............................................59

vi

*Biden v. Missouri*,
    595 U.S. 87 (2022) (per curiam)..........................................................................56

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023)...................................................... 54, 56, 57, 58

*Biestek v. Berryhill*,
    587 U.S. 97 (2019)..........................................................................26

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ..........................................................103

*Bus. Roundtable v. SEC*,
    905 F.2d 406 (D.C. Cir. 1990)..........................................................29

*Carlson v. Postal Regul. Comm'n*,
    938 F.3d 337 (D.C. Cir. 2019)...................................... 72, 113, 114

*Cent. Hudson Gas & Elec. Corp. v.*
    *Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980)............................................ 5, 25, 100, 101, 111

*Chamber of Com. of U.S. v. SEC*,
    443 F.3d 890 (D.C. Cir. 2006)..........................................................96

*Chamber of Com. of U.S. v. SEC*,
    85 F.4th 760 (5th Cir. 2023) ............... 4, 81, 83, 89, 90, 102, 105, 106, 107, 110

*Chem. Mfrs. Ass'n v. EPA*,
    870 F.2d 177 (5th Cir. 1989),
    *decision clarified on reh'g*,
    885 F.2d 253 (5th Cir. 1989) ..........................................................93

*Cmty. for Creative Non-Violence v. Turner*,
    893 F.2d 1387 (D.C. Cir. 1990)......................................................114

*Competitive Enter. Inst. v. U.S. Dep't of Transp.*,
    863 F.3d 911 (D.C. Cir. 2017)..........................................................96

*CTIA - The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) ...................................... 104, 105, 109

vii

*Department of Commerce v. New York,*
    588 U.S. 752 (2019)................................................................43

*Disc. Tobacco City & Lottery, Inc. v. United States,*
    674 F.3d 509 (6th Cir. 2012) ...........................................107

*Dryer v. National Football League,*
    814 F.3d 938 (8th Cir. 2016) ...........................................101

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021)........................................ 4, 25, 62, 89

*Florida v. HHS,*
    19 F.4th 1271 (11th Cir. 2021) ...........................................58

*Free Speech Coal., Inc. v. Paxton,*
    95 F.4th 263 (5th Cir. 2024),
    *cert. granted*, 2024 WL 3259690 (U.S. July 2, 2024)............................ 100, 105

*Full Value Advisors, LLC v. SEC,*
    633 F.3d 1101 (D.C. Cir. 2011)...........................................99

*Gallagher v. Abbott Lab'ys,*
    269 F.3d 806 (7th Cir. 2001) ...........................................67

*Gundy v. United States,*
    588 U.S. 128 (2019) (plurality opinion) ...................................... 60, 61

*Huawei Techs. USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) ...........................................93

*Inv. Co. Inst. v. CFTC,*
    720 F.3d 370 (D.C. Cir. 2013)...........................................90

*Janus v. AFSCME,*
    585 U.S. 878 (2018)...........................................105

*Lindeen v. SEC,*
    825 F.3d 646 (D.C. Cir. 2016)........................................... 54, 83, 90

viii

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007)......................................................................92

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024)........................... 4, 28, 33, 47, 58, 59

*Lowe v. SEC*,
  472 U.S. 181 (1985)....................................................................106

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.*,
  91 F.4th 238 (4th Cir. 2024) .............................................. 100, 105

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
  559 U.S. 229 (2010)........................................... 97, 98, 110

*Mistretta v. United States*,
  488 U.S. 361 (1989).................................................. 59, 61

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024)........................................... 98, 110

*NAACP v. Fed. Power Comm'n*,
  425 U.S. 662 (1976)................................................... 4, 29

*Nasdaq Stock Mkt. LLC v. SEC*,
  34 F.4th 1105 (D.C. Cir. 2022).................................... 4, 83

*Nat'l Ass'n for Surface Finishing v. EPA*,
  795 F.3d 1 (D.C. Cir. 2015) ...........................................91

*Nat'l Ass'n of Mfrs. v. SEC (NAM)*,
  800 F.3d 518 (D.C. Cir. 2015)................................... 49, 106

*Nat'l Ass'n of Mfrs. v. SEC*,
  105 F.4th 802 (5th Cir. 2024) .....................................114

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*,
  585 U.S. 755 (2018)................................................ 98, 110

*National Association of Private Fund Managers v. SEC*,
  103 F.4th 1097 (5th Cir. 2024) .....................................44

ix

*NetChoice, L.L.C. v. Paxton*,
  49 F.4th 439 (5th Cir. 2022),
  *vacated on other grounds*, 144 S. Ct. 2383 ......................................110

*Ohralik v. Ohio State Bar Ass'n*,
  436 U.S. 447 (1978)......................................................................98

*Omnicare, Inc. v. Laborers Dist. Council
  Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................ 5, 6, 30, 55, 99

*Org. for Competitive Mkts. v. U.S. Dep't of Agric.*,
  912 F.3d 455 (8th Cir. 2018) ......................................................63

*Owner-Operator Indep. Drivers Ass'n, Inc. v.
  Fed. Motor Carrier Safety Admin.*,
  494 F.3d 188 (D.C. Cir. 2007).....................................................95

*Pagel, Inc. v. SEC*,
  803 F.2d 942 (8th Cir. 1986) ......................................................26

*Panama Refin. Co. v. Ryan*,
  293 U.S. 388 (1935)......................................................................61

*Passions Video, Inc. v. Nixon*,
  458 F.3d 837 (8th Cir. 2006) ....................................................111

*R.J. Reynolds Tobacco Co. v. FDA*,
  696 F.3d 1205 (D.C. Cir. 2012),
   *rev'd in part on other grounds*,
  *Am. Meat Inst. v. U.S. Dep't of Agric. (AMI)*,
  760 F.3d 18 (D.C. Cir. 2014) (en banc)...........................................111

*Riley v. Nat'l Fed'n of the Blind*,
  487 U.S. 781 (1988)......................................................................99

*SEC v. Cap. Gains Rsch. Bureau,
  Inc.*, 375 U.S. 180 (1963)...........................................................2, 6

*SEC v. First Am. Bank & Tr. Co.*,
  481 F.2d 673 (8th Cir. 1973) ......................................................30

x

*SEC v. Ralston Purina Co.*,
346 U.S. 119 (1953)..................................................................30

*SEC v. Wall St. Publ'g Inst., Inc.*,
851 F.2d 365 (D.C. Cir. 1988)........................................ 99, 107, 109

*Slack Techs., LLC v. Pirani*,
598 U.S. 759 (2023)....................................................................6

*Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*,
908 F.3d 313 (8th Cir. 2018) .............................................95

*Tcherepnin v. Knight*,
389 U.S. 332 (1967)..................................................................30

*Tex. Med. Ass'n v. HHS*,
No. 23-40217, 2024 WL 3633795 (5th Cir. Aug. 2, 2024)...........113

*United States v. Craft*,
535 U.S. 274 (2002)..................................................................57

*United States v. Custer Channel Wing Corp.*,
376 F.2d 675 (4th Cir. 1967) .............................................31

*United States v. Texas*,
599 U.S. 670 (2023)................................................................113

*United States v. Wenger*,
427 F.3d 840 (10th Cir. 2005) ...................................... 99, 107

*United States v. White*,
97 F.4th 532 (7th Cir. 2024) ..............................................58

*Universal Health Services, Inc. v. United States*,
579 U.S. 176 (2016)........................................................ 53, 54

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748 (1976)..................................................................98

*Van Dyke v. Coburn Enters., Inc.*,
873 F.2d 1094 (8th Cir. 1989) .............................................30

xi

*Vidal v. Elster,*
    602 U.S. 286 (2024)................................................................. 99, 111

*Vistra Corp. v. FERC,*
    80 F.4th 302 (D.C. Cir. 2023).........................................................74

*Voyageurs Nat'l Park Ass'n v. Norton,*
    381 F.3d 759 (8th Cir. 2004) ........................................................25

*Wayman v. Southard,*
    23 U.S. (10 Wheat) 1 (1825).........................................................59

*West Virginia v. EPA,*
    597 U.S. 697 (2022)........................................................... 54, 55, 56

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001)......................................................................60

*Yakus v. United States,*
    321 U.S. 414 (1944).............................................................. 60, 61

*Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio,*
    471 U.S. 626 (1985) ....................................... 5, 25, 98, 100, 104, 107

**Statutes**

2 U.S.C. 1532(a)(4)..............................................................................90

5 U.S.C. 706(2) ....................................................................................25

Securities Act of 1933,
    ch. 38, tit. I, 48 Stat. 74 (15 U.S.C. 77a *et seq.*) ........................... 5, 30

    15 U.S.C. 77b(b) ................................................... 8, 62, 81, 90
    15 U.S.C. 77d................................................................6
    15 U.S.C. 77e................................................................6
    15 U.S.C. 77g........................................................... 6, 26
    15 U.S.C. 77g(a)(1) ........ 2, 4, 6, 23, 27, 29, 31, 32, 36, 41, 48, 53, 55, 58, 61
    15 U.S.C. 77i ............................................................113
    15 U.S.C. 77i(a)..........................................................26
    15 U.S.C. 77k(a)..........................................................53

Appellate Case: 24-1522    Page: 13    Date Filed: 08/06/2024  Entry ID: 5421154

15 U.S.C. 77q(a)(2) .................................................................53
15 U.S.C. 77s(a) .......................................... 4, 8, 28, 39, 61
15 U.S.C. 77aa .......................................... 6, 8, 31, 48, 53

Securities Exchange Act of 1934,
   ch. 404, tit. I, 48 Stat. 881 (15 U.S.C. 78a *et seq.*) .............5

15 U.S.C. 78b .......................................................... 6, 30
15 U.S.C. 78c(f) .......................................... 8, 62, 81, 90
15 U.S.C. 78k-1(a)(1) ...............................................107
15 U.S.C. 78*l* ...........................................................26
15 U.S.C. 78*l*(b) .......................................... 7, 27, 31, 61
15 U.S.C. 78*l*(b)(1) ..... 2, 4, 7, 8, 23, 27, 28, 29, 32, 36, 39, 41, 48, 53, 55, 58
15 U.S.C. 78*l*(g) .......................................... 7, 27, 31
15 U.S.C. 78*l*(g)(1) .......................................... 4, 27, 28
15 U.S.C. 78m .......................................... 7, 26, 27
15 U.S.C. 78m(a) ..................... 4, 7, 27, 28, 29, 31, 32, 36, 41, 53, 55, 58, 61
15 U.S.C. 78m(b) .......................................... 4, 61
15 U.S.C. 78m(b)(1) .......................................... 8, 28, 39
15 U.S.C. 78m(p) .......................................... 49, 106
15 U.S.C. 78n(e) .................................................53
15 U.S.C. 78o(d) .....................................................7
15 U.S.C. 78w(a)(1) .................................................8
15 U.S.C. 78w(a)(2) .......................................... 8, 62, 81
15 U.S.C. 78y ...........................................................113
15 U.S.C. 78y(a)(4) .................................................26
15 U.S.C. 78ff(a) .................................................53

44 U.S.C. 3501 .......................................................87

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ...............................49

**Legislative Materials**

H.R. 2570, 117th Cong. (2021) ...........................................57

H.R. 3623, 116th Cong. (2019) ...........................................57

H.R. Rep. No. 73-1383 (1934) .......................................... 6, 32

Appellate Case: 24-1522   Page: 14   Date Filed: 08/06/2024 Entry ID: 5421154

H.R. Rep. No. 73-85 (1933) ..................................................................6

S. 1217, 117th Cong. (2021) ...............................................................57

S. Rep. No. 73-792 (1934) ..................................................................7

**Regulations**

17 C.F.R. 229.101 ..............................................................................11

17 C.F.R. 229.101(c) ..........................................................................11

17 C.F.R. 229.103 ..............................................................................11

17 C.F.R. 229.103(c)(3) .....................................................................10

17 C.F.R. 229.105 ..............................................................................11

17 C.F.R. 229.303 ..............................................................................11

17 C.F.R. 229.401 ..............................................................................56

17 C.F.R. 229.402 ..............................................................................56

17 C.F.R. 229.407 ..............................................................................56

17 C.F.R. 230.408(a) ..........................................................................67

17 C.F.R. 240.12b-2 ...........................................................................18

17 C.F.R. 240.12b-20 .........................................................................67

**Commission Releases**

*Adoption of Integrated Disclosure System*,
    47 Fed. Reg. 11380 (Mar. 16, 1982)....................................... 10, 34, 48

*Amendments to Annual Report Form,*
    *Related Forms, Rules, Regulations, and Guides*,
    45 Fed. Reg. 63630 (Sept. 25, 1980) ...............................................34

Appellate Case: 24-1522    Page: 15    Date Filed: 08/06/2024 Entry ID: 5421154

*Business and Financial Disclosure Required by Regulation S-K*,
  81 Fed. Reg. 23916 (Apr. 22, 2016) .......................................................9

*Commission Guidance Regarding Disclosure Related to Climate Change*,
  75 Fed. Reg. 6290 (Feb. 8, 2010) ................................................. 11, 36

*Concept Release on Management's Discussion*
  *and Analysis of Financial Condition and Operations*,
  52 Fed. Reg. 13715 (Apr. 24, 1987) ............................................... 9, 34

*Conflict Minerals*,
  77 Fed. Reg. 56274 (Sept. 12, 2012) ...................................................49

*Disclosure with Respect to Compliance with Environmental*
  *Requirements and Other Matters*,
  38 Fed. Reg. 12100 (May 9, 1973) ................................................. 10, 35

*Disclosures Pertaining to Matters Involving*
  *the Environment and Civil Rights*,
  36 Fed. Reg. 13989 (July 29, 1971)......................................... 10, 35, 49

*Environmental and Social Disclosure*,
  40 Fed. Reg. 51656 (Nov. 6, 1975) ................................... 9, 35, 44, 45

Exchange Act Release No. 66,
  1934 WL 28615 (Dec. 21, 1934) ........................................... 9, 33, 55

*Guides for the Preparation and*
  *Filing of Registration Statements*,
  33 Fed. Reg. 18617 (Dec. 17, 1968)...................................................34

*Management's Discussion and Analysis, Selected Financial Data,*
  *and Supplementary Financial Information*,
  86 Fed. Reg. 2080 (Jan. 11, 2021)......................................................80

*Modernization of Regulation S-K Items 101, 103, and 105*,
  85 Fed. Reg. 63726 (Oct. 8, 2020) .......................................................9

*Proxy Disclosure Enhancements*,
  74 Fed. Reg. 68334 (Dec. 23, 2009)........................................... 34, 56

Appellate Case: 24-1522     Page: 16     Date Filed: 08/06/2024 Entry ID: 5421154

Securities Act Release No. 33-5, 1933 WL 28819 (July 3, 1933)...........................33

## Other Authorities

Bernard J. Kilbride,
*The British Heritage of Securities Legislation in the United States*,
17 Sw. L.J. 258 (1963).......................................................................................100

GSA and OMB, *Creating a Supporting Statement Part A*,
https://pra.digital.gov/uploads/supporting-statement-a-instructions.pdf............87

Louis Loss,
Fundamentals of Securities Regulation (3d ed. 1983)........................................54

Patrick Bolton et al.,
*The Financial Cost of Carbon*,
34 J. Applied Corp. Fin. 17 (June 2022). ............................................................74

## INTRODUCTION

Consistent with other longstanding requirements under the securities laws, the rules challenged here elicit disclosure of factual information directly relevant to the value of investments in public companies. Disclosure of information about a company's business, operations, and financial performance enables investors to better understand the value and risks of an investment and goes to the heart of how investors value securities. As with other risks, climate-related risks—and a public company's response to those risks—can significantly affect a company's financial performance and position. To the extent currently available information allows, many investors already incorporate information about climate-related risks into investment and voting decisions. And while many companies already make disclosures regarding these risks, existing disclosures are inconsistent, difficult to compare, and often boilerplate.

Recognizing these realities, the Securities and Exchange Commission adopted rules that require issuers of securities to disclose certain climate-related information, including risks that have materially impacted, or are reasonably likely to materially impact, the company. These disclosures will address inadequacies of existing climate-related disclosures and assist investors in making more informed decisions regarding securities in their portfolio. In challenging these rules,

petitioners attack a strawman. This case is not about climate change or environmental policy; it is about protecting investors.

Requiring disclosure of climate-related risks furthers a fundamental purpose of the securities laws—"to substitute a philosophy of full disclosure for the philosophy of caveat emptor." *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186 (1963). When Congress enacted the Securities Act of 1933 and the Securities Exchange Act of 1934 in the wake of the Great Depression, it did not impose government regulation of the merits of investments. Nor did it rely exclusively on antifraud enforcement authority to protect investors and police the markets. Instead, Congress enacted a disclosure-based regime, concluding that if investors have full and fair disclosure of decision-useful information, they would be able to protect their financial interests and simultaneously promote efficiency and capital formation in the securities markets. Congress thus gave the Commission express statutory authority to require disclosure as "necessary or appropriate in the public interest or for the protection of investors." *E.g.*, 15 U.S.C. 77g(a)(1), 78*l*(b)(1). Consistent with 90 years of disclosure-based regulation, the Commission exercised that and other rulemaking authority to promulgate the climate-related risk disclosure rules (the "Rules").

The Commission's authority to promulgate disclosure rules when the record demonstrates that investors are not receiving the information they need to make

2

informed investment and voting decisions is well-established. The Commission has done so since its inception, requiring disclosure of litigation that may materially impact the value of a security in the 1930s and addressing disclosure of risks facing an issuer's business in the 1960s. Since the early 1970s, the Commission has specifically required disclosure of certain environmental matters when the information would be important to a reasonable investor. And over the past 50 years, the Commission has considered various proposals for additional environmental and climate-related disclosures and has issued guidance addressing how existing disclosure rules apply to such information.

The proposed rules were subjected to a rigorous notice-and-comment process, which resulted in an unprecedented response from commenters and confirmed that existing rules were inadequate to protect investors. The Commission designed the final Rules to address commenters' concerns, modifying its proposal to make the required disclosures more useful to investors and less costly. Among other things, the Commission added materiality qualifiers, limiting most of the disclosures to circumstances in which the issuer determines—based on its own circumstances—that there is a substantial likelihood that a reasonable investor would consider the information important to their investment and voting decisions. The Commission also pared back the disclosures required in an issuer's financial statements and significantly reduced the required greenhouse gas

3

("GHG") emissions disclosures, adding an express materiality qualifier and eliminating the disclosures commenters identified as the most costly and difficult to ascertain—"Scope 3" disclosures.

Finally, the Rules are consistent with the First Amendment. Sidestepping the facts, petitioners contend that the Rules require issuers to offer their opinions about climate change. Instead, the Rules require issuers to disclose factual information about particular risks to their business. Such disclosure requirements have long coexisted with the First Amendment.

## STATEMENT OF ISSUES

1.     Whether the Commission has statutory authority to adopt each of the Rules.

Apposite authority:  15 U.S.C. 77g(a)(1), 77s(a), 78*l*(b)(1), 78*l*(g)(1), 78m(a)-(b); *NAACP v. Fed. Power Comm'n*, 425 U.S. 662 (1976); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

2.     Whether the Commission acted reasonably in adopting each of the Rules, reasonably assessed the Rules' economic effects, and satisfied the APA's procedural requirements.

Apposite authority:  *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021); *Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105 (D.C. Cir. 2022); *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760 (5th Cir. 2023).

4

3. Whether each of the Rules is consistent with the First Amendment.

Apposite authority: *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626 (1985); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).

## BACKGROUND

### A. Congress authorized the Commission to require corporate disclosures.

1. In the wake of the 1929 stock market crash, Congress passed the Securities Act of 1933 ("Securities Act"), ch. 38, tit. I, 48 Stat. 74 (15 U.S.C. 77a *et seq.*), which concerns the process through which securities are initially offered to the public and seeks, among other things, to "provide full and fair disclosure of the character of securities sold in interstate and foreign commerce." 48 Stat. at 74. The Act "protects investors by ensuring that companies issuing securities (known as 'issuers') make a 'full and fair disclosure of information' relevant to a public offering." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015).

The following year, Congress passed the Securities Exchange Act of 1934 ("Exchange Act"), ch. 404, tit. I, 48 Stat. 881 (15 U.S.C. 78a *et seq.*), which provides for the regulation of "securities exchanges and of over-the-counter markets," 48 Stat. at 881, and seeks "to insure the maintenance of fair and honest markets in [securities] transactions," including through "requir[ing] appropriate

5

reports." 15 U.S.C. 78b. Among other things, the Act "requires publicly traded companies to provide ongoing disclosures and regulates trading on secondary markets." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 763 (2023) (citing, *e.g.*, 15 U.S.C. 78m, 78o). Together, the Securities Act and the Exchange Act "form the backbone of American securities law," *id.* at 762, and implement "a philosophy of full disclosure," *Capital Gains*, 375 U.S. at 186; H.R. Rep. No. 73-1383, at 11 (1934) ("[T]he hiding and secreting of important information obstructs the operation of the markets as indices of real value. There cannot be honest markets without honest publicity.").

"The linchpin of the [Securities] Act is its registration requirement," *Omnicare*, 575 U.S. at 178, which requires companies seeking to access the public markets (with limited exceptions) to file a registration statement in which they disclose information about the company and the security for sale. 15 U.S.C. 77d, 77e, 77g; *see* H.R. Rep. No. 73-85, at 3 (1933) (describing a "principal purpose" of the Securities Act as "[a]n insistence that there should be full disclosure of every essentially important element attending the issue of a new security"). Congress enumerated certain required disclosures in Schedule A of the Securities Act, 15 U.S.C. 77aa. In addition, the registration statement must include "such other information" "as the Commission may … require as being necessary or appropriate in the public interest or for the protection of investors." *Id.* 77g(a)(1).

6

The Exchange Act requires covered issuers to register their securities with the Commission and make periodic disclosures.  15 U.S.C. 78*l*(b) & (g), 78m, 78o(d).  Exchange Act registration statements must contain "[s]uch information, in such detail … as the Commission may by rules and regulations require, as necessary or appropriate in the public interest or for the protection of investors, in respect of" a number of topics—such as the "organization, financial structure, and nature of the business," the issuer's "directors, officers, and underwriters," and "material contracts."  15 U.S.C. 78*l*(b)(1)(A), (D), (I).  Issuers of securities registered under the Exchange Act must also file, "in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security," (1) information to keep registration statements filed under the Exchange Act "reasonably current" and (2) such annual and quarterly reports "as the Commission may prescribe."  15 U.S.C. 78m(a); *see* S. Rep. No. 73-792, at 10 (1934) ("[A] condition of … registration [on an exchange] shall be the furnishing of complete information relative to the financial condition of the issuer, which information shall be kept up to date by adequate periodic reports.").

Both the Securities Act and the Exchange Act also authorize the Commission to adopt rules governing the disclosure of financial data through an issuer's financial statements.  Schedule A of the Securities Act requires disclosure

7

of a "balance sheet" and "a profit and loss statement … in such detail and such form as the Commission shall prescribe."  15 U.S.C. 77aa(25)-(26).  Exchange Act registration statements must disclose "balance sheets" and "profit and loss statements," along with "any further financial statements which the Commission may deem necessary or appropriate for the protection of investors."  15 U.S.C. 78*l*(b)(1)(J)-(L).  Both Acts also grant the Commission the authority to engage in rulemaking "as may be necessary to carry out" the Acts, including by "defining accounting, technical, and trade terms" as well as prescribing "the items or details to be shown in the balance sheet and earning statement."  15 U.S.C. 77s(a); *see id.* 78m(b)(1), 78w(a)(1).

Finally, whenever the Commission engages in rulemaking under the Acts and must consider whether the action is necessary or appropriate in the public interest, the Commission must also consider "whether the action will promote efficiency, competition, and capital formation."  15 U.S.C. 77b(b), 78c(f).  And the Commission must not adopt any rule or regulation that imposes "a burden on competition not necessary or appropriate in furtherance of [the Exchange Act]." 15 U.S.C. 78w(a)(2).

2.    Since its inception, the Commission has interpreted these provisions to authorize it to require disclosure of information important to investors' decisions whether and how to invest and vote the securities they hold.  *See*, *e.g.*, Exchange

8

Act Release No. 66, 1934 WL 28615, at *2 (Dec. 21, 1934) (Commission requiring disclosure of "factors which might [a]ffect the value of its securities in the open market"). For more than 90 years, the Commission has considered developments in the markets and amended disclosure requirements to ensure full and fair disclosure. *See, e.g.*, *Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23916, 23971 (Apr. 22, 2016) ("[T]he task of identifying what information is material to an investment and voting decision is a continuing one in the field of securities regulation."); *Concept Release on Management's Discussion and Analysis of Financial Condition and Operations*, 52 Fed. Reg. 13715, 13716 (Apr. 24, 1987) (changes made in 1980 "foster disclosure" regarding risks from "[h]igh interest rates and inflation"). In doing so, the Commission has weighed the importance of information to investor decision-making against the burdens on issuers and the risk that too much disclosure will obscure important information. 81 Fed. Reg. at 23919; *Modernization of Regulation S-K Items 101, 103, and 105*, 85 Fed. Reg. 63726, 63726-27 (Oct. 8, 2020); *Environmental and Social Disclosure*, 40 Fed. Reg. 51656, 51660 (Nov. 6, 1975).

The Commission has built on Congress's enumerated disclosures and developed "integrated" systems for disclosure for Securities Act registration statements and Exchange Act registration statements and periodic reports. 81 Fed. Reg. at 23918. These requirements have for decades included disclosure of certain

environmental matters, recognizing that "environmental issues can impact a company's business and its financial performance" in a "number of ways."  App. __[89FR21685] (discussing requirements).

For example, the Commission issued an interpretive release in 1971 explaining that issuers should consider disclosing the financial impact of compliance with environmental laws when material.  *Disclosures Pertaining to Matters Involving the Environment and Civil Rights*, 36 Fed. Reg. 13989 (July 29, 1971).  And in 1973, the Commission adopted rules requiring disclosures of the material effects of compliance with environmental laws, judicial or administrative proceedings involving environmental laws that are material, and any such proceedings brought by a governmental authority.  *Disclosure with Respect to Compliance with Environmental Requirements and Other Matters*, 38 Fed. Reg. 12100 (May 9, 1973); *see Adoption of Integrated Disclosure System*, 47 Fed. Reg. 11380 (Mar. 16, 1982) (amending 1973 rules); 17 C.F.R. 229.103(c)(3) (current requirements relating to environmental proceedings).  Similarly, in 1975, the Commission clarified that, while it did not interpret the securities laws to authorize it to require disclosures "for the sole purpose of promoting social goals," disclosure relating to environmental and other matters of social concern could be required when the information is "important to the reasonable investor."  40 Fed. Reg. at 51658-60.

More recently, the Commission published guidance (the "2010 Guidance") explaining how the Commission's existing disclosure rules "apply to climate change matters." *Commission Guidance Regarding Disclosure Related to Climate Change*, 75 Fed. Reg. 6290, 6290 (Feb. 8, 2010). As the Commission explained, "[f]or some companies," regulatory, legislative, and other developments related to climate change "could have a significant effect on operating and financial decisions." *Id.* at 6291. And the Commission discussed how existing disclosure requirements, such as the issuer's description of its business, legal proceedings, risk factors, and management's discussion and analysis, might apply to climate change issues. *Id.* at 6293-97; *see* 17 C.F.R. 229.101, 229.103, 229.105, 229.303. The Commission further stated that it would monitor the impact of its guidance on company filings and consider whether further guidance or rulemaking was appropriate. 75 Fed. Reg. at 6297. And in 2020, the Commission amended its disclosure rules to require, to the extent material to an understanding of the business taken as a whole, disclosure of the material effects that compliance with government regulations, including environmental regulations, may have upon the capital expenditures, earnings, and competitive position of the issuer and its subsidiaries. 17 C.F.R. 229.101(c)(2)(i); *see* 85 Fed. Reg. 63726.

11

### B. The Commission adopted new climate-related disclosure rules.

#### 1. The Commission proposed climate-related disclosure rules and received significant public comment.

In March 2022, the Commission proposed rules to enhance and standardize climate-related disclosures. *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21334 (Apr. 11, 2022), App. __-__.  In general terms, the proposed rules would have required issuers to disclose information regarding (a) the impacts of climate-related risks on the issuer and the issuer's oversight of those risks, (b) climate-related targets, goals, and other processes and metrics, (c) the impact of severe weather events and other natural conditions, physical risks, and transition activities, in the issuer's financial statements, and (d) GHG emissions, including emissions that occur from sources owned or controlled by the issuer ("Scope 1" emissions) or primarily result from the generation of electricity purchased and consumed by the issuer ("Scope 2" emissions), as well as (in some circumstances) other indirect emissions not accounted for in Scope 2 emissions ("Scope 3" emissions), but only if the Scope 3 emissions are material or the issuer has set a target or goal that includes them. App. __-__[87FR21345-46] (summary).

In response, the Commission received a record number of comments expressing a range of views.  App. __-__[89FR21670-71].

12

### 2. The Commission adopted the Rules after considering comments and moderating its proposal.

After reviewing comments, the Commission modified the Rules from the proposal "to reduce the likelihood that the final rules result in disclosures that could be less useful for investors and costly for registrants to produce." App. __[89FR21680]; *see* App. __[89FR21671]. The Commission explained that "[t]he importance of climate-related disclosures for investors has grown" as market participants "have recognized that climate-related risks can affect a company's business and its current and longer-term financial performance and position in numerous ways." App. __-__[89FR21671-72]; *see* App. __[89FR21677] (citing comments). For example, climate-related natural disasters can damage assets; market-based transitions to lower carbon products, practices, and services can lead to "material changes in a company's business model or strategy"; and "changes in law, regulation, or policy may prompt companies to transition to lower carbon products, practices, and services." App. __[89FR21672].

A number of comments—as well as the staff's review of existing disclosures—indicated that, despite the growing importance of such information to investors and "an increase in climate-related information being provided by some companies since the Commission issued its 2010 Guidance," "there is a need to improve the consistency, comparability, and reliability of climate-related disclosures." App. __ & n.135[89FR21679]; *see* App. __ & nn.102-

13

03[89FR21677]; App. __-__[89FR21835-41]. The Commission observed that "investors have increasingly sought information from registrants about the actual and potential impacts of climate-related risks on their financial performance or position," App. __ & n.137[89FR21679], and that both institutional and retail investors have "found much of the voluntary climate-related reporting to be lacking in quality and completeness and difficult to compare." App. __ & nn.138-39[89FR21680]. As a result, investors have "incurred costs and inefficiencies when attempting to assess climate-related risks and their effect on the valuation of a registrant's securities." App. __[89FR21680]. Thus, the Commission adopted the Rules as modified "so that investors will have the information they need to make informed investment and voting decisions by evaluating a registrant's exposure to material climate-related risks." App. __[89FR21680].

As discussed below, the Rules amend both Regulation S-K, relating to non-financial statement disclosures, and Regulation S-X, relating to issuers' financial statements.[1] The Rules focus on factual disclosure of known, existing, or reasonably likely material impacts from climate-related risks and the issuer's current approach, if any, to assessing or managing those risks. They define climate-related risks as "the actual or potential negative impacts of climate-

---

[1] The forms where this information is required include Form S-1 (Securities Act registration statement), Form 10 (Exchange Act registration statement), and Form 10-K (Exchange Act annual report). *See* App. __-__[89FR21920-21].

14

conditions and events on [an issuer's] business, results of operations, or financial condition," and include both "physical risks" and "transition risks." App. __[89FR21914] (Item 1500).

### a. Climate-related risks, their impacts, and oversight

Pursuant to newly adopted Item 1502 in Regulation S-K, issuers must identify climate-related risks that have materially impacted or are reasonably likely to have a material impact on the issuer, App. __[89FR21915] (Item 1502(a)), and must discuss the actual and potential material impacts of these identified risks, App. __[89FR21915] (Item 1502(b), (d)).

In addition, pursuant to Items 1501 and 1503 in Regulation S-K, issuers must make certain disclosures about their oversight and management of climate-related risks. *If* an issuer has processes for identifying, assessing, and managing material climate-related risks, the issuer must disclose those processes and whether and how they have been integrated into the issuer's overall risk management program. App. __[89FR21915-16] (Item 1503(a)-(b); *see* Item 1502(c)). And *if* the board of directors plays a role in overseeing climate-related risks or management plays a role in assessing and managing material climate-related risks, issuers must describe those roles. App. __[89FR21915] (Item 1501(a)-(b)). The Rules do not require issuers to engage in any such oversight or management, and no disclosure is required of issuers that do not do so. App. __-__[89FR21712-13].

15

### b. Targets, goals, processes, and metrics

The Rules require additional disclosures from those issuers—and only those issuers—who have set climate-related targets or goals or use certain processes or metrics to assess or manage climate-related risks. *If* an issuer uses a climate-related target or goal, and *if* that target or goal has materially affected or is reasonably likely to materially affect the issuer's business, results of operations, or financial condition, *then* the issuer must disclose that target or goal. App. __[89FR21916] (Item 1504(a)-(b)). The issuer must also disclose any progress made toward the target or goal and how such progress was achieved. App. __[89FR21916] (Item 1504(c)). The Rules do not require any issuers to set any targets or goals.

Similarly, *if* an issuer has adopted or uses transition plans, scenario analysis, or internal carbon prices to manage or assess the impact of material climate-related and transition risks, *then* it must disclose certain information about those tools and their use. App. __-__[89FR21915-16] (Item 1502(e)-(g)). But the Rules do not prescribe their use and do not require disclosures from issuers who do not use these tools. App. __, __, __-__[89FR21703,21707,21709-10].[2]

---

[2] The Rules also clarify that disclosures regarding transition plans, scenario analysis, internal carbon pricing, and targets and goals, other than disclosures of historical facts, are covered by a safe harbor from private liability under the Securities Act and Exchange Act. App. __-__[89FR21918-19] (Item 1507).

16

### c.  Financial statement effects

The Commission amended Regulation S-X to require certain disclosures in issuer's financial statements regarding the financial effects of severe weather events and other natural conditions—for example, hurricanes, tornadoes, flooding, drought, wildfires, extreme temperatures, and sea level rise.  App. __-__[89FR21912-13] (Rules 14-01 and 14-02).  Issuers must include in their required financial statements disclosure of the capitalized costs, expenditures expensed, charges, and losses incurred as a result of severe weather events and other natural conditions, *if* the aggregated amounts are greater than applicable 1% and dollar amount thresholds.  App. __[89FR21913] (Rule 14-02).[3]  Issuers must also describe how any estimates or assumptions used to produce their financial statements were materially impacted by these events and conditions.  App. __[89FR21913] (Rule 14-02(h)).

### d.  GHG emissions information

Under Item 1505 of Regulation S-K, certain types of large issuers must make disclosures about their GHG emissions, but *only if* those emissions are

---

[3] In addition, *if* the issuer discloses a climate-related target or goal, and *if* the issuer uses carbon offsets or renewable energy credits as a material component to achieve that goal, *then* the registrant must disclose costs, expenditures, and losses related to those offsets and credits.  App. __[89FR21913] (Rule 14-02(e)).  Outside of the audited financial statements, issuers must also make additional disclosures about these credits or offsets.  App. __[89FR21916] (Item 1504(d)).

17

material to investors, as governed by traditional notions of materiality: disclosure of emissions is required only when a reasonable investor would consider the emissions information important in making an investment or voting determination. Emissions disclosure is *not* triggered simply because an issuer has a large amount of emissions. The Commission also limited disclosures of GHG emissions to only Scopes 1 and 2, but *not* Scope 3, emissions. App. __-__[89FR21732-33]. These disclosures must be made by issuers that are a "large accelerated filer" or an "accelerated filer" that is not a "smaller reporting company" or an "emerging growth company," *see* 17 C.F.R. 240.12b-2. If an issuer is required to disclose GHG emissions, the issuer must also describe the methodology, significant inputs, and significant assumptions they use to calculate those GHG emissions. App. __-__[89FR21916-17] (Item 1505(a)-(b)). And if an issuer is required to disclose its GHG emissions, it must include an attestation report covering this disclosure beginning three fiscal years after it is required to disclose these emissions. App. __-__[89FR21917-18] (Item 1506).

*      *      *

As adopted, the Rules generally take a "less prescriptive approach" than had been proposed; expressly qualify many of the disclosures "based on materiality"; adopt less detailed financial statement disclosures; and limit emissions disclosures to only the Scopes 1 and 2 emissions of certain large issuers, and only if those

18

emissions are material to investors.  *See* App. __[89FR21675] (summary of changes from proposed rules).  The Commission recognized the burdens of the disclosures, but it found that "those burdens are justified by the informational benefits of the disclosures to investors."  App. __[89FR21671].  The Commission adopted the Rules to "advance … investor protection, market efficiency and capital formation objectives," and it emphasized that it "has been and remains agnostic about whether or how registrants consider or manage climate-related risks."  App. __[89FR21671].  Rather, it adopted the Rules to provide investors with information important to their investment and voting decisions—information that investors said they need to value securities they hold or are considering purchasing.  App. __[89FR21671].

### 3.    The Commission analyzed the Rules' economic effects.

The Commission was "mindful of the economic effects that may result from the final rules" and carefully considered both the benefits and costs of the Rules, including their effect on efficiency, competition, and capital formation.  App. __[89FR21829].  The Commission quantified the economic effects of the Rules where practicable and otherwise performed a qualitative analysis.  App. __-__[89FR21829-30].

The Commission pointed to the benefits of the Rules in providing "investors with more consistent, comparable, and reliable disclosures with respect to" the

information covered by the Rules, "which will enable investors to make more informed investment and voting decisions." App. __[89FR21830]. The importance of the information to investor decision-making was demonstrated by multiple types of evidence, including "[a]cademic literature show[ing] a well-established link between climate-related risks and firm fundamentals." App. __ & n.2737[89FR21848]; *see* App. __-__ nn.2738-46[89FR21848-49]. Comments also "indicate[d] that there is broad support from investors for more reliable, consistent, and comparable information on how climate-related risks can impact companies' operations and financial conditions." App. __[89FR21846]; *see* App. __, __ & nn.2728-29[89FR21677,21847]. That support was confirmed by results from multiple surveys and evidence in academic studies. App. __-__ & nn.2720-21[89FR21846-47].

The Commission found that requiring issuers to provide climate-related information in a more standardized format in Commission filings would "mitigate the challenges that investors currently confront in obtaining consistent, comparable, and reliable information, assessing the nature and extent of the climate-related risks faced by registrants and their impact on registrants' business operations and financial condition, and making comparisons across registrants." App. __[89FR21830]. It would also reduce "information asymmetry between investors and registrants, which can reduce investors' uncertainty about estimated

20

future cash flows," and "contribute[] to a lowering of the risk premium that investors demand and therefore registrants' cost of capital." App. __[89FR21830]. The Rules would also reduce information asymmetry among investors and enable climate-related information to be more fully incorporated into securities prices. App. __[89FR21830]. The Commission concluded that, "[t]aken together, the final rules are expected to promote investor protection, the efficient allocation of capital, and, for some registrants, capital formation." App. __[89FR21830].

The Commission acknowledged that the Rules "will impose additional costs on registrants, investors, and other parties." App. __[89FR21830]. Issuers would face increased compliance burdens, which would vary "based on a registrant's filer status, existing climate-related disclosure practices (if any), and other characteristics." App. __[89FR21830]. The Commission noted that it had modified the Rules from the proposal to "reduce overall costs and help address commenters' concerns about the time and resources required to comply with the final rules' requirements." App. __ & n.2759[89FR21850]. The Commission then estimated the cost of compliance separately for a number of the provisions in the Rules, emphasizing "that there could be a considerable range in actual compliance costs given that not all costs" will apply "to all registrants or during all measurement periods." App. __[89FR21875]; *see generally* App. __-__[89FR21850-87].

21

### C. Petitioners sought judicial review.

The Commission adopted the Rules on March 6, 2024, by a 3-2 vote. Within ten days, nine petitions for review were filed in various courts of appeals. On March 21, 2024, those petitions were consolidated in this Court under 28 U.S.C. 2112. Consolidation Order, ECF 5376308, *Iowa v. SEC*, No. 24-1522 (8th Cir. Mar. 21, 2024). Additional petitions have since been transferred to this Court and included in the consolidated proceedings. *Nat'l Legal & Policy Ctr. v. SEC*, No. 24-1685 (8th Cir. Apr. 1, 2024); *Nat'l Ctr. for Pub. Policy Res. v. SEC*, No. 24-2173 (8th Cir. June 10, 2024).

On April 4, the Commission stayed the Rules "pending the completion of judicial review of the consolidated Eighth Circuit petitions" to "facilitate the orderly judicial resolution" of challenges to the Rules and avoid "potential regulatory uncertainty." Order Issuing Stay, ECF 5380534-2, at 2-3, *Iowa v. SEC*, No. 24-1522 (8th Cir. Apr. 4, 2024); *see* 15 U.S.C. 78y(c)(2); 5 U.S.C. 705.[4]

---

[4] After the Commission issued the stay, petitioners in all but one case withdrew their previously filed stay motions. Letter, ECF 5381875, *Chamber of Com. v. SEC*, No. 24-1628 (8th Cir. Apr. 9, 2024). The petitioners in the remaining case conceded that the Commission's stay made it unnecessary to decide their motion. Letter, ECF 5381450, *Liberty Energy Inc. v. SEC*, No. 24-1624 (8th Cir. Apr. 8, 2024).

## SUMMARY OF ARGUMENT

The Commission has statutory authority to adopt each of the Rules.  In the Securities Act and the Exchange Act, Congress expressly delegated to the Commission authority to require disclosure of not only certain enumerated information, but also "such other information" as the Commission determines to be "necessary or appropriate in the public interest or for the protection of investors." *E.g.*, 15 U.S.C. 77g(a)(1), 78*l*(b)(1).  Properly interpreted, those provisions authorize the Commission to require disclosure of information that protects investors by facilitating informed investment and voting decisions—particularly information that helps investors assess the value and risks of an investment.  Over 90 years, the Commission has required disclosures in accordance with this understanding of its authority.  The Rules are consistent with both the statutes and this longstanding interpretation.

Each of the Rules requires disclosure of information either about business and financial risks a company has faced (or is reasonably likely to face) or about actions the company has taken in response to those risks.  The disclosures thus inform investors about a company's business, operations, and financial performance, enabling them to better understand the value and risks of an investment in the company.  Contrary to petitioners' arguments, the Commission promulgated the Rules not to influence companies' approaches to climate-related

23

risks or to protect the environment, but to advance traditional securities-law objectives of facilitating informed investment and voting decisions. For similar reasons, petitioners' invocations of the major questions doctrine and the nondelegation doctrine are unavailing.

The Commission satisfied the APA and other applicable requirements in adopting the Rules. The Commission reasonably explained and substantiated the need for the Rules. Based on an extensive evidentiary record, the Commission found both that information about climate-related risks is important to investors because such risks affect companies' operations and financial performance and that the information companies currently provide is insufficiently detailed, comparable, and reliable to meet investors' needs. The Commission also reasonably analyzed the Rules' economic effects, properly assessing the Rules' likely costs and benefits and considering their likely effects on efficiency, competition, and capital formation. And the Commission satisfied the APA's procedural requirements, including by providing the public with a meaningful opportunity to participate in the rulemaking process and providing adequate notice of the factual basis for the Rules.

The Rules comport with the First Amendment. Disclosures in the commercial context—and pursuant to securities regulations in particular—are subject to limited First Amendment scrutiny. Because each of the Rules requires

24

disclosure of purely factual and uncontroversial information about business and financial risks or actions the company has taken in response to such risks, they are subject to review under *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985). Each of the required disclosures passes muster under that level of scrutiny—or even under the intermediate-scrutiny standard for commercial speech under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). The information is important for investors to make informed judgments about the value and risks of an investment in a company, and requiring disclosure of that information directly advances the Commission's well-established interest in investor protection.

## STANDARD OF REVIEW

Agency action may be set aside under the Administrative Procedure Act if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or in "excess of statutory … authority." 5 U.S.C. 706(2)(A), (C).

Review under the APA's arbitrary-and-capricious standard is "deferential," and "[a] court simply ensures that the agency … has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "If an agency's determination is supportable on any rational basis," a reviewing court "must uphold it." *Voyageurs Nat'l Park Ass'n v. Norton*, 381 F.3d 759, 763 (8th Cir. 2004).

25

"The findings of the Commission as to the facts, if supported by substantial evidence, are conclusive." 15 U.S.C. 78y(a)(4); *see id.* 77i(a); *Pagel, Inc. v. SEC*, 803 F.2d 942, 945 (8th Cir. 1986). This evidentiary threshold "is not high," but means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

## ARGUMENT

### I. The Commission has statutory authority for the climate-related disclosure rules.

Each provision of the Rules falls within the Commission's statutory authority and is consistent with the Commission's decades of practice exercising its delegated rulemaking authority. Petitioners' contrary arguments misapprehend the relevant statutes and mischaracterize the Rules.

#### A. Congress granted the Commission authority to require disclosure of information important to investors' investment and voting decisions.

1. The Commission promulgated the Rules under Section 7 of the Securities Act, 15 U.S.C. 77g, and Sections 12 and 13 of the Exchange Act, 15 U.S.C. 78*l*, 78m, among other provisions of those statutes. App. __[89FR21912]; *see* App. __[89FR21683]. Section 7(a)(1) of the Securities Act, which governs the "[i]nformation required in [a] registration statement," provides that "[t]he registration statement" for most issuers "shall contain the information, and be accompanied by the documents, specified in Schedule A of section 77aa" of the

26

Securities Act. 15 U.S.C. 77g(a)(1). In addition to the enumerated information, Congress provided that "[a]ny such registration statement shall contain such other information, and be accompanied by such other documents, as the Commission may by rules or regulations require as being necessary or appropriate in the public interest or for the protection of investors." *Id.* Section 7(a)(1) of the Securities Act thus authorizes the Commission to require disclosure of information that the Commission determines is "necessary or appropriate" either "in the public interest" or "for the protection of investors." *Id.*

Sections 12(b), 12(g), and 13 of the Exchange Act similarly govern the information in registration statements and periodic reports filed under that statute. *Id.* 78*l*(b), (g), 78m. Exchange Act registration statements "shall contain … [s]uch information, in such detail … as the Commission may by rules and regulations require, as necessary or appropriate in the public interest or for the protection of investors, in respect of" certain enumerated categories of information, such as "the organization, financial structure, and nature of the business." *Id.* 78*l*(b)(1)(A), (g)(1) (cross-referencing subsection (b)'s requirements); *see id.* 78m(a) (authorizing the Commission to require annual and quarterly reports "as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security"). Thus, like Section 7(a)(1) of the Securities Act, Sections 12(b) and (g) of the Exchange Act authorize the

Appellate Case: 24-1522    Page: 44    Date Filed: 08/06/2024 Entry ID: 5421154

Commission to require disclosure of certain information that the Commission determines is "necessary or appropriate" either "in the public interest" or "for the protection of investors." *Id.* 78*l*(b)(1), (g)(1); *see id.* 78m(a) ("for the proper protection of investors and to insure fair dealing in the security").

Further, Congress delegated to the Commission authority to prescribe the form and content of financial statements filed with the Commission. Section 19 of the Securities Act and Section 13 of the Exchange Act authorize the Commission to "prescribe … the items or details to be shown in the balance sheet and earning statement" and the "methods to be followed in the preparation of" accounts in registration statements and reports filed under those statutes. *Id.* 77s(a), 78m(b)(1). And Section 12 of the Exchange Act provides that the Commission may require disclosure of not only "balance sheets" and "profit and loss statements," but also "any further financial statements which the Commission may deem necessary or appropriate for the protection of investors." *Id.* 78*l*(b)(1)(J)-(L).

Each of these statutory authorities thus "expressly delegate[s]" to the Commission "discretionary authority" both to "fill up the details of a statutory scheme" and to "regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024); *see id.* at 2263 n.6 (listing "appropriate and necessary" and for the "protection of public health" as examples of such phrases). In particular, these

28

provisions authorize the Commission to require disclosure of information that the Commission determines is "necessary or appropriate" in "the public interest" or for the "protection of investors."  15 U.S.C. 77g(a)(1), 78*l*(b)(1); *see id.* 78m(a).

Under longstanding principles of statutory construction, phrases such as the "protection of investors" are interpreted in light of Congress's objectives in enacting the relevant statute.  The D.C. Circuit has looked to "the purposes Congress had in mind when it enacted [the] legislation" when interpreting an Exchange Act provision that required the Commission to consider whether certain actions would "protect investors and the public interest."  *Bus. Roundtable v. SEC*, 905 F.2d 406, 413 (D.C. Cir. 1990).  The Supreme Court has similarly recognized that the term "public interest" "take[s] meaning from the purposes of the regulatory legislation."  *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976).  Thus, "in order to give content and meaning" to that phrase, courts must "look to the purposes for which the [statutes] were adopted."  *Id.*

As relevant here, the purposes of the Securities Act and the Exchange Act include providing investors with information important to their investment and voting decisions, such as information that helps investors assess the value and risks of an investment in a company.  The Supreme Court has explained that the Securities Act is designed to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions."  *SEC v. Ralston*

29

*Purina Co.*, 346 U.S. 119, 124 (1953); *see Omnicare*, 575 U.S. at 178 ("The Securities Act of 1933 protects investors by ensuring that companies issuing securities … make a 'full and fair disclosure of information' relevant to a public offering."). And in the Securities Act's preamble, Congress stressed the need to "provide *full and fair disclosure* of the character of securities sold." 48 Stat. at 74 (emphasis added); *Van Dyke v. Coburn Enters., Inc.*, 873 F.2d 1094, 1097 (8th Cir. 1989) ("The design of the [Securities] Act is to protect investors by promoting full disclosure of information thought necessary to make informed investment decisions.").

Similarly, as the Supreme Court has recognized, one of the Exchange Act's "central purposes" is to "protect investors through the requirement of full disclosure by issuers of securities." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967); *see SEC v. First Am. Bank & Tr. Co.*, 481 F.2d 673, 680 (8th Cir. 1973). And in enacting the Exchange Act, Congress found that "transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are effected with a national public interest which makes it necessary to … require appropriate reports," among other things, to "insure the maintenance of fair and honest markets in such transactions." 15 U.S.C. 78b; *see* H.R. Rep. No. 73-1383, at 5 ("inadequate corporate reporting" keeps the investing public "in ignorance of necessary factors for intelligent judgment of the values of securities").

30

Read in light of Congress's purposes, the Securities Act and the Exchange Act authorize the Commission to require disclosure of information that is "necessary or appropriate in the public interest or for the protection of investors" in that such information is important to a reasonable investor's ability to assess the risks and value of an investment and make informed voting decisions. 15 U.S.C. 77g(a)(1), 78*l*(b), (g); *see id.* 78m(a).

2. The enumerated disclosures and categories of information in Section 7(a) of the Securities Act and Section 12(b) of the Exchange Act are consistent with this understanding. Section 7(a) of the Securities Act requires registration statements to include the information and documents specified in Schedule A. 15 U.S.C. 77g(a)(1). In turn, Schedule A requires disclosure of, among other things, information about the issuer's operations and financial condition, such as the "general character of the business," *id.* 77aa(8), the issuer's "capitalization," *id.* 77aa(9), its outstanding debts, *id.*, and "every material contract made[] not in the ordinary course of business," including "every material patent," *id.* 77aa(24). The information in Schedule A is "designed to protect the investor by furnishing him with detailed knowledge of the company and its affairs to make possible an informed investment decision." *United States v. Custer Channel Wing Corp.*, 376 F.2d 675, 678 (4th Cir. 1967).

31

Similarly, Section 12(b) of the Exchange Act enumerates certain categories of information about which the Commission may require disclosure "as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 78*l*(b)(1). Those include "the organization, financial structure, and nature of the business, *id.* 78*l*(b)(1)(A), "profit and loss statements," *id.* 78*l*(b)(1)(K), and "material contracts[] not made in the ordinary course of business," *id.* 78*l*(b)(1)(I). In authorizing the Commission to require disclosure about these matters, Congress sought to provide investors with "important information" to promote "the operation of the markets as indices of real value." H.R. Rep. No. 73-1383, at 11.

3. Consistent with the statutory text and context, the Commission from the beginning has interpreted its authority to require disclosures "necessary or appropriate in the public interest or for the protection of investors," 15 U.S.C. 77g(a)(1), 78*l*(b)(1); *see id.* 78m(a), as authorizing the agency to require disclosure of information that is important to investors' decisions to buy, hold, sell, or vote their securities. Shortly after the Securities Act's enactment, the Commission's predecessor agency relied on Section 7's express grant of rulemaking authority to require disclosure of information not specifically enumerated in Schedule A, including the length of time the issuer had been engaged in its business and "all litigation pending" that "may materially affect the value of the security." Form A-1 at 46-47 (1933); *see* App. __[89FR21684]. The agency promulgated these

32

rules with "regard for the public interest and for the protection of investors." Securities Act Release No. 33-5, 1933 WL 28819, at *1 (July 3, 1933).

Similarly, after the Exchange Act's enactment, the Commission promulgated rules that required disclosure of information including "the general character of the business" and the "[g]eneral effect" of "all material advisory, construction and services contracts." Form 10 at 1-2 (1934). The agency explained that the "main purpose" of the requested information was "to assemble the facts as to the history and nature of the business, its organization and management, its financial condition, its capital structure, and *other factors which might [a]ffect the value of its securities in the open market*." Exchange Act Release No. 66, 1934 WL 28615, at *2 (emphasis added). These "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright*, 144 S. Ct. at 2262.

Over the 90 years since those initial implementations of the Securities Act and the Exchange Act, the Commission has amended its disclosure requirements "dozens of times" across a range of topics based on its determination that the required information would be important to investment and voting decisions. *See* App. \_\_-\_\_[89FR21683-86]. For instance, in 1980, the Commission required issuers to provide a narrative explanation of the company's financial performance, referred to as "management's discussion and analysis" or "MD&A." *Amendments*

33

*to Annual Report Form, Related Forms, Rules, Regulations, and Guides*, 45 Fed. Reg. 63630, 63643-44 (Sept. 25, 1980). As the Commission later explained, such a narrative enables "an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance." 52 Fed. Reg. at 13717. Moreover, in 1982, the Commission adopted rules requiring issuers to disclose "risk factors" by providing a "discussion of the principal factors that make the offering speculative or one of high risk." 47 Fed. Reg. at 11423; *see Guides for the Preparation and Filing of Registration Statements*, 33 Fed. Reg. 18617 (Dec. 17, 1968) (previous Commission guidance relating to risk factors). In promulgating that requirement, among others, the Commission emphasized the importance of "ensuring that security holders, investors and the marketplace" have access to "meaningful, nonduplicative information upon which to base investment decisions." 47 Fed. Reg. at 11382. More recently, the Commission required disclosure about "the board's role in risk oversight," explaining that this information would "enhance [investors'] ability to make informed voting and investment decisions." *Proxy Disclosure Enhancements*, 74 Fed. Reg. 68334, 68334 (Dec. 23, 2009).

Similarly, the Commission's approach to disclosure of environmental matters has consistently centered on the information's importance to investment and voting decisions. For example, in 1971, the Commission interpreted its rules

34

to require disclosure about "compliance with statutory requirements with respect to environmental quality" when such compliance efforts "may materially affect the earning power of the business" or "cause material changes in [the issuer's] business." 36 Fed. Reg. at 13989. And in 1973, the Commission required issuers to disclose any administrative or judicial proceedings arising under environmental laws if "material to the business or financial condition" of the issuer, concluding that such disclosure would "promote investor protection." 38 Fed. Reg. at 12100-01.

By contrast, in 1975, the Commission declined to adopt rules that would have required "comprehensive disclosure of the environmental effects" of an issuer's "corporate activities." 40 Fed. Reg. at 51662. Based on the record before the agency at the time, the Commission observed that such information would not be useful in "investment decisions," and there was "virtually no direct investor interest in voluminous information of this type." *Id.* But the Commission reiterated that its choice was based on the record evidence, *see id.* at 51663-65, emphasizing that Congress had authorized the agency to require disclosure of "such information as the Commission believes is important to the reasonable investor." *Id.* at 51660.

Consistent with that understanding of its authority, and in light of subsequent market developments, the Commission in 2010 issued guidance

35

explaining that certain existing disclosure requirements—such as the issuer's description of its business, risk factors, and MD&A—"may require disclosure related to climate change." 75 Fed. Reg. at 6293. The Commission explained that legislative and regulatory developments related to climate change "could have a significant effect" on some companies' "operating and financial decisions." *Id.* at 6291. Accordingly, the Commission's approach to climate-related information has been consistent with its longstanding interpretation of its statutory authority: the Securities Act and the Exchange Act authorize the Commission to mandate disclosures that protect investors by facilitating informed investment and voting decisions.

### B. The Commission has statutory authority to promulgate each of the Rules.

1. Each disclosure requirement in the Rules is designed to elicit information that is important to informed investment and voting decisions and is therefore "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 77g(a)(1), 78*l*(b)(1); *see id.* 78m(a). To begin, Item 1502 (Strategy) requires issuers to disclose any climate-related risks that the issuer has determined have already had, or are reasonably likely to have, a material impact on the issuer's strategy, results of operations, or financial condition, as well as these actual or potential material impacts. *See* App. __-__, __[89FR21696-701,21915] (Item 1502(a)-(b), (d)). As the Commission explained, "climate-related risks often

36

translate into material financial risks with implications for firm growth and profitability," App. __[89FR21852], and disclosure of the actual or potential material impacts of these risks will "directly benefit investors who use this information to evaluate the financial prospects of the firms in which they are looking to invest," App. __[89FR21853].

Under Item 1501 (Governance), issuers whose board of directors oversee climate-related risks and/or whose management plays a role in assessing and managing any material climate-related risks are required to disclose that oversight and/or assessment and management. App. __-__, __[89FR21710-16,21915]. And Item 1503 (Risk management) requires issuers that use processes for identifying and managing any material climate-related risks to disclose those processes. *See* App. __-__, __[89FR21716-20,21916]; *see also* App. __-__, __[89FR21699-700, 21915] (Item 1502(c)). This information "allow[s] investors to understand whether climate-[related] risks are among those that are significant enough to be considered at the board level and how management and the board collectively oversee such risks," App. __[89FR21855], as well as to "better assess the risk management processes registrants use to evaluate and address material climate-related risks," App. __[89FR21864]; *see* App. __[89FR21853].

2.      Item 1504 (Targets and goals) requires issuers that have climate-related targets or goals to disclose them, if (and only if) that target or goal has

37

materially affected or is reasonably likely to materially affect the issuer's business, results of operations, or financial condition. App. __-__, __[89FR21720-26,21916]. As the Commission explained, this information facilitates informed investor decision-making because disclosures about any climate-related targets or goals an issuer has adopted "will enable investors to better understand the costs associated with pursuing these objectives as well as the benefits associated with achieving them." App. __[89FR21856]. Likewise, if issuers use transition plans, scenario analysis, or internal carbon prices to manage or assess the impact of material climate-related and transition risks, they must disclose information about those tools. App. __[89FR21915-16] (Items 1502(e)-(g)). If issuers have adopted any of these tools, information about them is important to help investors evaluate the issuer's management and assessment of identified climate-related risks. *See* App. __, __, __-__, __-__, __-__[89FR21703,21707,21709-10,21853-54,21856-57].

3. The Rules' amendments to Regulation S-X—which governs disclosures in financial statements—are authorized by Section 19 of the Securities Act and Sections 12 and 13 of the Exchange Act, among other provisions. As explained above, these sections authorize the Commission to prescribe "items or details" to be shown in balance sheets and earning statements, as well as the

38

"methods to be followed in the preparation of" accounts or reports.  15 U.S.C. 77s(a), 78m(b)(1); *see id.* 78*l*(b)(1)(J)-(L).

The Rules create Article 14 of Regulation S-X, which requires the inclusion of "items or details" in financial statements—specifically, "expenditures," "losses," and "capitalized costs and charges" that have resulted from severe weather events and other natural conditions and are therefore "recorded in [an issuer's] books and records underlying the financial statements."  App. __, __[89FR21778,21913] (Rule 14-02(c), (d)); *see generally* App. __-__[89FR21776-817].  Article 14 also prescribes "items or details," as well as "methods to be followed in the preparation of" accounts or reports, by requiring disclosure of whether any "estimates and assumptions" used to produce financial statements were "materially impacted" by risks, uncertainties, or known impacts from severe weather events and other natural conditions.  App. __[89FR21913] (Rule 14-02(h)).

As with the amendments to Regulation S-K, the Commission explained that the Regulation S-X amendments "will help investors make better informed investment or voting decisions by eliciting more complete disclosure of financial statement effects and improving the consistency, comparability, and reliability of such disclosures."  App. __[89FR21779].

4.     The requirements to disclose material Scope 1 and Scope 2 GHG emissions by a subset of issuers—generally, larger entities, not smaller or emerging companies—and to require attestations about such disclosures are likewise within the Commission's authority.  *See* App. __-__, __-__[89FR21726-772,21916-17].  As the Commission explained, an issuer's GHG emissions are a "central measure and indicator of [its] exposure to transition risk" and "a useful tool for assessing its management of transition risk and understanding its progress towards [its] own climate-related targets or goals."  App. __[89FR21732]; *see, e.g.*, App. __[3603CL4] ("GHG [e]missions are critical for understanding an issuer's transition risks.").  For instance, an issuer may face transition risk if its GHG "emissions are currently or are reasonably likely to be subject to additional regulatory burdens through increased taxes or financial penalties" under state or foreign law.  App. __[89FR21733].

Thus, disclosure of an issuer's GHG emissions "can help investors understand whether those emissions are likely to subject the [issuer] to a transition risk that will materially impact its business, results of operations, or financial condition in the short- or long-term."  App. __[89FR21858]; *see, e.g.*, App. __[89FR21732].  Because they elicit information that relates to the business and financial risks facing an issuer, and thus facilitate informed investor decision-

40

making, these requirements are "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 77g(a)(1), 78*l*(b)(1); *see id.* 78m(a).

## C. Petitioners' contrary arguments lack merit.

Petitioners' statutory-authority arguments largely attack a strawman—challenging reimagined rules that the Commission did not enact and criticizing a rationale that the Commission expressly disclaimed. Properly understood, each of the individual disclosures required under the Rules is within Congress's grants of authority to the Commission.

### 1. The Rules regulate the securities markets, not the environment.

Petitioners charge the Commission with exceeding its statutory authority by acting as an "environmental guardian," States 29,[5] and seeking to "pressure" public companies to "alter their environmental policies and activities," Liberty 18. *See also, e.g.*, Chamber 53-54. But this ignores that the Commission expressly acted to promote core securities law objectives, not regulate the environment.

The Commission could not have been clearer. In promulgating the Rules, it stressed that, consistent with its longstanding view of its authority, its objective was "limited to advancing the Commission's mission to protect investors, maintain

---

[5] "States" refers to the brief filed by petitioners in Nos. 24-1522, -1627, -1631, and -1634; "Liberty" for petitioners in No. 24-1624; "Texas Alliance" for petitioners in No. 24-1626; "Chamber" for petitioners in Nos. 24-1628 and -2173; and "NLPC" for petitioners in No. 24-1685.

41

fair, orderly, and efficient markets, and promote capital formation." App. __[89FR21671]; *see also* App. __[89FR21687]. That objective permeates the Rules, and the Commission reiterated that the Rules "should be read in [the] context" of its authority to advance investor protection, market efficiency, and capital formation. App. __[89FR21671]. For example, "where the rules reference materiality … materiality refers to the importance of information to investment and voting decisions about a particular company, not to the importance of the information to climate-related issues outside of those decisions." App. __[89FR21671]; *see also, e.g.*, App. __[89FR21696] ("[R]egistrants should rely on traditional notions of materiality."); App. __[89FR21733] (same). *Contra* Liberty 34-39.

Cognizant of its role, the Commission was just as careful to explain what it was *not* doing. The Commission recognized that "climate-related issues are subject to various other regulatory schemes." App. __[89FR21671]. But it emphasized that the Rules do not "determine national environmental policy or dictate corporate policy." App. __[89FR21687]. The Commission also repeatedly stated that it is "agnostic as to whether and how issuers manage climate-related risks so long as they appropriately inform investors of material risks." App. __[89FR21687]; *see also* App. __[89FR21671,21713]. Thus, for example, the Rules focus on disclosure of practices that issuers have already employed. *See,*

42

*e.g.*, App. __[89FR21703] (the Rules do not "prescribe any particular tools, strategies, or practices with respect to climate-related risk"; "if a registrant does not have a [transition] plan, no disclosure is required"); App. __[89FR21712] (board oversight disclosures "are not required for registrants that do not exercise board oversight of climate-related risks"). In short, the Rules do not—and could not— "address climate-related issues more generally." App. __[89FR21671]. Rather, they protect investors by providing them with information about a company's business and financial condition to facilitate informed investment and voting decisions.

This case is not like *Department of Commerce v. New York*, 588 U.S. 752, 783-85 (2019), where the Supreme Court was presented "with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Contra* Liberty 15-16. Statements by dissenting Commissioners, *see, e.g.*, States 30; Chamber 14, ascribing to the Rules a different rationale than the rationale the Commission adopted do not alter that result. Various quotations that petitioners cite from beyond the rulemaking, such as the Paris Climate Agreement, Administration priorities, state legislation, and what petitioners claim to be the goals of the Rules' proponents, are even further afield. Chamber 50, 53-54.

43

The specific statutory authority issues that led the Fifth Circuit to identify a Commission rule as "pretextual" in *National Association of Private Fund Managers v. SEC*, 103 F.4th 1097, 1113 (5th Cir. 2024) (cited at Chamber 57), are also absent here. In that case, the court concluded that the Commission had impermissibly subjected private investment funds to a prescriptive framework contrary to Congress's historical choice "*not* to impose … [a] prescriptive framework on private funds." *Id.* at 1110-12. The court also held that the Commission had—in its view—inappropriately relied on a Congressional authorization to prevent *fraud* in order to prescribe *disclosure* rules, notwithstanding other parts of the securities laws that "expressly provide for disclosure and reporting of certain information." *Id.* at 1112-14. In contrast, the Rules here rely on different authority in different statutes, follow decades of historical practice in adopting disclosure requirements for public companies, and are directly rooted in disclosure, rather than antifraud, authority.

Further, contrary to petitioners' assertions, *e.g.*, States 31-32; Liberty 40, the Rules do not contravene the Commission's statement in 1975 that the agency lacks authority to "require disclosure for the sole purpose of promoting social goals unrelated to those underlying" the Securities and Exchange Acts, 40 Fed. Reg. at 51660. As discussed above, the Commission's decision in 1975 not to require disclosure regarding the environmental effects of corporate activities was based on

44

the record before it at the time, which showed that such information would not be useful in "investment decisions" and that there was little "investor interest" in such information. *Id.* at 51662.

The Rules are not predicated on a different view of the Commission's authority. They require disclosure of the impact of climate-related risks on the company's business and financial position, App. __[89FR21673], not disclosure about the company's effects on the environment. And they reflect changed facts, including subsequent market and regulatory developments. An extensive factual record supports the Commission's findings both that the information about climate-related risks elicited by the disclosures is important to informed investment and voting decisions, and that investors need more detailed, consistent, and comparable disclosure of such information. *Infra* pp. 63-69. Thus, the Commission's adoption of the Rules to promote investor protection, a core "objective[] of the federal securities laws"—not to pursue unrelated "social goals" such as environmental protection—is consistent with the understanding of its authority as articulated in 1975. 40 Fed. Reg. at 51656, 51660.

> **2.** **The Rules require disclosure of information that bears on an issuer's financial performance.**

Although petitioners use various formulations, they essentially assert that the Securities Act and the Exchange Act limit the Commission to requiring disclosure

Appellate Case: 24-1522    Page: 62    Date Filed: 08/06/2024 Entry ID: 5421154

of "financially related" information.  Chamber 47.[6]  That argument both sets a

hurdle the Rules easily clear and grafts a new requirement onto the statutory text.

First, to the extent petitioners argue that the Commission may only require

disclosure of information that pertains to an issuer's financial condition and

performance, the Rules do just that.  As the Commission explained, "[c]limate-

related risks, their impacts, and a public company's response to those risks can

significantly affect the company's *financial performance* and position."  App.

__[89FR21669] (emphasis added); *see, e.g.*, App. __[89FR21670] (relying on the

"growing recognition that climate-related risks affect public companies' business,

results of operations, and financial condition").  Moreover, "many investors …

currently seek" such information to evaluate "the price of [a] registrant's

securities" and thus "inform their investment and voting decisions."  App.

__[89FR21669]; *see, e.g.*, App. __[3619CL1] (AllianceBernstein) ("material risks

and opportunities associated with climate change" are "fundamental financial

factors that impact company cash flows and the valuation investors attribute to

those cash flows").  And "[m]any companies currently provide some information

regarding climate-related risks" to prospective and current investors, though that

---

[6] *See also, e.g.*, States 20-21 (information "central to a company's business and potential profitability"; "business and financial side of things"); NLPC 21 ("traditional financial data").

46

information often is insufficiently consistent, comparable, and reliable.  App. __[89FR21669].

Petitioners' disagreement with these conclusions amounts to an APA argument about whether the Commission "has engaged in reasoned decisionmaking" within "the boundaries of [its] delegated authority."  *Loper Bright*, 144 S. Ct. at 2263.  It is not an argument that the Commission lacks statutory authority to promulgate the Rules.  And as explained below, the Commission reasonably explained the Rules and the basis for them.  *Infra* pp. 62-80.

Second, to the extent petitioners suggest that the Commission may only require disclosure of information that is itself financial in nature, such as its assets and liabilities, *see, e.g.*, Liberty 29 (Commission's authority limited to "'balance-book' financial figures"), that argument contravenes the statutes.  The Securities Act and the Exchange Act authorize the Commission to mandate disclosure of information that the Commission determines to be "necessary or appropriate in the public interest or for the protection of investors"—without limitation to "financial information."  *E.g.*, 15 U.S.C. 77g(a)(1), 78*l*(b)(1); *see id.* 78m(a).  These provisions authorize the Commission to require information that is not itself financial in nature, but that pertains to the company's operations or financial condition, and thus affects the value and risks of an investment.

47

Not even the disclosures enumerated in the statutes are limited to "financial" information in the narrow sense in which petitioners use that term. The Securities Act requires disclosure of "the general character of the business," 15 U.S.C. 77aa(8), and the Exchange Act similarly authorizes the Commission to require disclosure about the "organization" and "nature of the business," *id.* 78*l*(b)(1)(A). That information goes beyond "financial figures." *Contra* Liberty 29. And both the Securities Act and the Exchange Act authorize the Commission to require disclosure of the issuer's "material contract[s]," 15 U.S.C. 77aa(24), 78*l*(b)(1)(I)— information that bears on an issuer's financial condition but does not directly reflect it. The Commission's authority to require other, additional information to protect investors, *e.g.*, 15 U.S.C. 77g(a)(1), cannot be read as *more* limited than those provisions, and it is not limited to information that is itself "financial in nature." *Contra* States 20-21; Chamber 47.

Moreover, the Commission has long required disclosure of information that is not itself narrowly "financial." The Commission for decades has required disclosure about litigation that "may materially affect the value of the security," Form A-1 at 47, and "risk factors" affecting an issuer, 47 Fed. Reg. at 11423. *Supra* pp. 32-34. And in the context of environment-related disclosures, the Commission since the early 1970s has made clear that its rules require disclosure if "compliance with statutory requirements with respect to environmental quality …

48

may materially affect the earning power of the business" or "cause material changes in [the] registrant's business." 36 Fed. Reg. at 13989. That information informs investors about factors that may *affect* the issuer's finances but are not themselves "financial" as petitioners apparently use that term.

Contrary to petitioners' assertions, instances where Congress "expressly directed" the Commission to "require disclosures outside th[e] traditional, financial-information domain," Chamber 49-50; *see* Liberty 27-30; States 41; NLPC 27, do not demonstrate that the Commission lacks authority to promulgate the Rules. Petitioners' chief example is a mandatory provision directing that the Commission require issuers to disclose their use of "conflict minerals." 15 U.S.C. 78m(p). Congress expressly stated that the mandate was intended to further the "humanitarian" goal of ending violent conflict in the Democratic Republic of the Congo, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1502(a), 124 Stat. 1376, 2213 (2010)—not to facilitate informed investment and voting decisions. *Conflict Minerals*, 77 Fed. Reg. 56274, 56293 (Sept. 12, 2012). Indeed, the D.C. Circuit observed that, "unlike in most of the securities laws, Congress intended the Conflict Minerals Provision to serve a humanitarian purpose." *Nat'l Ass'n of Mfrs. v. SEC (NAM)*, 800 F.3d 518, 521 n.7 (D.C. Cir. 2015). Congress's decision to use the securities laws to further those specific congressional objectives has no bearing on the Commission's ability to use

49

its existing disclosure authority under the Securities Act and the Exchange Act to advance traditional securities-law ends.

### 3. The Rules' approach to materiality is consistent with the Commission's statutory authority.

Petitioners' arguments that the Commission exceeded its statutory authority by requiring disclosure of information that is not "material," Chamber 50-51; *see, e.g.*, States 25-27, both ignore how the Commission crafted the Rules and misunderstand the role materiality plays in the Commission's disclosure regime. Each of the Rules is designed to elicit disclosure that is important to the investment and voting decisions of a reasonable investor, although that is accomplished in different ways.

a. For most of the Rules, the materiality determination is left to issuers in the first instance through the express inclusion of a materiality qualifier. All of Item 1502 (strategy) is limited by express materiality qualifiers. App. __-__[89FR21915-16]. The same is true of Item 1503 (risk management disclosure). App. __[89FR21916]. And Items 1505 and 1506 (GHG emissions disclosures) are likewise limited by express materiality qualifiers. App. __-__[89FR21916-18].

Petitioners' assertions that the Commission departed from the Supreme Court's approach to materiality in these provisions are incorrect. *E.g.*, States 26. The Commission made plain that "traditional notions of materiality," derived from "Supreme Court precedent," govern the Rules. App. __-__ & n.381[89FR21695-

50

96] (citing, *e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32, 240 (1988)). Those

determinations must be made "objective[ly]." App. __[89FR21696]; *see* App.

__[89FR21763]. Speculation is not called for or required. *E.g.*, App.

__[89FR21720]. And for the reasons discussed below, *infra* pp. 77-80, petitioners

are wrong that these materiality qualifiers focus on issues other than what a

reasonable investor uses to make investment and voting decisions. Chamber 35-

36; Liberty 34.

  b. In the two instances where the Commission did not place express

materiality qualifiers on the required Regulation S-K disclosures, the Rules' text

and the Commission's explanation demonstrate that, even without such a qualifier,

the required disclosure is still important to investment and voting decisions. Item

1501(a) requires disclosure of how an issuer's board of directors oversees climate-

related risk, if it does. The Commission explained that a materiality qualifier was

not necessary because, if a board of directors determines to oversee a particular

risk, the fact of such oversight is "likely material to investors given other demands

on the board's time and attention." App. __[89FR21713]. Further, Item 1504(c)

requires issuers to "[d]isclose any progress made toward meeting the target or goal

and how any such progress has been achieved." App. __[89FR21916]. Here, too,

a materiality qualifier is not necessary because "the target or goal" must be

disclosed under Item 1504(a) only if it is material.

51

Similarly, the Commission explained why it took a different approach in the financial statement requirements in Article 14 of Regulation S-X.  Unlike the qualitative, narrative disclosures in the Regulation S-K amendments, the Regulation S-X amendments require disclosures of quantitative information.  App. __[89FR21795].  The Commission accordingly explained that a "bright-line standard" would "simplify compliance," "reduce the risk of underreporting such information, and promote comparability and consistency among a[n] [issuer's] filings over time and among different [issuers]."  App. __[89FR21795].  The Commission further explained that the Regulation S-X amendments were "unlikely to result in immaterial disclosure" because, among other reasons, they use *de minimis* thresholds and limit the required disclosures to circumstances where the severe weather event or other natural condition was a significant contributing factor in incurring the capitalized cost, expenditure expensed, charge, or loss.  App. __-__[89FR21796-97].

c.      Petitioners also mistakenly attempt to constrain the Commission's disclosure authority by invoking the application of materiality in individual antifraud cases.  *See, e.g.*, Chamber 47-54; States 25; Liberty 31-39.  Unlike specific cases in which courts determine whether to impose liability, in designing a prospective disclosure rule, the Commission is not required to establish that the information elicited will be material under all facts and circumstances.  Rather, it

52

can make a reasoned determination that its rules appropriately elicit information important to investment and voting decisions, such as information regarding the risks and value of an investment, thereby acting within the bounds of its discretion to "require" information "as being necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 77g(a)(1), 78*l*(b)(1); *see id.* 78m(a).

Nor must the Commission include an express materiality qualifier in every disclosure rule. The relevant provisions in the Securities Act and Exchange Act contain no such limitation. *See, e.g.*, 15 U.S.C. 77g(a)(1), 78*l*(b)(1), 78m(a); *compare, e.g.*, 15 U.S.C. 77k(a), 77q(a)(2), 78n(e), 78ff(a) (expressly requiring materiality). Further, some of the congressionally mandated disclosures in Schedule A of the Securities Act are expressly qualified by materiality, *e.g.*, Item 24—"material contract[s]," but others are not. For example, Item 18 requires disclosure of all expenses—no matter the amount—incurred "in connection with the sale of the security to be offered," and Item 20 requires disclosure of "any amount paid within two years preceding the filing of the registration statement" to "any promoter"—again, without limitation. 15 U.S.C. 77aa.

For similar reasons, petitioners are incorrect that the Commission has authority to require only disclosures that are necessary to protect investors from "fraud." *E.g.*, Chamber 50. Petitioners' cited cases are inapposite. For instance, *Universal Health Services, Inc. v. United States*, 579 U.S. 176 (2016), analogized

53

an express materiality requirement in the False Claims Act to the materiality principles in "common law … fraud." *Id.* at 193. The Supreme Court did not suggest that all "legal obligations" generally, Chamber 51—much less the Commission's disclosure authorities at issue here—must be limited to combating fraud. Indeed, in opting for a disclosure approach in the securities laws, Congress rejected an approach limited to anti-fraud measures. Louis Loss, Fundamentals of Securities Regulation 32-35 (3d ed. 1983); *Lindeen v. SEC*, 825 F.3d 646, 649 (D.C. Cir. 2016).

### D. The major questions doctrine does not apply, and in any event, the Rules are consistent with that doctrine.

Lacking support from "the ordinary tools of statutory interpretation," *Biden v. Nebraska*, 143 S. Ct. 2355, 2375 (2023), petitioners invoke the major questions doctrine. *E.g.*, States 28-41; Chamber 54-59. That doctrine is reserved for "extraordinary cases" in which an agency asserts "an unheralded power representing a transformative expansion in [its] regulatory authority" by means of "a radical or fundamental change to a statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 722-25 (2022); *see Nebraska*, 143 S. Ct. at 2372-73 (agency exercised "never previously claimed powers" effecting a "fundamental revision of the statute"). This is not such a case.

The Commission did not rely on "vague," "cryptic," "ancillary," or "modest" statutory language. *West Virginia*, 597 U.S. at 721-24. Rather, the

Commission invoked core provisions of the securities laws that expressly authorize it to promulgate disclosure requirements to protect investors. *See, e.g.*, 15 U.S.C. 77g(a)(1), 78*l*(b)(1), 78m(a); *see also Omnicare*, 575 U.S. at 178 (describing Securities Act's "registration requirement" as "[t]he linchpin of the Act"). The Commission has relied on these grants of rulemaking authority to administer the statutory disclosure regime since the agency's inception. *See, e.g.*, Exchange Act Release No. 66, 1934 WL 28615, at *2. The major questions doctrine has no application in these circumstances. *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 727 (10th Cir. 2024) (rejecting major questions doctrine argument based on "longstanding historical practice").

The Rules do not effect a "transformative expansion in [the Commission's] regulatory authority." *West Virginia*, 597 U.S. at 724. The Rules are consistent with the Commission's longstanding administration of its disclosure regime by requiring the disclosure of information that facilitates informed investment and voting decisions. *Supra* pp. 32-36. This is not a case where an agency interpretation gave it "virtually unlimited power to rewrite the [statute]," *Nebraska*, 143 S. Ct. at 2373, empowered it to "substantially restructure the American energy market," *West Virginia*, 597 U.S. at 724, or identified "no limit" on measures "outside [its] reach," *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764-65 (2021) (per curiam). The Rules do not prescribe any changes to issuers' operations—they

55

require disclosure of known or reasonably anticipated risks or actions already taken.

Nor is this a case in which the agency lacks "comparative expertise in making [the relevant] policy judgments," *West Virginia*, 597 U.S. at 729, or is regulating "outside its wheelhouse," *Nebraska*, 143 S. Ct. at 2382 (Barrett, J., concurring). Ensuring that market participants have appropriate information to make investment and voting decisions "is what [the Commission] does." *Biden v. Missouri*, 595 U.S. 87, 95 (2022) (per curiam). This includes information about the activities of companies' boards. *See* 74 Fed. Reg. 68334; 17 C.F.R. 229.401, .402, .407. *Contra* Florida and Kansas Amicus; Manhattan Institute Amicus 4-11; Americans for Prosperity Amicus 11-12. And the Rules' disclosures are directly responsive to investor needs for such information, as substantiated by a robust record. *Infra* pp. 63-69.

Moreover, petitioners are wrong that Congress has "'considered and rejected' bills that would do exactly what the [Rules] attempt[]." *E.g.*, Chamber 57 (quoting *West Virginia*, 597 U.S. at 731). The bills petitioners cite, Chamber 57-58; Liberty 16-18; States 35; NLPC 38-39; Texas Alliance 53-54 & n.18, differ in key respects from the Rules. Several would have *required* the Commission to adopt disclosure rules, including rules mandating that all issuers disclose their GHG emissions, without regard to materiality. *See, e.g.*, H.R. 2570, 117th Cong.

56

(2021); S. 1217, 117th Cong. (2021); H.R. 3623, 116th Cong. (2019). And some of the bills would have mandated disclosures not required under the Rules, such as the "amount of fossil-fuel related assets" an issuer owns. *See, e.g.*, H.R. 2570. These failed legislative proposals "lack[] persuasive significance." *United States v. Craft*, 535 U.S. 274, 287 (2002).

Petitioners are thus left to rely on the Rules' alleged political and economic significance. *E.g.*, States 36-37; Chamber 55-56. But the Supreme Court has never treated the major questions doctrine as a license to override statutory text based on assertions that an agency's action is politically or economically consequential. *See Nebraska*, 143 S. Ct. at 2374 (emphasizing presence of additional "indicators").

In any event, petitioners' arguments on this score are flawed. Even if "[c]limate change" is a subject of "public discourse," *e.g.*, States 34, the Rules do not implicate the debates petitioners invoke. *Supra* pp. 41-45. The Rules are not designed to address climate change, do not require disclosure of information that does not bear on investment and voting decisions, and do not circumvent congressional limitations on the Commission's authority. *E.g.*, States 33-36; Chamber 56-57. The Commission's authority to require public companies to make factual disclosures about important risks to their businesses—as it did here—is not controversial.

57

Even if the major questions doctrine applied, the Rules pass muster under that mode of analysis. For the reasons discussed above, the Commission has correctly—and consistently—interpreted its statutory authority since its inception, and that authority is clear. The Securities Act and the Exchange Act expressly delegate authority to the Commission to establish "rules or regulations" requiring disclosure of information "necessary or appropriate in the public interest or for the protection of investors," as it did here. 15 U.S.C. 77g(a)(1), 78*l*(b)(1); *see id.* 78m(a). The major questions doctrine provides no basis to invalidate agency action where the statute "specifically authorizes the [agency] to make decisions like th[e] one" under review. *United States v. White*, 97 F.4th 532, 540 (7th Cir. 2024); *see Florida v. HHS*, 19 F.4th 1271, 1288 (11th Cir. 2021) (major questions doctrine did not apply because "a broad grant of authority" that "plainly encompasses the [agency's] actions … does not require an indication that specific activities are permitted"); *Nebraska*, 143 S. Ct. at 2378 (Barrett, J., concurring).

Indeed, as the Supreme Court recently stressed, the "best reading of a statute" may be that it "delegates discretionary authority to an agency" to "prescribe rules … subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Loper Bright*, 144 S. Ct. at 2263. When, as here, the agency acts within "the boundaries of the delegated authority," a reviewing court

58

"effectuate[s] the will of Congress" by upholding the agency's exercise of that authority. *Id.*

### E. The Securities Act and the Exchange Act do not violate the nondelegation doctrine.

In baselessly asserting that the Commission claims authority "to impose whatever rules it might deem fit," Texas Alliance's nondelegation argument disregards the Supreme Court's nondelegation precedent and the text of the relevant statutes. Texas Alliance 23, 56-66.

Since the Founding era, the Supreme Court has held that "Congress may certainly delegate to others[] powers which the legislature may rightfully exercise itself." *Wayman v. Southard*, 23 U.S. (10 Wheat) 1, 43 (1825) (Marshall, C.J.). Delegations are constitutional so long as Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (quoting *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928)). It is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Id.* at 372-73 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)); *Bhatti v. Fed. Hous. Fin. Agency*, 15 F.4th 848, 854 (8th Cir. 2021) (emphasizing "the low threshold for validation under the nondelegation doctrine").

59

The Supreme Court has held a delegation unconstitutional "[o]nly twice in this country's history," *Gundy v. United States*, 588 U.S. 128, 146 (2019) (plurality opinion) (citing *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)).  In the almost 90 years since those decisions, the Supreme Court has "over and over upheld even very broad delegations."  *Id.*  In the securities context in particular, the Supreme Court upheld provisions authorizing the Commission to ensure that a holding company's structure does not "unfairly or inequitably distribute voting power among security holders."  *Am. Power & Light*, 329 U.S. at 104-05.  And in other contexts, the Supreme Court has upheld statutes authorizing an agency to fix "fair and equitable" commodities prices, *Yakus v. United States*, 321 U.S. 414, 420 (1944), and to set air-quality standards limiting pollution to the level required to "protect the public health," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001); *see Gundy*, 588 U.S. at 146 (plurality opinion) (listing other examples).

Texas Alliance errs in comparing the delegations here to those at issue in *Panama Refining* and *Schechter Poultry*.  Texas Alliance 66.  The provision at issue in *Panama Refining*, which permitted the President to prohibit the shipment of oil for any reason, "provid[ed] literally no guidance for the exercise of discretion."  *Am. Trucking*, 531 U.S. at 474.  Rather, "Congress left the matter to the President without standard or rule, to be dealt with as he pleased."  *Panama*

60

*Refin.*, 293 U.S. at 418. Similarly, in *Schechter Poultry*, the statute authorized private parties to write, and the President to approve or prescribe, "codes of fair competition" in order "to rehabilitate industry," 295 U.S. at 534-35, but it did not prescribe any method of attaining that goal, any limitations on the codes that could be created, or the standards against which to adjudge the codes, *see Yakus*, 321 U.S. at 424.

In contrast, the Securities Act and the Exchange Act "clearly delineate[d]" the "boundaries" of the authority Congress delegated to the Commission as well as "the general policy" that it intended the Commission to pursue. *Mistretta*, 488 U.S. at 372-73 (quoting *Am. Power & Light*, 329 U.S. at 105). The Commission is authorized to require disclosure in registration statements and periodic reports of information that the Commission determines is "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. 77g(a)(1); *see id.* 78*l*(b) & (g), 77s(a), 78m(a)-(b). And these boundaries on the Commission's discretion are reinforced by the "context, purpose, and history" of the Securities Act and the Exchange Act—including the Acts' enumerated disclosures and Congress's objectives in enacting each statute. *Gundy*, 588 U.S. at 136 (plurality opinion); *supra* pp. 5-8, 26-32.

Moreover, when the Commission is engaged in rulemaking and is required to consider or determine whether an action is necessary or appropriate in the public

61

interest, it must "also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. 77b(b), 78c(f). And the Commission must not adopt any rule or regulation that imposes "a burden on competition not necessary or appropriate in furtherance of [the Exchange Act]." *Id.* 78w(a)(2).

The Commission has correctly construed this authority in requiring disclosure of information that facilitates informed investment and voting decisions. *Supra* pp. 26-36. The Commission has not asserted boundless authority to require disclosure of "financially irrelevant topics," *contra* Texas Alliance 60; the Rules elicit financially relevant disclosures. *Supra* pp. 36-41, 46-47. And far from caving to the demands of investors who "want targeted non-financial information," Texas Alliance 61, the Commission reasonably explained, based on a thorough analysis of the record, why the disclosures called for in the Rules would advance core securities law objectives. *Infra* pp. 63-69; *see supra* pp. 41-50.

## II. The Commission reasonably explained its decision to adopt the Rules.

In adopting the Rules, the Commission substantiated the problems the Rules are designed to solve, reasonably analyzed the evidence before it, considered reasonable alternatives, and reached a rational conclusion. The Commission "reasonably considered the relevant issues and reasonably explained [its] decision," *Prometheus*, 592 U.S. at 423, and despite petitioners' claims, no more is

62

required under the APA's "narrow" and "highly deferential" standard of review. *Org. for Competitive Mkts. v. U.S. Dep't of Agric.*, 912 F.3d 455, 459 (8th Cir. 2018).

**A.** **The Rules will facilitate informed investment and voting decisions by providing more detailed, consistent, and comparable information.**

Based on substantial evidence, the Commission reasonably determined both that information regarding climate-related risks is important to investment and voting decisions and that there is a need for more detailed, consistent, and comparable disclosure of that information. As the Commission explained, "[c]limate-related risks, their impacts, and a public company's response to those risks can significantly affect the company's financial performance and position." App. __[89FR21669]. Empirical studies show that exposure to physical climate risks reduces firm revenues and operating income, predicts poor profit growth, and leads firms to choose capital structures with less debt due to higher expected distress costs and greater operating costs. App. __[89FR21848]. Other research shows that disclosures about climate-related risks, when made, become priced into a firm's value—investors demand higher expected returns for bearing exposure to firms with higher carbon emissions, climate-related risks are priced into financial instruments in debt and derivatives markets, and investors use climate disclosures to construct efficient hedging portfolios. App. __-__[89FR21848-49].

63

The importance of climate-related information to investment and voting decisions is also confirmed by substantial investor demand. Numerous comment letters from institutional and individual investors demonstrate that "investors seek to assess the climate-related risks that registrants face and evaluate how registrants are measuring and responding to those risks" to "inform investment and voting decisions." App. __-__[89FR21672-73]; *see* App. __ & n.14, __ & n.137[89FR21670,21679] (citing comments); *see, e.g.*, App. __[3982CL1] ("We consider climate risks to be material and fundamental risks for investors and the management of those risks is important for price discovery and long-term shareholder returns."); App. __[4096CL1] ("As a steward of our clients' assets … we incorporate climate risk evaluations in our investment decisions if and when they are material."); App. __, __, __[2154CL1,3619CL1,4021CL1].

The Commission determined—again, based on feedback from "many commenters"—that "the current state of climate-related disclosure has resulted in inconsistent, difficult to compare, and frequently boilerplate disclosures." App. __[89FR21673]. Even though institutional investors report spending hundreds of thousands of dollars each for climate-related information, App. __[89FR21842], "[b]oth institutional and retail investors have stated that they found much of the voluntary climate-related reporting to be lacking in quality and completeness and difficult to compare and as a result have incurred costs and inefficiencies when

64

attempting to assess climate-related risks and their effect on the valuation of a registrant's securities." App. __-__[89FR21679-80]; *see, e.g.*, App. __, __, __-__, __, __-__, __, __[2292CL4,2694CL2,3063CL3-4,3263CL3,3649CL3-4,3788CL5,4128CL5]. Existing disclosures have "proven inadequate to meet the growing needs of investors for more detailed, consistent, reliable, and comparable information about climate-related effects on a registrant's business and financial condition." App. __[89FR21673].

The Commission also reasonably explained why existing disclosure practices, including those outlined in its 2010 Guidance, are insufficient to facilitate informed investor decision-making. "[A]lthough the 2010 Guidance reflects that climate-related information may be called for by current Commission disclosure requirements, climate-related information has often been provided outside of Commission filings, such as in sustainability reports or other documents posted on registrants' websites, which are not subject to standardized disclosure rules, and, as noted by some commenters, are not necessarily prepared with the informational needs of investors in mind." App. __[89FR21680]. And such information "may not be prepared with the same level of rigor" as information "required for disclosure in Commission filings, and as a result may not be as reliable." App. __[89FR21680].

65

In particular, the Commission observed "considerable variation in the content, detail, and location … of climate-related disclosures." App. __ n.135[89FR21679]. There was also "significant inconsistency in the depth and specificity of disclosures by registrants across industries and within the same industry." App. __ n.135[89FR21679]. And "the disclosures in registrants' [annual reports] frequently contained general, boilerplate discussions that provide limited information as to the registrants' assessment of their climate-related risks or their impact on the companies' business." App. __ n.135[89FR21679]; *see* App. __ & n.46[87FR21339].

By requiring specific, standardized climate-related disclosures in Commission filings, the Rules provide "more complete and decision-useful information" and improve "the consistency, comparability, and reliability of climate-related information for investors." App. __[89FR21669]. This "will allow investors to evaluate together the range of risks that a company faces, the existing and potential impacts of those risks, and the way that company management assesses and addresses those risks." App. __[89FR21670].

## B. Petitioners' criticisms of the Commission's rationale fail.

### 1. The Commission reasonably explained and substantiated the need for the Rules.

Petitioners are mistaken in asserting that the Rules are unnecessary because existing rules already require disclosure of all material information. Chamber 20.

66

There is no such requirement: "We do not have a system of continuous disclosure," where "firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession." *Gallagher v. Abbott Lab'ys*, 269 F.3d 806, 808 (7th Cir. 2001). Instead, required disclosures are determined by the specific terms of the Commission's rules and the requirement to disclose such other information as necessary to prevent the disclosures made from being misleading. *See* 17 C.F.R. 230.408(a), 240.12b-20.

Petitioners' criticism that the Commission "cited 'no evidence' that any investor has ever been harmed by a lack of climate-related disclosures" is similarly unpersuasive. Chamber 22. The Rules are intended to serve informational, not antifraud, goals. That informational need is substantiated by numerous commenters who indicated that they had "incurred costs and inefficiencies when attempting to assess climate-related risks and their effect on the valuation of a registrant's securities." App. __ & nn.138-39[89FR21680]; App. __ & n.2754[89FR21850]. For instance, "one commenter submitted a survey reporting that institutional investors spend an average of $257,000 and $357,000 on 'collecting climate data related to assets' and 'internal climate-related investment analysis,' respectively." App. __[89FR21842]. And, because the Rules are predicated on the need for more detailed, reliable, and comparable disclosures— not inadequate compliance with existing rules—it makes sense that the

Commission did not identify specific "enforcement actions" related to inadequate climate-related disclosure, Chamber 22-23.

Nor are the concerns about underreporting of material climate-related information based on mere "speculat[ion]." Chamber 22-23. The Commission explained at length why climate-related information can be material to investors, *supra* pp. 45-54, 63-66. And it cited a study concluding that "absent mandatory requirements from regulators, voluntary disclosures following third-party frameworks were generally of poor quality and that companies making these disclosures cherry-picked to report primarily non-material climate risk information." App. __ n.2652[89FR21841].

The States' argument that the Commission "fail[ed] to explain why EPA's existing authority to require emissions disclosures is inadequate" is also meritless. States 46. As the Commission explained, "there are distinct and significant differences between both the goals and requirements" of the EPA's GHG emissions reporting requirements and those in the Rules. App. __[89FR21832]. For example, the EPA requirements "apply to facility owners and operators[] and suppliers" rather than public companies registered with the Commission, App. __ & n.2601[89FR21833], and the "EPA's emissions data … presents challenges for investors to use" because, "[w]hile each facility is matched to its parent company, this company may not be the entity registered with the [Commission]," App. __

68

n.2830[89FR21858].  Moreover, the EPA's comment letter directly contradicts the States' assertion that the Rules "may be intruding on EPA's domain."  States 46. The EPA's comment "clarif[ies] the substantial differences between the goals and requirements of its Greenhouse Gas Reporting Program" and the Commission's proposed rules.  App. __[4141CL1].

### 2. The Commission reasonably analyzed the record evidence.

Petitioners' erroneous attacks on the evidence relied on by the Commission either misunderstand what is required or mischaracterize the Commission's analysis—or both.

a. The Chamber errs in asserting, Chamber 25-26, that sufficient information is already available, and therefore the Rules are unnecessary, because studies show that disclosures of "climate-related risks, when they are made, become priced into the value of a firm," App. __[89FR21849].  That the limited information currently provided is incorporated by the market says nothing about whether there is *sufficient* information available to investors, and the record demonstrates that there is not.  *Supra* pp. 63-69.  Nor does the study petitioners cite—which analyzed publicly available GHG emissions information for a select group of firms—demonstrate that the GHG emissions disclosed by other firms would have no incremental informational value to investors.  And it sheds no light on the incremental value of other climate-related disclosures.

69

b.     The Chamber's argument that the Commission inappropriately relied on comments from investors that supposedly "exhibit nonpecuniary preferences involving" climate-related information, Chamber 27, lacks merit.  The Commission discussed a broad range of comments.  *See* App. __-__, __-__[89FR21677-79,21846-47].  And the comments from investors and asset-management firms on which the Commission relied expressed *pecuniary* aims.  *See, e.g.*, App. __ & n.14[89FR21670] (citing, *e.g.*, App. __[3619CL1] ("[AllianceBernstein] views material risks and opportunities associated with climate change as fundamental financial factors that impact company cash flows and the valuation investors attribute to those cash flows."); App. __[3603CL1] ("Accurate and comparable information about climate risk is critical to Wellington Management's ability to make informed investment decisions on behalf of our clients."); *see also* App. __ & nn.99-108[89FR21677] (citing comments).

Petitioners cherry-pick citations to the submission of a single commenter—"As You Sow"—but they are simply wrong in asserting that this commenter was the "principal example of investor demand," Chamber 27, for climate-related risk information.  *See, e.g.*, App. __ nn.99-101[89FR21677] (citing sample of commenters including issuers and investors, such as Alphabet, Amazon, Bloomberg, Morningstar, and Wellington Management); App. __-__ nn.137-

70

39[89FR21679-80] (citing comments, including Washington State Investment Board, Vanguard, Harvard Management, and Breckenridge Capital Advisors).

c. The Chamber's contention that the Commission "'completely discounted' contrary evidence," Chamber 28, fails to account for the explanations the Commission provided. In discussing the effect of climate-related information on "the prices at which investors are willing to buy or sell assets (*i.e.*, their investment decisions)," App. __-__[89FR21848-49], the Commission acknowledged the few studies finding that "asset prices may not fully price in climate related risks" and finding "a lack of relation between climate-related risks and asset prices," App. __ n.2745[89FR21849]. But the Commission also cited the many other studies that collectively support its conclusion that such climate-related information affects investment decisions, App. __ & nn.2737-2746[89FR21848-49]. That conclusion is confirmed by extensive evidence from commenters. *Supra* pp. 63-69.

Nor did the Commission improperly disregard evidence from Dr. Daniel Taylor, as petitioners contend. Chamber 29. To the contrary, it modified the Rules to address the concern he raised. Professor Taylor focused his analysis on provisions in the proposal requiring issuers to disclose Scopes 1 and 2 emissions, *regardless of whether such emissions were material*, and material Scope 3 emissions, App. __-__[87FR21468-69], arguing that, "on average," event studies

71

show that disclosures about an issuer's GHG emissions are not material to the valuation of a company. App. __ [3381CLii]. The Commission acknowledged comments raising the concern that the proposed rules' treatment of GHG disclosures would "not result in decision-useful information for investors." App. __[89FR21729]. And, in response, the Commission both narrowed the scope of GHG emissions disclosure and added an express materiality qualifier. App. __, __-__[89FR21729,32-33]. The Commission thus satisfied its obligation to respond to commenters' concerns, and nothing in the APA required it to identify Professor Taylor by name. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) (agency must respond to "significant points" but "need not 'discuss every item of fact or opinion included in the submissions made to it'").

Moreover, petitioners are incorrect that Professor Taylor's comment about GHG emissions speaks to, much less contradicts the Commission's assessment of, other portions of the Rules. Chamber 29. His analysis focused on GHG emissions, not "climate-related information" more generally. And he cautioned that this evidence about the materiality of GHG disclosures "does *not* suggest climate risk is immaterial, but rather it suggests that GHG emissions are not material." App. __ [3381CL6]; *see* App. __[3381CL1] ("Climate-related risks can be material.").

Petitioners likewise miss the mark in arguing that the Commission "failed to address evidence" that "other information, such as cash flows, profitability and

72

industry," is more important to professional investment analysts in valuing securities. Chamber 32. The Rules are premised on evidence that information about climate-related risks is important to investment and voting decisions, not that it is *more* important than other factors in those decisions. And petitioners misquote the Commission's acknowledgement that some literature has found that "very few analyst reports traditionally discuss topics related to climate," omitting the remainder of the sentence, which explains that this same literature nonetheless finds that "climate-related disclosures can offer useful predictive signals about future financial performance" and "influence analysts to revise their target prices." App. \_\_[89FR21841].

d. Liberty's criticism that "no study has shown an overall positive effect on profitability or stock price as a result of mandating climate disclosures" misunderstands the Rules' purpose and the Commission's disclosure authority in general. Liberty 42. The Commission adopted the Rules—as it has done with prior disclosures—not to increase companies' stock prices, but to provide investors with decision-useful information and "reduce information asymmetry between investors and registrants," thus "enabling climate-related information to be more fully incorporated into securities prices." App. \_\_[89FR21830]; *supra* pp. 19-21, 63-69.

73

e. Liberty and the States draw the wrong conclusion from a footnote in which the Commission described "seemingly contradictory empirical results found in studies involving stock returns and carbon emissions." *E.g.*, States 48 (citing App. __ n.2745[89FR21849]). Far from a "concession that there is 'at best mixed' evidence" for a "core premise" of the Rules, Liberty 42, the cited paper at most bears on only one aspect of the Rules' disclosures, and the paper nonetheless concludes that financial markets discount companies with high emissions. Patrick Bolton et al., *The Financial Cost of Carbon*, 34 J. Applied Corp. Fin. 17 (June 2022).

### 3. The Commission adequately considered reasonable alternatives.

The Commission considered—and explained why it declined to adopt—several alternatives to the Rules. App. __-__[89FR21891-94]. Petitioners assert that the Commission failed to also consider the alternative of "requir[ing] the reporting of greenhouse-gas emissions 'at less frequency than annually.'" Chamber 45. But the Commission explained in its economic analysis of the Rules that "requir[ing] disclosures on an annual basis" will "allow investors to make better comparisons across time" than "provid[ing] disclosures at irregular or multi-year intervals." App. __ & n.2570[89FR21830]. This satisfied the Commission's obligation to "respond meaningfully to alternative proposals" raised in the rulemaking proceeding. *Vistra Corp. v. FERC*, 80 F.4th 302, 313 (D.C. Cir. 2023);

74

*see, e.g.*, *Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000).

Moreover, petitioners' assertions that "[GHG] 'emissions are extremely highly correlated over time'" do not support their claim that less-than-annual disclosure would "provid[e] the same amount of potentially useful information." Chamber 45. Year-to-year consistency or change can provide investors with important information. For example, regular reporting of emissions may be important to understand an issuer's progress toward meeting any target or goal. *See* App. __ & n.2826[89FR21858]. And in any case, if an issuer determines its GHG emissions are not material in any given year, no disclosures are required.

### 4. The Rules are internally consistent.

Liberty's assertion, Liberty 49-51, of an inconsistency between the Commission's decision to exclude Scope 3 emissions and the inclusion of material impacts on the issuers' suppliers, purchasers, or counterparties to material contracts in the disclosure required of material impacts on an issuer rests on an inapt comparison. The two requirements differ in many ways, including that the requirement to disclose material impacts on others is only triggered when those impacts, in turn, materially impact the issuer. *See* App. __[89FR21915] (Item 1502(b)). And comments about the two proposed requirements raised different concerns. Beyond just difficulty in tracking data from third parties, comments

75

regarding the proposed Scope 3 disclosures included concerns about the breadth of data called for and the "current reliability and robustness of the data associated with Scope 3 emissions." App. __[89FR21736]. In contrast, commenters who opposed the requirement to include impacts on suppliers, purchasers, or contractual counterparties expressed concern that those third parties may resist pressure to provide data. App. __ & nn.416-17[89FR21698].

Nor is there any inconsistency in the Commission's approach to these aspects of the proposed rules. Liberty ignores that disclosure of the material impact of climate-related risks on third parties such as the issuers' suppliers is required *only* "to the extent known or reasonably available." App. __[89FR21915] (Item 1502(b)(3)); *see* App. __[89FR21699 (this limitation "eliminat[es] any potential need for registrants to undertake unreasonable searches or requests for information from their value chains"); 17 C.F.R. 230.409, 240.12b-21 ("Information required need be given only insofar as it is known or reasonably available to the registrant."). By making these and other changes to address commenters' concerns, App. __[89FR21699], the Commission acted consistently with the decision to avoid similar (and other) burdens by eliminating the proposed Scope 3 emissions disclosure requirements.

Liberty's arguments that the Commission inconsistently treated existing GHG attestation practices, Liberty 50, similarly rests on an incomplete description

76

of the Commission's rationale.  In explaining that requiring attestation about GHG emissions would enhance the reliability of information available to investors, the Commission acknowledged that:  (1) "after decades of development and required use," auditing standards for financial statement audits "are more established" than assurance standards and practices for GHG emissions; and (2) nevertheless, assurance over GHG emissions "is far from nascent and is now expected by many market participants."  App. __[89FR21746].  Similarly, in its economic analysis, the Commission acknowledged both that:  (1) sustainability assurance is "fairly new" and "GHG emission assurance is still maturing," as compared to the "decades of financial audit practice"; and (2) nevertheless, a number of issuers "currently obtain voluntary assurance over their GHG emissions disclosures, which presumably they would not do if existing assurance standards were unworkable or did not meaningfully enhance the reliability of those disclosures."  App. __[89FR21862].  There is no inconsistency in these parallel acknowledgements, much less the "stark[]" one Liberty asserts, Liberty 50.

### C.  The Rules apply traditional concepts of materiality.

Petitioners incorrectly assert, Chamber 33-35; States 43, that the Commission failed to sufficiently explain a change in its position regarding the application of the materiality standard in disclosure rules.  But as discussed, the Rules rely on traditional materiality standards.  *Supra* pp. 50-54.  And the Rules do

77

not, as petitioners assert, "demand[] disclosure of information that is *not* material under well-settled standards."  Chamber 33; *see* States 43.  As explained, the Rules are designed to elicit disclosure of information important to a reasonable investors' investment and voting decisions.  *Supra* pp. 36-40, 63-69.

Petitioners focus on the board oversight and financial-statement disclosures, which do not contain express materiality qualifiers.  Chamber 34.  But the Commission explained that an express materiality qualifier was not necessary for these provisions.  *Supra* pp. 51-52.  And there is no basis for petitioners' assumptions that these requirements will "'prompt[]' companies to consider climate-related issues in circumstances, and at a level, where otherwise they typically would not" or improperly "pressure[] boards to consider those climate-related issues."  *Contra* Chamber 36-37; Business Roundtable Amicus 2-3, 21-26.  Disclosure is required only if a board currently oversees climate-related risks.  And the Commission "reiterate[d]" that the Rules "are focused on disclosure and do not require … registrants to change their governance or other business practices."  App. __[89FR21856]; *see, e.g.*, App. __[89FR21671] ("The Commission has been and remains agnostic about whether or how registrants consider or manage climate-related risks.").  And, while the Commission recognized that disclosures could affect behavior, such secondary effects would generally "stem from

78

investors' improved ability to assess managerial decisions." *See* App. __-__, __[89FR21887-88,21891].

As for the financial-statement disclosures, the Commission explained that the requirement to disclose "specific categories of discrete capitalized costs, expenditures expensed, charges, and losses" and the 1% and "de minimis thresholds" mean that the rules are "unlikely to result in immaterial disclosure." App. __[89FR21796]. And the use of such bright-line thresholds is consistent with prior practice. App. __ n.2063[89FR21797] ("Regulation S-X … includes a variety of different percentage thresholds prescribing disaggregated disclosure—rather than relying only on principles-based materiality thresholds." (citing, *e.g.*, 17 C.F.R. 210.5-03.1(a), 210.5-02.8)).

Petitioners also err in asserting that the Rules' requirement to disclose climate-related risks that are "reasonably likely to have a material impact" represents an unexplained change in position. Chamber 34-35. The Commission stressed that, in determining whether any climate-related risks are reasonably likely to have a material impact, "registrants should rely on traditional notions of materiality." App. __[89FR21696] (citing, *e.g.*, *Basic*, 485 U.S. at 231-32, 240). And, far from being "novel," Chamber 34, the Commission explained that, in operation, this standard is the same as the analysis long required in MD&A disclosures. App. __[89FR21695]. That analysis was developed in 1989 and,

79

rather than broadening traditional notions of materiality, it is intended to guide companies in making traditional materiality determinations pertaining to forward-looking information. It is also designed to prevent having to conduct a materiality analysis for unlikely future events. *See Management's Discussion and Analysis, Selected Financial Data, and Supplementary Financial Information*, 86 Fed. Reg. 2080, 2093-94 (Jan. 11, 2021). This standard is "not … intended" to "result" in "disclosure that is not material," *id.* at 2094, and it addresses precisely the over-disclosure concern petitioners assert the Commission fails to address, Chamber 33-34. *See* 86 Fed. Reg. at 2094.

Petitioners also misconstrue the Rules in asserting that they require disclosure of "other information that is 'material' to subordinate company plans and activities, regardless whether that information would affect a reasonable *investor's* decisions." Chamber 35; *see* Liberty 34. The Commission expressly stated that issuers "should rely on traditional notions of materiality." App. __[89FR21696]. When describing a "material impact[] … on" an issuer's "strategy," for example, *see* Liberty 34, the impact on the strategy must itself be material *to investors*. *See* App. __-__[89FR21695-96].

## III. The Commission reasonably considered the Rules' economic effects.

The Commission thoroughly analyzed the Rules' benefits and costs, and it addressed the likely economic effects of each of the Rules' specific provisions.

80

App. __-__[89FR21852-70]. The Commission quantified its analysis where practicable, including "attempt[ing] to quantify the direct costs of compliance for registrants that will be impacted by the final rules," App. __-__[89FR21870-87], and otherwise conducted a qualitative analysis. And the Commission considered the Rules' potential effects on efficiency, competition, and capital formation. App. __-__[89FR21888-91].

### A. The Commission reasonably considered the Rules' impact on efficiency, competition, and capital formation.

The Commission satisfied its obligations to "consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation," 15 U.S.C. 77b(b), 78c(f), and to "consider … the impact any such rule or regulation would have on competition," *id.* 78w(a)(2).[7] The Commission explained that the Rules "should have positive effects on market efficiency" because the required disclosures about climate-related risks will enable investors and other market participants to "better evaluate registrants and make more informed investment and voting decisions," thus "reduc[ing] information asymmetry and mispricing in the market, improving market efficiency." App.

---

[7] By their plain terms, these provisions require the Commission to "consider" whether—not to "find" that—adopted rules would promote "efficiency, competition, and capital formation." *Chamber of Com.*, 85 F.4th at 773; *contra* Texas Alliance 59. Nor is the Commission required to "establish" a rule's precise "effect" on competition. *Contra* Business Roundtable Amicus 27.

__[89FR21888].  For instance, the Rules will "reduc[e] the costs associated with compiling and organizing information on climate-related risks and oversight." App. __[89FR21888].  And "eliciting more consistent and reliable information about climate-related risks," those risks "can be better incorporated into asset prices."  App. __[89FR21889].

As for competition, the Commission concluded that "by standardizing reporting practices, the final rules would level the playing field among firms, making it easier for investors to assess the climate-related risks of a registrant against those of its competitors."  App. __[89FR21890].  Regarding capital formation, the Commission determined that "[m]ore consistent, comparable, and reliable disclosures could lead to capital market benefits."  App. __[89FR21890]. In particular, "[t]he reduction in information asymmetry between managers and investors could allow investors to better estimate future cash flows, which could reduce investors' uncertainty, thus lowering the costs of capital."  App. __[89FR21890].  And "less information asymmetry *among* investors" is "likely to improve stock liquidity (*i.e.*, narrower bid-ask spreads), which could attract more investors and reduce the cost of capital overall."  App. __[89FR21890].

The Chamber asserts that the Rules' "costs will deter companies from going (or staying) public."  Chamber 38.  But the Commission reasonably determined that "the benefits of being a public registered company are sufficiently strong such

82

that it is unlikely many companies will choose to avoid becoming or continuing as a public registered company as a result of the final rules." App. __[89FR21891]. And while petitioners assert that the Rules' costs "will fall disproportionally on smaller firms," Chamber 38, the Commission modified the Rules to mitigate this concern by adding longer phase-in periods for emerging growth companies and smaller registrants and excluding smaller companies from the requirement to disclose material GHG emissions. App. __[89FR21890]; *see also* App. __[89FR21891] (discussing modifications "intended to mitigate the compliance burden on registrants and lessen disproportionate impacts on smaller and emerging growth firms").

## B. The Commission reasonably estimated the costs of the Rules.

The securities laws require the Commission to "determine as best it can the economic implications of the rule it has proposed," but it is not required to "base its every action upon empirical data" or a "quantitative analysis." *Chamber of Com.*, 85 F.4th at 772-73. Nor is the Commission obligated to conduct a "precise cost-benefit analysis." *Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1111 (D.C. Cir. 2022). Rather, the Commission "may reasonably conduct 'a general analysis based on informed conjecture.'" *Chamber of Com.*, 85 F.4th at 774; *Lindeen*, 825 F.3d at 657-58.

83

### 1. The Commission reasonably considered varying cost estimates from commenters.

In estimating the costs of the Rules, the Commission acknowledged that "commenters offered a wide range of cost estimates, suggesting that there is significant heterogeneity when it comes to expected compliance costs among registrants, and such estimates may not provide a representative view of the costs of compliance for all affected registrants." App. __[89FR21870]. The Commission also explained that "[t]hroughout the cost estimation process," it "use[d] medians instead of means since the former is less sensitive to outliers." App. __ n.3046[89FR21877]. Thus, far from relying on "biased" or "padd[ed]" cost data, Chamber 39, the Commission "endeavored … to factor" in the evidence it received on the costs of the proposed rules, while recognizing the limitations of such data. App. __[89FR21871]; *see* App. __[89FR21871-74].

The Chamber emphasizes a single "$4 million per year" estimate regarding the proposed GHG emissions requirement, but they fail to explain why it was unreasonable for the Commission to take account of all cost estimates it received or why the Commission was required to credit their preferred estimate. As the Commission explained, that estimate includes Scope 3 emissions, *contra* Chamber 39; "includes the cost of third-party limited assurance"; and was derived from the application of conservative estimates for hours and wages of the employee time the company asserted would be required for compliance. App. __

84

n.5[89FR21879]; App. __, __[3040CL1,3]. This figure therefore may overstate the cost of GHG disclosure, and it was an upper-end outlier among the cost estimates submitted by commenters. App. __, tbl.10 & n.5[89FR21879]. By including this and other estimates in its calculation of median costs, the Commission controlled for these potential overstatements, as well as any outliers in the other direction.

The Chamber's assertion that a particular survey included respondents that erroneously reported "zero" costs, which it asserts artificially depressed that survey's calculations of total average costs, misunderstands the Commission's analysis. Chamber 41; *see* App. __, __, tbl.2.3 & n.20[3278CL5,18]. When citing this survey, the Commission was analyzing the costs of specific components of the Rules, *see* App. __-__[89FR21870-87], not overall costs. And, in doing so, it used the more specific data from the survey regarding the costs of specific categories of expenditures, *not* the overall estimates petitioners highlight. App. __, __, __-__[89FR21872,21879,21882-83] (costs relating to GHG emissions and scenario analysis). That data did not include the "zero" responses the Chamber criticizes; instead, it indicated "Issuer Average Spend *among Those Spending in Each Defined Survey Category*." App. __, tbl.2.1[3278CL5] (emphasis added).

To the extent the Chamber complains that the survey was generally unreliable because "the rule requires more and different disclosures than companies are currently making," Chamber 41, the Commission acknowledged

85

this concern, explaining that "many commenters provided aggregate cost estimates that did not include certain elements required by the final rules, or included other elements that are not required in the final rules."  App. __[89FR21871].  And the Commission made adjustments to the data from this specific survey to account for differences from the specific provisions of the Rules.  App. __, tbl.10 & n.4[89FR21879].

### 2. The Commission reasonably accounted for the costs of disclosing material Scopes 1 and 2 GHG emissions.

The Chamber elides the relevant discussion in the release in erroneously contending that the Commission failed to address the costs to issuers of "determin[ing] 'whether' scopes-1-and-2 emissions are 'material' and thus required."  Chamber 42.  The Commission acknowledged that "some registrants may need to expend resources to first determine whether particular disclosure items are material, even in cases where registrants ultimately determine they do not need to make disclosure."  App. __[89FR21875].  And far from "ignoring" this cost, Chamber 42, the Commission reasonably explained that the estimates provided of the costs of measuring and assessing GHG emissions were not detailed enough to allow the Commission "to reliably disaggregate the materiality determination from the costs of disclosure more broadly," and "the cost of such a determination could vary depending on the registrant's facts and circumstances and

86

may in some cases be de minimis." App. __[89FR21875]. Petitioners do not point to any data that calls this determination into question.

The Chamber's assertion that the Commission opportunistically framed the costs and benefits of the GHG disclosures is also baseless. In estimating the percentage of issuers that will make GHG disclosures as required under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.*),[8] the Commission considered surveys of companies that currently provide climate-related disclosures, in addition to commenter and staff estimates. App. __[89FR21902]. Petitioners claim this was "illogical" because the Rules are based on the inadequacy of existing disclosures. Chamber 43. But there is nothing illogical about viewing the fact that an issuer currently provides climate-related disclosure as an indication that it may be required to do so under the Rules—and the petitioners do not suggest other data or methodologies the Commission should have used.

Moreover, the Commission recognized the limitations of existing data and that its estimate may "underestimate or overestimate the actual number of affected respondents." App. __ n.3205[89FR21902]. And there is no "inconsisten[cy]" (Chamber 42) in concluding that the GHG disclosure requirements will "improv[e] the accuracy and reliability" of current disclosures, App. __[89FR21859], and the

---

[8] *See also* GSA and OMB, *Creating a Supporting Statement Part A*, https://pra.digital.gov/uploads/supporting-statement-a-instructions.pdf (agency should "[i]ndicate the number of respondents" in its estimate).

Appellate Case: 24-1522    Page: 104    Date Filed: 08/06/2024   Entry ID: 5421154

use of existing disclosure practices in making this predictive judgment, App. __[89FR21902].

### 3. Petitioners' other challenges to the Commission's economic analysis lack merit.

a. Liberty erroneously contends that the Commission generated a "misleadingly low" estimate of total average costs of compliance over a ten-year period by including in its calculation costs from the Rules' first two years, when the GHG emissions disclosure requirements phase in. Liberty 45-46. But there was nothing misleading about it. The Commission forthrightly explained the basis of its estimates, saying that "[r]egistrants will incur compliance costs for different disclosure items at different times due to applicable phase in periods," App. __ n.3032[89FR21875], and provided examples to illustrate the different types of disclosures issuers might be required to make, the costs of those disclosures, and when those requirements would phase in. App. __ & nn.3033-37[89FR21875]. It also explained that its calculations took "into account the various disclosure items and their respective phase in periods." App. __ n.3037[89FR21875]. And the Commission explained why it included these figures, stating that "[f]or ease of comprehension and comparability, these estimates are presented as the average annual compliance cost over the first ten years of compliance." App. __ n.3032[89FR21875].

88

b.      The Chamber criticizes the Commission for not relying on "event studies" to support its conclusion regarding the importance of climate-related information to investors.  Chamber 24.  As an initial matter, and as petitioners' own brief shows, the Commission did consider such evidence.  Chamber 26 (discussing event study relied on by the Commission).  More importantly, neither the APA nor the Commission's organic statutes "restrict the universe of otherwise permissible methods by which the SEC can analyze the economic implications of a proposed rule."  *Chamber of Com.*, 85 F.4th at 773; *see id.* at 773-74 ("It is within the agency's discretion to determine the mode of analysis that most allows it 'to determine as best it can the economic implications of the rule it has proposed.'").

The Commission reasonably declined to conduct its own "event study to study price or volume responses to climate-related disclosures."  App. __[89FR21841].  *Contra* Chamber 24-25, 29-30.  "[A]n agency need not create data that doesn't already exist."  *Chamber of Com.*, 85 F.4th at 776; *see also Prometheus*, 592 U.S. at 427 ("The APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies.").  And, as the Commission explained, such an event study was unnecessary "in light of the support in peer-reviewed literature for the importance of climate-related disclosures to investors," such as "[e]xisting research find[ing] an increase in stock price volatility around the day when GHG or carbon emissions are disclosed in a

89

Form 8-K filing." App. __ & n.2660[89FR21841]; *see also* App. __-
__[89FR21846-50].

 c. The Chamber erroneously faults the Commission for failing to assess
or quantify "the effect of the [Rules] across the economy." Chamber 43. Nothing
in the Securities Act, the Exchange Act, or the APA requires the Commission to do
so. Rather, when the Commission engages in rulemaking, it must "consider, in
addition to the protection of investors, whether the action will promote efficiency,
competition, and capital formation." 15 U.S.C. 77b(b), 78c(f). And courts have
consistently recognized that where Congress has required more, "it has made that
requirement clear in the agency's statute." *Inv. Co. Inst. v. CFTC*, 720 F.3d 370,
379 (D.C. Cir. 2013); *Lindeen*, 825 F.3d at 658; *Chamber of Com,* 85 F.4th at 773;
*cf., e.g.*, 2 U.S.C. 1532(a)(4) (requiring other agencies to "prepare a written
statement" that includes, among other things, "estimates by the agency of the
[rule's] effect on the national economy").

 The Commission met its obligation to assess, as best it can, the likely
economic consequences of the Rules by qualitatively addressing the concerns
underlying the comment the Chamber cites on this point. The commenter
contended that economy-wide impacts would result from, among other things,
"reductions in domestic business competitiveness, reductions in retail investor
returns, and market inefficiency from a resulting misallocation of resources." App.

__[3981CL3-4].  The Commission explained that: changes made from the proposal significantly lowered the burdens from the Rules, thus mitigating concerns about competitive impacts on U.S. registrants, App. __ & n.3148[89FR21890]; that the Rules could lead to improved liquidity and lower costs of capital, App. __[89FR21890-91]; and that the addition of materiality qualifiers addressed concerns that the proposed rules were too prescriptive and may lead to inefficient allocation of resources, App. __ & nn.2762, 2764[89FR21851].  The Commission also recognized this commenter's assertion that the proposed Rules could lead to higher costs or lower wages in different industries, concluding that the modifications made to the proposal, which lowered the burdens of the Rules, mitigated those concerns.  App. __ & nn.2772-73[89FR21851].

d.      Finally, the Chamber criticizes the Commission for not estimating costs from "diminished shareholder value."  Chamber 43.  But they fail to cite any data the Commission could have used to do so.  *See Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 12 (D.C. Cir. 2015) ("simply criticiz[ing] [an] agency for not obtaining and evaluating more data" does not demonstrate its analysis was unreasonable); *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 448 (D.C. Cir. 2012) (rejecting challenge to economic analysis in part because "Appellant points to no data or study the Department ignored").

Moreover, as petitioners recognize, Chamber 43, the Commission qualitatively assessed this issue.  It recognized that "[t]o the extent that the final rules lead companies to alter their governance structures in ways that are less efficient … investors could incur costs in the form of diminished shareholder value," and that "the disclosure requirements may either prompt *or deter* companies from overseeing climate-related risks at the board or management level."  App. __[89FR21856] (emphasis added).  But the Commission also found that these effects were mitigated by modifications from the proposal, including moving to less prescriptive requirements and adding an express materiality qualifier to the requirement to disclose any current management oversight practices.  And the Commission reiterated that the Rules do not require any company to change governance or business practices and issuers "remain free to establish or retain the procedures and practices that they determine best fit their business."  App. __[89FR21856].

## IV.    The Commission satisfied the APA's procedural requirements.

### A.    The Rules are a logical outgrowth of the proposal.

The Commission provided the public with a meaningful opportunity to participate in the rulemaking process.  A final rule "must be a logical outgrowth of the rule proposed," *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007), and a proposing release must "adequately frame the subjects for

92

discussion" such that an "affected party should have anticipated the agency's final course in light of the initial notice," *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021). The record here meets that standard, and petitioners' arguments to the contrary misstate the Rules and ignore relevant parts of the record.

Petitioners' argument that the Rules' "approach[]" to materiality is not a logical outgrowth, Liberty 47, rehashes their erroneous assertions that the Rules are inconsistent with traditional conceptions of materiality, asserting that there was insufficient notice of this "novel" approach. But this characterization of the Rules is incorrect. *Supra* pp. 50-54, 77-80. And the proposing release specifically requested comment on the approach actually taken—the inclusion of express materiality qualifiers, *see, e.g.*, App. __, __, __[87FR21369,21371,21381]. Many commenters responded, proposing such qualifiers, confirming that fair notice was provided of this aspect of the Rules. *E.g.*, App. __ nn.415, 420[89FR21698] (citing, among others, App. __, __, __[3657CL2,3881CL8,4027CL7]; *see also, e.g.*, App. __[3688CL17]; *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989) (changes that "were instigated by … comments" are a logical outgrowth), *decision clarified on reh'g*, 885 F.2d 253 (5th Cir. 1989).

Petitioners next allege a lack of notice for the Rules' "requirement" that issuers collect data from third parties. Liberty 47. But under the proposed rules,

93

issuers would have been required to disclose climate-related impacts on their "[s]uppliers and other parties in its value chain." App. __[87FR21354; *compare* App. __[88FR21467] (Item 1502(b)(1)(iii)), *with* App. __[89FR21915] (Item 1502(b)(3)).

And Liberty's argument that the Commission's stay opposition in the Fifth Circuit somehow "conceded that the final Rule was not a 'logical outgrowth of the rule proposed,'" Liberty 49, is well wide of its mark. In its stay application, Liberty attempted to show that it had satisfied the requirement that it "move first before the agency for a stay pending review," Fed. R. App. P. 18(a)(1), by relying on a comment letter—submitted more than a year before the Rules' adoption—suggesting that the Commission stay any final rules pending judicial review. *See* Letter, ECF 5377132, Ex. 1, at 3 n.1, *Liberty Energy Inc. v. SEC*, No. 24-1624 (8th Cir. Mar. 26, 2024). The fact that the comment letter did not satisfy Rule 18(a)(1), including because it "did not provide the Commission with an opportunity to address specific arguments for a stay of the Final Rules as adopted, including the impact of extended compliance dates," *id.* Ex. 2, at 6, says nothing about the substantive aspects of the Rules or the extent of modifications from the proposal.

## B.  The Commission reasonably relied on supplementary studies in adopting the Rules.

The Commission also provided sufficient notice of the studies it relied on. Petitioners incorrectly contend that a number of authorities cited in the Rules are

94

outside the administrative record and, in their view, not "legitimate support" for the Rules.  Chamber 24; States 52-53; Liberty 42-43 (collectively citing nn.2721, 2728-29, and 2737-50 of the Rules).  Only one of the petitioners specifies any of the articles they refer to.  States 53 (citing Aswani, addressed below); *see Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 341 (8th Cir. 2018) (issue forfeited when defendants did not "develop their argument" beyond a "single sentence").  But even if the Court were to consider these arguments, they find no support in the record or caselaw.

To begin, 27 of the 47 authorities cited in the footnotes petitioners highlight *were* cited in either the proposing release or by commenters.[9]  Moreover, only "critical factual material," *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 201 (D.C. Cir. 2007), that provides the "basic assumptions" for the agency's rulemaking, *Chamber of Com. of U.S. v.*

---

[9] The articles by Christensen, van Binsbergen, Greenwald, Ilhan, Hong, Hartzmark, an earlier version of Matsumura (2022), Akerlof, Verrecchia, FSOC, and CDP, were cited in the proposal.  *Compare* App. __-__ nn.2721, 2729, 2739, 2743, 2744, 2748, 2750[89FR21846-49], *with* App. __, __, __-__, __, __, __ nn.6, 804, 840, 850, 853, 854, 856, 888, 969, 988[89FR21336,21425,21428-30,21436,21445,21447].  The articles by Kölbel, Moss, Pankratz, Kacperczyk, Sautner, Li, Bolton (2021), Griffin, Matsumura (2014), Huynh, Aswani, Faccini, Goldsmith-Pinkham, Painter, Engle, and Krueger, were cited by commenters.  *Compare* App. __-__ nn.2721, 2737, 2738, 2742, 2744, 2745, 2748[89FR21846-49], *with* App. __, __, __, __, __, __, __, __-__, __-__, __, __, __, __.[3202CL1,3381CL7,3592CL66,3688CL30,3690CL2,3691CL1,3893CL2, 4167CL1-9,23-24,4534CL1,4,6,10].

Appellate Case: 24-1522     Page: 112     Date Filed: 08/06/2024     Entry ID: 5421154

*SEC*, 443 F.3d 890, 902 (D.C. Cir. 2006), need be provided in the proposing release. The inclusion in the final rules of "supplementary" data that merely "clarif[ies], expand[s], or amend[s] other data that has been offered for comment" does not run afoul of the APA's notice requirement. *Id.* at 903. Thus, for example, the D.C. Circuit upheld a rule where the agency's the final rule cited additional, more recent studies "describing the same" harm. *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 863 F.3d 911, 920 (D.C. Cir. 2017).

So too here. Many of the cited studies stand for the same propositions about the importance to investors of climate-related risks already well supported in the proposing release or by commenters: investors are demanding and using information about climate-related risks;[10] climate-related risks relate to firm values and affect asset prices;[11] and improved disclosures can provide benefits to

---

[10] *Compare* App. __ n.2721[89FR21846] (Cohen, Castillo, Baier, Black, and Robinson), *with* App. __ n.2721[89FR21846] (Christensen); *compare* App. __ n.2728[89FR21847] (Li, Amel-Zadeh), *with* App. __, __, __ nn.40, 105, 139[89FR21673,21677,21680]; *see generally* App. __-__, __-__[87FR2121338-43,21424-25].

[11] *Compare* App. __ n.2729[89FR21847] (Ling), *with* App. __ n.888[87FR21436], *and* App. __ n.2729[89FR21847] (van Binsbergen, Greenwald); *compare* App. __-__nn.2739-41, 43-45[89FR21848-49] (Custodio, Ginglinger, Lu, Schlenker, Bolton (2022), Nguyen), *with* App. __ nn.2739-40[89FR21848] (Hong, Kacperczyk, Huynh, Goldsmith-Pinkham, Painter, Kölbel, Ilhan); *see generally* App. __& n.802, __ & nn.964-66[87FR21425,21445].

96

investors and the market.[12]  And the remaining studies did not provide "critical

factual material" that was relied on by the Commission, as the Commission

acknowledged these studies provided contrary evidence.[13]

## V.     The Rules are consistent with the First Amendment.

Properly construed, the Rules warrant the lesser First Amendment scrutiny

applied to commercial disclosure requirements.  And they readily pass muster

under that, or a higher, standard.

### A.     Commission disclosure rules are generally subject to the lesser scrutiny applicable to commercial speech.

1.     First Amendment protection for commercial speech "is justified in

large part by the information's value to consumers" rather than its expressive value

for the speaker.  *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229,

249 (2010).  As a result, commercial speech may be subject to "modes of

---

[12] *Compare* App. __ n.2748[89FR21849] (Amihud, Glosten), *with* App. __ n.865[87FR21430] (Lambert), *and* App. __n.2748[89FR21849] (Verrecchia); *compare* App. __ n.2749[89FR21849] (citing n.2570 and study by Corporate Knights), *with* App. __ n.2570[89FR21830] (citing App. __, __, __[3465CL19,3418CL2,3988CL5]).

[13] App. __ n.2745[89FR21849] (Murfin).  In any case, this study is supplementary of similar evidence cited by commenters.  App. __ n.2745[89FR21848-49] (Aswani).  And the Commission acknowledged in both the proposal and in the final release that some investors exhibit nonpecuniary preferences, but it did not justify the Rules on this ground.  *Compare* App. __n.2743[89FR21848] (Riedl, Pástor), *with* App. __ n.804[87FR21425] (Hartzmark).

97

regulation that might be impermissible in the realm of noncommercial expression." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *see Cent. Hudson*, 447 U.S. at 562-63.

Within the commercial speech context, "disclosure requirements" warrant lesser scrutiny than "outright prohibitions on speech." *Zauderer*, 471 U.S. at 650. In *Zauderer*, the Supreme Court upheld a law requiring disclosure of "factual and uncontroversial information" where the law was "reasonably related" to an adequate government interest and not "unjustified or unduly burdensome" on protected expression. *Id.* at 651. The Court has repeatedly reaffirmed that framework. *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra (NIFLA)*, 585 U.S. 755, 768 (2018); *Milavetz*, 559 U.S. at 249-50; *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2396, 2398 (2024).

2.    Like other forms of commercial expression, disclosures in the securities law context "relate to the good or service offered by the regulated party," *Am. Meat Inst. v. U.S. Dep't of Agric. (AMI)*, 760 F.3d 18, 26 (D.C. Cir. 2014) (en banc), and pertain to the "terms under which" securities "will be available." *Zauderer*, 471 U.S. at 651. Just like "commercial speech" in which a speaker "seeks to disseminate information about a specific product or service," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n.24 (1976), disclosures in Commission registration statements and periodic reports

98

inform prospective and current investors' decisions about whether to purchase, hold, or sell securities or how to vote their securities, *see Omnicare*, 575 U.S. at 178.

Courts have thus long recognized that "regulation of the exchange of information regarding securities is subject only to limited First Amendment scrutiny." *SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988).[14] Whether such communications are commercial speech, or a distinct form of speech akin to it, the government's power to regulate "[s]peech relating to the purchase and sale of securities … is *at least as broad* as with respect to the general rubric of commercial speech." *Id.* (emphasis added).

Indeed, "[i]f speech employed directly or indirectly to sell securities were totally protected, any regulation of the securities market would be infeasible—and that result has long since been rejected." *Id.* That securities disclosure requirements "have always coexisted with the First Amendment" further supports the consensus that heightened scrutiny does not apply in this context. *Vidal v. Elster*, 602 U.S. 286, 295, 299 (2024); *cf.* Bernard J. Kilbride, *The British Heritage*

---

[14] *See also Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1109 (D.C. Cir. 2011) ("Securities regulation involves a different balance of concerns and calls for different applications of First Amendment principles."); *United States v. Wenger*, 427 F.3d 840, 848 (10th Cir. 2005) (analyzing non-transactional securities communications as commercial speech); *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 n.9 (1988) (observing, in reference to securities regulations, that "[p]urely commercial speech is more susceptible to compelled disclosure requirements").

99

*of Securities Legislation in the United States*, 17 Sw. L.J. 258, 262-63 (1963) (England's Joint Stock Companies Act of 1844 required disclosures including "full and fair" balance sheet and served as foundation for Securities Act).

3.    Petitioners erroneously argue that the disclosures required by the Rules are not "commercial speech" because they do not "propose[] a commercial transaction." *E.g.*, Chamber 64.  While some decisions describe commercial speech that way, the Supreme Court also has defined it more broadly as encompassing "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson*, 447 U.S. at 561; *see, e.g.*, *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 247-48 (4th Cir. 2024) (rejecting argument that *Zauderer* is limited to speech that "propose[s] a commercial transaction'" (emphasis omitted)).  And the Supreme Court has not articulated the "precise bounds of the category of expression that may be termed commercial speech." *Zauderer*, 471 U.S. at 637; *see Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 280 (5th Cir. 2024) (same), *cert. granted*, 2024 WL 3259690 (U.S. July 2, 2024).

Contrary to petitioners' arguments (*e.g.*, Liberty 56), courts of appeals have also "unanimously held that *Zauderer* applies outside the context of misleading advertisements." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 756 (9th Cir. 2019) (en banc) (collecting cases); *see, e.g.*, *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 541 (D.C. Cir. 2020) (*Zauderer* standard not "limited to restrictions on

Appellate Case: 24-1522     Page: 117     Date Filed: 08/06/2024     Entry ID: 5421154

advertising and point-of-sale labeling").  Nor does the Court's reasoning in *Zauderer* provide a basis to impose such a limitation.  *Cf. AMI*, 760 F.3d at 22 (because *Zauderer* involved "misleading advertisements," "it was natural for the Court to express the rule in such terms").  And Liberty's reliance on *Dryer v. National Football League*, 814 F.3d 938, 943 (8th Cir. 2016), is inapposite.  *Dryer* involved Copyright Act preemption, not the First Amendment.

### B. The lesser scrutiny applicable to commercial disclosures applies to the Rules.

Because the Rules require disclosure of factual, noncontroversial information in commercial speech, they are reviewed under *Zauderer* and they satisfy that review.  But even if the Court were to disagree, the Rules should be reviewed under the intermediate scrutiny otherwise applied to commercial speech, which they also survive.  *See Cent. Hudson*, 447 U.S. at 566.

### 1. The Rules require "purely factual" disclosures.

Each category of information that the Rules require issuers to disclose is "purely factual" under *Zauderer*:  it is "supported by facts" and "conclusions driven by those facts," and is not "akin to unfalsifiable statements of opinion." *R.J. Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 879 (5th Cir. 2024).

a. Disclosure of "climate-related risks that have materially impacted" the issuer's "strategy, results of operations, or financial condition," App. \_\_[89FR21915] (Item 1502(a)), consists solely of facts known to the issuer or

conclusions driven by facts. And disclosure of climate-related risks that the issuer deems "reasonably likely" to have a material impact on its business or financial condition, App. __[89FR21915] (Item 1502(a)), entails only conclusions or inferences based on facts. *R.J. Reynolds*, 96 F.4th at 879.

Contrary to NLPC's assertion, NLPC 54, these disclosures do not cease to be purely factual merely because they require issuers to draw a conclusion or inference based on factual information. And the Fifth Circuit has correctly rejected the argument that disclosure of "an issuer's subjective opinion about the business benefits of its actions cannot be a purely factual disclosure." *Chamber of Com.*, 85 F.4th at 769-70.

The Rules' governance disclosures—which are required only if an issuer's board or management *does* oversee or play a role in managing material climate-related risks—are also factual. App. __[89FR21915]. How an issuer oversees, assesses, and/or manages climate-related risks consists of verifiable facts about the issuer's current practices, and petitioners barely contend otherwise.

b.     Similarly, disclosure about any material "climate-related target or goal," "transition plan," "scenario analysis," or "internal carbon price," if the issuer has adopted any such tools, App. __-__[89FR21915-16] (Items 1502(e)-(g), 1504), requires statements of past and present fact. It does not require issuers to offer unfalsifiable statements of opinion, such as their general views of "climate change"

or "climate change's long-term consequences and corporations' responsibilities to address it."  Chamber 61.[15]

c.      Petitioners do not specifically dispute that the Rules' Article 14 financial statement disclosures are purely factual.  Nor can they, as those provisions require issuers to disclose verifiable quantitative information regarding the effects of severe weather events and other natural conditions on their financial statements.  App. __-__[89FR21912-13].

d.      Finally, the Rules' GHG emissions disclosure requirements are also purely factual.  The quantities of GHG emissions that occur at sources owned or controlled by an issuer (Scope 1) or as a result of the issuer's activities (Scope 2) are based on verifiable facts.  That the calculation of these figures may involve "assumptions" or "estimates," *see* App. __, __[89FR21734,21859], does not change their purely factual character.  *Contra* Chamber 64-65.  As the Commission found, methodologies for calculating at least Scopes 1 and 2 GHG emissions are well established, App. __-__[89FR21673-74], and these quantities are "inferable from scientific observation."  *R.J. Reynolds*, 96 F.4th at 881.  And information

---

[15] *Compare Book People, Inc. v. Wong*, 91 F.4th 318, 325, 339 (5th Cir. 2024) (concluding that law requiring book sellers to assign all library material a rating of "sexually explicit," "sexually relevant," or "no rating" based on "weighing and balancing" various factors did not require disclosure of purely factual information).

103

does not cease to be factual merely because it might provoke an "emotional response" or has "ideological baggage." *Id.* at 880.

### 2. The required disclosures are uncontroversial.

The disclosures under the Rules are "uncontroversial" within the meaning of *Zauderer*. 471 U.S. at 651. Issuers are required to disclose specific items of information about known or reasonably anticipated risks affecting their own business and financial performance—and actions the issuer has already taken (if any) in response to such risks; they are not required to "take sides in a heated political controversy" or to "convey a message fundamentally at odds with [their] mission." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 845, 858 (9th Cir. 2019). Nor do the Rules compel issuers to opine on matters such as "the scientific basis of … climate change" or "appropriate responses to climate change." NLPC 33. Similarly, issuers must disclose the effects of severe weather events in their financial statements, App. __[89FR21913], but they are not required to opine on "connections between weather events and global climate change," Chamber 65.

Rather than explain why any of these specific items of information are controversial, petitioners merely assert that "climate change" in general is a "politically charged" subject. *E.g.*, Chamber 61, 65-66. Even assuming the premise, merely involving the same general subject matter as a debated political or

104

ideological matter is not enough to be considered "controversial." *R.J. Reynolds*, 96 F.4th at 881 ("[M]ere connection to a live, contentious, political issue" does not render a factual statement controversial.); *see CTIA*, 928 F.3d at 845 (explaining that a "purely factual statement that can be tied in some way to a controversial issue" is not "for that reason alone[] controversial"). Nor is a factual statement "controversial" solely because the "speaker dislikes or disagrees with the message he must convey." *Free Speech Coal.*, 95 F.4th at 282. Rather, to be controversial under *Zauderer*, a statement must be "an *integral* part of a live, contentious political or moral debate." *Id.* at 281-82 (emphasis added).

For instance, in *R.J. Reynolds*, the Fifth Circuit held that warnings about the adverse health effects of smoking were "uncontroversial under *Zauderer*," even though they may have been "related to ideological and political issues," because the statements were not "an inherent part of a national political debate." 96 F.4th at 882. And in *Maryland Shall Issue*, the Fourth Circuit concluded that statements about gun access increasing the risk of suicide were "uncontroversial." 91 F.4th at 249-50; *see Chamber of Com.*, 85 F.4th at 770 (reasons behind share repurchase uncontroversial even though share repurchases are "one of the most controversial corporate decisions an issuer can make"). The description of "climate change" as a "controversial subject[]" in *Janus v. AFSCME*, 585 U.S. 878, 913 (2018)—which

Appellate Case: 24-1522     Page: 122     Date Filed: 08/06/2024     Entry ID: 5421154

did not address *Zauderer* or compelled disclosures in the context of commercial speech—thus does not help petitioners. *E.g.*, Chamber 65.

The Chamber's cited decisions involving other Commission actions are similarly inapposite. Chamber 64-65. *NAM* involved Commission rules requiring certain issuers to use the prescribed phrase "not been found to be 'DRC [Democratic Republic of the Congo] conflict free'" to describe certain of their products. 800 F.3d at 530; *see* 15 U.S.C. 78m(p)(1)(A) (requiring the Commission to promulgate rules regarding the use of "conflict minerals"). The D.C. Circuit's decision not to apply *Zauderer* turned on the implications of the particular language issuers were required to use. *NAM*, 800 F.3d at 530 ("conflict free" or "not conflict free" "conveys moral responsibility for the Congo war" and "requires an issuer to tell consumers that its products are ethically tainted"). Here, by contrast, issuers are not required to use any particular language, and are free to use their own words to provide the required information. *See Chamber of Com.*, 85 F.4th at 772 (rejecting First Amendment challenge to Commission rules that required issuers to provide a "privately crafted explanation" for share repurchases).

And *Lowe v. SEC*, 472 U.S. 181 (1985), involved an enforcement action in which the Commission sought to *enjoin* publication of "disinterested commentary and analysis" in "securities newsletters." *Id.* at 183, 206. *Lowe* thus has no bearing on the Commission's ability to require *disclosure* of factual information in

106

issuers' registration statements and annual reports—which has long been understood as implicating different First Amendment principles. *See Wall St. Publ'g*, 851 F.2d at 371 (distinguishing *Lowe* as involving an injunction prohibiting publication rather than a required "disclosure statement"); *supra* pp. 97-101.

### C.    The Rules satisfy *Zauderer*.

The Rules satisfy *Zauderer*'s standard that a disclosure requirement comports with the First Amendment if it is "reasonably related" to a legitimate state interest and not "unjustified or unduly burdensome" so as to "chill[] protected commercial speech." 471 U.S. at 651; *see also Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 554 (6th Cir. 2012) (describing *Zauderer* as a "rational-basis standard").

### 1.    The disclosure requirements are reasonably related to a legitimate government interest.

Congress has recognized that the securities markets are "an important national asset which must be preserved and strengthened." 15 U.S.C. 78k-1(a)(1)(A). The Commission therefore "has a substantial interest through the securities laws in making capital markets more open and efficient" by giving "all investors equal access to all relevant information." *Wenger*, 427 F.3d at 850-51; *Chamber of Com.*, 85 F.4th at 771 ("The SEC has a legitimate interest in promoting the free flow of commercial information.").

107

As the Commission found based on an extensive record, climate-related risks and a company's responses to those risks "can significantly affect the company's financial performance and position." App. __[89FR21669]; *see* App. __-__, __-__[89FR21671-72,21848-49]; *supra* pp. 19-21, 45-47, 63. But existing climate-related disclosures are "inconsistent, difficult to compare, and frequently boilerplate." App. __[89FR21673]; *supra* pp. 64-68. The record amply demonstrates that the Rules are needed to "provide investors with more consistent, comparable, and reliable disclosures" about climate-related risks that have materially affected an issuer's business, among other matters. App. __[89FR21830]; *supra* pp. 63-69.

Petitioners' contrary arguments largely repeat their erroneous contentions that the Rules require disclosure of information that is immaterial or "not financially impactful" or that the Rules are unnecessary. *E.g.*, Chamber 65-66; NLPC 60. They also err in asserting that the Commission claims a substantial interest in merely "giving consumers information" or satisfying "consumer curiosity alone." *E.g.*, Chamber 62; Liberty 57-58 (quoting *AMI*, 760 F.3d at 31-32 (Kavanaugh, J., concurring in the judgment)). As the Commission reasonably found, information about climate-related risks facing an issuer's business—and the other information required under the Rules—can have a significant effect on the issuer's financial performance, and investors thus regularly

108

use such information in making investment and voting decisions. *Supra* pp. 19-21, 44-45, 63-69. Just like the "historically rooted interest in supporting American manufacturers" that supported the disclosures in *AMI* (760 F.3d at 32 (Kavanaugh, J., concurring in the judgment)), the Commission's interest in providing investors with decision-useful information traces to the enactment of the Securities Act and the Exchange Act more than 90 years ago. *Supra* pp. 26-36.

Further, the Chamber is incorrect that "protecting investors from fraud" or similar risks is the only legitimate interest that could justify the Rules under *Zauderer*. Chamber 62. Courts of appeals have "unanimously concluded that the *Zauderer* exception for compelled speech applies even in circumstances where the disclosure does not protect against deceptive speech." *CTIA*, 928 F.3d at 843 (collecting cases); *see, e.g.*, *R.J. Reynolds*, 96 F.4th at 882-83. After all, "*Zauderer*'s characterization of the speaker's interest in opposing forced disclosure of such information as 'minimal'" is "inherently applicable beyond the problem of deception." *AMI*, 760 F.3d at 22. And more generally, "disclosure requirements have been upheld in regulation of commercial speech even when the government has not shown that absent the required disclosure, the speech would be false or deceptive." *Wall St. Publ'g*, 851 F.2d at 373. Petitioners identify no authority holding that the Commission's interest in supporting investor access to decision-useful information is not a legitimate government interest.

109

### 2. The disclosure requirements are not "unjustified or unduly burdensome."

*Zauderer*'s "unduly burdensome" prong focuses on whether the disclosure requirement "unduly burden[s] *expressive* activity." *NetChoice*, 144 S. Ct. at 2398-99 & n.3 (emphasis added). The *Zauderer* analysis thus "does not countenance a broad inquiry into whether disclosure requirements are 'unduly burdensome' in some abstract sense." *NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 486 (5th Cir. 2022), *vacated on other grounds*, 144 S. Ct. 2383.

The Rules impose no such burden on expressive activity. The required disclosures do not limit issuers' ability to speak (or not) about any climate-related issues. They do not "drown[] out" an issuer's "own message." *NIFLA*, 585 U.S. at 778; *see Chamber of Com.*, 85 F.4th at 772 ("A requirement that compels speech solely within the narrow confines of SEC filings is not the type of forced disclosure that would meaningfully 'chill protected commercial speech.'"). Moreover, by allowing issuers to make the disclosures in their own words, rather than requiring them to use government-mandated language, the Rules give issuers "flexibility to tailor the disclosures to [their] individual circumstances." *Milavetz*, 559 U.S. at 252. Nor do the Rules "prevent[]" issuers "from adding their own message" in addition to the required disclosures. *Am. Hosp. Ass'n*, 983 F.3d at 541. Thus, the Rules are not unduly burdensome under *Zauderer*, and they are consistent with the First Amendment.

110

**D.    The Rules would survive more exacting scrutiny under *Central Hudson*.**

Even if *Zauderer* did not apply, "[r]egulations on commercial speech are subject to intermediate scrutiny under the framework set forth in *Central Hudson*." *Passions Video, Inc. v. Nixon*, 458 F.3d 837, 841-42 (8th Cir. 2006).  Where a commercial disclosure requirement "does not fall within … *Zauderer … Central Hudson* is the appropriate standard."  *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1217 (D.C. Cir. 2012), *rev'd in part on other grounds*, *AMI*, 760 F.3d 18. Petitioners, Chamber 61-64; Liberty 53-54; NLPC 50-53, are thus incorrect in arguing for the application of strict scrutiny.  *Cf. Vidal*, 602 U.S. at 300 (declining to apply heightened scrutiny to content-based trademark restriction because of longstanding coexistence of content-based trademark restrictions and First Amendment).

Under *Central Hudson*, a restriction on commercial speech is permissible if it "directly advances" a "substantial" governmental interest and is "not more extensive than is necessary to serve that interest."  447 U.S. at 566.  The regulation need not be the "single best disposition" or "least restrictive means" of achieving that end, but rather the "fit" between the "ends and the means" must be "reasonable" and "in proportion to the interest served."  *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).

111

For similar reasons as those discussed above, the Rules would withstand review under *Central Hudson*. Based on the well-established connection between climate-related risks and a company's financial performance, App. __-__[89FR21848-49]; *supra* pp. 19-21, 45-47, 63, the Commission has a substantial interest in providing investors with more consistent, comparable, and reliable disclosures about such risks for use in their investment and voting decisions, App. __[89FR21830]; *supra* pp. 63-69. The Commission also has a substantial interest in strengthening investor protection, improving market efficiency, and facilitating capital formation—interests that the Commission reasonably determined the Rules would promote. App. __[89FR21830]; *supra* pp. 81-83.

Further, as the Commission explained, the specific matters that the Rules require issuers to disclose are important to investors' investment and voting decisions. App. __-__[89FR21848-50]; *see generally* App. __-__, __-__[89FR21687-772,21776-817]; *supra* pp. 46-47, 63-69. The Rules thus "directly advance[]" the Commission's legitimate interests, and there is a "reasonable" fit between ends and means that is "in proportion to the interest served." *Fox*, 492 U.S. at 475, 480.

## VI. Petitioners' requested relief is overbroad.

For the above reasons, all of plaintiffs' challenges to the Rules fail. But should the Court conclude otherwise, it should not "vacate [the Rules] in [their]

112

entirety," as petitioners request. *E.g.*, Chamber 67. "There are many reasons to think" that statutes authorizing courts to "set aside" agency action—like the review provisions of the securities laws—use that term "to mean 'disregard' rather than 'vacate.'" *United States v. Texas*, 599 U.S. 670, 696 (2023) (Gorsuch, J., concurring in the judgment); *see* 15 U.S.C. 77i, 78y. *But see Tex. Med. Ass'n v. HHS*, No. 23-40217, 2024 WL 3633795, at *11 (5th Cir. Aug. 2, 2024).

Regardless, courts have treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. In particular, remand without vacatur may be warranted should the Court determine that the Commission did not adequately consider an issue or explain its choices. *See A.P. Bell Fish Co., Inc. v. Raimondo*, 94 F.4th 60, 65 (D.C. Cir. 2024) ("[r]emand without vacatur is appropriate" where there is a "strong possibility" that the agency will be able to cure any defects); *see also U.S. Steel Corp. v. EPA*, 649 F.2d 572, 577 (8th Cir. 1981); *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019).

In addition, if this Court determines that a particular provision of the Rules is unlawful, it should sever the Rules and limit any remedy to the invalid provision. "[T]he APA permits a court to sever a rule by setting aside only the offending parts of the rule." *Carlson*, 938 F.3d at 351. Courts sever the invalid parts of a rule where (1) "the agency would have adopted the same disposition regarding the

113

unchallenged portion of the regulation if the challenged portion were subtracted" and (2) "the parts of the regulation that remain" can "function sensibly without the stricken provision." *Id.* "In such an inquiry, the presumption is always in favor of severability." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990).

Both factors would support severance here. The Commission expressly stated that "if any of the provisions of these rules" or any "application" of the rules "is held to be invalid, the Commission intends tha1t such invalidity shall not affect other provisions or application of such provisions to other persons or circumstances that can be given effect without the invalid provision or application." App. __[89FR21829]. This "dispels any doubt about what the [Commission] would have done" if any particular disclosure "were subtracted." *Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 816 (5th Cir. 2024); *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 624 (2020) (courts generally "should adhere to the text of [a] severability or nonseverability clause").

The remainder of the Rules could also function sensibly without any particular disclosure requirement, if the Court were to invalidate a specific provision of the Rules. As the Commission explained, the Rule's required disclosures "serve[] distinct but related purposes." App. __[89FR21829]. Thus, although the disclosure requirements "are each intended to improve the overall

114

consistency, comparability, and reliability of climate-related disclosures," the Commission determined that "the invalidity of any particular disclosure requirement would not undermine the operability or usefulness of other aspects of" the Rules. App. __[89FR21829] (providing examples of categories of disclosure that are "capable of operating independently"). Thus, if this Court were to conclude that a certain disclosure requirement is unlawful, it should sustain the remainder of the Rules, which would protect investors by providing them with important information that would facilitate informed investment and voting decisions.

## CONCLUSION

The petitions for review should be denied.

Respectfully submitted,

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

TRACEY A. HARDIN
DANIEL STAROSELSKY
Assistant General Counsels

SAMUEL GOLDSTEIN
Counsel to the General Counsel

/s/ John R. Rady
JOHN R. RADY
Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4997 (Rady)
radyjo@sec.gov

August 5, 2024

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by this Court's July 8, 2024 order granting the Commission leave to file a brief of up to 25,000 words, because this brief contains 24,879 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface—Times New Roman, 14 point—using Microsoft Word.

I further certify that this brief has been scanned for viruses and is virus-free.

/s/ John R. Rady
John R. Rady

August 5, 2024

# CERTIFICATE OF SERVICE

I certify that on August 5, 2024, I filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit through the Court's CM/ECF system. All counsel of record are registered CM/ECF users, and service will be accomplished through the CM/ECF system.

/s/ John R. Rady
John R. Rady

August 5, 2024