IN THE
## United States Court of Appeals for the Eighth Circuit

_____

STATE OF IOWA, ET AL.,

*Petitioners,*

v.

SECURITIES AND EXCHANGE COMMISSION,

*Respondent,*

DISTRICT OF COLUMBIA, ET AL.,

*Intervenors.*

_____

On Petitions for Review of an Order and Rule
of the Securities and Exchange Commission

_____

**CONSOLIDATED REPLY BRIEF OF STATE PETITIONERS**

_____

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*
PATRICK C. VALENCIA
*Deputy Solicitor General*
Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-8770
eric.wessan@ag.iowa.gov
patrick.valencia@ag.iowa.gov

September 17, 2024

*Counsel for State of Iowa*

*\*Additional counsel listed in
signature block*

## TABLE OF CONTENTS

                                                                    **Page**

TABLE OF CONTENTS ..............................................................i

TABLE OF AUTHORITIES.................................................iii

INTRODUCTION...........................................................1

ARGUMENT ...................................................................1

    I.    THE RULE ADDRESSES A MAJOR
        QUESTION. ...................................................... 1

        A.    The Rule Uses Old Laws in a Novel Way. .....................2

        B.    The Rule Fundamentally Alters SEC's
              Disclosure Scheme. ..........................................4

        C.    Congress Would Not Task SEC With
              Climate Regulation. ......................................8

        D.    The Rule Addresses a Politically Significant
              Problem. .......................................................10

        E.    The Rule Has a Staggering Effect on the
              Economy. ....................................................12

    II.    SEC CANNOT IDENTIFY ANY CLEAR
        STATEMENT GIVING IT THE AUTHORITY IT
        CLAIMS...........................................................14

    III.    THE RULE—AN UNACKNOWLEDGED,
         UNEXPLAINED, AND UNJUSTIFIED CHANGE
         IN AGENCY PRACTICE—IS ARBITRARY AND
         CAPRICIOUS..........................................................19

        A.    SEC Neither Acknowledges Nor Provides
              Reasoned Explanation for Its Significant
              Change in Practice. ........................................19

i

# TABLE OF CONTENTS—Continued

B. SEC Ignores Contradictory Evidence and Fails to Support the Rule by Substantial Evidence. ........................................................ 28

IV. VACATUR IS THE PROPER REMEDY. ............................ 31

CONCLUSION ........................................................................... 34

CERTIFICATE OF COMPLIANCE ........................................... 41

CERTIFICATE OF SERVICE .................................................... 42

Appellate Case: 24-1522    Page: 3    Date Filed: 09/26/2024 Entry ID: 5440360

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ala. Ass'n of Realtors v. HHS,*
   594 U.S. 758 (2021)..............................................................3, 12

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
   522 U.S. 359 (1998)..................................................................29

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
   934 F.3d 649 (D.C. Cir. 2019) ...............................................32

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988)..............................................................4, 5

*Biden v. Nebraska,*
   143 S. Ct. 2355 (2023)...................... 3, 4, 8, 13, 15, 16, 17, 19

*Bittner v. United States,*
   598 U.S. 85 (2023)....................................................................3

*BST Holdings, LLC v. OSHA,*
   17 F.4th 604 (5th Cir. 2021) ..................................................11

*Bus. Roundtable v. SEC,*
   647 F.3d 1144 (D.C. Cir. 2011) .............................................24

*Carlson v. Postal Regul. Comm'n,*
   938 F.3d 337 (D.C. Cir. 2019) ...............................................32

*Cent. S. Dakota Co-op. Grazing Dist. v. USDA,*
   266 F.3d 889 (8th Cir. 2001)..................................................24

*Chadbourne & Parke LLP v. Troice,*
   571 U.S. 377 (2014)................................................................18

*Christopher v. SmithKline Beecham Corp.,*
   567 U.S. 142 (2012)..................................................................7

*Cmty. for Creative Non-Violence v. Turner,*
   893 F.2d 1387 (D.C. Cir. 1990) .............................................33

*Cnty. of Maui, Haw. v. Haw. Wildlife Fund,*
   590 U.S. 165 (2020)................................................................17

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.,*
   144 S. Ct. 2440 (2024)...........................................................31

*Cort v. Ash,*
   422 U.S. 66 (1975)..................................................................12

Appellate Case: 24-1522    Page: 4    Date Filed: 09/26/2024 Entry ID: 5440360

**Page(s)**

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ................................................ 20, 22, 23

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ................................................ 18

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................ 20, 23, 24

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000) ................................................ 3, 11, 13, 14

*Gallagher v. Abbott, Lab'ys*,
269 F.3d 806 (7th Cir. 2001) ................................................ 7

*Gonzales v. Oregon*,
546 U.S. 243 (2006) ................................................ 9, 12

*Gundy v. United States*,
588 U.S. 128 (2019) ................................................ 16

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (2000) ................................................ 14

*In re NVIDIA Corp. Sec. Lit.*,
768 F.3d 1046 (9th Cir. 2014) ................................................ 6

*Janus v. AFSCME, Council 31*,
585 U.S. 878 (2018) ................................................ 10

*Jarecki v. G.D. Searle & Co.*,
367 U.S. 303 (1961) ................................................ 15

*King v. Burwell*,
576 U.S. 473 (2015) ................................................ 13

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ................................................ 8

*MCI Telecomm. Corp. v. Am. Tel. & Tele. Co.*,
512 U.S. 218 (1994) ................................................ 4

*MD/DC/DE Broadcasters Ass'n v. FCC*,
253 F.3d 732 (D.C. Cir. 2001) ................................................ 33

*Mistretta v. United States*,
488 U.S. 361 (1989) ................................................ 15

*Morall v. DEA*,
412 F.3d 165 (D.C. Cir. 2005) ................................................ 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ................................................ 29

iv

**Page(s)**

*N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*,
  76 F.4th 291 (4th Cir. 2023) .............................................. 12

*NFIB v. OSHA*,
  595 U.S. 109 (2022) ........................................................... 2

*Norfolk and W. Ry. Co. v. Am. Train Dispatchers Ass'n*,
  499 U.S. 117 (1991) ......................................................... 17

*SEC v. Ralston Purina Co.*,
  346 U.S. 119 (1953) ......................................................... 17

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ........................................................... 5

*Shazi v. Wilkinson*,
  988 F.3d 441 (8th Cir. 2021) ...................................... 19, 24

*Touby v. United States*,
  500 U.S. 160 (1991) ......................................................... 16

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .................................................. 4, 9, 18

*United Hous. Found., Inc. v. Forman*,
  421 U.S. 837 (1975) ......................................................... 18

*United States v. Jackson*,
  390 U.S. 570 (1968) ......................................................... 33

*United States v. Naftalin*,
  441 U.S. 768 (1979) ......................................................... 18

*United Steel v. Mine Safety & Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) ....................................... 31

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ......................................................... 13

*Voyageurs Region Nat. Park Ass'n v. Lujan*,
  966 F.2d 424 (8th Cir. 1992) ........................................... 22

*West Virginia v. EPA*,
  597 U.S. 697 (2022) .................... 1, 2, 3, 10, 11, 12, 14, 19

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ......................................................... 16

**Statutes**

5 U.S.C. § 706 ..................................................................... 31

15 U.S.C. § 77g ................................................................... 14

15 U.S.C. § 78l ............................................................. 14, 16

Appellate Case: 24-1522     Page: 6     Date Filed: 09/26/2024 Entry ID: 5440360

**Page(s)**

15 U.S.C. § 78m ........................................................................ 14

42 U.S.C. § 7414 ........................................................................ 8

## Regulations

*Commission Guidance Regarding Disclosure Related to Climate Change*, Exchange Act Release No. 33-9106, 75 Fed. Reg. 6,290 (Feb. 8, 2010) .................................... 21, 22

*The Enhancement and Standardization of Climate-Related Disclosures for Investors*, Securities Act Release No. 33-11275 (Mar. 6, 2024), 89 Fed. Reg. 21,668 (Mar. 28, 2024) .................... 5, 6, 10, 11, 13, 21, 29

## Other Authorities

Brie Strickland Miller, *Risky Business: Shining A Light with Corporate Climate-Related Disclosures in an Age of Agency Skepticism*, 9 Oil & Gas, Nat. Resources & Energy J. 655 (2024) ........................ 10

Caleb Nelson, *What is Textualism?*, 91 Va. L. Rev. 347 (2005) ................................................. 15

Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121 (2020) ................................ 31, 33

Statement from Hester M. Peirce, *Green Regs and Spam: Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024), http://tinyurl.com/2p8xzwj9 ............................. 7, 23, 30

Appellate Case: 24-1522    Page: 7    Date Filed: 09/26/2024 Entry ID: 5440360

## INTRODUCTION

The Rule mandates extensive disclosures relating to non-financial "climate-related" risks, targets, and emissions. Companies already have to report *material* climate-related information. The Rule thus requires disclosing non-material climate-related information. But SEC fails to recognize that drastic shift. And that shift will have a massive cost on publicly traded companies and the economy at large. For such a major action, SEC must point to clear authority from Congress. It does not, because it cannot. The Rule thus raises a major question and is arbitrary and capricious. Because of these fundamental defects, vacatur—the default remedy—is proper here.

## ARGUMENT

## I.  THE RULE ADDRESSES A MAJOR QUESTION.

When the question is of the "major policy" variety, courts "presume" Congress kept it for itself. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up). The Rule asserts authority over a major question: climate change. It does so without *any* congressional authorization—let alone a clear one. In arguing otherwise, SEC misapplies its own history, misuses its statutory power, and misunderstands the Rule's novelty.

1

### A.    The Rule Uses Old Laws in a Novel Way.

The Rule mandates publicly listed companies to place environmentalism at the center of their work. Companies must now accept SEC's view that combatting global warming is paramount and lay out—at great length—how they plan to address the problems SEC perceives. SEC "has never before adopted a broad [environmental] regulation of this kind." *NFIB v. OSHA*, 595 U.S. 109, 119 (2022). Thus, SEC "claims to discover in a long-extant statute an unheralded power." *West Virginia*, 597 U.S. at 724 (cleaned up).

SEC recasts its environmental edicts as requirements to publish "information [that] would be important to investment and voting decisions." SEC Br. 33. Supposedly, the Rule is based on "core provisions of the securities laws that expressly authorize it to promulgate disclosure requirements to protect investors." *Id.* at 55.

But even if that were true, SEC forgets that disclosures on climate issues are a *new exercise* of its authority. Measures to address infectious disease may be part of the core powers of the Centers for Disease Control, for example, but the Supreme Court still found CDC overstepped when it tried to use those powers to address a major question—national housing

policy—in a new way. *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 763-765 (2021).

So too in *West Virginia*; though EPA has long issued regulations combating air pollution, the statutes enabling it to do so were not clear enough to endorse a new effort to reorient the national energy system. *See* 597 U.S. at 730 (rejecting an argument that EPA was justified in acting because "reduc[ing] air pollution from power plants . . . is EPA's bread and butter"); *see also*, *e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-160 (2000) (rejecting FDA's effort to regulate tobacco as a "drug" based on major questions doctrine).

The Rule is "a novel and fundamentally different" disclosure scheme than those seen before. *Biden v. Nebraska*, 143 S. Ct. 2355, 2369 (2023). Throughout its history, SEC has not only declined to enact such a scheme but also repeatedly said it would be improper to do so. Even apart from the major questions doctrine, that background is important, as courts must "consider the consistency of an agency's views when [they] weigh the persuasiveness of any interpretation it proffers." *Bittner v. United States*, 598 U.S. 85, 97 (2023).

Appellate Case: 24-1522    Page: 10    Date Filed: 09/26/2024 Entry ID: 5440360

The court should "pump[] the brakes" and apply the major questions doctrine before approving such innovation. *Nebraska*, 143 S. Ct. at 2383 (Barrett, J., concurring).

## B. The Rule Fundamentally Alters SEC's Disclosure Scheme.

The Rule's twisted view of SEC's powers to compel disclosure (even when it comes to immaterial information) is not just new: it also represents a "radical" and "fundamental change" to SEC's disclosure regime. *MCI Telecomm. Corp. v. Am. Tel. & Tele. Co.*, 512 U.S. 218, 229 (1994). Most obviously, the Rule turns from helping investors maximize their returns and embraces regulations that serve broader social interests. The best example of this is how the Rule recasts materiality.

Here, again, SEC tries to dress the Rule in the garb of "traditional concepts of materiality." SEC Br. 77. But if the Rule took the traditional approach, it would require companies to disclose only facts that impact a company's "fortune" in "certain and clear ways." *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988). After all, it has long been "universally agreed" that materiality involves "the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976). And reasonable investors

4

"invest[] [their] money . . . expect[ing] profits." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946). Thus, a "material misrepresentation[]" is one that affects "the market price of shares traded." *Basic*, 485 U.S. at 246.

But as the States explained before, the Rule requires disclosures well outside the longstanding definition of materiality. For instance, SEC admits that at least some of the Rule's changes in Regulation S-X will compel "immaterial disclosure[s]," but it waves them away by claiming that they are "unlikely" on a case-by-case basis. SEC Br. 52. Similarly, the new Regulation S-K requires disclosures that SEC says have no materiality qualifier but are "still important to investment and voting decisions" in some undefined way. *Id.* at 51. By mandating companies disclose information that SEC acknowledges is immaterial, the Rule is inconsistent with nearly a century of practice.

Even where SEC includes a supposed materiality qualifier, it is a façade: throughout the Rule, disclosures are required of climate-related risks that have a material effect or "are reasonably likely to have a material effect." *See, e.g.*, *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, Securities Act Release No. 33-11275 (Mar. 6, 2024), *published at* 89 Fed. Reg. 21,668, 21,691 (Mar. 28,

2024). But a standard based on a reasonable likelihood of materiality is "much broader than what is required under the [materiality] standard." *In re NVIDIA Corp. Sec. Lit.*, 768 F.3d 1046, 1055 (9th Cir. 2014) (comparing the materiality standard to a regulation requiring disclosure of "trends or uncertainties" that a registrant "reasonably expects will have a material . . . impact"). "Reasonable," "likely," and more are meant to create ambiguity that will force companies to err on the side of overdisclosure—or risk facing SEC enforcement or private lawsuits. By layering qualifying term upon qualifying term, the Rule includes far more information than traditional materiality requires.

And SEC should know that it is adding disclosures beyond what is material. For years, it has explained that its rules "already require the disclosure of" "environmental . . . information" that is "material to investors." *See, e.g.*, SEC Opening Br., at 2 n.1, *NRDC v. SEC*, No. 77-1761 (D.C. Cir. Oct. 17, 1977) ("SEC NRDC Brief"). The Rule itself acknowledges that "existing rules already require disclosure about material risks," including climate-related risks. 89 Fed. Reg. at 21,719; *see also id.* at 21,797 ("We agree . . . that registrants are already required

6

to disclose the financial statement effect of material climate risks under existing rules.").

Only in defending the Rule before this Court does SEC suggest "[t]here is no . . . requirement" to disclose material climate information. SEC Br. 67. SEC insists companies can dodge making material disclosures under the existing regime because there's no "duty to disclose all information material to stock prices as soon as news comes into [a company's] possession." *Id.* (quoting *Gallagher v. Abbott Lab'ys*, 269 F.3d 806, 808 (7th Cir. 2001)).

But a company has a duty to promptly disclose where "positive law" creates such a duty. *Gallagher*, 269 F.3d at 808. And as to material climate risks, such a positive-law duty exists. *See* Commission Guidance Regarding Disclosure Related to Climate Change, 18 (Feb. 2, 2010), https://tinyurl.com/yc4dt736 (explaining how "existing disclosure requirements . . . apply to climate change matters"). The Court should thus ignore SEC's "convenient litigating position." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (cleaned up).

Make no mistake: the Rule defies traditional notions of materiality and is merely "decorated . . . with materiality ribbons." Statement from

7

Hester M. Peirce, *Green Regs and Spam: Statement on the Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 6, 2024), http://tinyurl.com/2p8xzwj9.

### C. Congress Would Not Task SEC With Climate Regulation.

When viewed properly as requiring non-material climate information, the Rule is well beyond SEC's "expertise." *Kisor v. Wilkie*, 588 U.S. 558, 578 (2019). SEC does not dispute that climate regulation would be "outside of its wheelhouse," either. *Nebraska*, 143 S. Ct. at 2382 (Barrett, J., concurring). SEC's lack of expertise explains, for instance, why Congress has tasked EPA—not SEC—with administering climate-related reporting requirements in the past. *See* 42 U.S.C. § 7414.

SEC's only counter is that it is *not* regulating climate issues but "[e]nsuring that market participants have appropriate information to make investment and voting decisions." SEC Br. 56. But SEC's ill-defined notion of what might be "appropriate" (as opposed to material) for public disclosure has never extended to social issues like climate change. And the power to mandate all information SEC determines to be "appropriate" would constitute a breathtaking grant of authority unparalleled in any other statutory disclosure scheme.

8

Further, a "robust record," SEC Br. 56, of "comment letters" the agency believes demonstrates "investor demand," *id.*, 64, does not change how climate information is "both beyond [SEC's] expertise and incongruous with the statutory purposes and design" of the Acts. *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006). Materiality is based on whether a given fact "would have been viewed by the reasonable *investor* as having significantly altered the total mix of information made available." *TSC Indus.*, 426 U.S. at 449 (emphasis added). The "mere possibility" that someone "might consider it important" is not enough. *Id.* (cleaned up).

Relying on politically animated comment letters—often backed by political-action groups that serve interests unrelated to maximizing investor returns—suggests that SEC has lost sight of who it is supposed to serve: investors and markets, not special interests or social causes. *See* Michael S. Piwowar, Comm'r, SEC, *Advancing and Defending the SEC's Core Mission* (Jan. 27, 2014), https://tinyurl.com/muaaz7sb (recognizing the "threat" that "special interests" will "co-opt the SEC's corporate disclosure regime . . . to the detriment of investors"). That is especially true here, where the "volume" of comment letters came from "a few

9

concerted organizations," and "the most common support theme . . . applauded the Proposed Rule's ability to help protect the environment." Brie Strickland Miller, *Risky Business: Shining A Light with Corporate Climate-Related Disclosures in an Age of Agency Skepticism*, 9 OIL & GAS, NAT. RESOURCES & ENERGY J. 655, 663 (2024).

### D. The Rule Addresses a Politically Significant Problem.

An agency action can also implicate a major question when it carries "vast . . . political significance." *West Virginia*, 597 U.S. at 716. On that score, SEC suggests that climate change is not "a subject of public discourse." SEC Br. 57 (cleaned up). The Supreme Court disagrees: "climate change" is a "controversial subject." *Janus v. AFSCME, Council 31*, 585 U.S. 878, 913 (2018). And the Court is right: "[l]ess than half (46%) of the American public sees climate change as a very serious problem," and over a third "oppose the U.S. government doing more to reduce the type of activities that cause climate change." *Climate Change Concerns Dip*, MONMOUTH UNIV., https://tinyurl.com/47efxbu2 (May 6, 2024) (cleaned up).

The Rule is about climate change. Indeed, the phrase "climate change" appears at least 80 times throughout the Rule. *See* 89 Fed. Reg.

10

at 21,668-921; *see also id.* ("climate" alone appears over 2,300 times). Beyond that, SEC fundamentally misunderstands the major questions doctrine. The major questions doctrine does not include an administrative scienter requirement. It does not look at what an agency claims an action is ostensibly "designed to address." SEC Br. 57. Rather, it looks to an action's objective "political magnitude." *Brown & Williamson*, 529 U.S. at 133. Here, the Rule shoulders companies with billions of dollars in costs by imposing vast disclosures related to one of the nation's "most hotly debated political issues," climate change. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021). Thus, the court "must be guided to a degree by common sense as to the manner in which Congress is likely to delegate" such power. *Brown & Williamson*, 529 U.S. at 133.

Courts should be especially skeptical when, as here, an agency enacts a program like ones that "Congress considered and rejected" in the past. *West Virginia*, 597 U.S. at 731. Several bills could have imposed disclosure requirements like those in the Rule, had Congress not declined to pass any of them. SEC objects that these bills were not identical to the Rule and so "lack persuasive significance." SEC Br. 57 (cleaned up).

But the Rule need not be a precise incantation of earlier failed bills to raise alarm bells. It is enough that the Rule is "essentially" the same in substance, if not form, as schemes that Congress has "consistently rejected." *West Virginia*, 597 U.S. at 731. Because the Rule is a "similar measure[]," *id.* at 732, to past failed proposals, *see* States' Br. 35-36, Congress would not likely delegate the power to enact it in an "oblique form," *Gonzales*, 546 U.S. at 267.

Beyond that, SEC does not contest that the Rule "intrudes into an area that is the particular domain of state law," *Ala. Ass'n*, 594 U.S. at 764, as "[c]orporations are creatures of state law," *Cort v. Ash*, 422 U.S. 66, 84 (1975). That misguided foray onto the States' traditional turf confirms the Rule is politically significant in yet another way. *See N.C. Coastal Fisheries Reform Grp. v. Capt. Gaston LLC*, 76 F.4th 291, 297 (4th Cir. 2023) (an agency action can raise the major questions doctrine "when the asserted power raises federalism concerns").

### E. The Rule Has a Staggering Effect on the Economy.

When "an agency decision[]" has "vast 'economic . . . significance,'" that's another instance in which the Supreme Court "expect[s] Congress to speak clearly if it wishe[d] to" authorize such power. *Util. Air Regul.*

12

*Grp. v. EPA*, 573 U.S. 302, 324 (2014). Yet SEC hardly addresses the Rule's economic implications. Instead, it describes the Rule's "economic significance" as only "alleged." SEC Br. 57. But the Rule's "economic significance" is manifest: even SEC's own estimate places the annual costs at over $2.3 billion. 89 Fed. Reg. at 21,908. Thus, the Rule comfortably exceeds "billions of dollars in spending" each year. *King v. Burwell*, 576 U.S. 473, 485 (2015). That level of spending signals that if "Congress wished to assign" this power to SEC, "it surely would have done so expressly." *Id.* at 486.

Perhaps recognizing the undeniable costs, SEC stops short of claiming the Rule is economically insignificant. Instead, SEC says only that economic significance is not "a license to override statutory text." SEC Br. 57. True. But that is not what the major questions doctrine says, either. It only says that when an agency action has certain features, such as "economic . . . significance," there is "reason to hesitate before concluding that Congress" granted such power. *Brown & Williamson*, 529 U.S. at 159-160. And based on SEC's own estimates, the Rule's costs are "staggering by any measure." *Nebraska*, 143 S. Ct. at 2373. That

13

economic weight suggests a major question requiring SEC to show "clear congressional authorization" before acting. *West Virginia*, 597 U.S. at 723.

## II. SEC CANNOT IDENTIFY ANY CLEAR STATEMENT GIVING IT THE AUTHORITY IT CLAIMS.

Because the Rule addresses a major question, SEC must meet its burden by pointing to "clear congressional authorization for the power it claims." *West Virginia*, 597 U.S. at 723. It cannot. "All [SEC] can offer . . . is . . . a vague statutory grant," *id.* at 732, of power to "require disclosure of information that the Commission determines is 'necessary or appropriate' in 'the public interest' or for the 'protection of investors,'" SEC Br. 29 (quoting 15 U.S.C. §§ 77g(a)(1), 78l(b)(1), and 78m(a)). And read closely: SEC never suggests that language rises to be a clear statement.

The laws that SEC cites do not give it carte blanche to require any disclosures it wishes. SEC concedes that much but says terms like "necessary," "proper," and "public interest" "take meaning from the purposes of the regulatory legislation." *Id.* (cleaned up).

But before jumping to the statutes' purposes, the court should look to the textual "company" the relied-on phrases "keep[]." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (2000); *see also Brown & Williamson*, 529

14

U.S. at 131 (stressing that the "meaning" of a word or phrase "may only become evident when placed in context"). Doing so is important "to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961). Likewise, "giving narrow construction" to the Acts' broad terms avoids an unchecked "delegation[] that might otherwise be thought to be unconstitutional" under "the non-delegation doctrine." *Mistretta v. United States*, 488 U.S. 361, 373 n.7 (1989). Context is particularly important when confronted with an agency attempting to address a major question, as that doctrine "emphasize[s] the importance of *context* when a court interprets a delegation to an administrative agency." *Nebraska*, 143 S. Ct. at 2376 (Barrett, J., concurring).

SEC does not look to the phrases' context in the statute. Instead, SEC does what "no 'textualist' favors": it "isolate[es] [the] statutory language" to read it as expansively as it wants. Caleb Nelson, *What is Textualism?*, 91 VA. L. REV. 347, 348 (2005). In doing so, SEC insists the Acts apparently have no concrete bounds and permit them to require disclosing anything the agency declares "important to investors' decisions to buy, hold, sell, or vote their securities," SEC Br. 32.

In other words, SEC believes the Acts have no "specific restrictions" that "meaningfully constrain[]" its ability to determine what it thinks investors need to know. *Touby v. United States*, 500 U.S. 160, 166-167 (1991). That understanding lacks an "intelligible principle to guide [SEC's] use of discretion" and so flouts the nondelegation doctrine. *Gundy v. United States*, 588 U.S. 128, 137 (2019). Thus—under SEC's reading— the Acts would constitute "an unlawful delegation of legislative power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).

"But a vacuum is no home for a textualist," and SEC is mistaken. *Nebraska*, 143 S. Ct. at 2382 (Barrett, J., concurring). Here, the Acts' seemingly broad grants of power show that SEC's ability to mandate disclosures is limited to categories which are financial in nature. Indeed, each of the Securities Act's enumerated disclosures—which precede any allowance for other disclosures—concern a company's financial profitability or business. *See* States' Br. 20–21.

The Exchange Act is no different: it lists specific financial disclosures and then allows only for "further financial statements" SEC deems "necessary or appropriate for the protection of investors." 15 U.S.C. § 78l(b)(1)(L). And "when a general term follows a specific one, the

16

general term should be understood as a reference to subjects akin to the one with specific enumeration." *Norfolk and W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991).

The context here—disclosures on financial and business information—"imposes limitations" on SEC's power to require disclosures to only those similar in kind to those listed. *Cnty. of Maui, Haw. v. Haw. Wildlife Fund*, 590 U.S. 165, 172 (2020).

Still, the Acts' purpose confirms SEC lacks the power it claims. The States agree that the Acts are designed to "protect investors by promoting full disclosure of information thought necessary to informed investment decisions." SEC Br. 29 (quoting *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953)). But SEC again fails to address two questions: what can it protect investors from, and what information is necessary for that protection? At most, SEC's brief reflects a belief that it can protect investors from any social ill SEC might recognize. As to the second point, SEC apparently believes necessary means that it might be remotely helpful for any purpose to some person. If those were the right answers, then SEC would have "virtually unlimited power to rewrite federal law" to address any problem it wished. *Nebraska*, 143 S. Ct. at 2373.

Appellate Case: 24-1522     Page: 24     Date Filed: 09/26/2024 Entry ID: 5440360

But Congress restricted SEC's authority. When it passed the Acts in 1929, "Congress' primary contemplation was that regulation of the securities market might help set the economy on the road to recovery." *United States v. Naftalin*, 441 U.S. 768, 775 (1979). To that end, the Acts were designed "to eliminate serious abuses in a largely unregulated securities market." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975); *see also Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 390 (2014) (explaining these statutes were meant to "insure honest securities markets and thereby promote investor confidence" (cleaned up)). And "securities transactions are economic in character." *Forman*, 421 U.S. at 849. Thus, the Acts' "focus" is on the "capital market," including "the sale of securities to raise capital for profit-making purposes," the "exchanges," and the need "to prevent fraud and . . . protect the interest of investors" in the market. *Id.*

In line with their purpose, the Acts do not protect against all risks or require disclosure of "all facts which a reasonable shareholder *might* consider important." *TSC Industries*, 426 U.S. at 445 (cleaned up). They "protect investors against" the abuses that led to the stock market crash in 1929—"fraud" and the "manipulation of stock prices." *Ernst & Ernst v.*

18

*Hochfelder*, 425 U.S. 185, 195 (1976). Thus, the financial-market-focused provisions that SEC relies on are not "clear congressional authorization" tasking it with imposing climate-related disclosures. *West Virginia*, 597 U.S. at 732 (cleaned up). Instead, they reject the expansive view of power that would greenlight this Rule.

And remember: SEC needs a "clear congressional authorization" to support its new power. *West Virginia*, 597 U.S. at 716. SEC's need to resort to its (incorrect) view of the Acts' purpose, rather than their text, shows no clear authorization can be found. *Nebraska*, 143 S. Ct. at 2375.

## III. THE RULE—AN UNACKNOWLEDGED, UNEXPLAINED, AND UNJUSTIFIED CHANGE IN AGENCY PRACTICE—IS ARBITRARY AND CAPRICIOUS.

Even if Congress had authorized SEC to issue the Rule, the Rule is arbitrary and capricious. SEC still does not acknowledge its significant change in practice and continues to fail to give a reasoned explanation for such change supported by substantial evidence. *See Shazi v. Wilkinson*, 988 F.3d 441, 449 (8th Cir. 2021).

### A. SEC Neither Acknowledges Nor Provides Reasoned Explanation for Its Significant Change in Practice.

1. An "[u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from

19

agency practice." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). SEC needed to provide a more reasoned explanation for its decision to change course and require these expansive, and expensive, disclosures. But it did not.

SEC is "free to change [its] existing policies," but it must "provide a reasoned explanation for the change." *Id.* at 221. That is especially important when its "prior policy has engendered serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009). The agency must explain why it disregarded the "facts and circumstances that underlay or were engendered by the prior policy" in favor of its change in policy. *Id.*

But SEC denies that the Rule is a change in policy. It instead claims the "Rules rely on traditional" and longstanding policies. *E.g.*, SEC Br. 9-11, 77. SEC contends that the Rule simply requires registrants to disclose the same material climate-related information they were already required to disclose, but this time "in a more standardized format" to help investors better compile and compare the data when making investment decisions. SEC Br. 20. Nothing to see here, says SEC. The 900-page Rule shows otherwise. Intervenors at least acknowledge the Rule here is new,

Appellate Case: 24-1522    Page: 27    Date Filed: 09/26/2024 Entry ID: 5440360

but they dub it a "new application of longstanding policy" and "not a change in policy." Intervenors' Br. 45 (quotation marks omitted).

For decades, SEC had said registrants had a duty to report material climate-related information. *See, e.g.*, 89 Fed. Reg. at 21,797-98; *Commission Guidance Regarding Disclosure Related to Climate Change*, Exchange Act Release No. 33-9106, 75 Fed. Reg. 6,290, 6,297 (Feb. 8, 2010); SEC NRDC Brief at 2 n.1. ("If environmental . . . information is material to investors, the Commission's rules already require the disclosure of such information."). What SEC had said for decades is no longer true.

The Rule does not apply "traditional notions of materiality." 89 Fed. Reg. at 21,733. Indeed, it requires disclosing not only material risks, but climate-related risks that are "reasonably likely to have a material impact." *Id.* at 21,695. The latter standard—"reasonably likely to have a material impact"—differs considerably from the decades-old materiality standard.

Consider the Rule's emissions disclosures. The Rule requires extensive disclosures from many registrants of their GHG emissions. *Id.* at 21,674-76. Contrast that with SEC's 2010 Guidance, which

Appellate Case: 24-1522    Page: 28    Date Filed: 09/26/2024 Entry ID: 5440360

summarized "obligations under existing federal securities laws and regulations to consider climate change and its consequences." 75 Fed. Reg. at 6,297. Nowhere there did SEC summarize registrants' obligation to disclose their GHG emissions. That guidance instead explained that a registrant's emissions could sometimes have a material impact on financials, if that registrant were subject to a state cap-and-trade regime. *Id.* at 6,297.

If registrants had a general emissions-disclosure obligation, then the 2010 Guidance's summary of registrants' obligations would have mentioned that. But it did not. And SEC cannot point to an analogue in the preexisting regulations requiring such extensive emissions disclosures. Emissions disclosures mark one "significant policy change[]" (of many) in SEC's practice. *Voyageurs Region Nat. Park Ass'n v. Lujan*, 966 F.2d 424, 428 (8th Cir. 1992).

Those changes matter. They cannot be chalked up to "new application" of the same policy. When an agency announces its policy, companies listen. And when that policy remains the same for decades, companies "structure[]" their plans around that "background understanding." *Encino*, 579 U.S. at 222-223. This is what courts refer to

22

as policy "engender[ing] serious reliance interests." *Fox Television*, 556 U.S. at 515-516. So when an agency announces a policy inconsistent with its past policy, it must be "cognizant" that its decades-old policy created reliance interests, and those interests "must be taken into account." *Encino*, 579 U.S. at 221-222. Companies must then "adapt to the [agency's] new position," which "could necessitate systemic, significant changes" to how the company operates. *Id.*

Registrants have long taken SEC at its word that only material climate-related information must be disclosed—but now SEC requires a lot more. Which is why the Rule could "increase the typical external costs of being a public company by around 21%." Peirce, *supra*, at 8.

Put simply, registrants have serious reliance interests in SEC's longstanding position on climate-related disclosures. They are entitled to a reasoned explanation. But SEC both fails to account for those interests and denies any change in agency practice. *See, e.g.*, SEC Br. 1, 23, 41, 55 (referencing the Rule as adhering to its "longstanding" practice and view of its authority). Even "an alternative within the ambit of an existing standard may not be abandoned without any consideration whatsoever."

23

*Cent. S. Dakota Co-op. Grazing Dist. v. USDA*, 266 F.3d 889, 898 (8th Cir. 2001).

The Rule is a significant (and costly) departure from past agency practice. Even if SEC has authority to make such a change, it must at least "display awareness that it is changing position." *Fox Television*, 556 U.S. at 515. It fails to do even that. And that failure is reason enough to hold the Rule arbitrary and capricious. *See Shazi*, 988 F.3d at 449 ("An unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.") (cleaned up).

2. A new regulation requiring public companies to disclose material climate-related information creates "no net benefit" because that requirement already exists. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1154-56 (D.C. Cir. 2011).

SEC's explanations for why preexisting regulations failed—and why the Rule creates a "net benefit"—reveal that the Rule is a change in agency practice. Worse, its explanations are inconsistent. SEC first says there was no prior requirement to disclose all material climate-related information, so the Rule is necessary. SEC Br. 66-67. Next, SEC says the

24

Rule requires nothing new, because registrants already had to disclose all material climate-related information; the Rule simply seeks to have registrants disclose the same substance in a more standardized format. *See, e.g.*, SEC Br. 14, 20, 82. Both cannot be true. And both together admit the Rule amounts to a change in agency practice.

*First*, SEC says the Rule is needed because preexisting regulations did not require disclosing all material information, including climate-related information. SEC Br. 66-67. That, if true, undermines SEC's decades-long advice to registrants that "if environmental . . . information is material to investors, the Commission's rules already require the disclosure of such information." SEC NRDC Brief at 2 n.1.

If "no such requirement" to disclose all material climate-related information existed, and the Rule now requires disclosure of a "registrant's exposure to material climate-related risks," SEC Br. 14, then there has been a significant change in the agency's practice. *Contra* SEC Br. 9-11, 77 (claiming the "Rules rely on traditional" and longstanding policies). But that is not so. As SEC has reported for decades, its regulations required disclosing all material climate-related information. Thus, if the Rule is limited to requiring disclosing only

25

material climate-related information, it is redundant while imposing an unnecessary multi-billion-dollar burden on registrants. At bottom, by claiming there was "no such requirement," SEC sidesteps having to adequately explain why its preexisting regulations did not suffice.

*Second*, SEC contends the Rule mirrors longstanding practice and is necessary to help registrants standardize the same information's format. SEC Br. 20. That alternative explanation fails.

SEC argues its preexisting disclosure requirements did not allow investors to easily find and digest climate-related information to help inform their investment decisions. At first blush, SEC seems to flag an organizational problem. Probing further, it becomes clear it seeks to address a substantive gap in its preexisting disclosure requirements.

SEC views "existing disclosure practices" as "insufficient" because they did not capture the "climate-related information" that registrants disclose voluntarily in other formats. SEC Br. 65. Such information was often disclosed "in sustainability reports or other documents posted on registrants' websites, which are not subject to standardized disclosure rules, and, as noted by some commenters, are not necessarily prepared with the informational needs of investors in mind." *Id*. And because those

26

disclosures are not to SEC, they "may not be prepared with the same level of rigor as information required for disclosure in Commission filings, and as a result may not be as reliable." *Id.* (quotation marks omitted).

SEC's explanation admits that its earlier regulations did not require disclosing the information now required by the Rule. SEC wants to mandate disclosure of the information that registrants often voluntarily posted on their websites, something its earlier regulations had not previously mandated.

More, SEC alleged concerns that climate-related disclosures were boring and "boilerplate." SEC Br. 66. So SEC sought to "elicit[] more complete disclosure" to get "more consistent and reliable information about climate-related risks." SEC Br. 39, 82. The Rule thus would reduce investors' costs in "compiling and organizing" this climate-related information. *Id.* at 82.

But SEC's explanation says nothing about whether the allegedly non-disclosed information was "material." Indeed, SEC has not tried to determine whether this apparently missing information is material; if it were, then one would think SEC's Division of Enforcement, Climate and ESG Task Force would bring an enforcement action because SEC's "rules

27

already require the disclosure of such information." SEC NRDC Brief at 2 n.1.

What this explanation instead shows is not that SEC wants more *material* information; it wants registrants to turn over more *climate-related* information. That is a sharp turn off the path SEC has long taken.

\* \* \*

However SEC goes about trying to show the Rule is not arbitrary and capricious, it leads itself into either expressly or implicitly saying that the Rule amounts to a change in agency practice. And however conflicting SEC's various responses may be, one thing is clear: SEC does not acknowledge, either in the Rule or here, that it is changing its longstanding practice. That alone is enough to hold the Rule is arbitrary and capricious.

## B. SEC Ignores Contradictory Evidence and Fails to Support the Rule by Substantial Evidence.

When developing a rule, an agency cannot ignore "contradictory evidence or evidence from which conflicting inferences could be drawn" nor can it minimize that evidence without adequate explanation. *Morall v. DEA*, 412 F.3d 165, 177, 179-180 (D.C. Cir. 2005). Particularly when the evidence is "mixed," the agency needs to address the contrary

28

evidence so that a "reasonable jury" could "reach the [agency's] conclusion." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366-367 (1998). SEC fails to do this too.

The States highlighted that the evidence in support of the Rule is mixed. But SEC does not even try to reconcile the contradictions in the data. It does not analyze the studies and explain why those that run against SEC's findings deserve little weight. It instead (again) ignores the evidence and claims it "bears on only one aspect of the Rules' disclosures." SEC Br. 74. That is wrong.

One key reason SEC gives in support of the Rule is that "disclosures about climate-related risks, when made, become priced into a firm's value." SEC Br. 63. SEC believes that climate-related information affects investment decisions, and thus should be disclosed.

SEC writes off evidence of a pricing non-effect as just "one aspect" of the Rule. The Rule even characterizes the data as "seemingly contradictory." *Id.* (quoting 89 Fed. Reg. at 21,849 n.2745). But it is a core purpose driving the supposed need for the Rule. SEC must analyze that "seemingly contradictory" data, and "articulate a satisfactory explanation" for why the balance still favors the Rule. *Motor Vehicle*

29

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). If that data demands weight, then perhaps climate-related information does not affect investment decisions like SEC assumes, and thus does not demand a multi-billion-dollar Rule. SEC's disclaimer here only confirms it is serving interests apart from those of shareholders— that is, acting without authority.

Lastly, much of the evidence SEC and Intervenors cite as supporting the Rule instead supports SEC's theory that investors are having a hard time compiling climate-related information and want a more standardized format. *See, e.g.*, SEC Br. 64-66; Interv. Br. 38-41. But the Rule does not merely revamp already required disclosures into a standard format. It imposes additional multi-billion-dollar burdens on registrants, thus "increas[ing] the typical external costs of being a public company by around 21%." Peirce, *supra*. That is no mere formatting change.

The evidence SEC provides supports one theory; the Rule operates under another. In other words, the Rule is not supported by substantial evidence and should thus be vacated.

30

## IV. VACATUR IS THE PROPER REMEDY.

When a rule is invalid, the "ordinary practice is to vacate it." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). The text and history of the APA establish that to "set aside" unlawful agency action requires vacatur. 5 U.S.C. § 706(2)(A). "When Congress enacted the APA in 1946, the phrase 'set aside' meant cancel, annul, or revoke." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2462 (2024) (Kavanaugh, J., concurring) (quotation and citations omitted) (collecting contemporaneous sources). The APA thus incorporated the "appellate review model that supplied the rubric for judicial review of administrative agency action in the pre-APA period." Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1133 (2020); *see also* T. Elliot Gaiser, *et al.*, *The Truth of Erasure: Universal Remedies for Universal Agency Actions*, U. Chi. L. Rev. Online (2024), https://tinyurl.com/6mzpmvk5 (summarizing academic and judicial consensus on historical support for vacatur).

SEC's half-hearted assertion that "set aside" does not mean "vacate," SEC Br. 112, does not confront the robust text, history, and precedent to the contrary. *See Corner Post*, 144 S. Ct. at 2462 (Kavanaugh, J.,

31

concurring). Nor does it carry SEC's burden to show that the default remedy—vacatur—should not apply.

This is not the "rare case" where remand without vacatur is appropriate. *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019). As SEC concedes, remand without vacatur is available when "there is a 'strong possibility' that the agency will be able to cure any defects." SEC Br. 113 (quotation omitted). But SEC has not attempted to explain how it could cure its serious defects on remand. Nor can it. The procedural flaws taint the Rule. To remedy that, SEC must go back to the drawing board.

Severability does not work for the same reason—no part of the regulation remains valid to sever. If the Court accepts the States' merits theory, it cannot adopt SEC's remedies theory. Nor has SEC established why this Court should extend the same deference to an agency's severability preferences that it does to legislatures enacting statutes. None of the out-of-circuit cases SEC cites, SEC Br. 113-114, answers that question. This Court should not adopt an approach of deferring to agency preferences for severability. *See Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).

32

After all, the regulatory process is meaningfully distinct from legislative power in that it requires reasoned decision-making even when no individual constitutional right is at stake, and an opportunity for regulated parties to participate in the process. *See, e.g.*, Sohoni, *supra*, at 1135. Severing the regulation, even if feasible, would "create a rule that the Commission did not consider" and on which stakeholders did not have an opportunity to comment. *See MD/DC/DE Broadcasters Ass'n v. FCC*, 253 F.3d 732, 736 (D.C. Cir. 2001).

Even if this Court were to try to sever, SEC's "evidence" to support severance does not move the needle. As to the boilerplate severance clause, SEC has affirmed that "'the ultimate determination of severability will rarely turn on the presence or absence' of such a clause." *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (quoting *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968)). And SEC's "conclusory statement" in the record that some of the disclosures may function alone does not establish that severance "would leave a sensible regulation in place." *MD/DC/DE Broadcasters Ass'n*, 253 F.3d at 735.

Appellate Case: 24-1522     Page: 40     Date Filed: 09/26/2024 Entry ID: 5440360

# CONCLUSION

The petitions for review should be granted and the Rule vacated.

September 17, 2024     Respectfully submitted,

BRENNA BIRD      /s/ Eric Wessan
Attorney General of Iowa   ERIC WESSAN
             Solicitor General

             /s/ Patrick C. Valencia
             PATRICK C. VALENCIA
             Deputy Solicitor General

             Hoover State Office Building
             1305 East Walnut Street
             Des Moines, Iowa 50319
             (515) 823-9117 / (515) 281-5191
             (515) 281-4209 (fax)
             eric.wessan@ag.iowa.gov
             patrick.valencia@ag.iowa.gov

             *Counsel for State of Iowa*

             spetrany@law.ga.gov

CHRISTOPHER M. CARR
Georgia Attorney General   *Counsel for State of Georgia*

/s/ Stephen J. Petrany     DAVE YOST
STEPHEN J. PETRANY
Solicitor General       Ohio Attorney General
Office of the Attorney General of
Georgia          /s/ T. Elliot Gaiser
40 Capitol Square, SW    T. ELLIOT GAISER
Atlanta, GA 30334     Solicitor General
(404) 458-3408       MATHURA J. SRIDHARAN
             Deputy Solicitor General

Office of the Attorney General
365 East Broad Street
Columbus, Ohio 43215
Phone: (614) 466-8980
thomas.gaiser@ohioago.gov

*Counsel for Ohio Bureau of Workers' Compensation*
PATRICK MORRISEY
West Virginia Attorney General

/s/ *Michael R. Williams*
MICHAEL R. WILLIAMS
*Solicitor General*
Office of the Attorney General of West Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Counsel for State of West Virginia*

STEVE MARSHALL
Alabama Attorney General

/s/ *Edmund G. LaCour Jr.*
EDMUND G. LACOUR JR.
*Solicitor General*
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
 (334) 242-7300

Edmund.LaCour@AlabamaAG.gov

*Counsel for State of Alabama*

TREG TAYLOR
Alaska Attorney General

/s/ *William Milks*
WILLIAM MILKS
*Assistant Attorney General*
BEN HOFMEISTER
*Assistant Attorney General*
Alaska Department of Law
1031 W. 4th Ave., Ste. 200
Anchorage, AK 99501
(907) 269-5100
bill.milks@alaska.gov
ben.hofmeister@alaska.gov

*Counsel for State of Alaska*

TIM GRIFFIN
Arkansas Attorney General

s/ *Nicholas J. Bronni*
NICHOLAS J. BRONNI
*Solicitor General*
DYLAN L. JACOBS
*Deputy Solicitor General*
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Nicholas.Bronni@ArkansasAG.gov

Appellate Case: 24-1522   Page: 42   Date Filed: 09/26/2024 Entry ID: 5440360

*Counsel for the State of Arkansas*

RAÚL R. LABRADOR
Attorney General of Idaho

*/s/ Joshua N. Turner*

JOSHUA N. TURNER
*Chief of Constitutional Litigation and Policy*
ALAN M. HURST
*Solicitor General*
Office of the Idaho Attorney General
P.O. Box 83720 Boise, Idaho 83720 (208) 334-2400
Josh.Turner@ag.idaho.gov
Alan.Hurst@ag.idaho.gov

*Counsel for State of Idaho*

THEODORE E. ROKITA
Indiana Attorney General

*/s/ James A. Barta*

JAMES A. BARTA
*Solicitor General*
Office of the Attorney General of Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone: (317) 232-0709
James.Barta@atg.in.gov

*Counsel for State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

*/s/ Matthew F. Kuhn*

MATTHEW F. KUHN
*Solicitor General*
VICTOR B. MADDOX
*Counsel for Special Litigation*
JACOB M. ABRAHAMSON
*Assistant Solicitor General*
Office of Kentucky Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Matt.Kuhn@ky.gov
Victor.Maddox@ky.gov
Jacob.Abrahamson@ky.gov

*Counsel for the Commonwealth of Kentucky*

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*

J. BENJAMIN AGUIÑAGA
*Solicitor General*
AUTUMN HAMIT PATTERSON
*Special Assistant Solicitor General*
Office of the Louisiana Attorney General
1885 North Third Street
Baton Rouge, LA 70804
(225) 326-6766
aguinagaj@ag.louisiana.gov

*Counsel for State of Louisiana*

36

LYNN FITCH
Attorney General of Mississippi

*/s/ Justin L. Matheny*
JUSTIN L. MATHENY
*Deputy Solicitor General*
Mississippi Attorney General's Office
P.O. Box 220
Jackson, MS 39205

(601) 359-3680
justin.matheny@ago.ms.gov

*Counsel for State of Mississippi*

ANDREW T. BAILEY
Missouri Attorney General

/s/ *Joshua M. Divine*
JOSHUA M. DIVINE, 69875MO
*Solicitor General*
Office of the Attorney General
207 West High St.
Jefferson City, MO 65101
Phone: (573) 751-8870
Josh.Divine@ago.mo.gov

*Counsel for the State of Missouri*

AUSTIN KNUDSEN
Montana Attorney General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
*Solicitor General*
Montana Department of Justice
215 North Sanders

P.O. Box 201401
Helena, Montana 59620-1401
(406) 444-2026
christian.corrigan@mt.gov

*Counsel for the State of Montana*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ *Grant D. Strobl*
GRANT D. STROBL
*Assistant Solicitor General*
Office of the Nebraska Attorney General
2115 State Capitol
Lincoln, NE 68509
(402) 471-2683
Grant.Strobl@nebraska.gov

*Counsel for the State of Nebraska*
JOHN M. FORMELLA
New Hampshire Attorney General

*/s/ Samuel R.V. Garland*
SAMUEL R.V. GARLAND
*Senior Assistant Attorney General*
New Hampshire Department of Justice
1 Granite Place
Concord, NH 03301
(603) 271-3650
samuel.rv.garland@doj.nh.gov

*Counsel for State of New Hampshire*
DREW H. WRIGLEY
North Dakota Attorney General

/s/ *Philip Axt*
PHILIP AXT
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck ND 58505

Phone: (701) 328-2210
pjaxt@nd.gov

*Counsel for the State of North Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ *Garry M. Gaskins, II*
GARRY M. GASKINS, II
*Solicitor General*
Office of the Attorney General of Oklahoma
313 NE Twenty-First St.
Oklahoma City, OK 73105
(405) 521-3921
garry.gaskins@oag.ok.gov

*Counsel for State of Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ *Thomas T. Hydrick*
THOMAS T. HYDRICK

*Assistant Deputy Solicitor General*
Office of the South Carolina Attorney General
1000 Assembly Street
Columbia, SC 29201
(803) 734-4127
thomashydrick@scag.gov

*Counsel for State of South Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

/s/ *Charles McGuigan*
CHARLES MCGUIGAN
*Deputy Attorney General*
Paul S. Swedlund
*Solicitor General*
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
605-773-3215
charles.mcguigan@state.sd.us

*Counsel for the State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

J. MATTHEW RICE
*Solicitor General*
/s/ *Whitney Hermandorfer*
WHITNEY HERMANDORFER
*Director of Strategic Litigation*

38

Office of the Attorney General and
Reporter of Tennessee
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 741-3491
matt.rice@ag.tn.gov

*Counsel for the State of Tennessee*

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
*First Assistant Attorney General*
JAMES LLOYD
*Deputy Attorney General for Civil Litigation*
KELLIE E. BILLINGS-RAY
*Chief, Environmental Protection Division*
/s/ *Wesley S. Williams*
WESLEY S. WILLIAMS
*Assistant Attorney General*
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
(512) 463-2012
Wesley.Williams@oag.texas.gov

*Counsel for State of Texas*

SEAN D. REYES
Utah Attorney General

/s/ *Christopher A. Bates*
CHRISTOPHER A. BATES
*Deputy Solicitor General*
350 N. State Street, Suite 230
P.O. Box 142320

Salt Lake City, UT 84114-2320
Telephone: (801) 538-9600
chrisbates@agutah.gov

*Counsel for the State of Utah*

JASON MIYARES
Virginia Attorney General

/s/ *Kevin M. Gallagher*
KEVIN M. GALLAGHER
*Principal Deputy Solicitor General*
Virginia Attorney General's Office
202 North 9th Street
Richmond, VA 23219
(804) 786-2071
kgallagher@oag.state.va.us

*Counsel for Commonwealth of Virginia*

BRIDGET HILL
Wyoming Attorney General

/s/ *Ryan Schelhaas*
RYAN SCHELHAAS
*Chief Deputy*

39

Office of the Attorney General of
Wyoming
109 State Capitol
Cheyenne, WY 82002
(307) 777-7895
ryan.schelhaas@wyo.gov

*Counsel for State of Wyoming*

/s/ *R. Trent McCotter*
R. TRENT MCCOTTER
JONATHAN BERRY
MICHAEL BUSCHBACHER
BOYDEN GRAY PLLC
801 17th St. NW, Suite 350
Washington, DC 20006
Telephone: (202) 706-5488
tmccotter@boydengray.com

*Counsel for American Free
Enterprise Chamber of
Commerce*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 25A, I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,481 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements of Local R. 25A because the text of the electronic brief is identical to the text of the paper copies and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

September 17, 2024

/s/ Eric Wessan
ERIC WESSAN
*Solicitor General*

*Counsel for State of Iowa*

Appellate Case: 24-1522   Page: 48   Date Filed: 09/26/2024 Entry ID: 5440360

# CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on September 17, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

September 17, 2024

*/s/ Eric Wessan*
ERIC WESSAN
*Solicitor General*

*Counsel for State of Iowa*

Appellate Case: 24-1522    Page: 49    Date Filed: 09/26/2024 Entry ID: 5440360