No. 24-1522 and all consolidated cases: Nos. 24-1624, 24-1626, 24-1627, 24-1628, 24-1631, and 24-1634

———————

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

———————

STATE OF IOWA, *et al.*,
PETITIONERS,
V.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT,
DISTRICT OF COLUMBIA, *et al.*,
INTERVENORS.

———————

ON PETITIONS FOR REVIEW OF AN ORDER AND RULE
OF THE SECURITIES AND EXHANGE COMMISSION

———————

**FINAL RESPONSE BRIEF FOR INTERVENORS**

———————

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

GLENN KAPLAN
Assistant Attorney General & Chief
ANDREW LABADINI
DANIELLE KLEE
ANNIE KILLELEA
Assistant Attorneys General
Insurance and Financial Services Division

JULIA JONAS-DAY
MICHELE HUNTON
Assistant Attorneys General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place, Boston, MA 02108
(617) 963-2453
glenn.kaplan@mass.gov
julia.jonas-day@mass.gov

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

BRYAN J. LEITCH
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 805-7426
ashwin.phatak@dc.gov

*Additional counsel listed in signature block*

# SUMMARY OF THE CASE

In March 2024, the Securities and Exchange Commission ("SEC") issued final rules requiring registrants to disclose certain information about climate-related risks that have or likely will have a material impact on their businesses. *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, 89 Fed. Reg. 21668 (Mar. 28, 2024) ("Rules" or "Final Rules"), App. 441. Those Rules fit within SEC's statutory authority and regulatory traditions, they are supported by substantial evidence and fully explained, and they are constitutional.

This case involves nine consolidated petitions for review of the Rules.[1] The District of Columbia, Massachusetts, Arizona, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Michigan, Minnesota, Nevada, New Mexico, New York, Oregon, Rhode Island, Vermont, Washington, and Wisconsin ("Intervenor States") intervened to defend the Rules. Intervenor States agree with SEC that petitioners' challenges to the Rules lack merit and that oral argument is warranted. Intervenor States propose argument for 30 minutes per side, with the parties on each side dividing time between themselves.

---

[1] State Petitioners ("Iowa") (Nos. 24-1522, 24-1627, 24-1631, 24-1634); Liberty Energy and Nomad Proppant Services ("Liberty") (No. 24-1624); Texas Alliance of Energy Producers and Domestic Energy Producers Alliance ("Texas Alliance") (No. 24-1626); Chamber of Commerce and National Center for Public Policy Research ("Chamber") (Nos. 24-1628, 24-2173); National Legal & Policy Center and Oil & Gas Workers Association ("NLPC") (No. 24-1685).

i

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT OF ISSUES ....................................................................3

STATEMENT OF THE CASE.................................................................4

    1.    Legal Background ................................................................4

        A.    Federal securities laws and SEC disclosure authority ...............4

        B.    History of SEC disclosure rules...................................5

    2.    Factual Background...............................................................6

        A.    Proposed Rules....................................................7

        B.    Final Rules ........................................................8

    3.    Procedural Background ......................................................10

STANDARD OF REVIEW ...................................................................10

SUMMARY OF ARGUMENT .............................................................11

ARGUMENT ......................................................................................13

    I.    The Securities Laws Plainly Authorize The Rules ............................13

        A.    Congress authorized SEC to compel information of the kind required by the Rules ......................................................13

            1.    The securities laws authorize SEC to require disclosures that are "necessary or appropriate in the public interest or for the protection of investors"..........14

            2.    The Rules require information that is necessary or appropriate to further the public interest and to protect investors...........................................................18

            3.    Petitioners' contrary arguments lack merit....................18

Appellate Case: 24-1522    Page: 3    Date Filed: 10/01/2024 Entry ID: 5441535

a. SEC's authority is not limited to addressing the market risks of the 1930s ................................. 18

b. The Acts authorize SEC to require disclosures of financially relevant information, not only traditional financial data .......................................................... 21

c. Petitioners' misguided "materiality" challenges fail ................................................. 23

B. Petitioners offer no sound reason to depart from Congress's clear statutory language .......................................... 27

1. The major-questions doctrine does not apply ................ 27

a. The Rules are a classic exercise of SEC's primary authority to require disclosure of important risk-related information—matters squarely within its expertise ................................. 27

b. The Rules neither regulate a politically controversial issue nor impose disproportionate costs ........................................... 31

c. Unenacted legislation does not counsel a different result ...................................................... 34

2. Even if the major-questions doctrine applies, the Acts supply the requisite "clear statement" authorizing the Rules ....................................................... 35

3. Petitioners' artificial narrowing of SEC's authority is not necessary to avoid any constitutional issue .......... 36

II. The Rules Are Supported By Substantial Evidence And SEC Followed All Relevant Requirements In Promulgating Them .......... 36

A. Substantial evidence supports the Rules, including public comments and empirical data ..................................................... 37

Appellate Case: 24-1522    Page: 4    Date Filed: 10/01/2024 Entry ID: 5441535

|  |  | 1. | Investors provided support for the Rules......................37 |
|  |  | 2. | Registrants also provided support for the Rules............40 |
|  |  | 3. | Substantial evidence supports the Rules whether or not petitioners believe some data were "mixed"............42 |

|  | B. | SEC reasonably explained that the Rules build on decades of SEC policy and practice by standardizing the disclosure of climate-related risk information ...............................................44 |
|  | C. | The Rules are a logical outgrowth of SEC's proposals, and petitioners have shown no prejudice in any event ...................48 |
|  | D. | SEC properly considered the Rules' economic effects.............51 |
|  | E. | Petitioners' accusations of pretext lack merit ...........................54 |

| III. | The Rules Comport With The First Amendment................................55 |
|  | A. | The Rules principally govern commercial activity, and any incidental regulation of speech is amply justified ...................56 |
|  | B. | Petitioners' demands for heightened scrutiny lack merit .........60 |
| IV. | The Rules Satisfy The Nondelegation Doctrine .................................62 |
| V. | The Court Should Reject Petitioners' Overbroad Relief ...................65 |

CONCLUSION .................................................................................66

Appellate Case: 24-1522     Page: 5     Date Filed: 10/01/2024 Entry ID: 5441535

# TABLE OF AUTHORITIES

*Cases*

*1-800-411-Pain Referral Serv., LLC v. Otto,*
744 F.3d 1045 (8th Cir. 2014) .................................................. 57, 61

*303 Creative LLC v. Elenis,*
600 U.S. 570 (2023) ................................................................... 59

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ................................................................... 64

*Ala. Ass'n of Realtors v. DHHS,*
594 U.S. 758 (2021) ................................................................... 29

*Ali v. Fed. Bureau of Prisons,*
552 U.S. 214 (2008) ............................................................. 22, 23

*Allentown Mack Sales & Serv., Inc. v. NLRB,*
522 U.S. 359 (1998) ................................................................... 37

*Am. Coke & Coal Chems. Inst. v. EPA,*
452 F.3d 930 (D.C. Cir. 2006) .................................................. 51

*Am. Power & Light Co. v. SEC,*
329 U.S. 90 (1946) ..................................................................... 62

*Am. Sumatra Tobacco Corp. v. SEC,*
110 F.2d 117 (D.C. Cir. 1940) .................................................. 63

*Am. Equity Inv. Life Ins. Co. v. SEC,*
613 F.3d 166 (D.C. Cir. 2010) .................................................. 53

*AMI v. USDA,*
760 F.3d 18 (D.C. Cir. 2014) (en banc) ................................. 4, 57

*Amoco Oil Co. v. EPA,*
501 F.2d 722 (D.C. Cir. 1974) .................................................. 24

*Anna Jaques Hosp. v. Sebelius,*
583 F.3d 1 (D.C. Cir. 2009) ................................................. 45, 46

v

*Bank of Am. v. Douglas*,
    105 F.2d 100 (D.C. Cir. 1939) ............................................................ 16

*Barnhart v. Thomas*,
    540 U.S. 20 (2003) ............................................................................ 24

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................... 17, 24

*Bd. of Trs. v. Fox*,
    492 U.S. 469 (1989) ......................................................................... 56

*Bhatti v. FHFA*,
    15 F.4th 848 (8th Cir. 2021) ........................................................ 4, 62

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) .................................................................... 32

*Biestek v. Berryhill*,
    587 U.S. 97 (2019) ................................................................ 3, 11, 37

*Bldg. Indus. Ass'n v. Norton*,
    247 F.3d 1241 (D.C. Cir. 2001) ...................................................... 50

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024) ........................................................... 59

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020) ................................................................... 19, 35

*Bradford v. DOL*,
    101 F.4th 707 (10th Cir. 2024) .................................................... 3, 27

*Bricklayers & Trowel Pension v. Credit Suisse LLC*,
    752 F.3d 82 (1st Cir. 2014) ............................................................. 44

*Bus. Roundtable v. SEC*,
    647 F.3d 1144 (D.C. Cir. 2011) ................................................. 42, 43

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
    447 U.S. 557 (1980) ............................................................. 3, 12, 60

Appellate Case: 24-1522    Page: 7    Date Filed: 10/01/2024 Entry ID: 5441535

*Chamber of Com. v. SEC*,
    412 F.3d 133 (D.C. Cir. 2005).......................................... 28, 47, 48, 51, 54

*Chamber of Com. v. SEC*,
    443 F.3d 890 (D.C. Cir. 2006) ........................................... 50

*Chamber of Com v. SEC*,
    85 F.4th 760 (5th Cir. 2023) ....................................... 58, 59

*Chem. Mfrs. Ass'n v. EPA*,
    919 F.2d 158 (D.C. Cir. 1990)...................................... 45, 46

*Citizens Telecomm. Co. of Minn., LLC v. FCC*,
    901 F.3d 991 (8th Cir. 2018) ............................................. 49

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
    596 U.S. 61 (2022) ............................................................. 62

*Cmty. for Creative Non-Violence v. Turner*,
    893 F.2d 1387 (D.C. Cir. 1990) ........................................ 65

*Cmty. Nutrition Inst. v. Block*,
    749 F.2d 50 (D.C. Cir. 1984) ............................................ 50

*Coal. for Renewable Nat. Gas v. EPA*,
    108 F.4th 846 (D.C. Cir. 2024)) ....................................... 30

*Confederacion de Asociaciones Agricolas v. United States*,
    32 F.4th 1130 (Fed. Cir. 2022) ......................................... 55

*Consumer Elecs. Ass'n v. FCC*,
    347 F.3d 291 (D.C. Cir. 2003)........................................... 20

*CTIA v. Berkeley*,
    928 F.3d 832 (9th Cir. 2019) ....................................... 56, 57

*Dep't of State v. Munoz*,
    144 S. Ct. 1812 (2024).......................................................62

*Disc. Tobacco City & Lottery, Inc. v. United States*,
    674 F.3d 509 (6th Cir. 2012) ............................................ 57

vii

*Domestic Sec., Inc. v. SEC*,
    333 F.3d 239 (D.C. Cir. 2003)........................................................ 42

*Dyer v. SEC*,
    287 F.2d 773 (8th Cir. 1961) ....................................................... 16

*Encino Motorcars v. Navarro*,
    579 U.S. 211 (2016)..................................................................... 46

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)........................................................... 1, 4, 14

*FCC v. Fox Television*,
    556 U.S. 502 (2009)..................................................................... 46

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)................................................................ 3, 42

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..................................................................... 29

*First Am. Disc. Corp. v. CFTC*,
    222 F.3d 1008 (D.C. Cir. 2000)................................................... 48

*Friends of Richards-Gebaur Airport v. FAA*,
    251 F.3d 1178 (8th Cir. 2001) ..................................................... 54

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)..................................................................... 32

*Gorman v. Bartch*,
    152 F.3d 907 (8th Cir. 1998) ...................................................... 19

*Ill. Com. Comm'n v. ICC*,
    776 F.2d 355 (D.C. Cir. 1985)..................................................... 24

*In re FCC 11-161*,
    753 F.3d 1015 (10th Cir. 2014) ................................................... 49

*In re Laurie Bebo*,
    2020 WL 4784633 (SEC 2020) .................................................. 43

Appellate Case: 24-1522    Page: 9    Date Filed: 10/01/2024    Entry ID: 5441535

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  855 F.3d 913 (8th Cir. 2017) ...................................................... 18

*In re Trib. Co. Fraudulent Conv. Litig.*,
  946 F.3d 66 (2d Cir. 2019) ........................................................ 36

*Jagers v. Fed. Crop Ins. Corp.*,
  758 F.3d 1179 (10th Cir. 2014) ................................................. 55

*Johnson v. Copyright Royalty Bd.*,
  969 F.3d 363 (D.C. Cir. 2020) ................................................... 43

*King v. Burwell*,
  576 U.S. 473 (2015) .................................................................. 30

*Lindeen v. SEC*,
  825 F.3d 646 (D.C. Cir. 2016) ............................................... 3, 51

*Logic Tech. Dev. LLC v. FDA*,
  84 F.4th 537 (3d Cir. 2023) ...................................................... 54

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ................................................. 10, 14, 16

*Md. Shall Issue v. Anne Arundel Cnty.*,
  91 F.4th 238 (4th Cir. 2024) ............................................ 4, 57, 61

*Menendez-Donis v. Ashcroft*,
  360 F.3d 915 (8th Cir. 2004) .................................................... 37

*Menorah Med. Ctr. v. Heckler*,
  768 F.2d 292 (8th Cir. 1985) ............................................... 44, 47

*Michigan v. EPA*,
  576 U.S. 743 (2015) .................................................................. 16

*Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*,
  323 F.3d 649 (8th Cir. 2003) .................................................... 60

*Mistretta v. United States*,
  488 U.S. 361 (1989) .................................................................. 64

Appellate Case: 24-1522   Page: 10   Date Filed: 10/01/2024 Entry ID: 5441535

*Moody v. NetChoice, LLC,*
    144 S. Ct. 2383 (2024) ................................................................ 55

*Motor Vehicle Mfrs.' Ass'n v. State Farm,*
    463 U.S. 29 (1983) ....................................................................... 46

*NAACP v. FPC,*
    425 U.S. 662 (1976) ..................................................................... 17

*NAM v. SEC,*
    800 F.3d 518 (D.C. Cir. 2015) ..................................................... 59

*Nasdaq Stock Mkt. LLC v. SEC,*
    34 F.4th 1105 (D.C. Cir. 2022) ............................................... 51, 54

*Nat'l Fuel Gas Supply v. FERC,*
    468 F.3d 831 (D.C. Cir. 2006) ............................................... 47, 48

*Nat'l Ass'n of Broadcasters v. FCC,*
    740 F.2d 1190 (D.C. Cir. 1984) ................................................... 20

*Nat'l Ass'n of Regul. Util. Comm'rs v. FCC,*
    737 F.2d 1095 (D.C. Cir. 1984) ................................................... 42

*Nat'l Cable Television Ass'n, Inc. v. FCC,*
    747 F.2d 1503 (D.C. Cir. 1984) ................................................... 49

*Nat'l Elec. Mftr. Ass'n v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001) .................................................. 57, 58

*Nat'l Parks Conservation Ass'n v. McCarthy,*
    816 F.3d 989 (8th Cir. 2016) ....................................................... 44

*New York v. FERC,*
    535 U.S. 1 (2002) ......................................................................... 19

*NFIB v. DOL,*
    595 U.S. 109 (2022) ................................................................ 29, 32

*NIFLA v. Becerra,*
    585 U.S. 755 (2018) ..................................................................... 59

Appellate Case: 24-1522    Page: 11    Date Filed: 10/01/2024   Entry ID: 5441535

*Northport Health Servs. of Ark. v. DHHS*,
  14 F.4th 856 (8th Cir. 2021) ........................................................ 3, 34, 44, 45, 47

*NRDC v. Jackson*,
  650 F.3d 662 (7th Cir. 2011) ......................................................... 49

*NRDC, Inc. v. SEC*,
  606 F.2d 1031 (D.C. Cir. 1979) ................................................... 5, 15, 18

*Nw. Airlines, Inc. v. Goldschmidt*,
  645 F.2d 1309 (8th Cir. 1981) ......................................................... 11

*Ohralik v. Ohio State Bar Ass'n*,
  436 U.S. 447 (1978) ........................................................................... 56

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ........................................................................... 17

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) ............................................................. 25

*Pa. Dep't of Corr. v. Yeskey*,
  524 U.S. 206 (1998) ........................................................................... 36

*Pagel, Inc. v. SEC*,
  803 F.2d 942 (8th Cir. 1986) ........................................................... 41

*Pan. Refin. Co. v. Ryan*,
  293 U.S. 388 (1935) ........................................................................... 64

*PBGC v. LTV Corp.*,
  496 U.S. 633 (1990) ....................................................................... 34, 35

*Pharm. Care Mgmt. Ass'n v. Rowe*,
  429 F.3d 294 (1st Cir. 2005) .................................................... 57, 60, 61

*Planned Parenthood v. Rounds*,
  530 F.3d 724 (8th Cir. 2008) (en banc) ........................................... 60

*Pub. Serv. Comm'n v. FERC*,
  397 F.3d 1004 (D.C. Cir. 2005) ....................................................... 51

Appellate Case: 24-1522    Page: 12    Date Filed: 10/01/2024 Entry ID: 5441535

*R.A. Holman & Co. v. SEC*,
  299 F.2d 127 (D.C. Cir. 1962) ......................................................... 20

*Reno v. Flores*,
  507 U.S. 292 (1993) ...................................................................... 13

*Riffin v. Surface Transp. Bd.*,
  733 F.3d 340 (D.C. Cir. 2013) ......................................................... 19

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ...................................................................... 57

*RJ Reynolds Tobacco Co. v. FDA*,
  96 F.4th 863 (5th Cir. 2024) ....................................................... 56, 57

*Ross v. O'Malley*,
  92 F.4th 775 (8th Cir. 2024) ........................................................... 43

*S. Cal. Edison Co. v. FERC*,
  717 F.3d 177 (D.C. Cir. 2013) ......................................................... 52

*Sabre, Inc. v. DOT*,
  429 F.3d 1113 (D.C. Cir. 2005) .................................................... 19, 20

*Safari Club Int'l v. Haaland*,
  31 F.4th 1157 (9th Cir. 2022) ......................................................... 54

*Save Jobs USA v. DHS*,
  --- F.4th ---, 2024 WL 3627942 (D.C. Cir. Aug. 2, 2024) ............... 32

*Scherer v. U.S. Forest Serv.*,
  653 F.3d 1241 (10th Cir. 2011) .................................................... 13, 26

*Scope Pictures v. Kansas City*,
  140 F.3d 1201 (8th Cir. 1998) ......................................................... 60

*SEC v. GenAudio Inc.*,
  32 F.4th 902 (10th Cir. 2022) ......................................................... 16

*SEC v. Tex. Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir. 1968) (en banc) .............................................. 17

Appellate Case: 24-1522     Page: 13     Date Filed: 10/01/2024 Entry ID: 5441535

*SEC v. Wall St. Pub. Inst., Inc.*,
  851 F.2d 365 (D.C. Cir. 1988) ................................................................. 56, 58

*SEC v. World Tree Fin., L.L.C.*,
  43 F.4th 448 (5th Cir. 2022) ................................................................. 24

*Solite Corp. v. EPA*,
  952 F.2d 473 (D.C. Cir. 1991) ................................................................. 50

*South Dakota v. U.S. Dep't of Interior*,
  423 F.3d 790 (8th Cir. 2005) ................................................................. 63

*Spirit Airlines, Inc. v. DOT*,
  687 F.3d 403 (D.C. Cir. 2012) ................................................................. 37

*Stilwell v. Off. of Thrift Supervision*,
  569 F.3d 514 (D.C. Cir. 2009) ................................................................. 47

*Syracuse Peace Council v. FCC*,
  867 F.2d 654 (D.C. Cir. 1989) ................................................................. 52

*Telescope Media Grp. v. Lucero*,
  936 F.3d 740 (8th Cir. 2019) ................................................................. 59

*Thompson v. Clark*,
  741 F.2d 401 (D.C. Cir. 1984) ................................................................. 44

*Time Warner Ent. Co., L.P. v. FCC*,
  240 F.3d 1126 (D.C. Cir. 2001) ................................................................. 50

*Touche Ross & Co. v. SEC*,
  609 F.2d 570 (2d Cir. 1979) ................................................................. 5, 15

*Transdev Servs., Inc. v. NLRB*,
  991 F.3d 889 (8th Cir. 2021) ................................................................. 42

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1977) ................................................................. 24, 25

*U.S. Steel Corp. v. EPA*,
  649 F.2d 572 (8th Cir. 1981) ................................................................. 65

Appellate Case: 24-1522   Page: 14   Date Filed: 10/01/2024 Entry ID: 5441535

*UARG v. EPA*,
573 U.S. 302 (2014)................................................................. 33

*United States v. Arnold*,
740 F.3d 1032 (5th Cir. 2014) ............................................. 60

*United States v. Bruguier*,
735 F.3d 754 (8th Cir. 2013) (en banc) ............................... 26

*United States v. Hansen*,
772 F.2d 940 (D.C. Cir. 1985)............................................. 23

*United States v. Sindel*,
53 F.3d 874 (8th Cir. 1995) ................................................. 61

*United States v. White*,
97 F.4th 532 (7th Cir. 2024) ............................... 3, 27, 30, 31

*Verizon v. FCC*,
740 F.3d 623 (D.C. Cir. 2014)............................... 3, 32, 35

*Vidal v. Elster*,
602 U.S. 286 (2024)............................................................. 62

*Welch v. Helvering*,
290 U.S. 111 (1933)............................................................. 16

*West Virginia v. EPA*,
597 U.S. 697 (2022)...................................................... 27, 32

*Whitman v. Am. Trucking*,
531 U.S. 457 (2001)......................................................... 4, 64

*Wright v. SEC*,
112 F.2d 89 (2d Cir. 1940) ................................................. 63

*Yakus v. United States*,
321 U.S. 414 (1944)............................................................. 63

*Zauderer v. Off. of Disciplinary Counsel*,
471 U.S. 626 (1985)............................. 3, 12, 56, 57, 58, 60, 61

Appellate Case: 24-1522     Page: 15     Date Filed: 10/01/2024 Entry ID: 5441535

## Statutes and Regulations

5 U.S.C. § 706 ................................................................... 3, 11, 36

15 U.S.C. § 77aa ............................................................. 4, 15, 21, 26

15 U.S.C. § 77b ................................................................ 3, 17, 51

15 U.S.C. § 77g ..................................................... 1, 3, 4, 5, 15, 21, 35, 63

15 U.S.C. § 77i .................................................................. 3, 11, 36

15 U.S.C. § 78c ......................................................................... 17

15 U.S.C. § 78*l* ............................................................... 3, 5, 15, 21

15 U.S.C. § 78m .......................................................................... 5, 15

15 U.S.C. § 78w ................................................................ 3, 17, 51

15 U.S.C. § 78y ............................................................ 3, 4, 11, 36

17 C.F.R. § 229.103 ....................................................................... 5

17 C.F.R. § 229.105 ................................................................... 5, 61

17 C.F.R. § 229.106 ....................................................................... 5

17 C.F.R. § 229.407 ...................................................................... 22

42 U.S.C. § 7414 ......................................................................... 30

*Business and Financial Disclosure Required by Regulation S-K*,
   81 Fed. Reg. 23916 (Apr. 22, 2016) ............................................. 6, 26

*Commission Guidance Regarding Disclosure Related to Climate Change*,
   75 Fed. Reg. 6290 (Feb. 8, 2010) ............................................... 6, 45

*Conclusions and Final Action on Rulemaking Proposals Relating to
   Environmental Disclosure*, 41 Fed. Reg. 21632 (May 27, 1976)................. 48

Appellate Case: 24-1522   Page: 16   Date Filed: 10/01/2024 Entry ID: 5441535

*Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure*, 88 Fed. Reg. 51896 (Aug. 4, 2023) ............................................. 5, 20

*Disclosures Pertaining to Matters Involving the Environment and Civil Rights*, 36 Fed. Reg. 13989 (July 29, 1971) .................................................... 5, 6

*Electronic Signatures in Regulation S-T Rule 302*, 85 Fed. Reg. 78224 (Dec. 4, 2020) .................................................................. 21

*Environmental and Social Disclosure, Notice of Commission Conclusions and Rulemaking Proposals*, 40 Fed. Reg. 51656 (Nov. 6, 1975).......... 28, 29, 45

*Proxy Disclosure Enhancements*, 74 Fed. Reg. 68334 (Dec. 23, 2009) .................................................................. 22

*Uniform and Integrated Reporting Requirements*, 43 Fed. Reg. 34402 (Aug. 3, 1978) ..................................................................22

## Other

1 Hazen, *Law of Securities Regulation* § 1:16 (May 2024)......................................4

Statement of Allison Herren Lee, Comm'r, SEC, *Public Input Welcomed on Climate Change Disclosures* (Mar. 15, 2021) ...................................... 6

Fed. R. App. P. 28(i) ..... 18, 23, 34, 35, 37, 41, 44, 45, 49, 52, 53, 54, 58, 60, 61, 65

Funk & Wagnalls, *Practical Standard Dictionary* (1924) ...................................... 15

H. Res. 1028, 117th Cong. (2022) ....................................................................... 35

H.R. 8589, 117th Cong. (2022).......................................................................... 35

H.R. 9408, 117th Cong. (2022).......................................................................... 35

H.R. Rep. No. 1383, 73d Cong., 2d Sess. (1934) ................................................ 19

H.J. Res. 88, 117th Cong. (2022)........................................................................ 35

H.J. Res. 127, 118th Cong. (2024)...................................................................... 35

S. Rep. No. 792, 73d Cong., 2d Sess. 5 (1934) ................................................... 19

Appellate Case: 24-1522     Page: 17     Date Filed: 10/01/2024 Entry ID: 5441535

S. Res. 5005, 117th Cong. (2022)............................................................... 35

S.J. Res. 72, 118th Cong. (2024) ...............................................................35

*The Concise Oxford Dictionary of Current English* (1917) ..............................15, 16

*Webster's New Int'l Dictionary* (1930) ................................................................ 16

xvii

Appellate Case: 24-1522    Page: 18    Date Filed: 10/01/2024 Entry ID: 5441535

## INTRODUCTION

The Rules do exactly what Congress expected of SEC: they respond to evolving market conditions by requiring registrants to disclose decision-useful information about present and future risks facing their businesses. Specifically, the Rules require standardized information about climate-related risks that investors—including Intervenor States—need to make informed investment and voting decisions. This is a classic exercise of SEC's authority to solicit information in the public interest and for the protection of investors. Petitioners' contrary arguments distort the law, mischaracterize the Rules, and should be rejected.

The principal goal of federal securities law is to provide investors with relevant information about registrants' securities. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194-95 (1976). To that end, Congress empowered SEC to require the disclosure of information that is "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1). SEC has exercised this authority for decades to require a broad range of disclosures amidst ever-changing market conditions—from pending litigation to cybersecurity risks.

For more than 50 years, SEC has also required registrants to disclose certain environmental-related risks. These rules make good sense, too, as environmental risks can affect companies' finances and operations—whether from severe weather events, loss of natural resources, or increasing governmental regulation. And as

Intervenor States know firsthand, investors benefit from having such information when deciding where to invest and how to vote their securities.

In 2022, in response to investor demand, SEC proposed to require additional information about climate-related risks in a consistent, comparable, and decision-useful format. Thousands of commenters supported the proposal, including many companies that would be subject to the new requirements. *See, e.g.*, App. 451 n.110 (citing comments from Walmart, Inc. and Dominion Energy, Inc., among others). As those registrants acknowledged, "stakeholders, including asset owners and asset managers, will benefit from consistent, standardized disclosures addressing climate-related risks and opportunities to help them make decisions on where best to deploy capital in alignment with investor goals." App. 451 n.110 (quoting comment from Bank of America, Inc., App. 1272).

SEC issued its Final Rules in March 2024. The Rules require registrants to disclose material climate-related risks; the ways in which they plan to mitigate those risks, if any; the ways in which their directors and managers oversee those risks, if at all; certain material greenhouse-gas-emissions data; and the financial effects of severe-weather events.

Petitioners dislike the Rules and try to make a federal case out of their policy disputes by throwing a litany of challenges at them. Their arguments fail. The Rules fall well within SEC's core disclosure authority and build on decades of practice.

They are supported by substantial evidence and fully explained, as is clear from the hundreds of pages SEC devoted to justifying each of the Rules and responding to comments. In addition, the Rules comport with the First Amendment by requiring only factual, noncontroversial information about commercial risks. And the statutory basis for the Rules—which SEC has frequently invoked in rulemakings over the past 90 years—provides an intelligible principle to guide SEC's authority.

## STATEMENT OF ISSUES

1.      Whether SEC has statutory authority to promulgate the Rules.

**Authorities:** 15 U.S.C. §§ 77g(a)(1), 78*l*(b), (g); *Bradford v. DOL*, 101 F.4th 707 (10th Cir. 2024); *United States v. White*, 97 F.4th 532 (7th Cir. 2024); *Verizon v. FCC*, 740 F.3d 623 (D.C. Cir. 2014).

2.      Whether the Rules are based on substantial evidence and satisfy arbitrary-and-capricious review.

**Authorities:** 15 U.S.C. §§ 78y(b), 77b(b), 77i(a), 78w(a)(2); 5 U.S.C. 706(2); *FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021); *Biestek v. Berryhill*, 587 U.S. 97 (2019); *Northport Health Servs. of Ark. v. DHHS*, 14 F.4th 856 (8th Cir. 2021); *Lindeen v. SEC*, 825 F.3d 646 (D.C. Cir. 2016).

3.      Whether the Rules comport with the First Amendment.

**Authorities:** *Zauderer v. Off. of Disciplinary Counsel*, 471 U.S. 626 (1985); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980); *Md.*

3

*Shall Issue v. Anne Arundel Cnty.*, 91 F.4th 238 (4th Cir. 2024); *AMI v. USDA*, 760 F.3d 18 (D.C. Cir. 2014) (en banc).

4.      Whether      SEC's      disclosure-authorizing      statutes      satisfy      the nondelegation doctrine.

**Authorities:** 15 U.S.C. §§ 77g(a)(1), 78y(b); *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001); *Bhatti v. FHFA*, 15 F.4th 848 (8th Cir. 2021).

## STATEMENT OF THE CASE

**1.      Legal Background.**

**A.      Federal securities laws and SEC disclosure authority.**

Congress enacted the Securities Act of 1933 and the Exchange Act of 1934 ("Acts") to protect the public interest in stable and efficient securities markets. *See Hochfelder*, 425 U.S. at 194.  The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings of securities," and the Exchange Act was enacted "principally to protect investors" and "to impose regular reporting requirements on [public] companies." *Id.* at 194-95. This focus on disclosure reflected Congress's "conclusion that sunlight is the best disinfectant." 1 Hazen, *Law of Securities Regulation* § 1:16 (May 2024).

The Acts set forth many disclosure requirements expressly, eliciting identifying information, 15 U.S.C. § 77aa(1) (names); organizational information, *id.* § 77aa(8) (character of the business); financial information, *id.* § 77aa(9) (capitalization statements); and legal information, *id.* § 77aa(29) (counsel opinions).

4

Yet "Congress realized that it could not enact express statutory provisions to deal with every possible evil that might develop." *Touche Ross & Co. v. SEC*, 609 F.2d 570, 580 (2d Cir. 1979). So it gave SEC "broad discretionary powers to promulgate" rules requiring disclosures of information "beyond that specifically required by statute." *NRDC, Inc. v. SEC*, 606 F.2d 1031, 1045 (D.C. Cir. 1979). In particular, the Acts authorize SEC to require disclosures beyond those specifically enumerated when "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1); *see id.* §§ 78*l*(b)(1)(A), (L), 78m(a)(1)-(2).

### B.    History of SEC disclosure rules.

Consistent with those provisions, SEC has required registrants to disclose an array of information important to investor decision-making. *See* SEC Br. 8-10, 32-33. For instance, it has required registrants to disclose information about "material pending legal proceedings." 17 C.F.R. § 229.103. It has required registrants to disclose "Risk Factors" that may "make an investment in the registrant or offering speculative or risky." *Id.* § 229.105(a). And, recently, it has required registrants to disclose "cybersecurity" risks and their management, strategy, and governance of those risks. *Id.* § 229.106; *see Cybersecurity Risk Management, Strategy, Governance, and Incident Disclosure*, 88 Fed. Reg. 51896 (Aug. 4, 2023).

SEC also has mandated disclosure of certain environmental-related risks since the early 1970s. *See, e.g.*, *Disclosures Pertaining to Matters Involving the*

*Environment and Civil Rights*, 36 Fed. Reg. 13989 (July 29, 1971).  More recently, SEC has recognized that the "significant physical effects of climate change" can "have a material effect on a registrant's business," whether that involves "personnel, physical assets, supply chain and distribution chain," or "consumer demand." *Commission Guidance Regarding Disclosure Related to Climate Change*, 75 Fed. Reg. 6290, 6291, 6295-97 (Feb. 8, 2010).  And SEC has acknowledged the public's "concern that disclosures made in response to the Commission's current rules do not adequately address the risks associated with climate change."  *Business and Financial Disclosure Required by Regulation S-K*, 81 Fed. Reg. 23916, 23971-72 (Apr. 22, 2016).

### 2.    Factual Background.

In March 2021, due to growing investor demand, SEC requested public input about specific climate-related disclosure rules.  *See* Statement of Allison Herren Lee, Comm'r, SEC, *Public Input Welcomed on Climate Change Disclosures* (Mar. 15, 2021),  https://tinyurl.com/593rx65p.   A  chorus  of  investors  and  registrants responded.   As  SEC  later  explained,  many  investors  noted  that  they  seek climate-related  information  to  understand  "significant  financial  risks"  in  their investments. *The Enhancement and Standardization of Climate-Related Disclosures for Investors*, 87 Fed. Reg. 21334, 21339 (Apr. 11, 2022) ("Proposed Rules"), App. 286.   And  investors  and  registrants  alike  found  the  existing  landscape  of

6

voluntary climate-disclosure frameworks to be burdensome and lacking in comparable and decision-useful information.  App. 287.

### A.    Proposed Rules.

In response, SEC built on its tradition of risk-disclosure requirements by proposing new climate-related disclosure rules "to protect investors, maintain fair, orderly and efficient markets, and promote capital formation."  App. 283.  As SEC explained, "[i]nvestors need information about climate-related risks" because such "risks have present financial consequences that investors in public companies consider in making investment and voting decisions."  App. 282-83.  Among other things, "[s]evere and frequent natural disasters can damage assets, disrupt operations, and increase costs."  App. 283.  In 2020, for example, the United States endured 22 separate climate-related disasters, each causing at least $1 billion in damages.  App. 283 n.10.  In addition, many registrants may be forced to alter their business models as a result of "[t]ransitions to lower carbon products, practices, and services, triggered by changes in regulations, consumer preferences, availability of financing, technology and other market forces."  App. 283 (footnote omitted).

SEC requested feedback on several issues.  It proposed requiring registrants to disclose their direct greenhouse-gas ("GHG") emissions (Scope 1 emissions); their GHG from purchased or acquired electricity, steam, heat, or cooling (Scope 2 emissions); and all of their other indirect GHG emissions across their value chain

7

(Scope 3 emissions). App. 292, 321. It also proposed requiring disclosure of the "impact of climate-related events" and "transition activities" "on the line items of a registrant's consolidated financial statements," as well as "disclosure of financial estimates and assumptions impacted by such climate-related events and transition activities." App. 321.

In addition to thousands of other commenters, several Intervenor States supported the Proposed Rules. *See* App. 1333-67. They explained the need for investors to understand how registrants are managing climate-related physical, economic, and transition risks. App. 1337-47. And they noted that the Proposed Rules would improve investment decision-making, thereby benefitting the Intervenor States as institutional investors and resulting in "improved financial outcomes" for their residents. App. 1336.

### B. Final Rules.

SEC issued its Final Rules in March 2024. Recognizing that climate-related risks can "significantly affect" a registrant's "financial performance and position," SEC found that the Rules will provide "more complete and decision-useful information about the impacts of climate-related risks on registrants, improving the consistency, comparability, and reliability of climate-related information for investors." App. 442.

8

SEC made a number of modifications in response to comments. For example, it added express "materiality" requirements to certain provisions. App. 448. It removed the "requirement for all registrants to disclose Scope 1 and Scope 2 emissions," and eliminated altogether the "requirement to provide Scope 3 emissions disclosure." App. 448. It also removed "the requirement to disclose the impact of severe weather events and other natural conditions and transition activities on each line item of a registrant's consolidated financial statements." App. 448. And it extended "certain phase in periods" as well as "a safe harbor from private liability for certain disclosures." App. 448.

In broad outline, the Final Rules require disclosure of a few discrete categories of information. App. 446-49; *see* SEC Br. 15-19.

- *First*, registrants must describe "climate-related risks" that have materially impacted them or that are reasonably likely to do so in the short term (within 12 months) and in the long term (beyond 12 months), as well as describe how registrants consider such impacts strategically, operationally, and financially. App. 447-48, 626-28, 688-89.

- *Second*, registrants must disclose information about the tools and strategies, if any, that they use to mitigate or measure climate-related risks. App. 447, 686, 688-89.

9

- *Third*, registrants must disclose the role, if any, of their board of directors or managers in overseeing material climate-related risks, and describe the processes by which they are informed of such risks and the processes for identifying, assessing, and managing such risks. App. 447, 688-89.

- *Fourth*, registrants of a certain size must disclose material Scope 1 and Scope 2 emissions, in addition to their methodology for calculating those emissions. App. 447, 505-06, 689-91.

- *Fifth*, registrants must disclose information in their audited financial statements about costs and expenditures related to severe-weather events and other natural conditions (e.g., hurricanes, droughts, wildfires), and describe how those events and conditions materially impacted any estimates or assumptions underlying their financial statements. App. 448, 578-79, 685-86.

## 3.   Procedural Background.

Several entities filed petitions for review of the Rules, and the cases were assigned to this Court on March 25, 2024. The undersigned States moved to intervene as respondents. SEC stayed its Rules pending resolution of this litigation. The Court granted Intervenor States' motion.

## STANDARD OF REVIEW

Legal issues are reviewed de novo, but "review of agency policymaking and factfinding" is "deferential." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244,

2261 (2024); *see* 5 U.S.C. § 706(2). SEC rules must be upheld unless challengers show that they are unsupported by "substantial evidence" or they are "arbitrary [and] capricious." 15 U.S.C. § 78y(b); *id.* § 77i(a). Neither standard permits exacting review. "Substantial evidence" simply means "relevant evidence" that "a reasonable mind might accept as adequate to support a conclusion," *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019), and arbitrary-and-capricious review "presume[s] agency action to be valid," *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1317 (8th Cir. 1981) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

I.     The Rules fit within SEC's statutory authority. Congress empowered SEC to require the disclosure of information beyond that specifically enumerated in the Acts to further the public interest in efficient, stable securities markets and to protect investors by providing information relevant to investment and voting decisions. That is what the Rules do. They provide information about climate-related risks in a more consistent, comparable, decision-useful format than currently exists. Nothing about those requirements raises the sort of extraordinary political or economic issues covered by the major-questions doctrine, and no other consideration requires a narrow construction of SEC's authorizing statutes.

II.    The Rules are supported by substantial evidence and consistent with all applicable requirements. SEC supported its findings and predictive judgments with

11

public comments and empirical data, as well as its own experience and expertise; it explained its reasons for adopting the Rules; and it analyzed the relevant factors, including the Rules' economic effects. Contrary to petitioners' assertions, while the Rules are new, they are not an unexplained change in policy, and SEC need not justify them with a history of documented abuses or undisputed empirical evidence. In addition, the Rules are a logical outgrowth of the Proposed Rules, and petitioners' assertions of pretext are unsupported. Moreover, petitioners have not even tried to show that they were prejudiced by the Rules.

III. The Rules comport with the First Amendment. SEC disclosure rules regulate commercial activity and any incidental impact on speech is reviewed deferentially under *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985). The Rules here pass *Zauderer* review because they help to preserve the efficiency of the securities markets by providing investors factual information relevant to the value of securities. Likewise, the Rules meet the test for commercial speech: they directly and appropriately advance SEC's substantial interest in protecting investors and preserving efficient securities markets without unnecessarily curtailing protected expression. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Petitioners' arguments for applying strict scrutiny would upend First Amendment doctrine and jettison nearly a century of tradition by subjecting countless federal and state commercial disclosure laws to the most

12

demanding test in constitutional law, contrary to the practical realities of the securities industry.

IV. Congress's delegation of authority to SEC to set disclosure requirements for securities offered on the public markets is constitutional. The nondelegation doctrine requires only an "intelligible principle" to guide agency discretion, and as numerous courts have held, terms like "public interest" and "protection of investors" provide that intelligible principle. The Texas Alliance petitioners' contrary theory lacks merit.

## ARGUMENT

## I. The Securities Laws Plainly Authorize The Rules.

The Rules fit squarely within SEC's statutory mandate to require disclosures of information that will further the public interest and protect investors. Petitioners' challenges flout core principles of statutory construction and provide no basis to extend the major-questions doctrine to this case.

### A. Congress authorized SEC to compel information of the kind required by the Rules.

To succeed on a "facial challenge to an agency's regulation, the plaintiffs must show that there is 'no set of circumstances' in which the challenged regulation might be applied consistent with the agency's statutory authority." *Scherer v. U.S. Forest Serv.*, 653 F.3d 1241, 1243 (10th Cir. 2011) (Gorsuch, J.) (quoting *Reno v. Flores*, 507 U.S. 292, 301 (1993)). It is not enough for plaintiffs to show that a regulation

13

could be "invalid as applied to" others or even "in their particular circumstances."
*Id.* They must instead show that "*every time*" the challenged regulation applies the agency "exceeds its statutory authority." *Id.* at 1244. Petitioners here have not come close to meeting that high bar.

>    1. The securities laws authorize SEC to require disclosures that are "necessary or appropriate in the public interest or for the protection of investors."

When "deciding whether an agency has acted within its statutory authority," courts apply "the traditional tools of statutory construction." *Loper Bright*, 144 S. Ct. at 2268. In the context of statutes authorizing agency action, "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion." *Id.* at 2263. In such cases, the court's role is to "recogniz[e] constitutional delegations, fix[] the boundaries of the delegated authority, and ensur[e] the agency has engaged in 'reasoned decisionmaking' within those boundaries." *Id.* (citations omitted). Here, the relevant provisions' plain meaning, statutory context, and history reveal that Congress expressly authorized SEC to determine which disclosures would serve the statutory aims of protecting investors and promoting fair and efficient securities markets.

In the wake of the 1929 stock-market crash and the onset of the Great Depression, Congress passed the Acts to protect markets and investors principally through the disclosure of risk-related information. *See Hochfelder*, 425 U.S. at 194-

14

95. To that end, the Acts expressly require disclosure of certain organizational, legal, and financial information. 15 U.S.C. §§ 77aa, 78*l*(b). But, recognizing that it could not address every conceivable issue through "express statutory provisions," *Touche Ross*, 609 F.2d at 580, Congress empowered SEC to require additional disclosures by rule, *NRDC*, 606 F.2d at 1045 ("Rather than casting disclosure rules in stone, Congress opted to rely on the discretion and expertise of the SEC[.]").

The disclosure-authorizing provisions are clear. In relevant part, the Securities Act empowers SEC to go beyond the disclosures listed in Section 77a by requiring "such other information" and "such other documents" as it deems "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1). The Exchange Act likewise authorizes SEC to require disclosure of "[s]uch information, in such detail," as it finds "necessary or appropriate in the public interest or for the protection of investors, in respect of" various matters. *Id.* § 78*l*(b)(1)(L); *see id.* §§ 78*l*(g), 78m(a).

The phrase "such other information" gives SEC latitude to require additional disclosures beyond those mandated in the Acts. By itself, "such" refers to things of "like kind" but does so in a way that is "purposely left indefinite." Funk & Wagnalls, *Practical Standard Dictionary* 1124 (1924). The adjectival phrase "such other" is clearer still, because "other" means "additional," "[d]ifferent from the one specified," and "not the same." *Id.* at 803; *see The Concise Oxford Dictionary of*

*Current English* 579 (1917) (same). "Such other information," then, encompasses additional and different information beyond that specifically enumerated in the Acts.

The plain meaning of the phrase "necessary or appropriate" confirms the Acts' grant of discretionary authority to SEC to require additional disclosures. In the 1930s, "appropriate" meant "suitable" or "proper," *Webster's New Int'l Dictionary* 111 (1930), and "necessary" generally meant "appropriate and helpful," *Welch v. Helvering*, 290 U.S. 111, 113 (1933). Hence, "'necessary or appropriate'" in the securities context "is legally of the broadest content in its grant of regulatory and administrative power." *Dyer v. SEC*, 287 F.2d 773, 779 (8th Cir. 1961) (construing since-repealed provision). As the Supreme Court has repeatedly recognized, the term "appropriate" entrusts an agency with "discretion" and "flexibility." *Loper Bright*, 144 S. Ct. at 2263 & n.6 (quoting *Michigan v. EPA*, 576 U.S. 743, 752 (2015)).

The terms "public interest" and "protection of investors" further guide SEC's decision-making, and relate to the "complete and truthful exposure of all matters in relation to the registrant's financial condition," *Bank of Am. v. Douglas*, 105 F.2d 100, 103 (D.C. Cir. 1939). Such matters include not only "the earnings and distributions of a company, but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *SEC v. GenAudio Inc.*, 32 F.4th 902, 933 (10th Cir. 2022)

16

(quoting *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc)). Serving the public interest and protecting investors can thus be distilled to one simple idea: "[d]isclosure, and not paternalistic withholding of accurate information." *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988).

Statutory context further informs the meaning of "public interest" and "protection of investors." In determining "whether an action is necessary or appropriate in the public interest," SEC "shall also consider, in addition to the protection of investors, whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. §§ 77b(b), 78c(f). In addition, the Exchange Act instructs SEC to ensure that any rule or regulation it promulgates not impose "a burden on competition not necessary or appropriate in furtherance of the purposes" of the Act. *Id.* § 78w(a)(2).

Read in this context, it is clear that "public interest" is "not a broad license to promote the general public welfare." *NAACP v. FPC*, 425 U.S. 662, 669-70 (1976). Rather, paired with "protection of investors," this term refers to SEC's authority to require information as appropriate to preserve the efficiency and integrity of the securities markets and to assist investors in making informed investment and voting decisions. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015) (describing the Securities Act's purpose to protect investors by ensuring "full and fair disclosure of information").

17

2. **The Rules require information that is necessary or appropriate to further the public interest and to protect investors.**

In simplest terms, the Rules will further the public interest and protect investors by providing important information in a more decision-useful format than currently exists. *See, e.g.*, App. 449. Specifically, such disclosures will serve the public interest by, among other things, helping to mitigate information asymmetries, thereby promoting market efficiency and capital formation. App. 603. And they will protect investors by, among other things, providing this important, financially relevant information in a consistent, standardized, and comparable framework, thereby facilitating better decisions and portfolio allocation. App. 446, 449-50, 456. Congress gave SEC authority to address precisely those sorts of issues and to promulgate precisely these sorts of rules. *See NRDC*, 606 F.2d at 1045, 1050-51. Intervenor States adopt SEC's arguments on this point (Br. 26-40, 45-49) pursuant to Federal Rule of Appellate Procedure 28(i). *See In re Target Corp. Customer Data Sec. Breach Litig.*, 855 F.3d 913, 915-17 (8th Cir. 2017).

3. **Petitioners' contrary arguments lack merit.**

a. **SEC's authority is not limited to addressing the market risks of the 1930s.**

Petitioners incorrectly speculate that the Rules must be unlawful because, when Congress enacted the Acts in the 1930s, it could not have imagined that climate-related information would be financially relevant and appropriate to protect investors today, 90 years later. *See, e.g.*, NLPC 41. Yet the Acts' legislative history

18

confirms that Congress explicitly intended to empower SEC to adapt to changing circumstances. "In a field where practices constantly vary," Congress knew it was "practically essential" for SEC to have "broad discretionary powers" under the securities laws to make "the determination of the most appropriate form of rule" in light of "the technical character of the problems to be dealt with." H.R. Rep. No. 1383, 73d Cong., 2d Sess. 6-7 (1934). Congress accordingly gave SEC "considerable latitude," so that the securities laws did not become an "unworkable 'strait-jacket' regulation." S. Rep. No. 792, 73d Cong., 2d Sess. 5 (1934).

In any event, statutes often apply "beyond the principal evil legislators may have intended or expected to address." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) (internal quotation marks omitted); *see Gorman v. Bartch*, 152 F.3d 907, 912-13 (8th Cir. 1998). And "agencies are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday." *Riffin v. Surface Transp. Bd.*, 733 F.3d 340, 345 (D.C. Cir. 2013) (internal quotation marks omitted). To the contrary, agencies can construe their authorizing statutes to address matters Congress did not foresee, absent "evidence that if Congress had foreseen the developments," it "would have objected to [the agency's] interpretations." *New York v. FERC*, 535 U.S. 1, 16-17, 19-24 (2002) (recognizing that a "statute's coverage" is not defined by the issues that "catalyzed [its] enactment"); *see Sabre,*

19

*Inc. v. DOT*, 429 F.3d 1113, 1122-25 (D.C. Cir. 2005) (similar); *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297-98 (D.C. Cir. 2003) (Roberts, J.) (similar).

Here, nothing in the statutory text or legislative history suggests that the enacting Congresses would have objected to SEC's position.  Far from it.  As described above, the term "public interest," for example, is precisely the sort of language Congress uses when it intends agencies to have the flexibility to address emerging risks and unforeseen issues: "Regulatory practices and policies that will serve the 'public interest' today may be quite different from those that were adequate to that purpose in 1910, 1927, or 1934, or that may further the public interest in the future."  *Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1199 (D.C. Cir. 1984) (internal quotation marks omitted).  The same is true of "necessary or appropriate" and "protection of investors," which also must be read in light of the fact that SEC regulates markets that are "constantly changing," *R.A. Holman & Co. v. SEC*, 299 F.2d 127, 132 (D.C. Cir. 1962).

Were it otherwise, SEC's authority to issue rules addressing contemporary and emerging risks would be illogically hamstrung, defying Congress's intent.  Take cybersecurity, for instance.  While the 1930s Congresses would never have expected that issue to be relevant (modern computers had not been invented), there is little doubt that understanding registrants' cybersecurity risks is helpful to investors today.  *See* 88 Fed. Reg. at 51896-99.  Under petitioners' cramped theory, however,

20

SEC could not address that issue, leaving investors to fend for themselves with no systematized access to such information. So too with other modern issues, ranging from artificial intelligence to e-signatures. *See Electronic Signatures in Regulation S-T Rule 302*, 85 Fed. Reg. 78224 (Dec. 4, 2020). Congress gave SEC the flexibility to address precisely those sorts of risks in the modern economy, just as it did with the Rules' climate-related disclosures.

> b. The Acts authorize SEC to require disclosures of financially relevant information, not only traditional financial data.

Petitioners are wrong to dismiss the statutes on which SEC relies as mere "residual" clauses that must be read restrictively to cover only data that are *per se* financial. Chamber 46-51; *see* NLPC 21-30; Iowa 19-28; Texas Alliance 32-41. Contrary to petitioners' contentions, even the Acts' enumerated disclosures are not limited to traditional "financial data." A cursory reading of Section 77aa and related provisions reveals that they also require information of an organizational, legal, and decidedly non-financial nature that is helpful in contextualizing registrants' business and operations. *See* 15 U.S.C. §§ 77aa, 78*l*(b). This includes a registrant's articles of incorporation, *id.* § 77aa(31); the names and addresses of board members, *id.* § 77aa(4); and the names and addresses of attorneys as well as copies of their opinions, *id.* § 77aa(23), (29); *see id.* § 77g(a)(1) (same, for engineers). Because none of that information is inherently financial in nature, petitioners' artificially

21

restrictive reading of "such other information" fails. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 221-27 (2008) (declining to narrow "catchall phrase").

Rather, the Acts authorize SEC to require, as one petitioner admits, "financially-relevant information," Texas Alliance 29, but impose no independent subject-matter limitation on that information. Indeed, SEC has long invoked the above provisions in issuing regulations that elicit information relevant to assessing registrants' financial prospects, even if the information is not *per se* financial. *See* SEC Br. 8-11, 32-34, 48-49. In 1978, for example, SEC required disclosure of additional governance information, including directors' ages and backgrounds; familial relationships between board members and officers; and board-member attendance policies. *Uniform and Integrated Reporting Requirements*, 43 Fed. Reg. 34402, 34403-07 (Aug. 3, 1978); *see* 17 C.F.R. § 229.407(b). And in 2009, SEC required disclosures of directors' "specific experience, qualifications, attributes, or skills." *Proxy Disclosure Enhancements*, 74 Fed. Reg. 68334, 68362 (Dec. 23, 2009). Such disclosures, while not financial in format, nevertheless bear directly on financial risk and investor decision-making, and therefore fall squarely within SEC's authority—just like the disclosures required by these Rules.

Moreover, the fact that Congress has occasionally passed isolated amendments to the securities laws that expressly require certain non-financial disclosures (for example, those related to conflict minerals) does not limit SEC's

authority through retroactive implication.  *Contra* Chamber 49; NLPC 26-27; Liberty 27-31.  Intervenor States adopt SEC's arguments on this point (Br. 48-49) under Rule 28(i), and further note that Congress often adds specific examples to statutes "out of an abundance of caution" and "to remove any doubt" that certain items "were included."  *Ali*, 552 U.S. at 224-27 (internal quotation marks omitted); *see United States v. Hansen*, 772 F.2d 940, 946-47 (D.C. Cir. 1985) (Scalia, J.) (explaining that Congress sometimes makes "assurance doubly sure").

> c. Petitioners' misguided "materiality" challenges fail.

Petitioners attempt to impugn the Rules by imposing a blanket—and incorrect—materiality limitation on SEC's authority.  *See* Liberty 31-39; Chamber 50; Iowa 25-27.  But the Court need not address this atextual theory at all because the Rules will elicit information that is material to investors, as SEC explains (Br. 49-53) and Intervenor States adopt under Rule 28(i).  *See also infra* pp. 37-42.  In any event, while SEC disclosure rules often incorporate materiality standards, nothing in the Acts supports petitioners' categorical materiality limit on SEC's authority.  Here, SEC acted well within its authority—especially for purposes of defeating petitioners' facial challenge—by incorporating both express and presumptive materiality qualifiers in the Rules to elicit information that is material to investors like Intervenor States and their residents.

Appellate Case: 24-1522     Page: 41     Date Filed: 10/01/2024 Entry ID: 5441535

*First*, the Acts do not limit SEC's disclosure authority with the materiality standard as defined in securities-fraud litigation. *Contra* Liberty 32-33; Iowa 25-27; Chamber 32-37, 50. Nor would it make sense to cabin SEC's "necessarily forward-looking" rulemaking authority, *see Amoco Oil Co. v. EPA*, 501 F.2d 722, 729 n.10 (D.C. Cir. 1974), with the securities-fraud materiality framework, which applies in the case- and "fact-specific" context of fraud litigation, *SEC v. World Tree Fin., L.L.C.*, 43 F.4th 448, 459 (5th Cir. 2022) (quoting *Basic*, 485 U.S. at 240). A contrary rule would require SEC to formulate disclosure rules *ex ante* that, in all of their conceivable applications, require *only* material information. *See Barnhart v. Thomas*, 540 U.S. 20, 29 (2003) ("Virtually *every* legal (or other) rule has imperfect applications in particular circumstances."); *Ill. Com. Comm'n v. ICC*, 776 F.2d 355, 359 (D.C. Cir. 1985) (Scalia, J.) ("General rules need not work perfectly in all their applications[.]").

To be sure, SEC may, and often does, employ materiality analyses to pursue the statutory aims of advancing the "public interest" and "protecti[ng] investors," as information is "material" when there is a substantial likelihood that reasonable investors would deem it important to investment and voting decisions, *see TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1977). This judicious use of materiality requirements reflects SEC's effort to balance benefitting investors with more information and limiting burdens on registrants. *See, e.g.*, App. 471 (adding

24

materiality qualifier to climate-related risk disclosure requirement to "address commenters' concerns" about excessive disclosures and registrant burden), App. 505-06 (similar); *see also* App. 469 n.383 (describing materiality qualifier in 2020 disclosure requirement). But as the Supreme Court has recognized, SEC "of course" can "enact a rule specifically requiring the disclosure of" facts whose omission would not be "materially misleading as a matter of law." *TSC Indus.*, 426 U.S. at 462-63. Thus, nothing in the Acts prohibits SEC from creating "disclosure obligations" that fall short of "the general test for securities fraud materiality." *See Oran v. Stafford*, 226 F.3d 275, 287-88 (3d Cir. 2000) (Alito, J.) (holding that omitting information required by SEC rule did "not automatically give rise to a material omission").

*Second*, SEC acted well within its authority here—and consistent with past practice—by including an express materiality requirement in some provisions and bright-line tests in others to elicit information that is material to investors like State Intervenors and their residents. *Contra* Liberty 31-39; Iowa 11-13, 25-27; Chamber 32-37, 50. While most of the Rules' disclosure requirements are expressly qualified by materiality, *see, e.g.*, App. 505-06 (requiring GHG-emissions disclosures only when material), others establish a presumption of materiality as to specific categories of information, *see, e.g.*, App. 486 (requiring disclosure of board of directors' oversight of climate-related risks based on presumption that "risks

25

elevated to the board level will be material").  Both approaches aim to advance the "public interest" and "protection of investors" by capturing information a reasonable investor would consider important in buying or voting a security—either by "rely[ing] on a registrant's management to evaluate the significance of information in the context of the registrant's overall business and financial circumstances" or by "employ[ing] objective . . . bright-line tests."  81 Fed. Reg. at 23925.  While a management-led materiality determination can allow registrants more flexibility, bright-line rules can improve consistency and comparability for investors.  *See id.* at 23927.  Both approaches are permissible ways to structure disclosure rules, especially given Congress's own selective use of express materiality qualifiers in the Acts' enumerated disclosure requirements, *see, e.g.*, 15 U.S.C. § 77aa(30) ("material contracts").  *See United States v. Bruguier*, 735 F.3d 754, 759-60 (8th Cir. 2013) (en banc) ("[D]isparate inclusion or exclusion of statutory language is intentional." (cleaned up)).

*Third*, petitioners certainly cannot clear the high bar for a facial challenge on this basis because the Rules will plainly elicit material information.  *See Scherer*, 653 F.3d at 1243-44.  Indeed, one petitioner concedes as much, noting that "climate change risks may be relevant to the financial outlook of some companies," and that "greenhouse gas emissions" data may have "direct financial implications" for firms

"operating under a cap-and-trade regime." Texas Alliance 26-29. Nothing more is required to defeat petitioners' facial challenge.

**B.** **Petitioners offer no sound reason to depart from Congress's clear statutory language.**

With no viable argument based on the statutory text, structure, history, or purpose, petitioners resort to the major-questions doctrine and various theories of constitutional avoidance. Each argument lacks merit.

1. The major-questions doctrine does not apply.

The Rules are far from the "extraordinary cases" that trigger the major-questions doctrine. *West Virginia v. EPA*, 597 U.S. 697, 700 (2022). That doctrine counsels courts to "hesitate before concluding that Congress" gave an agency "unheralded power" in an "ancillary provision" when the "economic and political significance" of the issue engenders skepticism. *Id.* at 724-25; *United States v. White*, 97 F.4th 532, 540 (7th Cir. 2024) (limiting doctrine to "truly extraordinary cases").

a. The Rules are a classic exercise of SEC's primary authority to require disclosure of important risk-related information—matters squarely within its expertise.

The Rules rest on SEC's core disclosure authority and are fully consistent with past SEC practice. *See Bradford v. DOL*, 101 F.4th 707, 726-27 (10th Cir. 2024)

27

(rejecting major-questions argument given agency's similar actions).  Petitioners'
contrary assertions mischaracterize the Rule and distort the regulatory history.

There is nothing "ancillary," "oblique," or "cryptic" about SEC's authority to
require information about registrants that is necessary or appropriate to further the
public interest and protect investors.  *Contra* NLPC 32, 39-41; Iowa 41; Texas
Alliance 50-52; Chamber 49, 54-58.  As petitioners' own cited cases emphasize,
"disclosure" is "a familiar tool in the Commission's tool kit," *Chamber of Com. v.
SEC* (*Chamber I*), 412 F.3d 133, 144 (D.C. Cir. 2005), which it has used countless
times over the last 90 years to provide investors "information important to making
informed investment and voting decisions," App. 456-57.  Indeed, SEC has long
required disclosures related to various forms of investment risks and opportunities,
including, as petitioners admit, *environmental*-related risks, *see, e.g.*, Iowa 9-10.
App. 443.  SEC has recognized for nearly 50 years that such rules follow directly
from "its rulemaking authority under the [Acts]."  *Environmental and Social
Disclosure, Notice of Commission Conclusions and Rulemaking Proposals*, 40 Fed.
Reg. 51656 (Nov. 6, 1975).  The same is true of the Rules here.

Petitioners make much of a 1975 proposed regulation that considered
requiring comprehensive environmental disclosures.  *See* Iowa 31; Liberty 20.  But
far from "conced[ing]" that SEC "lacked authority" to require "climate-related
disclosures," Iowa 4, that regulation actually proposed to require the "disclosure of

28

corporate noncompliance with applicable environmental standards." 40 Fed. Reg. at 51656, 51662-63. And although, on that rulemaking record, SEC found "[n]o showing" that "information describing corporate social practices should be specifically required of all registrants," *id.* at 51656, SEC made clear that disclosure rules need not be "frozen in the mold dictated by conditions perceived in 1933 and 1934," *id.* at 51659. Recognizing that "business relationships, supply conditions and a host of other factors which could not be foreseen in 1933 and 1934 may today have a significant impact on the financial condition of companies and the priorities of investors," *id.*, SEC confirmed that it would "continue to reevaluate the need for further disclosure requirements from time to time as our experience with disclosure in this area increases," *id.* at 51663. Contrary to petitioners' assertions, then, SEC's 1975 statements confirm the propriety of its action here given current market conditions and the robust record before SEC in this rulemaking.

The Rules thus simply mark the latest exercise of SEC's traditional authority to require the disclosure of information to assist investors in evaluating financial risks, no matter the source. *See supra* pp. 4-6. Petitioners cannot therefore plausibly liken these Rules to the CDC's first-ever eviction moratorium, *Alabama Ass'n of Realtors v. DHHS*, 594 U.S. 758 (2021); OSHA's unprecedented vaccine mandate, *NFIB v. DOL*, 595 U.S. 109 (2022); or FDA's groundbreaking assertion of authority over tobacco products, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,

160 (2000).  *See* Iowa 34; Chamber 56-57.  Where, as here, the agency exercises its express, long-established statutory authority, the major questions doctrine has no place.  *See, e.g.*, *Coal. for Renewable Nat. Gas v. EPA*, 108 F.4th 846, 853 (D.C. Cir. 2024) (rejecting major-questions argument where statute granted agency authority to address relevant issues).

The Rules also follow directly from SEC's expertise and experience in finance, accounting, and risk assessment.  *See White*, 97 F.4th at 539-41 (rejecting major-questions challenge on similar basis).  No agency is better suited to determine what information—whether related to foreign-exchange risk, cybersecurity risk, or, as here, climate-related risk—is necessary or appropriate to protect investors and serve the public interest in maintaining efficient, stable securities markets.  *See King v. Burwell*, 576 U.S. 473, 486 (2015) (considering agency's expertise in relevant policymaking area when evaluating Congress's intent).

Nor do EPA's distinct emissions disclosures displace SEC's expertise in regulating the securities markets, much less its authority to do so.  *Contra* Iowa 46.  EPA's requirements serve an entirely different purpose—to carry out its obligations under the Clean Air Act, *see* 42 U.S.C. § 7414(a).  They do not provide investors comparable, decision-useful information, or even cover the same information as the Rules here.  For example, EPA lacks authority to require disclosures of *international* emissions sources, as its mandate is advancing domestic environmental protection,

30

while SEC *can* require information from foreign issuers, consistent with its mission to protect domestic investors and markets.  *See, e.g.*, App. 591 n.2380, 595.  EPA's disclosure requirements therefore hardly suggest that SEC was acting outside of its "lane" here, as petitioners assert, *see* Liberty 21.

>  b.  The Rules neither regulate a politically controversial issue nor impose disproportionate costs.

The major-questions doctrine applies only where, among other things, an agency rule raises issues of "great economic and political significance."  *White*, 97 F.4th at 540.  But the Rules' disclosure requirements, while important, do not rise to that level of economic or political significance.   All but conceding that fact, petitioners instead assert that *climate change* is "controversial."  *E.g.*, NLPC 54; *see* Iowa 34; Liberty 15-16.  But the rules emphatically do not regulate climate change, so petitioners' claims fail.

*First*, as SEC affirms many times, "[t]he Commission has been and remains agnostic about whether or how registrants consider or manage climate-related risks." App. 444, *see* App. 460, 477, 486, 629.  The Rules neither mandate nor suggest any changes in registrants' GHG emissions, operations, risk management, or governance.   They simply clarify the format and content of disclosures about climate-related risks and ensure the availability of financially relevant information in order to promote "investor protection, market efficiency and capital formation."

Appellate Case: 24-1522     Page: 49     Date Filed: 10/01/2024 Entry ID: 5441535

App. 444. That is no more a regulation of climate change than disclosure of pending litigation is a regulation of the legal system.

Stripped of its fictitious premise, petitioners' claim fails. The details and format of disclosures required of publicly registered companies in periodic reports and registration statements are hardly hotly contested matters by Americans "across the country," unlike the legality of physician-assisted suicide, *Gonzales v. Oregon*, 546 U.S. 243 (2006); COVID-19 vaccine mandates, *NFIB*, 595 U.S. at 112-13; or mass student loan forgiveness, *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).

*Second*, the mere fact that entities have opposed the Rules does not create a politically salient controversy. As with all new regulations, some regulated entities will favor them, some will oppose them, and some will balk at their costs. But concerns about the Rules here—all of which SEC thoroughly considered, *see infra* pp. 36-54—do not give rise to an extraordinary political or economic controversy. Indeed, such claims are among the most *ordinary* disputes in administrative law— not major questions. *See, e.g.*, *Verizon v. FCC*, 740 F.3d 623, 638-39 (D.C. Cir. 2014) (major-questions doctrine does not apply every time petitioners claim a rule has "great economic and political significance").

*Third*, because the major-questions doctrine is an interpretive canon, *see West Virginia*, 597 U.S. at 721, any claims of excessive costs should be considered in the context of the relevant authorizing statutes. *See Save Jobs USA v. DHS*, --- F.4th --

32

-, No. 23-5089, 2024 WL 3627942, at *3 (D.C. Cir. Aug. 2, 2024) ("[T]he function of the major questions doctrine is simple—to help courts figure out what a statute means."). Here, the Rules' costs make sense in the context of the Acts, which empower SEC to require disclosures across the entire multi-trillion-dollar securities market to serve the public interest and to protect investors. *See supra* pp. 4-5, 14-17. Nothing in the Acts, or their historical context, suggests that the economic implications of these Rules are inconsistent with the types of costs that Congress would have reasonably expected in empowering SEC to require disclosures.

*Fourth*, the Rules do not exert authority over a new segment of the economy. With only minor exceptions, the Rules apply only to those companies that have already voluntarily subjected themselves to SEC's authority by participating in and benefiting from the securities markets that SEC regulates. *See, e.g.*, App. 604 & n.2580 (expecting Rules to require only a few hundred companies each year to file registrant documents for the first time). In fact, in response to concerns about smaller firms' compliance costs, SEC exempted some registrants subject to other reporting requirements from the Rules. App. 684. This case is thus nothing like *UARG v. EPA*, 573 U.S. 302, 328 (2014), where the agency's action would have swept into its ambit millions of previously unregulated entities.

33

c.     Unenacted legislation does not counsel a different result.

Petitioners reliance on unenacted legislation is also misplaced.  From Congress' failure to pass several bills that would have expressly required climate-related disclosures, petitioners surmise that Congress has not intended SEC to address such matters.  In petitioners' view, the language Congress *did* enact must be narrowed based on language it did *not* enact decades later.  *See* Chamber 57; Iowa 35; NLPC 38-39; Liberty 16-17.  As explained by SEC (Br. 56)—and adopted by Intervenor States under Rule 28(i)—petitioners are wrong about those unenacted bills, and their arguments fail either way.

"Congressional inaction lacks persuasive significance."  *Northport Health Servs. of Ark. v. DHHS*, 14 F.4th 856, 871 (8th Cir. 2021) (internal quotation marks omitted).  This is because "several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *PBGC v. LTV Corp.*, 496 U.S. 633, 648-51 (1990) (holding that federal corporation's authority to restore certain pension plans was not affected by the fact that Congress had recently "considered, but did not enact, a provision that expressly would have" addressed such matters (internal quotation marks omitted)).  Accordingly, "speculation about why a later Congress declined to adopt new legislation offers a 'particularly dangerous' basis on which to rest an

34

interpretation of an existing law a different and earlier Congress did adopt." *Bostock*, 590 U.S. at 670 (quoting *PBGC*, 496 U.S. at 650).

That is particularly so given the muddled history here, where Congress has considered and rejected legislation cutting different ways. Indeed, Congress has not only declined multiple opportunities to narrow or excise SEC's authority over environmental-related disclosures, *see* H. Res. 1028, H.R. 9408, S. 5005, 117th Cong. (2022); it has also failed to pass legislation that would have specifically *repealed* the Rules at issue here, *see* H.J. Res. 127, S.J. Res. 72, 118th Cong. (2024); *see also* H.J. Res. 88, H.R. 8589, 117th Cong. (2022). That legislative record drives home why "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress." *PBGC*, 496 U.S. at 650 (internal quotation marks omitted); *Verizon*, 740 F.3d at 639 (rejecting similar argument because "conflicting pieces of subsequent failed legislation tell us little if anything about" "Congress' understanding of [agency's] power").

      2.    Even if the major-questions doctrine applies, the Acts supply the requisite "clear statement" authorizing the Rules.

As explained above, *supra* pp. 14-17, the Acts expressly grant SEC authority to establish disclosure rules that are "necessary or appropriate in the public interest or for the protection of investors," as SEC did here. 15 U.S.C. § 77g(a)(1). As SEC explains (Br. 57-58), and Intervenor States adopt under Rule 28(i), that express delegation provides the requisite "clear statement" here.

Appellate Case: 24-1522    Page: 53    Date Filed: 10/01/2024 Entry ID: 5441535

3.    Petitioners' artificial narrowing of SEC's authority is not necessary to avoid any constitutional issue.

Also flawed is petitioners' reliance on constitutional avoidance principles. That canon applies only where "ambiguous" statutes raise "grave and doubtful constitutional questions." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (internal quotation marks omitted). But the statutory language here is not ambiguous, *see supra* pp. 14-17, and it raises no constitutional doubts at all, *see infra* pp. 55-62 (First Amendment), pp. 62-65 (nondelegation). Nor do the Rules raise federalism concerns, *contra* Iowa 37-39, as directing companies to disclose information relevant to investors is consistent with nearly a century of joint federal and state regulation of the securities markets. *See, e.g.*, *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 94 (2d Cir. 2019) ("[S]ecurities markets are heavily regulated by state *and federal* governments." (emphasis added)).

## II.    The Rules Are Supported By Substantial Evidence And SEC Followed All Relevant Requirements In Promulgating Them.

Under the Acts, challengers have the burden to show that SEC rules are unsupported by substantial evidence, not reasonably explained, or otherwise invalid. *See* 15 U.S.C. §§ 77i(a), 78y(b). Petitioners here have not made any of those showings, much less that they were prejudiced by any asserted error, which is an independent ground for rejecting their challenges. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error.").

36

**A.** **Substantial evidence supports the Rules, including public comments and empirical data.**

SEC amply supported the Rules with substantial evidence. The "substantial evidence" bar "is not high." *Biestek*, 587 U.S. at 103-08. It requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 103 (internal quotation marks omitted). Because this standard "gives the agency the benefit of the doubt," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998), challengers must show "not only that a persuasive case has been made for the opposite position," but "that *every* reasonable fact-finder would come to a conclusion different from the [agency's]." *Menendez-Donis v. Ashcroft*, 360 F.3d 915, 919 (8th Cir. 2004) (emphasis added). Here, SEC's brief (at 62-65) cogently explains the Rules' evidentiary bases. Intervenor States adopt those arguments under Rule 28(i), in addition to the points detailed below.

1. Investors provided support for the Rules.

The record is replete with evidence that investors, including Intervenor States, seek out climate-related information to assess a security's value and that existing disclosure frameworks are inadequate to serve investor needs, *see, e.g.*, App. 450 n.105, 452-53 & nn.137, 139. *See Spirit Airlines, Inc. v. DOT*, 687 F.3d 403, 410-11 (D.C. Cir. 2012) (finding consumers' comments provided substantial evidence for agency rule). Tellingly, petitioners do not contend otherwise. Nor could they. As several Intervenor States explained to SEC, the Rules' disclosures are "material

37

to investor decisions" and will benefit the States and their "residents by ensuring more transparency about registered companies' exposure to climate-related risks," which, "in turn, will allow investors to more accurately price those risks." App. 1336, 1347; *see* App. 814 (Illinois State Treasurer) (rules could save Illinois "tens of thousands of dollars every year" that it now spends to gather and assess data about climate-related risks).

The following, moreover, are just a few other examples in the record of the considered views of individual and institutional investors:

- Franklin Templeton Investments—which manages roughly $1.45 trillion in assets—observed that "climate risk disclosure needs to be standardized" because existing frameworks "pose challenges to investors" and "adversely impact[] companies' cost of capital." App. 2122-23, cited at App. 450 nn.102-03.

- California Public Employees' Retirement System—the nation's largest public-pension fund with approximately $450 billion in assets—underscored the need for "consistent information" about how climate-related risks "impair companies' valuations," and noted that "the current disclosure regime for corporate reporting falls short of our expectations as investors." App. 973, 977, 988, cited at App. 443 n.11; *see also* App. 826 (East Bay Municipal Utility District Employee Retirement System) (similarly noting that "climate-related impacts or risks can materially affect a company's financial position"), cited at App. 452 n.137; App. 1198 (Washington State Investment Board) (similarly noting that GHG-emissions disclosures are "critical to our understanding of the quality of a company's earnings"), cited at App. 452-53 n.137.

- Wellington Management Company LLP—which oversees more than $1.3 trillion in investments—explained that "comparable information about climate risk is critical to [its] ability to make informed investment decisions" and to "fully assess the value of an issuer's securities,"

38

which is currently "limited by inadequate information and the absence of a standardized framework." App. 1234, cited at App. 453 n.138; *see also* App. 2032 (Pacific Investment Management Company) (similarly noting that "climate risks often pose a material financial risk"), cited at App. 443 n.14; App. 818 (Rockefeller Asset Management) (similarly noting that "climate related risks and opportunities are increasingly relevant to company valuations"), cited at App. 452 n.137.

- An individual investor likewise emphasized that "climate change is a systemic risk to financial markets," which "will be inadequately considered and avoided" if "the only information available to the SEC and to investors is the voluntary, cherry-picked, non-assured, non-comparable information available today." App. 1100-02, cited at App. 453 n.139.

- Another individual investor also noted that "standardized" and "comparable" "climate-related disclosures" were "vital" to "protect investors," to "ensure fair, orderly, and efficient markets," and to "facilitate capital formation." App. 825, cited at App. 453 n.139.

- And yet another individual investor expressed "strong support" for SEC's proposal because "[i]nvestors need transparent information about climate-related investment risks," given that "[c]limate change poses major risks to companies and their investors." App. 1762, cited at App. 453 n.139.

This is but a sampling of the substantial record evidence supporting the Rules.

Ignoring all of it, petitioners insist that SEC unduly relied on the views of "institutional" investors, Liberty 44, while largely ignoring "retail" investors, Chamber 31. That is plainly wrong. Echoing the comments noted above, SEC observed that "retail investors" have "found much of the voluntary climate-related reporting to be lacking in quality and completeness and difficult to compare." App. 450 n.105. As a result, those investors "have incurred costs and inefficiencies

39

Appellate Case: 24-1522    Page: 57    Date Filed: 10/01/2024 Entry ID: 5441535

when attempting to assess climate-related risks and their effect on the valuation of a registrant's securities," App. 450 n.105, "with several stating that there was a need for more consistent and comparable disclosure about climate-related risk," App. 453 n.139; *see* App. 452-53.

Survey evidence also supported SEC's conclusions about the Rules' benefits to individual investors. One such report, for instance, found that, of "3,000 retail investors" surveyed, roughly "95% of respondents would potentially consider GHG emissions reporting" to be "material" when deciding "whether they would purchase a security." App. 453 n.139 (quoting App. 1270). Another survey of retail investors likewise showed their interest in "climate-related risks and opportunities" and that they "would factor the information disclosed into their investment practices.'" App. 450 n.105 (quoting App. 1081). Petitioners do not even mention these studies, much less challenge their validity.

### 2. Registrants also provided support for the Rules.

Petitioners also overlook SEC's reliance on the views of major public companies, which likewise provided substantial evidence for the Rules. Again, to take just a sample, petitioners ignore all of the following evidence:

- Dominion Energy, Inc. attested that "climate-related disclosures are important to our investors" and will help them "make informed decisions." App. 1206, cited at App. 451 n.110.

- Alphabet, eBay, Meta, PayPal, Intel, Hewlett Packard Enterprises, HP Inc., Autodesk, Dropbox, and Workday noted that "[i]nvestors need

consistent, comparable, and reliable information on the material risks and impacts of climate-related events and transition activities on a registrant's consolidated financial position." App. 1750, cited at App. 443 n.14.

- Amazon.com supported SEC's proposals "of providing 'consistent, comparable, and decision-useful information' to investors on public companies' climate-related risks, initiatives, and metrics." App. 2097, cited at App. 443 n.14.

- Walmart, Inc. generally supported SEC's demand for "consistent, comparable, and reliable material climate-related information." App. 1788, quoted at App. 451 n.110.

- United Airlines Holdings, Inc. recognized that "the Proposed Rules could increase the comparability—and therefore the utility—of the GHG emissions data and other climate-related disclosures." App. 2019, cited at App. 451 n.110.

- Bank of America, Inc. agreed that "disclosures addressing climate-related risks" will help many stakeholders decide "where best to deploy capital." App. 1272, cited at App. 451 n.110.

Despite this evidence, petitioners maintain that SEC gave too much "weight" to the views of "activist" commenters with "nonpecuniary" motives. Chamber 26-28, 31; *see* Texas Alliance 21-22. That argument is belied by the record evidence just noted and it lacks merit for the reasons SEC argues (Br. 69-70), which Intervenor States adopt under Rule 28(i). Indeed, this Court's precedents foreclose petitioners' attempt to reweigh the evidence SEC considered. *See Pagel, Inc. v. SEC*, 803 F.2d 942, 945 (8th Cir. 1986) ("Our task is not to weigh the evidence[.]"). And besides, SEC *rejected* many proposals from the so-called activists that petitioners cite, *e.g.*, App. 547, 564-65, 577-78, making clear that, regardless of commenters

41

with "nonpecuniary" goals, "*financial motivations* play a central role in driving investor interest in information regarding climate- and sustainability-related issues," App. 621 n.2743 (emphasis added).

<blockquote>3. Substantial evidence supports the Rules whether or not petitioners believe some data were "mixed."</blockquote>

Bedrock administrative law refutes the assertion of some petitioners that "mixed" evidence cannot constitute "substantial evidence." Iowa 48-50; Liberty 42-43. Agencies rarely have "perfect empirical or statistical data," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021), and often must rely on "evidentiary facts less desirable or complete than one which would exist in some regulatory utopia," *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1140 (D.C. Cir. 1984). For that reason, substantial evidence exists even when the record includes "conflicting evidence," *Transdev Servs., Inc. v. NLRB*, 991 F.3d 889, 896 (8th Cir. 2021), just as "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence," *Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 249 (D.C. Cir. 2003) (internal quotation marks omitted).

Petitioners cannot change these principles with selectively curated snippets from *Business Roundtable v. SEC*, 647 F.3d 1144 (D.C. Cir. 2011). Far from describing the threshold for substantial evidence, *Business Roundtable* mentioned "mixed" data simply to underscore SEC's failure to grapple with the record in that

case.  *See id.* at 1150-51 (basing regulation on fatally flawed evidence while "completely" discounting empirical studies).  *Business Roundtable* thus did not upend settled precedent by turning "substantial evidence" into "undisputed evidence."  *Johnson v. Copyright Royalty Bd.*, 969 F.3d 363, 394 (D.C. Cir. 2020); *see Ross v. O'Malley*, 92 F.4th 775, 778-79 (8th Cir. 2024) (finding substantial evidence even where "record supports contradictory" and "inconsistent" findings).

Anyway, the evidence here is not nearly as "mixed" as petitioners suggest.  SEC addressed the "seemingly contradictory" results of certain studies and articles questioning whether "climate related risks" are "fully" priced into assets.  App. 622 & n.2745.  But it found that, "[c]ollectively," the relevant "research indicates that disclosures about climate-related risks, when they are made, become priced into the value of a firm, thereby demonstrating that the disclosure provides relevant information to investors."  App. 622 & n.2745.  Nothing about that conclusion runs "counter" to the evidence or otherwise suggests that SEC completely discounted important contrary data.

The Chamber also misses the mark in criticizing SEC for supposedly not relying on "event studies," which are regression analyses that try to measure the impact of information on asset prices.  Chamber 24-25, 29-31.  Intervenor States adopt SEC's response to this point (Br. 87-88) under Rule 28(i), and add that event studies are "not dispositive," *In re Laurie Bebo*, 2020 WL 4784633, at *87 (SEC

43

2020), or invariably reliable, *see Bricklayers & Trowel Pension v. Credit Suisse LLC*, 752 F.3d 82, 95 (1st Cir. 2014). And the Chamber has identified no provision of federal securities law requiring SEC to conduct such a study.

**B.    SEC reasonably explained that the Rules build on decades of SEC policy and practice by standardizing the disclosure of climate-related risk information.**

SEC thoroughly explained its reasons for issuing the Rules and adequately considered contrary evidence and reasonable alternatives. This Court upholds administrative actions so long as "the agency's path may reasonably be discerned." *Northport*, 14 F.4th at 873 (internal quotation marks omitted). While agencies cannot entirely ignore critical issues, they need not "respond to every comment" or "analyze every issue or alternative raised by the comments." *Thompson v. Clark*, 741 F.2d 401, 408-09 (D.C. Cir. 1984) (Scalia, J.) (holding that "failure to respond" in detail "to 1,854 written comments" did not violate APA). The Court, in other words, "does not ask who is right. It asks whether the [agency] followed a defensible process in assessing who is right." *Nat'l Parks Conservation Ass'n v. McCarthy*, 816 F.3d 989, 996 (8th Cir. 2016) (internal quotation marks omitted).

That deferential standard is met here for the reasons SEC explains (Br. 62-80), which Intervenor States adopt under Rule 28(i). Petitioners cannot support a contrary conclusion, moreover, based on *Menorah Medical Center v. Heckler*, 768 F.2d 292 (8th Cir. 1985). The agency there "received nearly 600 comments" on a

44

proposed Medicare rule and "*[a]ll* of the comments opposed the rule."  *Id.* at 294 (emphasis added).  Yet the agency nevertheless adopted the rule without considering "several important aspects of the problem," without mentioning "*any* of the alternatives" that were "proposed by the commenters," and without responding to "criticisms" that "cast serious doubt on the premise grounding the Secretary's explanation."  *Id.* at 295-97 (emphasis added).  The record here is entirely different, as SEC has shown in careful detail.  *See, e.g.*, App. 664-67.

Nor do the Rules reflect a reversal or change of SEC policy.  *Contra* Liberty 40-42; Chamber 32-37; Iowa 42-44.  A "new application" of "longstanding policy" is "not a change in policy," *Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 6 (D.C. Cir. 2009), and "extensions of current regulations" do "not constitute a reversal of policy," *Chem. Mfrs. Ass'n v. EPA*, 919 F.2d 158, 169-70 (D.C. Cir. 1990).  The Rules here build on decades of SEC regulations, *supra* pp. 5-6, and as petitioners' own materials confirm, SEC has long noted that its disclosure authority encompasses "information" that "is itself non-financial in nature" when it "bears on registrants' financial condition," 75 Fed. Reg. at 6294—including environmental-related information, 40 Fed. Reg. at 51656.  *See* App. 458-60.  Because the Rules are perfectly consistent with that longstanding position, they do not signal a break in SEC policy.  *See Northport*, 14 F.4th at 875 (suggesting a rule that "is generally in harmony with" past agency statements is not a policy change).

45

This case thus bears no resemblance to *FCC v. Fox Television*, 556 U.S. 502 (2009), *Motor Vehicle Manufacturers' Association v. State Farm*, 463 U.S. 29 (1983), *Encino Motorcars v. Navarro*, 579 U.S. 211 (2016), or any other case cited by petitioners on this point. The agency in *Fox*, for example, allowed "fleeting expletives" on TV—then it did not. 556 U.S. at 505-13. The agency in *State Farm* required "passive restraints" in cars—then it did not. 463 U.S. at 34-35. And the agency in *Encino Motorcars* said "service advisors" were not exempt from federal overtime laws—then it said they were exempt—and then it said they were not. 579 U.S. at 215-18. Those are policy *changes*. This case involves a policy *extension*. Administrative law does not treat them as the same. *See Anna Jaques*, 583 F.3d at 6; *Chem. Mfrs.*, 919 F.2d at 169-70.

Equally meritless is petitioners' assertion that the Rules are invalid because they supposedly fill no "gap" or remedy no abuses. Chamber 20-24; Iowa 44-46; *see* Liberty 45. For starters, the Rules *do* fill a gap: the current regime does not provide investors sufficient information in a consistent, comparable, and decision-useful format. *See* App. 442-44. As SEC explained, evidence revealed "inadequate consistency in how registrants are integrating material climate factors into their financial statements," App. 558 n.1833 (quoting App. 1568), and research noted the "potential for substantial underreporting of material climate-related information," App. 614 & n.2653. The Rules are necessary, in other words, not because

climate-risk information is *never* disclosed, but because it is not currently disclosed in a sufficient, systematized, and comparable way. That straightforward determination required no "leaps in reasoning," *Menorah Medical*, 768 F.2d at 295, and petitioners' contrary arguments lack merit for the reasons SEC explains (Br. 66-68).

Even were that not true, however, SEC would not need to show a history of abuse to justify these Rules. Agencies can adopt "rules to prevent potential problems before they arise," *Northport*, 14 F.4th at 874 (internal quotation marks omitted)—and SEC is no different, *see Chamber I*, 412 F.3d at 140-42. Petitioners' contrary argument focuses on then-Judge Kavanaugh's opinion in *National Fuel Gas Supply v. FERC*, 468 F.3d 831 (D.C. Cir. 2006), which they read as requiring SEC to prove that investors were "harmed by a lack of climate-related disclosures." Chamber 22; *see* Iowa 48. But *National Fuel* held simply that agencies cannot purport to base rules on a "record of abuse" that is "non-existent"—it did not require every regulation to be justified with "actual evidence of abuse." 468 F.3d at 839-44. The court in fact expressed "no view" as to "whether a theoretical threat *alone* would be sufficient," *id.* at 844-45, and for good reason. As then-Judge Kavanaugh himself put it elsewhere: "An agency need not suffer the flood before building the levee." *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009).

47

Petitioners' principal authority on this issue is accordingly inapposite. Unlike *National Fuel*, which involved as-applied challenges to a rule supported by "*zero* evidence*," 468 F.3d at 843-45, this case involves facial challenges to rules based on thousands of comments and other evidence and SEC's experience and expertise, *see* App. 442-44; *supra* pp. 37-42. Regardless of whether SEC has justified other rules based on past abuses or documented enforcement actions, petitioners' own cited authorities rebuff the notion that this is a categorical requirement or even SEC's "usual practice," Chamber 22. *See Chamber I*, 412 F.3d at 140-41 (upholding SEC rule that was "not a response to a present problem involving abuse of" existing rules); *Conclusions and Final Action on Rulemaking Proposals Relating to Environmental Disclosure*, 41 Fed. Reg. 21632, 21633, 21636 (May 27, 1976) (requiring disclosure of "estimated capital expenditures for environmental control facilities" "to make such disclosure more uniform and comparable" even if already covered "by existing requirements").

### C. The Rules are a logical outgrowth of SEC's proposals, and petitioners have shown no prejudice in any event.

"The law does not require that every alteration in a proposed rule be reissued for notice and comment." *First Am. Disc. Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000). Rather, a final rule must simply be a "logical outgrowth" of its predecessor, such that "a reasonable commenter should have anticipated" it. *Id.* (cleaned up); *see Citizens Telecomm. Co. of Minn., LLC v. FCC*, 901 F.3d 991, 1005

n.11 (8th Cir. 2018). Unless a final rule "materially change[s]" the proposal by "adding features that the commentators could not have anticipated," more public comment is unnecessary. *NRDC v. Jackson*, 650 F.3d 662, 666 (7th Cir. 2011).

The Rules here are plainly a logical outgrowth of the Proposed Rules. In addition to adopting SEC's arguments on this issue (Br. 91-95) pursuant to Rule 28(i), Intervenor States note that the primary changes to the Proposed Rules were subtractions—dropping Scope 3 GHG disclosures, eliminating line-item disclosures for climate-related risks, making the rules less prescriptive, and adding materiality qualifiers—some of which were suggested by petitioners themselves. App. 448. Those revisions benefited registrants and do not constitute material changes for purposes of the logical-outgrowth rule. *See Nat'l Cable Television Ass'n, Inc. v. FCC*, 747 F.2d 1503, 1507 (D.C. Cir. 1984) (recognizing that agencies "must be free to adopt a final rule not described exactly in the NPRM," or else they "could not change a rule in response to valid comments without beginning the rulemaking anew").

Petitioners' main objection is that the Rules cited "articles" not "mentioned in the proposed rule," and they think this "alone renders the Rule[s] unlawful." Liberty 43-44; Chamber 24; Iowa 52-53. That is not the law. *See In re FCC 11-161*, 753 F.3d 1015, 1040 (10th Cir. 2014) (holding that "late insertion" of "over 110 documents into the rulemaking record" did not violate APA). Agencies "may

49

use supplementary data, unavailable during the notice and comment period, that expands on and confirms information contained in the proposed rulemaking and addresses alleged deficiencies in the pre-existing data, so long as no prejudice is shown." *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991) (cleaned up). As long as "the most critical factual material that is used to support the agency's position on review has been made public," adequate notice has been provided. *Chamber of Com. v. SEC* (*Chamber II*), 443 F.3d 890, 900 (D.C. Cir. 2006) (cleaned up).

Here, petitioners bemoan SEC's citation of new articles, but they identify no instance in which those articles raised new points not fairly included in the Proposed Rules. Nor could they. The articles either provided additional support for matters already noticed in the Proposed Rules, *see* SEC Br. 94-95, or were not otherwise essential to SEC's determinations, *see Time Warner Ent. Co., L.P. v. FCC*, 240 F.3d 1126, 1140 (D.C. Cir. 2001) ("[O]bviously not every cited document is 'critical.'"). In short, because the Rules' most critical material was made public, petitioners cannot prevail. *See, e.g.*, *Bldg. Indus. Ass'n v. Norton*, 247 F.3d 1241, 1245-47 (D.C. Cir. 2001) (upholding agency rule that "relied substantially" on a study "released after the proposal" as it "only confirmed" earlier findings); *Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 57-58 (D.C. Cir. 1984) (Scalia, J.) (holding agency did not violate APA "by relying on two scientific studies completed" after "comment period" as they "did not provide entirely new information").

Appellate Case: 24-1522     Page: 68     Date Filed: 10/01/2024 Entry ID: 5441535

In any event, petitioners have not shown prejudice. Again, if anything, the Final Rules *softened* SEC's proposals, making them even easier on registrants, *supra* pp. 7-10, 49. This is an independent reason for rejecting petitioners' claims. *Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 941 (D.C. Cir. 2006) (finding "no prejudice" where final rule was "less stringent than the proposed [rule]").

### D. SEC properly considered the Rules' economic effects.

SEC also properly analyzed the Rules' economic effects, including whether they "will promote efficiency, competition, and capital formation." 15 U.S.C. § 77b(b); *id.* § 78w(a)(2). This inquiry "does not necessarily require a precise cost-benefit analysis" based on "empirical data." *Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105, 1111 (D.C. Cir. 2022) (internal quotation marks omitted). Rather, SEC must simply assess "the economic implications" of a rule "as best it can." *Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) (quoting *Chamber I*, 412 F.3d at 143). SEC did just that here for the reasons it explains (Br. 79-90), all of which Intervenor States adopt under Rule 28(i). *See* App. 661-64 & nn.3152-54.

Rather than show any flaw in SEC's well-supported findings, petitioners instead question its policy views and quibble with its data and methodology. *E.g.*, Chamber 20, 28-32, 38-46; Liberty 42-47. But "just nibbling at the margins" and "second-guessing close judgment calls" cannot invalidate agency action. *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1009-11 (D.C. Cir. 2005) (Roberts, J.).

*First*, the Chamber errs in asserting (Br. 38-39) that SEC eschewed "real-world estimates" in favor of four "biased" surveys from so-called "activist[s]" (i.e., Persefoni, South Pole, S&P Global, and ERM). The APA contains no "activist" commenter exception. *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 662 (D.C. Cir. 1989) (holding that "the self-interested character of" some "evidence did not bar the Commission from giving it substantial weight"). And anyway, SEC *did* rely on "real-world" evidence. As the Chamber admits, SEC included a public company's $4 million estimate of the annual costs of disclosing GHG emissions, App. 652 tbl.10 & n.5, not to mention estimates from three other companies, App. 652 tbl.10 & nn.1-3. That SEC considered lower figures and selected the "median" to limit the effect of "outliers" is hardly irrational, App. 650 n.3046, especially since the $4 million estimate noted above "may be overstated," App. 652 tbl.10 & n.5. *See S. Cal. Edison Co. v. FERC*, 717 F.3d 177, 182-86 (D.C. Cir. 2013) (holding agency acted reasonably in using "median methodology" to eliminate "atypical[]" outliers).

Nor does the Chamber supply any valid basis to question SEC's reliance on the four surveys that it characterizes as "activist." For one of them (Persefoni), the Chamber identifies no specific flaw of any kind. *See* Chamber 39. For two others (South Pole and S&P Global), the Chamber merely asserts—without reasoning or support—that the surveys "solicited lowball estimates," Chamber 39. And for the

52

last one (ERM), the Chamber's criticisms fail for the reasons SEC explains (Br. 83-84) and Intervenor States adopt under Rule 28(i).

*Second*, petitioners' reliance on *American Equity Investment Life Insurance Co. v. SEC*, 613 F.3d 166 (D.C. Cir. 2010), is misplaced. *See* Chamber 21; Iowa 44. *American Equity* held that SEC did not properly analyze the economic implications of a rule applying the Securities Act to certain insurance contracts that were previously regulated by state law. 613 F.3d at 167-68, 177-79. SEC believed the rule would increase "competition" by improving "price transparency," and promote "efficiency" and "capital formation" by providing "enhanced investor protections." *Id.* at 177-79. But SEC failed to consider "the baseline level of price transparency" and "investor protection" under "existing" state law, and thus it "could not accurately assess" the rule's effects. *Id.* Here, however, SEC expressly analyzed the Rule's economic effects "*relative to* the current baseline, which consists of the regulatory framework of disclosure requirements in existence today, the current disclosure practices of registrants, and the use of such disclosures by investors and other market participants." App. 602 (emphasis added).

*Third*, the Chamber says SEC did not support its predictions about the percentage of firms that will need to disclose GHG emissions because it failed to "guess" about the costs companies will incur to determine whether they have to make such disclosures in the first place. Chamber 41-42. This is a non-sequitur. SEC

53

was predicting the "percentage of filers" that "will be required to provide the climate-related disclosures"—not the percentage of filers that may incur costs in determining whether they are subject to the rules. App. 675, 676-77 tbl.5. Evidence about the latter has no bearing on SEC's predictions about the former, which deserve considerable deference in any case, *see Nasdaq*, 34 F.4th at 1110, 1113; *Chamber I*, 412 F.3d at 142-43.

### E. Petitioners' accusations of pretext lack merit.

As a last-ditch effort, petitioners accuse SEC of "pretextually" hiding its "real" goal of regulating the environment. Chamber 19, 26, 39; Liberty 4-6, 16. That assertion lacks merit for the reasons SEC explains (Br. 40-45), which Intervenor States adopt under Rule 28(i). Courts "may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537, 551 n.11 (3d Cir. 2023) (internal quotation marks omitted). To the contrary, absent a "strong showing of bad faith or improper behavior," courts will follow "the presumption of regularity accorded agency action." *Friends of Richards-Gebaur Airport v. FAA*, 251 F.3d 1178, 1187 n.3 (8th Cir. 2001) (internal quotation marks omitted). And they will not "reject an agency's stated reasons for acting simply because" challengers speculate that "the agency might also have had other unstated reasons." *Safari Club Int'l v. Haaland*, 31 F.4th

54

1157, 1169 (9th Cir. 2022) (internal quotation marks omitted); *see Jagers v. Fed. Crop Ins. Corp.*, 758 F.3d 1179, 1185-86 (10th Cir. 2014) (holding that "agency's possible motivations to reach a particular result" did not show "bad faith").

Petitioners here have made *no* showing of bad faith or improper behavior, much less a *strong* showing.  As noted, *supra* pp. 8-9, 37-48, SEC could not have been clearer about its reasons for acting—investor protection—and it could not have been clearer about its neutrality regarding climate policy: "the Commission is agnostic as to whether and how issuers manage climate-related risks."  App. 460. SEC should be taken at its word in this case given the myriad investor calls for the Rules' climate-related disclosures, *supra* pp. 37-42, and the absence of support in the administrative record for petitioners' accusations of pretext.  *See Confederacion de Asociaciones Agricolas v. United States*, 32 F.4th 1130, 1141-42 (Fed. Cir. 2022) (recognizing the Supreme Court has "expressly foreclose[d]" challenges "based on alleged political influence" when "the face of the agency decision does not identify that it was motivated by any improper consideration").

## III.   The Rules Comport With The First Amendment.

History, common sense, and caselaw confirm that the Rules are constitutional, and petitioners have not satisfied the "rigorous standard" for facial First Amendment challenges.  *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024).

**A.** **The Rules principally govern commercial activity, and any incidental regulation of speech is amply justified.**

Petitioners' First Amendment claims fail for numerous reasons, not the least of which is that SEC disclosure rules primarily regulate commercial activity. Commercial regulation does not raise First Amendment issues just because "speech is a component of" the regulated activity, and the same is true of "the exchange of information about securities." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). For nearly a century, mandatory disclosures have been a cornerstone of federal securities law, and for the last 50 years, they have covered environmental information, *see supra* pp. 5-6. This history underscores the importance of affording "the Legislative and Executive Branches" the same "leeway" here that exists for other commercial regulations that incidentally involve speech. *See Bd. of Trs. v. Fox*, 492 U.S. 469, 481 (1989); *see also SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) ("Speech relating to the purchase and sale of securities . . . forms a distinct category of communications[.]").

Indeed, the government can require companies to disclose factual, noncontroversial commercial information related to their products when reasonably related to a legitimate government interest and not "unduly burdensome." *Zauderer*, 471 U.S. at 651. Such information need not be apolitical or undisputed, and it need not be something the speaker agrees with. *CTIA v. Berkeley*, 928 F.3d 832, 845 (9th Cir. 2019); *see RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 881 (5th Cir. 2024)

56

("[T]hat the speaker does not like the message does not make it controversial[.]"). Rather, statements are sufficiently factual and noncontroversial when, as here, they do not take sides in "a heated political controversy" or force the speaker "to convey a message fundamentally at odds with its mission." *CTIA*, 928 F.3d at 845.

Some examples illustrate the rule. Under *Zauderer* review, the government can require country-of-origin labelling on meat. *AMI v. USDA*, 760 F.3d 18, 23-25 (D.C. Cir. 2014) (en banc). It can require gun dealers to disclose the connection between firearms and suicide. *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 244-52 (4th Cir. 2024). It can require referral services to display the names of healthcare providers. *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1060-63 (8th Cir. 2014). It can require graphic images of health effects on tobacco products. *RJ Reynolds*, 96 F.4th at 875-87; *Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 554-69 (6th Cir. 2012). It can require radio-exposure warnings on cellphones. *CTIA*, 928 F.3d at 845-48. It can require mercury warnings on light bulbs. *Nat'l Elec. Mftr. Ass'n v. Sorrell*, 272 F.3d 104, 114 (2d Cir. 2001). And it can require conflict-of-interest disclosures in the pharmaceutical field. *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 297-98, 316 (1st Cir. 2005).

This case is even simpler. The "securities field" is inherently "more susceptible to compelled disclosure requirements." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 n.9 (1988) (citing *Zauderer*, 471 U.S. 626); *see*

*Sorrell*, 272 F.3d at 116 (citing "securities disclosures" as "long-established" rules not subject "to searching scrutiny"). This follows not only from "the federal government's broad powers to regulate the securities industry," but also from practical reality: "If speech employed directly or indirectly to sell securities were totally protected, any regulation of the securities market would be infeasible." *Wall St. Pub.*, 851 F.2d at 372-73. The First Amendment thus allows Congress and SEC to compel a variety of information from registrants. *See, e.g.*, *Chamber of Com v. SEC* (*Chamber III*), 85 F.4th 760, 768-72 (5th Cir. 2023) (upholding SEC rule compelling disclosure of issuers' reasons for stock repurchases).

Here, for the reasons SEC explains (Br. 99-109)—and Intervenor States adopt under Rule 28(i)—*Zauderer* review applies and the Rules satisfy that deferential standard. After all, the Rules simply direct registrants to report factual commercial information about climate-related risks they face; to document plans—if any—for managing those risks; and to measure and report certain data (i.e., GHG emissions). App. 447-48. Asking companies to evaluate and disclose risks—climate-related or otherwise—is a basic component of securities law, and such information relates directly to registrants' products (i.e., their securities). The Rules, moreover, clearly relate to SEC's legitimate interest in protecting the securities markets by providing investors relevant information in a consistent, decision-useful format—without requiring registrants to endorse any message or refrain from expressing any message.

58

*See Chamber III*, 85 F.4th at 771 (upholding disclosure rule adopted to mitigate "asymmetry in information" given SEC's "legitimate interest in promoting the free flow of commercial information").

The Rules thus differ strikingly from those petitioners cite. No one here is required to "confess blood on its hands" by disclosing involvement in humanitarian crises. *NAM v. SEC*, 800 F.3d 518, 530 (D.C. Cir. 2015). No one is required to issue value-laden "ratings" based on amorphous "community standards." *Book People, Inc. v. Wong*, 91 F.4th 318, 325, 338-41 (5th Cir. 2024). No one is forced to "speak favorably about" a topic that would "betray[] their convictions" or "religious beliefs." *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 747, 752-53, 758-60 (8th Cir. 2019); *see 303 Creative LLC v. Elenis*, 600 U.S. 570, 586-88 (2023). And no one is required to post "controversial" information unrelated to their products or services that undermines their institutional mission (e.g., information about state-sponsored abortion services in pro-life pregnancy clinics). *NIFLA v. Becerra*, 585 U.S. 755, 761, 768-69 (2018). The Rules instead require precisely the sort of commonsense economic disclosures about risks and risk mitigation that the First Amendment has long permitted. *See Rowe*, 429 F.3d at 297-98, 316 (Boudin, C.J., & Dyk, J., maj. op.) (holding that "routine disclosure of economically significant information" is "so obviously" constitutional "as to make elaboration pointless").

59

Even if *Zauderer* did not apply, however, the Rules are constitutional under the *Central Hudson* test, as SEC has explained (Br. 109-11). *See Cent. Hudson*, 447 U.S. at 566. Intervenor States adopt SEC's arguments under Rule 28(i), which are fully consistent with this Court's precedents. *See, e.g.*, *Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 654-55, 660 (8th Cir. 2003) (requiring only "a reasonable fit" for commercial-speech regulations, and holding that government can show "substantial interest" based on "history" and "common sense," without "empirical studies" (cleaned up)).

### B. Petitioners' demands for heightened scrutiny lack merit.

No form of heightened scrutiny applies here. "First Amendment protection against compelled speech" is generally limited to "the context of governmental compulsion to disseminate a particular political or ideological message." *Scope Pictures v. Kansas City*, 140 F.3d 1201, 1205 (8th Cir. 1998) (internal quotation marks omitted). And this makes sense. "There are literally thousands" of speech-mandating "regulations on the books," and the "idea that these thousands of routine regulations require an extensive First Amendment analysis is mistaken." *Rowe*, 429 F.3d at 297-98, 316 (Boudin, C.J., & Dyk, J., maj. op.); *see Planned Parenthood v. Rounds*, 530 F.3d 724, 726, 733-38 (8th Cir. 2008) (en banc) (upholding law requiring physicians to inform patients that "abortion will terminate the life of a whole, separate, unique, living human being"); *United States v. Arnold*, 740 F.3d

Appellate Case: 24-1522     Page: 78     Date Filed: 10/01/2024 Entry ID: 5441535

1032, 1035 (5th Cir. 2014) (upholding sex-offender registration); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (upholding tax disclosures).

Petitioners offer no sound reason to abandon those commonsense principles, as SEC explains (Br. 98-05).  *See* Chamber 63-66; NLPC 54-55; Liberty 53-58. Intervenor States adopt SEC's arguments under Rule 28(i), and emphasize that petitioners' theories yield untenable consequences and doctrinal confusion.  For one, SEC rules often require disclosure of future risks, and the Court should reject any theory that would subject such commonplace rules to "the highest level of scrutiny under the First Amendment," Liberty 52.  *See, e.g.*, 17 C.F.R. § 229.105 (requiring registrants to discuss "material factors that make an investment in" them "speculative or risky").  For another, petitioners' crabbed approach to *Zauderer* review would create a rift with this Court's sister circuits and its own precedents— for many of the permissible compelled-speech examples noted above involved sensitive public issues (e.g., gun rights and suicide-prevention, *see Md. Shall Issue*, 91 F.4th at 244-52), and all of them involved information the speaker wished not to convey (e.g., healthcare-provider names, *see Pain Referral*, 744 F.3d at 1060).  Yet none of them received heightened scrutiny.  The same goes for the Rules here.

Petitioners fare no better in labelling the Rules viewpoint- or content-based regulations.  Liberty 53-54; NLPC 50-51; Chamber 59-60.  To begin, the Rules are viewpoint-neutral in every relevant sense as they mandate factual disclosures with

no limit on registrants' views. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 70-71 (2022). The Rules' content requirements do not change the analysis either, because securities disclosures have "coexisted with the First Amendment" in a "longstanding, harmonious relationship," *Vidal v. Elster*, 602 U.S. 286, 299-301 (2024) (trademark law), and they "reasonably relate to" an important federal regulatory regime that poses no "serious risk of censorship," *id.* at 324-25 (Barrett, J., concurring in part); *see City of Austin*, 596 U.S. at 75 (giving weight to "50-plus years" of tradition). Holding otherwise would work a sea change in American law, subjecting an untold number of federal—and state—securities regulations to "the most demanding test in constitutional law," *see Dep't of State v. Munoz*, 144 S. Ct. 1812, 1822 (2024) (declining to subject certain immigration decisions to "strict scrutiny" on this basis). That is reason enough to reject petitioners' radical and unprecedented approach.

## IV.    The Rules Satisfy The Nondelegation Doctrine.

The Texas Alliance petitioners insist (Br. 55-66) that SEC's authorizing statutes violate the nondelegation doctrine. Not so. The nondelegation doctrine sets a "low threshold." *Bhatti v. FHFA*, 15 F.4th 848, 854 (8th Cir. 2021). It requires only an "intelligible principle," which exists when Congress "delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). As courts have

62

held, "the public interest" provides "a sufficient guide for" SEC "to decide whether or not disclosure" should be required, *Am. Sumatra Tobacco Corp. v. SEC*, 110 F.2d 117, 121 (D.C. Cir. 1940) (involving confidential disclosures), and the "'protection of investors'" is likewise "a sufficiently definite criterion," *Wright v. SEC*, 112 F.2d 89, 95 (2d Cir. 1940) (involving expulsion from exchanges).

Here, Congress clearly delineated SEC's disclosure policy and set boundaries on its authority: requiring disclosure of "such other information" as is "necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 77g(a)(1). The meaning of these terms is clear from statutory context, *supra* pp. 14-17, and they provide intelligible criteria to guide SEC, *see Wright*, 112 F.2d at 95; *Am. Sumatra*, 110 F.2d at 121. The Constitution requires nothing more. *See South. Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 796 (8th Cir. 2005) ("Congress fails to give sufficient guidance in its delegations only if it 'would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed.'" (quoting *Yakus v. United States*, 321 U.S. 414, 426 (1944))).

The Texas Alliance petitioners offer no viable basis to conclude otherwise. They admit that Congress "can delegate the duty to carry out a declared policy" and that "Congress plainly intended to authorize rules as needed to protect investors[.]" Texas Alliance 56, 63 (cleaned up). Yet they assert that "nothing" will govern SEC's disclosure authority if it goes beyond "matters of obvious financial relevance" or

63

preventing "fraud or misleading information," to protecting investors from "evils that Congress never contemplated." Texas Alliance 63, 65. And they further contend that the nondelegation doctrine bars SEC from "weighing" or "choos[ing]" between competing public values in deciding what rules will serve the public interest." Texas Alliance 61.

Those arguments fail. To start, the Rules here *do* require financially relevant information, *supra* pp. 23-27, and they *do* address evils that Congress contemplated, as they protect investors and promote the public interest by standardizing and enhancing the quality of risk-related information that is important to investors, *supra* pp. 8-11, 18, 37-42. Moreover, the theory that agencies may not "weigh" competing values would hobble countless administrative regimes, given that "[a] certain degree of discretion, and thus of lawmaking, inheres in most executive or judicial action," *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 475 (2001) (quoting *Mistretta v. United States*, 488 U.S. 361, 417 (1989) (Scalia, J., dissenting)).

Finally, for the reasons SEC explains (Br. 59-62), the Texas Alliance petitioners cannot salvage their nondelegation theory by citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), or *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)—the only two cases where the Supreme Court has ever found unconstitutional delegations. Intervenor States adopt SEC's arguments under

Rule 28(i), all of which confirm that no constitutional principle prevented Congress from empowering SEC to issue the Rules in this case.

## V.    The Court Should Reject Petitioners' Overbroad Relief.

As SEC explains (Br. 111-13), even were petitioners' claims not meritless, they have not shown that the Rules should be vacated in their entirety.  Intervenor States adopt those arguments under Rule 28(i).  Vacatur is a discretionary remedy—not an automatic right, *contra* Chamber 66.  *See U.S. Steel Corp. v. EPA*, 649 F.2d 572, 576-77 (8th Cir. 1981).  SEC, moreover, has removed any doubt that the Rules' various provisions are severable and should be upheld in part even if aspects of them warrant vacatur or remand, App. 602.  *See Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) ("[T]he presumption is always in favor of severability.").  This Court should at the very least, then, reject petitioners' overbroad demand to invalidate the Rules in their entirety.

Appellate Case: 24-1522     Page: 83     Date Filed: 10/01/2024 Entry ID: 5441535

# CONCLUSION

This Court should deny the petitions for review.

Respectfully submitted,

ANDREA JOY CAMPBELL
Attorney General for Massachusetts

/s/ Glenn Kaplan
GLENN KAPLAN
Assistant Attorney General & Chief
ANDREW LABADINI
DANIELLE KLEE
ANNIE KILLELEA
Assistant Attorneys General
Insurance and Financial Services
Division

JULIA JONAS-DAY
MICHELE HUNTON
Assistant Attorneys General
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2453
glenn.kaplan@mass.gov
julia.jonas-day@mass.gov

September 2024

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

CAROLINE S. VAN ZILE
Solicitor General

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK
Principal Deputy Solicitor General

BRYAN J. LEITCH
Assistant Attorney General
Office of the Solicitor General
Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 805-7426
ashwin.phatak@dc.gov

66

FOR THE STATE OF ARIZONA

KRISTIN K. MAYES
Attorney General for Arizona

/s/ Kristin K. Mayes
Office of the Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-7922
AGinfo@azag.gov

FOR THE STATE OF
CONNECTICUT

WILLIAM TONG
Attorney General for Connecticut

/s/ Kaelah M. Smith
KAELAH M. SMITH
Assistant Attorney General
Connecticut Attorney General's
Office
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5250
kaelah.smith@ct.gov

FOR THE STATE OF COLORADO

PHILIP J. WEISER
Attorney General for Colorado

SHANNON WELLS STEVENSON
Solicitor General

ERNEST LEE REICHERT III
Deputy Attorney General
Revenue and Regulatory Section

/s/ Shalyn Kettering
SHALYN KETTERING
Counsel to the Attorney General
Colorado Department of Law
Office of the Attorney General
1300 Broadway
Denver, CO 80203
(720) 508-6000

FOR THE STATE OF DELAWARE

KATHLEEN JENNINGS
Attorney General for Delaware

CHRISTIAN DOUGLAS WRIGHT
Director of Impact Litigation

JILLIAN A. LAZAR
Director of Investor Protection

RALPH K. DURSTEIN III
Deputy Attorney General

/s/ Vanessa L. Kassab
VANESSA L. KASSAB
Deputy Attorney General
Delaware Department of Justice
820 N. French Street

67

Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

FOR THE STATE OF HAWAII

ANNE E. LOPEZ
Attorney General of the State for
Hawai'i

KALIKO'ONĀLANI D.
FERNANDES
Solicitor General

/s/ Ewan C. Rayner
EWAN C. RAYNER
Deputy Solicitor General
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
ewan.rayner@hawaii.gov

FOR THE STATE OF ILLINOIS

KWAME RAOUL
Attorney General for Illinois

MATTHEW J. DUNN
Chief, Environmental Enforcement/
Asbestos Litigation Division

/s/ Jason E. James
JASON E. JAMES
Assistant Attorney General
Office of the Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226
(872) 276-3583
jason.james@ilag.gov

FOR THE STATE OF MARYLAND

ANTHONY G. BROWN
Attorney General for Maryland

/s/ Steven J. Goldstein
STEVEN J. GOLDSTEIN
Special Assistant Attorney General
Office of the Attorney General of
Maryland
200 Saint Paul Place
Baltimore, MD 21202
(410) 576-6414
sgoldstein@oag.state.md.us

FOR THE STATE OF MICHIGAN

DANA NESSEL
Attorney General for Michigan

AARON J. WALDEN
Assistant Attorney General

/s/ Michael E. Moody
MICHAEL E. MOODY
Assistant Attorney General
Special Litigation Division
525 W. Ottawa Street
P.O. Box 30755
Lansing, MI 48909
(517) 335-7627
moodym2@michigan.gov

68

FOR THE STATE OF MINNESOTA

KEITH ELLISON
Attorney General for Minnesota

/s/ Peter N. Surdo
PETER N. SURDO
Special Assistant Attorney General
Minnesota Attorney General's Office
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
(651) 757-1061
Peter.surdo@ag.state.mn.us

FOR THE STATE OF NEW MEXICO

RAÚL TORREZ
Attorney General for New Mexico

WILLIAM GRANTHAM
Assistant Attorney General
Director, Environment Protection
Division

/s/ Aletheia V.P. Allen
ALETHIA V.P. ALLEN
Solicitor General
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 527-2776
Aallen.@nmdoj.gov

FOR THE STATE OF NEVADA

AARON D. FORD
Attorney General for Nevada

/s/ Heidi Parry Stern
HEIDI PARRY STERN
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, NV 89101
HStern@ag.nv.gov

FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General for New York

BARBARA D. UNDERWOOD
Solicitor General

ELIZABETH A. BRODY
Assistant Solicitor General

STEPHANIE L. TORRE
Assistant Attorney General
Executive Division

/s/ Jonathan Bashi
JONATHAN BASHI
Assistant Attorney General
Investor Protection Bureau
28 Liberty Street
New York, NY 10005
(212) 416-8564
Jonathan.Bashi@ag.ny.gov

69

FOR THE STATE OF OREGON

ELLEN F. ROSENBLUM
Attorney General for Oregon

STEVE NOVICK
Special Assistant Attorney General

/s/ Paul Garrahan
PAUL GARRAHAN
Attorney-in-Charge
Natural Resources Section
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096
(503) 947-4540
Paul.Garrahan@doj.state.or.us

FOR THE STATE OF RHODE
ISLAND

PETER F. NERONHA
Attorney General for Rhode Island

SARAH W. RICE
Deputy Chief, Public Protection Bureau

/s/ Alison Carney
ALISON CARNEY
Assistant Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400

FOR THE STATE OF VERMONT

CHARITY R. CLARK
Attorney General for Vermont

/s/ Hannah Yindra
HANNAH YINDRA
Assistant Attorney General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

FOR THE STATE OF WASHINGTON

ROBERT W. FERGUSON
Attorney General for Washington

SARAH REYNEVELD
Managing Assistant Attorney General
Environmental Protection Division

/s/ Yuriy Korol
YURIY KOROL
Assistant Attorney General
Environmental Protection Division
Washington State Attorney General's
Office
800 5th Ave Suite 2000, TB-14
Seattle, WA 98104-3188

Appellate Case: 24-1522    Page: 88    Date Filed: 10/01/2024 Entry ID: 5441535

FOR THE STATE OF WISCONSIN

JOSHUA L. KAUL
Attorney General for Wisconsin

/s/ Bradley J. Motl
BRADLEY J. MOTL
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-0505
motlbj@doj.state.wi.us

Appellate Case: 24-1522    Page: 89    Date Filed: 10/01/2024 Entry ID: 5441535

# CERTIFICATE OF SERVICE

I certify that on September 24, 2024, this final response brief was served on

all parties via this Court's CM/ECF system.

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK
Principal Deputy Solicitor General
Office of the Solicitor General
Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 805-7426
ashwin.phatak@dc.gov

# CERTIFICATE OF COMPLIANCE

I certify that this response brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's order of August 8, 2024, extending that limit to 18,000 words, because the brief contains 15,173 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

I also certify that this document has been scanned for viruses using the Microsoft Defender virus-scan software and is virus free.

/s/ Ashwin P. Phatak
ASHWIN P. PHATAK
Principal Deputy Solicitor General
Office of the Solicitor General
Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 805-7426
ashwin.phatak@dc.gov

2